REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5400
Eric A. Schaffer
David M. Schlecker

Counsel for Defendant and Counterclaim Plaintiff BNY Corporate Trustee Services Limited

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : : : | |
| | : | |
| Plaintiffs, | : | |
| | : | Adversary Proceeding |
| -against- | : | |
| | : | No.: 09-01261 (JMP) |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS and BNY CORPORATE TRUSTEE SERVICES LIMITED | : : : : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS | : : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : : : | |
| | : | |
| Counterclaim Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

US_ACTIVE-101877366

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BNY CORPORATE TRUSTEE SERVICES          :
LIMITED                                  :
                                         :
                  Counterclaim Plaintiff, :
                                         :
 -against-                               :
                                         :
LEHMAN BROTHERS SPECIAL FINANCING        :
INC. and LEHMAN BROTHERS HOLDINGS        :
INC.                                     :
                                         :
                  Counterclaim Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## ANSWER, AFFIRMATIVE DEFENSES & COUNTERCLAIM OF DEFENDANT BNY CORPORATE TRUSTEE SERVICES LIMITED

## I.      ANSWER

BNY Corporate Trustee Services Limited (the "Trustee"), by and through its undersigned counsel, answers the Complaint of Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, "Plaintiffs"), as follows:

Response to Paragraph No. 1:  The allegations in Paragraph 1 are legal conclusions that do not require an admission or denial.  To the extent a response may be required, the relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 1 to the extent they are not consistent with the documents.

Response to Paragraph No. 2: The allegations in Paragraph 2 are legal conclusions that do not require an admission or denial.  To the extent a response may be required, the relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 2 to the extent they are not consistent with the documents.

Response to Paragraph No. 3:  The allegations in Paragraph 3 are legal conclusions that do not require an admission or denial.  To the extent a response may be required, the relevant

US_ACTIVE-101877366

documents speak for themselves and the Trustee denies the allegations in Paragraph 3 to the extent they are not consistent with the documents.

Response to Paragraph No. 4: The allegations in Paragraph 4 state legal conclusions to which no response is required.

Response to Paragraph No. 5: The Trustee is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 5, and therefore denies the allegations in Paragraph 5.

Response to Paragraph No. 6: The Trustee is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 6, and therefore denies the allegations in Paragraph 6.

Response to Paragraph No. 7: The Trustee is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 7, and therefore denies the allegations in Paragraph 7.

Response to Paragraph No. 8: The Trustee denies the allegations of Paragraph 8 but admits that the Trustee is a company organized with limited liability under the laws of England with its principal place of business at One Canada Square, London E14 5AL, England. The second sentence of Paragraph 8 purports to state a legal conclusion to which no response is required.

Response to Paragraph No. 9: The allegations in Paragraph 9 state legal conclusions to which no response is required. The Trustee expressly reserves all rights under 28 U.S.C. §§157 and 1334.

Response to Paragraph No. 10: The allegations in Paragraph 10 state legal conclusions to which no response is required.

US_ACTIVE-101877366

Response to Paragraph No. 11: The allegations in Paragraph 11 state legal conclusions to which no response is required.

Response to Paragraph No. 12: The Trustee is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 12.

Response to Paragraph No. 13: The Trustee admits the allegations in Paragraph 13.

Response to Paragraph No. 14: The allegations in Paragraph 14 state legal conclusions to which no response is required.

Response to Paragraph No. 15: The allegations in Paragraph 15 are legal conclusions to which no response is required. To the extent a response may be required, the relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 15 to the extent they are not consistent with the documents.

Response to Paragraph No. 16: The Trustee denies the allegations in Paragraph 16 except admits that there are Supplemental Trust Deed and Drawdown Agreements among Beryl Finance Limited, the Trustee or an affiliate, LBSF, and one or more other parties dated March 6, 2007, October 30, 2007, January 10, 2008, and July 28, 2008, incomplete copies of which are attached to the Complaint as Exhibits B – E. The Trustee further avers that the relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 16 to the extent they are not consistent with the documents.

Response to Paragraph No. 17: The Trustee lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 to the extent relating to any unspecified agreements included in the definition of "Transaction Documents." The Trustee further avers that the relevant documents speak for themselves and The Trustee denies the allegations in Paragraph 17 to the extent they are not consistent with the documents.

US_ACTIVE-101877366

Response to Paragraph No. 18:  The Trustee denies the allegations in Paragraph 18 except admits that there is a letter dated November 25, 2008, from counsel to Plaintiffs, a true and correct copy of which is attached to the Complaint as Exhibit G, and respectfully refers the Court to such document for a complete description of its terms and effect.

Response to Paragraph No. 19:  The Trustee denies the allegations in the first two sentences of Paragraph 19 except admits that letters dated September 24, 2008, were sent by American Family Life Assurance Company of Columbus ("Aflac"), the terms of which speak for themselves.  The Trustee admits the allegations in the third sentence of Paragraph 19.  The allegations in the fourth sentence of Paragraph 19 state legal conclusions to which no response is required.

Response to Paragraph No. 20:  The Trustee denies the allegations in Paragraph 20 except admits that Aflac is the owner of the "Aflac Notes" as defined in the First Amended Answer and Counterclaims filed by Aflac in this adversary proceeding.

Response to Paragraph No. 21:  The Trustee denies the allegations in the first sentence of Paragraph 21.  The Trustee denies knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 21.

Response to Paragraph No. 22:  The allegations in Paragraph 22 state legal conclusions to which no response is required.

Response to Paragraph No. 23:  The Trustee incorporates by reference, as if fully set forth herein, its responses to Paragraphs 1 through 22.

Response to Paragraph No. 24:  The allegations in Paragraph 24 state legal conclusions to which no response is required.  To the extent a response may be required, the

US_ACTIVE-101877366

relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 24 to the extent they are not consistent with the documents.

Response to Paragraph No. 25:  The allegations in Paragraph 25 state legal conclusions to which no response is required.

Response to Paragraph No. 26:  The allegations in Paragraph 26 state legal conclusions to which no response is required.

Response to Paragraph No. 27:  The allegations in Paragraph 27 state legal conclusions to which no response is required.  To the extent a response may be required, the relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 27 to the extent they are not consistent with the documents.

Response to Paragraph No. 28:  The allegations in Paragraph 28 state legal conclusions to which no response is required.  To the extent a response may be required, the relevant documents speak for themselves and the Trustee denies the allegations in Paragraph 28 to the extent they are not consistent with the documents.

Response to Paragraph No. 29:  The allegations in Paragraph 29 state legal conclusions to which no response is required.

Response to Paragraph No. 30:  The allegations in Paragraph 30 state legal conclusions to which no response is required.

Response to Paragraph No. 31:  The Trustee denies the allegations in Paragraph 31 except admits there is an actual controversy between the parties.

Response to Paragraph No. 32:  The allegations in Paragraph 32 state legal conclusions to which no response is required.

-6-

US_ACTIVE-101877366

Response to Paragraph No. 33:  The Trustee incorporates by reference, as if fully set forth herein, its responses to Paragraphs 1 through 32.

Response to Paragraph No. 34: The allegations in Paragraph 34 state legal conclusions to which no response is required.

Response to Paragraph No. 35:  The allegations in Paragraph 35 state legal conclusions to which no response is required.

Response to Paragraph No. 36:  The Trustee denies the allegations of Paragraph 36 except admits that there is an actual controversy between the parties.

Response to Paragraph No. 37:  The allegations in Paragraph 37 state legal conclusions to which no response is required.

## II.     AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unclean hands.

### Third Affirmative Defense

Plaintiffs' claims are barred by the doctrine of equitable estoppel.

### Fourth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unjust enrichment.

### Fifth Affirmative Defense

The Trustee affirmatively raises and reserves all other applicable equitable and legal defenses.

US_ACTIVE-101877366

## Sixth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, to the extent the Court does not have subject matter jurisdiction over this matter under 28 U.S.C. § 1334.

## Seventh Affirmative Defense

Plaintiffs' claims must be reduced by amounts owed by them pursuant to the underlying contracts.

## Eighth Affirmative Defense

Plaintiffs' claims are barred by the implied covenant of good faith and fair dealing.

## RESERVATION OF RIGHTS

The Trustee reserves the right to assert additional affirmative defenses as they discover them through discovery or other investigation.

WHEREFORE, the Trustee respectfully requests the Court to enter an order:

 a. Dismissing the Complaint with prejudice;

 b. Awarding the Trustee its reasonable attorneys' and professionals' fees and costs; and

 c. Awarding such other relief as the Court deems just and proper.

US_ACTIVE-101877366

# III.    COUNTERCLAIM

## Preliminary Statement

The Trustee, as counterclaim plaintiff, seeks a declaratory judgment against LBSF and LBHI as counterclaim defendants that will allow the swap transactions referenced in the Complaint and the Answer to be closed out and the related collateral to be distributed in accordance with the express terms of the swap transactions and the so-called "safe harbor" provisions of the Bankruptcy Code.  "Lehman" refers to Plaintiffs and their affiliated entities. Capitalized terms not otherwise defined in this Counterclaim are used as defined in the above Answer.  The Trustee alleges, on knowledge as to itself and its own acts and on information and belief as to all other matters, as follows:

1.    Lehman formed Beryl Finance Limited ("Beryl"), a Cayman Islands special-purpose entity that is not a debtor in the Chapter 11 cases, to engage in credit-linked note issuance transactions structured and administered by Lehman.  Relevant to this Counterclaim are four swap agreements (each, as set forth in multiple documents, a "Credit Default Swap Agreement") with LBSF under which the parties agreed to exchange payments based on a hypothetical reference portfolio.[1]  Each Credit Default Swap Agreement was described in a series prospectus (the "Series Prospectus") and documented in the form of a 1992 International Swaps and Derivatives Association, Inc. Master Agreement between LBSF and (via an accession agreement) Beryl (the "Master Agreement"), the Schedule to the Master Agreement (the "Schedule"), the Credit Support Annex to the Schedule (the "Credit Support Annex"), and the confirmation of the credit default swap transaction (the "Confirmation").  True and correct copies of the Series Prospectuses (which includes the forms of the Confirmation and of paragraph 11 of

---

[1] The swaps are the type referred to in the Bankruptcy Code (as defined below) as a "credit swap" (Bankruptcy Code section 101(53B)(A)(i)(VI)) and referred to in the market as a "credit default swap."

US_ACTIVE-101877366

the Credit Support Annex) and the forms of Master Agreement and Schedule pertaining to the Credit Default Swap Agreements are attached to the First Amended Answer and Counterclaim filed by Aflac in this adversary proceeding (the "Aflac Counterclaim") as Exhibits 1-12.[2]

2.      As an integral part of the parties' agreement, the Trustee, Beryl, and LBSF entered into a security arrangement (the "Security Arrangement") embodied in a Supplemental Trust Deed, the form of which (other than the Schedule 2 thereto) is attached as Ex. E to the Complaint of LBSF and LBHI (the "Lehman Complaint").

3.      The Supplemental Trust Deed, among other things, incorporates the "Terms and Conditions" of the related tranche of Aflac Notes (the base conditions as set forth in the Principal Trust Deed, as modified and supplemented by the series-specific supplemental conditions forming part of the relevant Supplemental Trust Deed, the "Conditions"), and incorporates by reference the Principal Trust Deed.[3] The series-specific supplemental conditions also are repeated at pages 5 through 22 of each Prospectus. See Aflac Counterclaim Ex. 1 at 5–22; Ex. 4 at 5-22; Ex. 7 at 5-22; Ex. 10 at 5-22.

4.      Under the Security Arrangement, the Trustee (or a custodian on its behalf) holds securities (the "Collateral") as collateral for the obligations of Beryl under the relevant Credit Default Swap Agreement and under the related Aflac Notes. In addition, as part of the parties' agreement, other credit enhancements were provided for Beryl's benefit: (i) an unconditional

---

[2] Exhibits 1-3 pertain to the Series 2006-15A Credit Default Swap Agreement; Exhibits 4-6 pertain to the Series 2007-5A Credit Default Swap Agreement; Exhibits 7-9 pertain to the Series 2007¬14A Credit Default Swap Agreement; and Exhibits 10-12 pertain to the Series 2008-7A Credit Default Swap Agreement.

[3] The Principal Trust Deed is a base document – initially entered into as of October 10, 2002 by the Trustee and Dante Finance Public Limited Company – to which Beryl is a party (via an accession agreement) with respect to particular tranches of notes. The terms of the Principal Trust Deed (as in effect on the date referred to in the relevant Supplemental Trust Deed) are incorporated by reference in, and supplemented and modified by, the terms of the Supplemental Trust Deed for each tranche of the Aflac Notes. True and correct copies of the Principal Trust Deeds relating to the transactions here at issue are attached to the Aflac Counterclaim as Exhibits 13 and 14.

US_ACTIVE-101877366

guaranty by LBHI of all of the obligations of LBSF under the related Credit Default Swap Agreement, and (ii) an obligation of LBSF to transfer cash or eligible securities as additional credit support (the "LBSF Credit Support") in the amounts and under the circumstances specified in the Credit Support Annex forming a part of each Credit Default Swap Agreement.  The form of guaranty also appears in each Series Prospectus.  See Aflac Counterclaim Ex. 1 at 80-81; Ex. 4 at 80-81; Ex. 7 at 80-81; Ex. 10 at 80-81.

5.     On October 10, 2008, the swap transactions under the Credit Default Swap Agreements were terminated in accordance with their terms.  Since the termination, (i) Beryl has been obligated to redeem the Aflac Notes by applying the Collateral or the proceeds thereof together with other assets available to Beryl (including the LBSF Credit Support) and (ii) Aflac has directed the Trustee to exercise remedies under the Security Arrangements.

6.     Aflac has asked the Trustee to cause the Aflac Notes to be redeemed, and has taken steps to cause a redemption to occur.

7.     The Trustee advised Aflac that the Trustee received a letter from Lehman's bankruptcy counsel stating that the application of the Collateral and other assets of Beryl in the manner expressly provided for in the Security Arrangements may be improper.[4]

8.     As instructed by Aflac, the Trustee has brought this counterclaim in order to confirm the rights of Aflac and Beryl, and the Trustee's authority to enforce those rights as instructed by Aflac, and the obligations of LBSF, in each case under the Swap Transaction Documents.

9.     This is an action for declaratory relief in which the Trustee seeks a judgment declaring, among other things, that (i) the termination of each swap transaction in accordance with

---

[4] See Paragraph 18 of Plaintiffs' Complaint and Ex. E thereto.  It should be noted that the letter related to a number of scheduled transactions and not just to the Credit Default Swap Agreements and the Aflac Notes.

US_ACTIVE-101877366

the Credit Default Swap Agreement was not stayed by the Bankruptcy Code, (ii) Beryl has the right, enforceable by the Trustee as instructed by Aflac, to take any and all actions necessary and appropriate to realize upon the Collateral and other assets available to Beryl and cause the early redemption of the Aflac Notes and/or otherwise exercise all rights and remedies under the Security Arrangement and the other credit enhancements relating to the Credit Default Swap Agreements, (iii) no amounts are payable to LBSF under the Credit Default Swap Agreements or, alternatively, if amounts of any nature are determined to be owing by Beryl to LBSF, such amounts are subordinated to the payment of all amounts payable to the holders of the Aflac Notes and (iv) Beryl is entitled to the payment by LBSF of accrued and unpaid amounts owing by LBSF under the Credit Default Swap Agreements and to the delivery of LBSF Credit Support required to have been provided by LBSF under the Credit Default Swap Agreements in an aggregate amount to be determined. Alternatively, to the extent that any amounts should be determined to be owing by Beryl to LBSF and not subordinated to payments in respect of the Aflac Notes, the Trustee seeks a declaration that any such amounts determined to be owing by Beryl to LBSF must be reduced by amounts payable or deliverable by LBSF to Beryl.

## **PARTIES**

10.     The Trustee is a company organized with limited liability under the laws of England with its principal place of business at One Canada Square, London E14 5AL, United Kingdom.

11.     Aflac is a Nebraska domiciled life insurance company with its principal business address at 1932 Wynnton Road, Columbus, Georgia 31999.

US_ACTIVE-101877366

12.     LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020.

13.     LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

15.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16.     The statutory predicates for the relief requested herein are sections 101, 105(a), 362 and 560 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), 28 U.S.C. § 2201, and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.     Transaction Structure**

17.     The Aflac Notes represent a product that was marketed by Lehman globally, to numerous investors and for a number of years.  Lehman formed Beryl for the purposes of issuing multiple "tranches" of debt securities, each backed by a separate pool of financial assets, and acquiring and entering into the financial assets, including swap agreements, relating to those debt securities.  Aflac purchased four of these tranches, each being one of the tranches of "Aflac Notes" referred to above, in 2007 and 2008.  Each tranche of Aflac Notes relates to a Credit Default Swap Agreement and is governed by certain documents, including the relevant Security Arrangement.[5]

---

[5] The Aflac Notes, the Credit Default Swap Agreements and the Security Arrangements are governed by English law.

US_ACTIVE-101877366

The Aflac Notes entitle Aflac to quarterly payments of interest accrued on the outstanding principal of the Aflac Notes at a fixed rate, and repayment of principal at maturity.

18. Beryl used Aflac's investment in each tranche of Aflac Notes to purchase the Collateral (highly-rated debt securities), which Beryl then pledged to the Trustee to secure Beryl's obligations under the related Aflac Notes and Credit Default Swap Agreement. Simultaneously, as requirements for the rating of the Aflac Notes, LBHI unconditionally guaranteed all of the obligations of LBSF under the Credit Default Swap Agreement and LBSF agreed to provide LBSF Credit Support, as described below.

19. At the time of the closing of each tranche of the Aflac Notes, Lehman Brothers International (Europe) ("LBIE") was appointed as the "calculation agent" and "disposal agent" for the Aflac Notes. LBIE is also the subject of insolvency proceedings (in England) and is not capable of performing those duties. On December 18, 2008, Beryl notified LBIE of its removal as calculation agent and disposal agent. In addition, the Collateral for one tranche of Aflac Notes (Series 2008-7A) is held by Lehman Japan, another insolvent affiliate of LBSF, as custodian.

20. Each tranche of Aflac Notes is linked, via the related Credit Default Swap Agreement, to a hypothetical debt portfolio comprised of over 100 large companies identified as "Reference Entities." In the ordinary course, prior to the scheduled maturity or earlier termination of the swap transactions, the payments contemplated to be exchanged by the parties in respect of the reference portfolio were (i) amounts payable by LBSF quarterly sufficient to pay the interest due on the related Aflac Notes, as well as the Trustee's fees and expenses, and (ii) amounts payable by Beryl in respect of losses, if any, incurred as described below.[6] In the market, payments of the type made by LBSF are commonly referred to as a "premium" paid by one party to

---

[6] Under each Credit Default Swap Agreement, in the ordinary course, LBSF was entitled to receive the interest amounts received by Beryl on the Collateral.

US_ACTIVE-101877366

a credit default swap for the "credit protection" provided by the other party, in this case Beryl, with respect to potential losses relating to the Reference Entities.

21.     Under the terms of the Credit Default Swap Agreements, a "loss" is established each time that a Reference Entity becomes insolvent or defaults on specified debt.  If the aggregate amount of losses for any Credit Default Swap Agreement had reached a specified "Subordination Amount" during the term of that Credit Default Swap Agreement,[7] any further losses incurred would have reduced (dollar-for-dollar) the notional amount of the relevant Credit Default Swap Agreement and the principal balance of the related Aflac Notes.  Any such reduction of the swap notional amount and related writedown of Aflac Notes would have occurred at the time that losses above the Subordination Amount were incurred, thereby reducing Aflac's entitlement to interest as well as to payment of principal at maturity.  However, if losses through the term of the swap transaction did not reach the Subordination Amount, there would be no writedown of the Aflac Notes, Beryl would not be required to make any loss payments, and Aflac would expect to receive full repayment of principal at the maturity of the Aflac Notes or earlier termination of the swap.  In fact, losses under all of the swap transactions were, at termination, and are significantly less than the Subordination Amount.

22.     With respect to the specified credit risk on the Reference Entities, LBSF and Aflac could have achieved a substantially equivalent economic result by entering a credit default swap directly.  However, by structuring rated notes that tracked the performance of credit default swaps, Lehman created a more liquid and marketable product, which translated into increased volume of business and profits to Lehman.  A key requirement of this structure was to insulate both LBSF and

---

[7] The "term" of the Credit Default Swap Agreement is the period beginning on the date of the Confirmation (also the date of the issuance and purchase of the related Aflac Notes) and ending on the scheduled maturity date or – as has occurred for the swap agreements in question – the date of its early termination.

US_ACTIVE-101877366

its special purpose entity counterparties (and thereby, the investors to whom Lehman sold the resulting securities) from the credit risk of the other. By making its initial investment in the Aflac Notes, Aflac in substance posted collateral to LBSF covering the maximum amount of credit protection relating to the Reference Entities to which LBSF was entitled under the related Credit Default Swap Agreement. This equivalent of full up-front collateral posting allowed LBSF to be indifferent to the creditworthiness of its counterparty. Other features of the structure, described below, were to shield investors from LBSF's credit risk. The result was a much more liquid product that LBSF could sell to a wider array of investors.

23. If the Credit Default Swap Agreement had gone to its scheduled maturity date, LBSF would have been required to pay Beryl the outstanding notional amount of the Credit Default Swap Agreement (which under the structure would be equal to the principal amount of the related Aflac Notes) and Beryl would have been obligated to deliver the Collateral to LBSF. The structure included features – primarily the LBSF Credit Support requirement and the treatment of Termination Payments (as defined below) – intended to assure an equivalent benefit to Beryl (and thereby to Aflac) in the event of an early termination of the Credit Default Swap Agreement due to a default by LBSF.

24. Under the Credit Support Annex, if the short-term rating of LBHI is downgraded below a specified level, LBSF is required to transfer LBSF Credit Support to Beryl in an amount that – taken together with the redemption formula described below that applies when LBSF is the defaulting party under the Credit Default Swap Agreement – was intended to provide Beryl with enough money to pay the Aflac Notes in full if such an early termination occurred.[8] Prior to the

---

[8] The amount required to be transferred is the sum of (in each case as further specified in the Credit Support Annex): (i) any excess of the outstanding principal balance of the Aflac Notes over the value of the Collateral, (ii) amounts in respect of LBSF's premium obligations, and (iii) the estimated cost of liquidating the Collateral. See definitions of "Exposure," "Swap Premium Exposure" and "Costs Exposure" under Paragraph 11 of each Credit Support Annex.

US_ACTIVE-101877366

filing of LBHI's chapter 11 petition, LBHI was downgraded to the level that obligated LBSF to

transfer, and LBSF did transfer, LBSF Credit Support under two of the Credit Default Swap

Agreements (those corresponding to Series 2006-15A and Series 2007-5A). However, the value

of the Collateral corresponding to those Credit Default Swap Agreements has deteriorated since

LBHI's filing such that LBSF became required to transfer additional LBSF Credit Support. LBHI

was not downgraded below the relevant specified level for the other two Credit Default Swap

Agreements prior to the filing of its chapter 11 petition. Neither LBSF nor LBHI has transferred

further LBSF Credit Support following the date of that filing. Accordingly, LBSF has failed to

provide the requisite LBSF Credit Support under all four Credit Default Swap Agreements.

25.     Either party may terminate the swap transaction under a Credit Default Swap

Agreement if the other party defaults. If a swap transaction had become subject to termination and

had been terminated by LBSF due to a default by Beryl, then LBSF or Beryl, as applicable, would

have owed a payment (the "Termination Payment") equal to the cost or gain to LBSF if it were to

enter into an equivalent swap transaction on the date of termination. The Conditions, which are

both a part of the Security Arrangement and incorporated by reference in the Credit Default Swap

Agreement, provide that, if the swap transaction under a Credit Default Swap Agreement is

terminated by Beryl due to a default by LBSF, neither party owes a termination payment.[9]

26.     Under each Credit Default Swap Agreement, the specified events of default with

respect to LBSF include (i) failure to pay amounts due thereunder (Failure to Pay or Deliver), (ii)

---

[9] Clause 40 of the Conditions provides that the "termination payment [under the Credit Default Swap Agreement] shall be deemed to be zero in the event that the [Credit Default Swap Agreement] is terminated due to the occurrence of an Event of Default (as defined in the ISDA Master Agreement) where [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement)." This term, and the other provisions of the Security Arrangement also are incorporated by reference into the Credit Default Swap Agreements: the Schedule forming part of each Credit Default Swap Agreement expressly provides that "in relation to each Transaction, each party confirms that it is bound by the terms of the Trust Deed and the terms of such Trust Deed prevail to the extent they conflict with terms relating to such Transaction." See Part 5(g) of each Schedule.

US_ACTIVE-101877366

filing for bankruptcy or otherwise becoming insolvent (Bankruptcy) and (iii) failure to comply with or perform under any other agreement or obligation under the ISDA Documents (Breach of Agreement).[10] Accordingly, if LBSF had breached a provision that did not relate to its insolvency or otherwise to its financial condition, it also would have been subject to termination without being entitled to any Termination Payment.

27.     The specific economic risk these provisions address is that the default of an institutional swap counterparty could expose the special purpose entity to a mark-to-market resulting in losses greater, and potentially substantially greater, than those that might ever actually occur in the reference portfolio. That is exactly the situation facing Beryl (and therefore Aflac). The market conditions prevailing since Lehman's filing are the most difficult in many decades. As noted above, however, actual credit losses under the swap transactions were (at termination) and are significantly less than the Subordination Amount.

28.     For a number of years, Lehman structured and placed many transactions of this type, in aggregate amounts of enormous magnitude, and received significant compensation and otherwise profited in various capacities, including as structuring agent, placement agent and swap counterparty. The limitations on Termination Payments that Lehman challenges, however, were structured and expressly agreed to by Lehman, and were key to its ability to sell and otherwise profit from these transactions. Rather than giving the parties the benefit of their bargain, Lehman's position would result in a large windfall accruing to Lehman as a result of its own defaults.

---

[10] See Section 5 of each Master Agreement as modified by Part 1, clauses (a) through (h) of each Schedule, and further modified by Paragraph 11, clauses (vi) through (viii) of each Confirmation.

US_ACTIVE-101877366

**B. Default, Termination Of The Swap Transaction, And Early Redemption Of The Aflac Notes**

29.     Under the Conditions, Beryl is obligated to redeem the Aflac Notes prior to their stated maturity date in specified circumstances that include termination of the Credit Default Swap Agreement (an "Early Redemption Event Date").[11]  Upon an early redemption, the holder of the Aflac Notes is entitled to receive an amount equal to their outstanding principal balance, plus all interest accrued and unpaid to their redemption date (the "Early Redemption Amount").[12]  The redemption is funded from the delivery of the Collateral to the holder of the Aflac Notes or from the proceeds of the Collateral, as well as from other funds available to Beryl, including any LBSF Credit Support.

30.     The bankruptcy filings of LBHI and LBSF[13] each constituted an "Event of Default" under each Credit Default Swap Agreement that entitled Beryl to terminate the swap transactions under those agreements.[14]  Beryl exercised that right and delivered a termination notice (the "Termination Notice") to LBSF designating October 10, 2008 as the "Early Termination Date".

31.     Since the termination of the swap transactions under the Credit Default Swap Agreements, Beryl has been required to apply the Collateral and other assets of Beryl (including any LBSF Credit Support) in accordance with the Security Arrangements to redeem the Notes.

---

[11] See clause 38 of the Conditions.

[12] See clause 44 of the Conditions.  The "Early Redemption Amount" includes "Unwind Costs" which, in the circumstances applicable here, are deemed to be an amount payable to Beryl equal to any shortfall in the value of the Collateral relative to the aggregate outstanding principal of the Aflac Notes.

[13] On September 15 and October 3, 2008, respectively, LBHI and LBSF filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

[14] See Section 5(a)(vii) of the Master Agreement forming part of each Credit Default Swap Agreement (the "Termination Provision").

US_ACTIVE-101877366

## COUNT I
### (*The Termination Of The Swap Transactions Was Valid And Effective*)

32.     The Trustee repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

33.     As a result of the Events of Default under the Credit Default Swap Agreement caused by the filing of a bankruptcy petition by LBHI (the "LBHI Event") and the filing of a bankruptcy petition by LBSF (the "LBSF Event"), Beryl was entitled to terminate the swap transactions under the Credit Default Swap Agreements by notice to LBSF.

34.     On October 10, 2008, Beryl delivered the Termination Notice to LBSF that designated October 10, 2008, as the "Early Termination Date" for the swap transactions under each Credit Default Swap Agreement on the basis of the Events of Default under those Credit Default Swap Agreements. As a result, the swap transactions were terminated on that date.

35.     Bankruptcy Code section 560 provides that a "contractual right" of a "swap participant" or "financial participant" to liquidate, terminate, or accelerate a "swap agreement" is not "stayed, limited or avoided" by the Bankruptcy Code. As a result, the automatic stay of Bankruptcy Code section 362 does not apply to such a liquidation, termination, or acceleration of a swap agreement, nor can such actions otherwise be stayed under Bankruptcy Code sections 362(b)(17) and 362(o).

36.     Beryl's termination of the swap transactions under the Credit Default Swap Agreements was not stayed because (i) the Credit Default Swap Agreements are "swap agreements" under Bankruptcy Code section 101(53B)(A)(i), (ii) the Termination Provision is protected by the safe harbor of section 560 of the Bankruptcy Code, (iii) upon the LBHI Event and the LBSF Event, Beryl had contractual rights under the Credit Default Swap Agreements to terminate the swap transactions under such agreements, (iv) Beryl is a "swap participant" as

US_ACTIVE-101877366

defined in Bankruptcy Code section 101(53C), and (v) under Bankruptcy Code sections 362(b)(17) and 362(o), such actions by Beryl are not stayed under the Bankruptcy Code or otherwise.

37.     There is an actual controversy between the parties on this issue because LBSF has contested the ability of Beryl to terminate the swap transactions in accordance with their terms.

38.     Accordingly, the Trustee is entitled to a declaratory judgment that the termination of the swap transactions in accordance with the Credit Default Swap Agreements was valid, effective and not stayed by the Bankruptcy Code or otherwise.

## COUNT II
### *(The Early Redemption Of The Aflac Notes And/Or The Exercise Of All Rights And Remedies Under The Transaction Documents Is Authorized)*

39.     The Trustee repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

40.     The termination of the swap transactions under the Credit Default Swap Agreements gave rise to a redemption event under clause 6(d)(ii) of the Conditions that would have caused, upon the completion of certain ministerial tasks, an "Early Redemption Event Date" under the Aflac Notes (collectively, the "Termination Event").

41.     Upon the termination of the swap transactions, Beryl is required by the Conditions to cause the early redemption of the Aflac Notes in accordance with the terms of the Security Arrangement.

42.     Although the terminations by Beryl of the swap transactions form the basis for the occurrence of an Early Redemption Event Date, the Security Arrangement provided that the calculation agent was the party to formally declare that an Early Redemption Event Date had occurred.  As a consequence of (i) LBIE's failure to declare that an Early Redemption Event Date

-21-

US_ACTIVE-101877366

had occurred, and (ii) LBSF's inaccurate claims that its bankruptcy filing prevented the exercise of the rights and remedies expressly provided to Beryl and Aflac under the Security Arrangement, the Trustee seeks confirmation of the rights of Aflac and Beryl, and the Trustee's authority to enforce those rights as instructed by Aflac, and the obligations of LBSF, in each case under the Credit Default Swap Agreements and the Security Arrangements.

43. The swap transactions under the Credit Default Swap Agreements were terminated due to one or more Events of Default (as defined in the Master Agreement) where LBSF was the Defaulting Party (as defined in the Master Agreement). Therefore, for each Credit Default Swap Agreement (i) the Termination Payment is deemed to be zero (see clause 40 of the Conditions), and (ii) the Collateral and other assets available to Beryl are to be distributed to pay, first, the Trustee's fees and expenses and then the Early Redemption Amount and other amounts, if any, owing by Beryl in respect of the Aflac Notes to the holders of those notes.

44. Even if amounts of any nature were deemed payable to LBSF, they would be subordinated to the payment of the Early Redemption Amount and other amounts, if any, owing by Beryl in respect of the Aflac Notes to the holders of those notes using "Noteholder Priority."[16] The proceeds or delivery in kind (as applicable) of the Collateral, together with other assets available to Swap Participant, are not expected to be sufficient to pay the Early Redemption Amount in full. Accordingly, either deeming the Termination Payment to be zero or distributing the Collateral and other assets available to Beryl up to the aggregate of the Early Redemption Amount and other amounts, if any, owing by Beryl in respect of the Aflac Notes under Noteholder Priority would

---

[16] For each tranche of Aflac Notes, see Principal Trust Deed, § 6.2(iii) and Supplemental Trust Deed, clause 5.5, which expressly subordinate any amounts payable to LBSF when an Event of Default occurs under the Credit Default Swap Agreement and it is the "Defaulting Party".

US_ACTIVE-101877366

have the same practical effect.  As a result, LBSF no longer has any interest in the Collateral or the LBSF Credit Support or the proceeds therefrom.

45.     Due to the occurrence of events that clearly form the basis for an Early Redemption Event Date and result in LBSF no longer having any interest in the Collateral or the LBSF Credit Support or the proceeds therefrom, the functions that the calculation agent and disposal agent were appointed to perform are no longer relevant.  Moreover, Beryl and Aflac would be prejudiced if required to appoint a replacement for LBIE in those capacities, because it might not be possible to find a suitable replacement without significant delay, and any replacement would require compensation, which would further erode Aflac's recovery on its investment in the Lehman product.

46.     Bankruptcy Code section 560 provides that a "contractual right" of a "swap participant" or "financial participant" to liquidate, terminate, or accelerate a "swap agreement" is not "stayed, limited or avoided" by the Bankruptcy Code.

47.     Under Bankruptcy Code section 362(b)(17), the automatic stay is not applicable to the exercise by a "swap participant" or a "financial participant" of a "contractual right" under "any security agreement or arrangement or other credit enhancement forming a part of or related to" a swap agreement.  Further, Bankruptcy Code section 362(o) provides that rights exempted from the automatic stay under Bankruptcy Code section 362(b)(17) may not be stayed by order of the bankruptcy court.

48.     The exercise of remedies under the Security Arrangements is not stayed because (i) the Credit Default Swap Agreements are "swap agreements" under Bankruptcy Code section 101(53B)(A)(i) and the Security Arrangements are "swap agreements" under Bankruptcy Code section 101(53B)(A)(vi), (ii) the exercise of remedies under the Security Arrangements constitutes

US_ACTIVE-101877366

the exercise of a contractual right under a swap agreement as provided by Bankruptcy Code

section 560, (iii) upon the occurrence of the Termination Event, Beryl was required under the

Security Arrangements to realize upon the Collateral and other assets available to Beryl to cause

the redemption of the Aflac Notes, (iv) Beryl is a "swap participant" as defined in Bankruptcy

Code section 101(53C), and (v) under Bankruptcy Code sections 362(b)(17) and 362(o), such

actions by Beryl (including their enforcement by the Trustee as instructed by Aflac) are not stayed

under the Bankruptcy Code or otherwise.

49.     There is an actual controversy between the parties on this issue because LBSF has

contested the legality of Beryl's exercise of its rights and remedies under the Credit Default Swap

Agreements and the Security Arrangements.

50.     Accordingly, the Trustee is entitled to a declaratory judgment (i) that no

Termination Payment is payable in connection with the termination of the swap transactions and

no other amounts are payable to LBSF (or, if any amounts are deemed to be payable to LBSF they

are subordinated to the payment of the Early Redemption Amount and other amounts, if any,

owing by Beryl in respect of the Aflac Notes to the holders of those notes), (ii) Beryl is not

required to appoint a replacement calculation agent or disposal agent because the functions those

agents were to have performed are no longer relevant, and (iii) as to the right of Beryl (including as

directed by the Trustee as instructed by Aflac) to exercise all rights and remedies under the Credit

Default Swap Agreements and the Security Arrangements.

### COUNT III
***(Beryl Is Entitled To The Payment Of Accrued And Unpaid Amounts Under The Credit Default
Swap Agreements And To The Delivery Of LBSF Credit Support Required To Have Been
Provided Under The Credit Default Swap Agreements)***

51.     The Trustee repeats and realleges each and every allegation set forth in the

preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

US_ACTIVE-101877366

52.     Pursuant to each Confirmation, LBSF is required to make a quarterly payment to Beryl, referred to in the Confirmations as the "Fixed Amount." LBSF was required to pay Fixed Amounts to Beryl in September 2008 which were not paid. Those Fixed Amounts and the further amounts accrued for the partial payment period following the September 2008 payment date and ending on the Early Termination Date, together with interest thereon as provided in the respective Credit Default Swap Agreements, remain outstanding and payable to Beryl. LBHI guaranteed LBSF's obligation to pay Fixed Amounts.

53.     Pursuant to each Credit Support Annex, if the short-term rating of LBHI is downgraded below a specified level, LBSF is required to transfer additional LBSF Credit Support to Beryl. In particular, the amount required to be transferred to Beryl under each Credit Default Swap Agreement is the sum of (in each case as further specified in the Credit Support Annex): (i) any excess of the outstanding principal balance of the related tranche of Aflac Notes over the value of the Collateral, (ii) amounts in respect of LBSF's Fixed Amount obligations, and (iii) the estimated cost of liquidating the Collateral. See definitions of "Exposure," "Swap Premium Exposure" and "Costs Exposure" under Paragraph 11 of each Credit Support Annex. LBHI guaranteed LBSF's obligation to transfer LBSF Credit Support.

54.     Prepetition, LBHI's short-term ratings were downgraded below the level required under two of the Credit Default Swap Agreements (those corresponding to Series 2006-15A and Series 2007-5A), triggering LBSF's obligation to transfer LBSF Credit Support under those agreements, and LBSF did transfer LBSF Credit Support under those agreements.

55.     Thereafter, but prior to the Early Termination Date, the value of the Collateral corresponding to the Series 2006-15A and Series 2007-5A Credit Default Swap Agreements

US_ACTIVE-101877366

deteriorated further, obligating LBSF to transfer additional LBSF Credit Support, but neither LBSF nor LBHI has transferred additional LBSF Credit Support.

56.     After LBHI's bankruptcy petition was filed, but prior to the Early Termination Date, LBHI suffered additional downgrades, triggering LBSF's obligation to transfer LBSF Credit Support under the other two Credit Default Swap Agreements (those corresponding to Series 2007-14A and Series 2008-7A), but neither LBSF nor LBHI has transferred LBSF Credit Support in respect of those agreements.

57.     Under the terms of the Credit Default Swap Agreements, the LBSF Credit Support required to be transferred by LBSF was the amount necessary to protect its counterparty, Beryl, from a loss caused by an LBSF default.  If the swap transactions had gone to maturity, LBSF would have been required to pay the face amount of the Aflac Notes and to take the Collateral in exchange; that is, LBSF was intended to be the party at risk for the credit and market value of the Collateral.

58.     There is an actual controversy between the parties on this issue because LBSF has contested the legality of Beryl's exercise of its rights and remedies under the Credit Default Swap Agreements and the Security Arrangements.

59.     Accordingly, Beryl is entitled to (i) the payment by LBSF (and/or, without duplication, LBHI as guarantor) of the accrued and outstanding Fixed Amounts under each Credit Default Swap Agreement as of the Early Termination Date, and (ii) the delivery by LBSF (and/or, without duplication, LBHI as guarantor) of the amount owed by LBSF to Beryl  in respect of the additional LBSF Credit Support that LBSF was obligated to have provided prior to and as of the Early Termination Date, and did not provide to Beryl, together with, in each case, interest thereon as provided in the respective Credit Default Swap Agreement.

US_ACTIVE-101877366

## COUNT IV
### *(Setoff and Recoupment)*

60.     The Trustee repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

61.     To the extent that any amounts should be determined to be owing by Beryl to LBSF and not to be subordinated to the payment of the Early Redemption Amount and other amounts, if any, owing by Beryl in respect of the Aflac Notes, the Trustee seeks a declaration that any amounts determined to be owing by Beryl to LBSF must be reduced by amounts payable or deliverable by LBSF to Beryl.

62.     Beryl is entitled to reduce, net, and/or offset any moneys determined to be owed by Beryl to LBSF by the aggregate amount of (i) the accrued and outstanding Fixed Amounts under each Credit Default Swap Agreements as of the Early Termination Date, and (ii) the additional LBSF Credit Support that LBSF was obligated to have provided prior to and as of the Early Termination Date, and did not provide to Beryl, together with, in each case, interest thereon as provided in the respective Credit Default Swap Agreement.

63.     There is an actual controversy between the parties on this issue because LBSF has contested the legality of Beryl's exercise of its rights and remedies under the Credit Default Swap Agreements and the Security Arrangements.

64.     Accordingly, the Trustee is entitled to a declaratory judgment that any amounts determined to be payable by Beryl to LBSF must be reduced by the amount owed by LBSF to Beryl in respect of the accrued and unpaid Fixed Amounts, and the additional LBSF Credit Support that in each case LBSF was obligated to, and did not, pay or transfer, as applicable, to Beryl, together with, in each case, interest thereon as provided in the respective Credit Default Swap Agreement.

US_ACTIVE-101877366

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that the Court grant the following relief:

1.    Entry of a declaratory judgment that:

    a.    the termination of each swap transaction in accordance with the respective Credit Default Swap Agreement was not stayed by the Bankruptcy Code or otherwise;

    b.    there is no Termination Payment in connection with the termination of the swap transactions and no other amounts are payable to LBSF or, if any amounts are deemed to be payable to LBSF, they are subordinated to the payment of the Early Redemption Amount, and other amounts, if any, owing by Beryl in respect of the Aflac Notes;

    c.    Beryl is not required to appoint a replacement calculation agent or disposal agent because the functions those agents were to have performed are no longer relevant;

    d.    Beryl has the right (including as directed by the Trustee as instructed by Aflac) to take any and all actions necessary and appropriate to realize upon the Collateral and the LBSF Credit Support and any proceeds thereof, and other assets of Beryl, if any, to cause the early redemption of the Aflac Notes and/or otherwise exercise all rights and remedies under the Credit Default Swap Agreements and the Security Arrangements;

    e.    Beryl is entitled to (i) the payment by LBSF (and/or, without duplication, LBHI, as guarantor) of the accrued and outstanding Fixed Amounts under each Credit Default Swap Agreement as of the Early Termination Date, and (ii) the delivery by LBSF (and/or, without duplication, LBHI, as guarantor) of the amount owed to Beryl by LBSF in respect of the additional LBSF Credit Support that LBSF was obligated to have provided prior to and as of the Early Termination Date, and did not provide to Beryl, together with, in each case, interest thereon as provided in the respective Credit Default Swap Agreement; and

    f.    Amounts, if any, determined to be payable by Beryl to LBSF must be reduced by the amounts owed to Beryl by LBSF in respect of accrued and unpaid Fixed Amounts, and the additional LBSF Credit Support that LBSF was obligated to, and did not, provide to Beryl, together with, in each case, interest thereon as provided in the respective Credit Default Swap Agreement.

US_ACTIVE-101877366

2.      Grant such other relief as the Court deems just and proper.

Dated: New York, New York
      July 6, 2009

                                    Respectfully submitted,

                                    /s/ Eric A. Schaffer
                                    Eric A. Schaffer
                                    David M. Schlecker
                                    REED SMITH LLP
                                    599 Lexington Avenue
                                    New York, New York  10022
                                    Telephone:  (212) 521-5400
                                    Facsimile:   (212) 521-5450
                                    Attorneys for Defendant and Counterclaim Plaintiff BNY Corporate Trustee Services Limited

TO:

Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

Sally McDonald Henry
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Anthony W. Clark
Robert A. Weber
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899

US_ACTIVE-101877366