**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| | : Adversary Proceeding |
| -against- | : |
| | : No.: 09-01261 (JMP) |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS and BNY CORPORATE TRUSTEE SERVICES LIMITED | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS | : |
| | : |
| Counterclaim Plaintiff, | : |
| | : |
| | : |
| -against- | : |
| | : |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : |
| | : |
| Counterclaim Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW OF AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Sally McDonald Henry

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
(302) 651-3000
Anthony W. Clark
Robert A. Weber

*Counsel for Defendant and Counterclaim Plaintiff*
*American Family Life Assurance Company of Columbus*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................i

PRELIMINARY STATEMENT ..........................................................................................1

    I.      STATEMENT OF FACTS .................................................................................3

          A.      Introduction ...............................................................................3

          B.      Procedural Posture .....................................................................4

          C.      The Credit Swap Transactions And The Aflac Notes ................4

    II.     ARGUMENT ..................................................................................................15

          A.      Standards For Summary Judgment ...........................................15

          B.      The Termination Of The Swap Transactions Under The
                Bankruptcy Termination Provision Was Valid And Effective. ...............15

          C.      The Termination Payment Provision Is Enforceable Against LBSF. .......18

          D.      Beryl Is Entitled To The Payment Of Accrued And Unpaid
                Amounts And To The Delivery Of LBSF Credit Support........................22

          E.      Beryl May Reduce, By Recoupment, Any Amounts Payable To
                LBSF By LBSF's Unpaid Amounts ..........................................................23

**Cases**

*Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313
 (2d Cir. 2006)...........................................................................................................15

*Calyon New York Branch v. Am. Home Mortgage Acceptance, Inc. (In re Am. Home
 Mortgage, Inc.)*, 379 B.R. 503 (Bankr. D. Del. 2008) ............................................17

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...........................................................15

*Devon Mobile Communications Liquidating Trust v. Adelphia Communications Corp
 .(In re Adelphia Communications Corp*.), 2006 Bankr. LEXIS 4600
 (Bankr. S.D.N.Y. Mar. 6, 2006)...............................................................................15

*Enron Creditors Recovery Corp. v. J.P. Morgan* (*In re Enron Creditors Recovery Corp.*),
 2009 Bankr. LEXIS 1589 (Bankr. S.D.N.Y. June 29, 2009) ...................................15

*Eternity Global Master Fund Ltd, v. Morgan Guar. Trust Co. of New York*,
 375 F.3d 168 (2d Cir. 2004) .......................................................................................7

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)................17

*In re Child World*, 161 B.R. 354 (Bankr. S.D.N.Y. 1993).........................................18

*In re Dean*, 174 B.R. 787 (Bankr. E.D. Ark.1994).....................................................21

*In re Drexel Burnham Lambert Products Corp. v. Midland Bank PLC*, 1992 US Dist. LEXIS
 21223 (S.D.N.Y. Nov. 10, 1992) ..............................................................................21

*In re Enron Corp.*, 306 B.R. 465 (Bankr. S.D.N.Y. 2004) .........................................18

*In re Margulis*, 323 B.R. 130 (Bankr. S.D.N.Y. 2005).............................................18

*In re McMahon*, 129 F.3d 93, 98 (2d Cir. 1997) .......................................................23

*Interbulk Ltd., v. Louis Dreyfus Corp. (In re Interbulk, Ltd).*, 240 B.R. 195 (Bankr. S.D.N.Y.
 1999)..........................................................................................................................15

*Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243 (2d Cir. 2002)...........................15

*Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131 (2d Cir.1998) ..........23

*Perpetual Tr. Co., Ltd., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009]
 W.L.R. (D) 262 (Ch. 2009) .........................................................................................5

*Reiter v. Cooper*, 507 U.S. 258 (1993)........................................................................23

*Tese-Milner v. Moon (In re Moon)*, 385 B.R. 541 (S.D.N.Y. 2008) ..........................15

*The Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63 (2d Cir. 2008) ...............15

*United States v. Ron Park Enters., Inc.*, 489 U.S. 235 (1989) ...................................16

*Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2d. Cir. 2002) ........................23

## Statutes and Legislative Reports

11 U.S.C. § 101(53B)(A)(i)(vi) ..............................................................17

11 U.S.C. § 101(53C) ...........................................................................17

11 U.S.C. § 362(b)(17) ..........................................................................21

11 U.S.C. § 362(o) ................................................................................21

11 U.S.C. § 365(e)(1) ......................................................................16, 18

11 U.S.C. § 560 ..............................................................................16, 20

H.R. REP. NO. 101-484 (1990)................................................................2

S. REP. NO. 95-989 (1978) ...................................................................18

## Rules

Fed. R. Bankr. P. 7056 ..........................................................................15

Fed. R. Civ. P. 56 .............................................................................4, 15

## Other Authorities

5 *Collier on Bankruptcy* ¶ 560.04[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ........................................................................................17

Arnaud De Servigny & Norbert Jobst, *The Handbook of Structured Finance*, 379-390 (2007)......................................................................................6

Global Rating Criteria for Synthetic CDOs, Fitch Ratings, March 2009, available at http://www.fitchratings.com/creditdesk/reports/report_frame.cfm?rpt_id=428408.................11

"Global CDO Market Issuance Data," prepared by the Securities Industry and Financial Market Association (citing Thomson Financial), *available at* http://www.sifma.org/research/pdf/CDO_Data2008-Q4.pdf ....................................6

Moody's Approach to Rating Corporate Collateralized Synthetic Obligations, Moody's Investors Services, Apr. 24, 2009, available at http://www.moodys.com/moodys/cust/research/MDCdocs/20/2007400000590359.pdf?search= 5&searchQuery=Moody ...........................................................................11

Satyajit Das, *Credit Derivatives, CDOs and Structured Credit Products*, 308, 407-8, 729-30 (3d ed. 2005) ...............................................................................6

Standard & Poor's, "Structured Finance Ratings, Criteria for Rating Synthetic CDO Transactions," September 2003, at 10, *available at* *http://www2.standardandpoors.com/spf/pdf/fixedincome/syntheticcriteria_092004.pdf?vregion =us&vlang=en.* ..................................................................................7, 11

American Family Life Assurance Company of Columbus ("Aflac"), by and through its undersigned counsel, submits this memorandum of law in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

This action presents an important question: whether swap counterparties may rely on the plain language of Bankruptcy Code sections 560, 362(b)(17) and 362(o) – the "safe harbor" provisions applicable in bankruptcy to credit swaps – to terminate credit swaps postpetition in accordance with the agreement of the parties. Contrary to the clear statutory mandates protecting the swaps here at issue, debtors Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, "Plaintiffs" or "Lehman"), contend that the safe harbors are negated by sections 365(e)(1) and 541(c)(1). The result they seek, in this case and others pending in this Court, is that tens of billions of dollars of swap-based investments marketed by Lehman affiliates to institutional and retail investors around the world should be rewritten to provide a windfall to Plaintiffs.

Through artful pleading, Lehman seeks to turn Aflac's swaps on their head. Plaintiffs' mantra is that the swap termination provisions are "unenforceable *ipso facto* clauses" by which Aflac seeks to "***improperly modify[] LBSF's right to priority of payments***" under the Aflac swap agreements. (Complaint ¶ 1) (Emphasis added) This assertion – that Aflac seeks to change, to "modify," Lehman's payment rights by terminating the swaps – is made *ad nauseum* in the pleading,[1] as if simple repetition will make it so. The reality is just the opposite. Aflac

---

[1] *See, e.g., Complaint* ¶ 1 ("The transactions provide for **modification** of LBSF's priority of payment rights when an 'Event of Default' has occurred … LBSF's right to payment priority is in imminent danger of being **modified** … [T]hese contractual provisions constitute unenforceable *ipso facto* clauses that inappropriately effect a **modification** (indeed here eradication) of [Plaintiffs'] interest in" the Aflac swaps.); *id.* ¶ 2 (referring to "[t]he **modification** of LBSF's priority of payments as a result of its bankruptcy filing", and arguing that the swap termination provision "improperly **modifies** LBSF's rights under the contracts solely because of its bankruptcy

does not seek to alter Lehman's existing rights under the swap contracts; rather, it is Plaintiffs who ask this Court to re-write and dramatically modify the agreements to give Lehman new rights to payments for which it did not bargain and that were never agreed to by the parties. Nothing in the law or equity even remotely supports such a result.

Congress enacted the safe harbors to protect the financial markets and their participants from the volatility that could cause heavy losses if swaps and other financial contracts could not be promptly closed out and settled.[2]  Plaintiffs' argument flatly contradicts the clear statutory language and unambiguous Congressional intent and, therefore, should be rejected.  Instead, the Court should confirm the safe harbor protections for credit swaps mandated by Congress and grant summary judgment in Aflac's favor (i) upholding the terminations, (ii) permitting distribution of the collateral in accordance with the parties' express agreements, and (iii) determining that Plaintiffs have failed to pay or deliver amounts owed to the swap counterparty.

filing"); *id.* ¶ 3 ("***Modification*** of LBSF's payment priority also violates the automatic stay"); *id.* ¶ 4 (Plaintiffs seek to prevent Aflac from "effectuating the ***modification*** of or seeking to ***modify*** LBSF's payment priority"); *id.* ¶ 17 ("the payment priority LBSF otherwise receives under the Transaction Documents will be ***modified*** so that LBSF will be paid out in a lower priority to payments made to the noteholders solely as a result of its bankruptcy filing"); *id.* ¶ 21 ("If LBSF's right to payment priority is ***modified*** as a result of its bankruptcy filing, and Noteholder Priority is applied, LBSF would most likely receive no payments"); *id.* ¶ 22 ("LBSF … seek[s] a declaration that these provisions ***modifying*** LBSF's payment priority solely because of the commencement of its bankruptcy case are unenforceable *ipso facto* clauses"); *id.* ¶ 24 ("The provisions in the Transaction Documents ***modifying*** LBSF's right to priority of payment under the Transaction Documents as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses"); *id.* ¶ 27 ("the provisions in the Transaction Documents … [which] ***modify*** LBSF's property interest in the right to receive payments under the agreements … are unenforceable *ipso facto* clauses"); *id.* ¶ 29 (the swap termination provision " improperly ***modifies*** LBSF's property interest"); *id.* ¶ 30 ("the provisions in the Swap Agreement ***modifying*** LBSF's payment priority are unenforceable"); *id.* ¶ 31 ("the Transaction Documents require BNY to ***modify*** LBSF's payment priority in violation of the Bankruptcy Code"); *id.* ¶ 32 ("the provisions in the Swap Agreement ***modifying*** LBSF's payment priority constitute unenforceable *ipso facto* clauses"); *id.* ¶ 34 ("The provisions ***modifying*** LBSF's payment priority as a result of its bankruptcy filing are not only unenforceable *ipso facto* clauses, but any action to enforce those provisions also violates the automatic stay"); *id.* ¶ 35 ("By ***modifying*** LBSF's payment priority, its property interests are being forfeited"); *id.* ¶ 36 ("the Transaction Documents require BNY to ***modify*** LBSF's payment priority in violation of the Bankruptcy Code"); *id.* ¶ 37 ("any ***modification*** of LBSF's payment priority under the Transaction Documents constitutes a willful violation of the automatic stay") (emphasis added in each).

[2]     *See, e.g.*, H.R. REP. NO. 101-484, at 2 (1990).

# I.  STATEMENT OF FACTS

## A.  Introduction

At issue here are four credit default swap transactions (the "Credit Default Swap Agreements") entered into between January 2007 and July 2008.[3]  Each Credit Default Swap Agreement is a "credit swap" under Bankruptcy Code section 101(53B)(A)(i)(VI)[4] and is referred to in the market as a "credit default swap."  Aflac, the sole investor in the Credit Default Swap Agreements, paid more than $240 million and, in return, received interest-bearing notes (the "Aflac Notes") from the nondebtor swap counterparty, Beryl Finance Limited ("Beryl"), a Cayman Islands company set up by a Lehman affiliate for these types of transactions.

LBHI and LBSF filed chapter 11 petitions on September 15 and October 3, 2008, respectively.  These were events of default under section 5(a)(vii) of the ISDA Master Agreements (defined below) that are part of the Credit Default Swap Agreements which entitled Beryl to terminate, and Aflac to receive the collateral supporting, the agreements.  On October 10, 2008 (the "Early Termination Date"), Beryl did terminate the swap transactions by delivering termination notices to LBSF.  But ten months later, solely because of Plaintiffs' improper threats and the subsequent filing of this lawsuit, Beryl still has not redeemed the Aflac Notes and caused the distribution of the underlying collateral to Aflac as required under the security arrangement for the Credit Default Swap Agreements.

The parties agree that the material facts here at issue – *e.g.*, the applicable agreements comprising the Credit Default Swap Agreements and related security arrangements, the existence of the events of default thereunder, and the termination of the transactions under

---

[3]  Copies of the transaction documents are attached as Exhibits 1-18 to the transmittal declaration of Robert A. Weber filed herewith (cited as "Weber Decl.").

[4]  Section 101(53B)(a)(i)(VI) provides that a "swap agreement" is "any agreement, including the terms and conditions incorporated by reference in such agreement, which is … a total return, credit spread or credit swap, option, future, or forward agreement …"

the Credit Default Swap Agreements – are undisputed.[5]  Accordingly, the issues presented are matters of law ripe for disposition on summary judgment under Fed. R. Civ. P. 56.

## B.  Procedural Posture

Plaintiffs filed their complaint ("Complaint") against Aflac and BNY Corporate Trustee Services Limited (the "Trustee") on June 3, 2009, docket item ("D.I.") 1.  Aflac's answer and counterclaim ("Aflac's Counterclaim") was filed on June 15, amended on July 2 and corrected with consent of the parties on July 7, D.I. 16, when the Trustee also filed its answer and counterclaim, D.I. 12.   Plaintiffs answered ("Plaintiffs' Answer") Aflac's Counterclaim on July 13, D.I. 20, and the Trustee's on July 27, D.I. 26.

## C.  The Credit Swap Transactions And The Aflac Notes

### 1.  Transaction documents

Each of the four Credit Default Swap Agreements and the related tranche of Aflac Notes is structured and documented similarly and consists of seven primary components, as follows:

(i)  the Credit Default Swap Agreement;[6]

(ii)  the Reference Portfolio (as defined below) for the swap transaction, identified in the Confirmation under the Credit Default Swap Agreement;

---

[5]  *See* Letter of Robert Weber to the Hon. James M. Peck dated July 13, 2009, Docket Item 21.

[6]  The documents for each Credit Default Swap Agreement, identified in a series prospectus for the respective tranche of Notes (the "Series Prospectus") (Weber Decl. Ex. 7, 10, 13 and 16), are the 1992 International Swaps and Derivatives Association, Inc. Master Agreement between LBSF and Beryl (the "ISDA Master Agreement") (Weber Decl. Ex. 8, 11, 14 and 17), the Schedule to the ISDA Master Agreement (the "Schedule") (Weber Decl. Ex. 9, 12, 14 and 18), and the Credit Support Annex to the Schedule (the "Credit Support Annex") and the confirmation of the credit default swap transaction (the "Confirmation"); the forms of paragraph 11 of the Credit Support Annex and of the Confirmation are included in each Series Prospectus (Weber Decl. Ex. 7, 10, 13 and 16 ).  Each Credit Default Swap Agreement also incorporates and is subject to the Conditions (as defined below).  *See* Part 5(g) of each Schedule.  (Weber Decl. Ex. 9, 12, 14 and 18 ).

(iii)     credit enhancements and support from Lehman for the benefit of Beryl and, consequently, Aflac as the holder of the Aflac Notes;[7]

(iv)     the related Aflac Notes issued to Aflac by Beryl;[8]

(v)     the Terms and Conditions of the Notes;[9]

(vi)     the Collateral, as specified and defined in the respective Series Prospectus and consisting of highly-rated debt obligations purchased by Beryl with the proceeds of Aflac's investment; and

(vii)     a security arrangement among the Trustee, Beryl and LBSF (the "Security Arrangement").[10]

---

[7]     These are LBHI's unconditional guaranty of all of LBSF's obligations under or relating to the Credit Default Swap Agreement (the "Guaranty"), and LBSF's obligation to transfer additional cash or securities (the "LBSF Credit Support") to Beryl as specified in the Credit Support Annex that is part of each Credit Default Swap Agreement. The form of the LBHI Guaranty appears in each Series Prospectus. (*See* Weber Decl., Ex. 7 at 80-81; Ex. 10 at 80-81; Ex. 13 at 80-81; Ex. 16 at 80-81)

[8]     The Aflac Notes are (i) the Series 2006-15 Tranche A JPY5,000,000,000 Synthetic Portfolio Notes Due 2016, (ii) the Series 2007-5 Tranche A JPY5,000,000,000 Synthetic Portfolio Notes Due 2017, (iii) the Series 2007-14 Tranche A JPY7,500,000,000 Synthetic Portfolio Notes Due 2017, and (iv) the Series 2008-7 Tranche A JPY10,000,000,000 Synthetic Portfolio Notes due 2018.

[9]     These are the base conditions set forth in Schedule 2, Part C of the Principal Trust Deed (Weber Decl. Ex. 5-6), as modified and supplemented by the series-specific Terms and Conditions of the Notes set forth in the respective Series Prospectus (Weber Decl. Ex. 7, 10, 13, 16) (collectively, the "Conditions"). The Principal Trust Deed was initially entered into as of October 10, 2002 by the Trustee and Dante Finance Public Limited Company. Beryl is a party with respect to particular tranches of notes that it issues. The terms of the Principal Trust Deed (as in effect on the date referred to in the relevant Supplemental Trust Deed) are incorporated by reference in, and supplemented and modified by, the terms of the Supplemental Trust Deed for each tranche of the Aflac Notes. (Weber Decl., Ex. 1 at 3; Ex. 2 at 3; Ex. 3 at 4; Ex. 4 at 3). The Series Conditions are set forth at pp. 5-22 of each Series Prospectus. (Weber Decl., Ex. 7 at 5 – 22; Ex. 10 at 5-22; Ex. 13 at 5-22; Ex. 16 at 5-22. *See also Perpetual Tr. Co., Ltd., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009] W.L.R. (D) 262 (Ch. 2009). (Weber Decl. Exh. 22, at 4, 7). In that recent decision of the English High Court of Justice, the court construed documents substantially similar to those governing Aflac's transactions, and confirmed that the "Terms and Conditions of the Notes" specific to a series are those attached to the related Series Prospectus.

[10]     The Security Arrangement is embodied in a Supplemental Trust Deed and Drawdown Agreement among Beryl, the Trustee, LBSF and others (the "Supplemental Trust Deed") which incorporates by reference the relevant Principal Trust Deed (the Principal Trust Deed, as modified and supplemented by the Supplemental Trust Deed, the "Trust Deed"). (Weber Decl., Ex. 1 at 3; Ex. 2 at 3; Ex. 3 at 4; Ex. 4 at 3) The Security Arrangement, among other things, provides for the pledge of the Collateral to the Trustee to secure Beryl's obligations to the holder of the Aflac Notes and to LBSF under the Credit Default Swap Agreement, and incorporates the Conditions.

### 2.     Transaction Structure

Each Credit Default Swap Agreement and the related tranche of Aflac Notes and Security Arrangement together constitute an investment product known as a "credit-linked note" or "synthetic collateralized debt obligation," the market for which developed in the late 1990s and burgeoned from 2004 through 2007.[11]  Among other reasons, the product was desirable to investors because, by combining a credit derivative with structured finance techniques, it afforded the opportunity to invest in a diversified investment portfolio for a specified term by acquiring a single, rated, fixed-income obligation, to do so in a short time with relative ease of execution, and to earn a higher yield than for a direct investment in the reference securities.[12] The motivations for those who provided the products (like Lehman) differ by institution, but include hedging other activities, acting as intermediary on offsetting trades and taking positions as principal, and earning fees, spreads and other profits from those and related trading activities, such as selling the securities that collateralized the swaps.[13]

LBHI, together with its subsidiaries, was a market leader for these products, other types of collateralized debt obligation structures ("CDOs"), and other sophisticated structured products combining credit derivatives and structured finance techniques.[14]  The transactions in

---

[11]  *See, e.g.*, "Global CDO Market Issuance Data," prepared by the Securities Industry and Financial Market Association (citing Thomson Financial), *available at* http://www.sifma.org/research/pdf/CDO_Data2008-Q4.pdf  (last accessed August 3, 2009).  The figures given for synthetic funded CDOs (like the Credit Default Swap Agreements and the Aflac Notes), rounded to the nearest hundred million dollars, are $37.2 billion in 2004, $65 billion in 2005, $66.5 billion in 2006, $48.5 billion in 2007 and 1.2 billion in 2008.  *Id.* at 1.

[12]  *See, generally*, Arnaud De Servigny & Norbert Jobst, *The Handbook of Structured Finance*, 379-390 (2007).

[13]  *See* De Servigny & Jobst, *supra* n. 12, at 385-386; *see also*, Satyajit Das, *Credit Derivatives, CDOs and Structured Credit Products*, 308, 407-8,729-30 (3d ed. 2005).

[14]  *See, e.g.*, Lehman Brothers 2006 Annual Report (Weber Ex. 19) at 86:  "We are a market leader in mortgage- and asset-backed securitizations and other structured financing arrangements."  The Lehman Brothers 2007 Annual Report (Weber Ex. 20) at 103 notes that from 2006 to 2007 the total value of pledged collateral in special purpose entities involved in credit-linked notes relating to swaps of LBSF and affiliates grew from $10.8 billion to $15.7 billion.

which Aflac invested were structured and privately placed by a Lehman affiliate, Lehman Brothers International Europe, and were structured to, and did, receive the highest, long-term debt rating ("AAA") assigned by Standard & Poor's ("S&P") for three of the tranches, and an S&P rating of "AA" for the fourth.[15]

A credit default swap is a bilateral financial contract in which one party (in this case, LBSF) makes periodic payments to another party (in this case Beryl) in exchange for a contingent payment if a specified credit event occurs to one or more referenced entities or securities; this is called "buying" and "selling" credit protection.[16] The party selling protection (Beryl) is effectively investing in those specified entities or securities and taking the risk of their default.[17] Credit default swaps and the note investments based on them can be structured with widely varying degrees of risk.[18] When the swap is linked to a highly-rated, low-yielding note, such as the Aflac Notes, the investor expects to receive timely payments of interest and full principal at maturity, and the structures are designed by their promoters (like Lehman) and the rating agency to meet those expectations.[19]

Under each Credit Default Swap Agreement, LBSF and Beryl agreed to exchange certain payments based upon a hypothetical portfolio of corporate bonds that neither party was required to own (the "Reference Portfolio"). Each Reference Portfolio was comprised of the debt

---

[15]  *See* page 2 of each Series Prospectus.

[16]  *See Eternity Global Master Fund Ltd, v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 172-173 (2d Cir. 2004).

[17]  *See* De Servigny & Jobst, *supra* note 12, at 419.

[18]  *Id*. at 383-384.

[19]  *See, e.g.,* Standard & Poor's, "Structured Finance Ratings, Criteria for Rating Synthetic CDO Transactions," September 2003, at 10, *available at* http://www2.standardandpoors.com/spf/pdf/fixedincome/syntheticcriteria_092004.pdf?vregion=us&vlang=en.

obligations of 100+ large companies ("Reference Entities").  Each tranche of Aflac Notes corresponds to a related Credit Default Swap Agreement, and the payment of interest and principal on the Aflac Notes depends upon the performance of the corresponding Reference Portfolio.  On each quarterly payment date, LBSF had to make a payment (the "Fixed Amount") to Beryl for the credit protection it had purchased.  The Fixed Amount is calculated as a percentage of the swap notional amount, which is the same as the principal amount of the Aflac Notes, and Beryl used these payments by LBSF to pay interest to Aflac under the Aflac Notes. LBSF was entitled to receive the periodic interest earned on the Collateral pledged by Beryl.

Other than LBSF Credit Support when applicable, the Collateral for each transaction was the sole source of payment by Beryl for both its obligations to LBSF and the repayment of principal on the Aflac Notes.  Each swap transaction had a specified amount of losses that could occur in the Reference Portfolio, due to credit events with respect to Reference Entities, before any losses would be incurred by Beryl (and, by extension, the holder of the Aflac Notes).  This specified loss threshold is typically referred to in the synthetic CDO market as the "tranche attachment point."  If losses in the Reference Portfolio exceeded the tranche attachment point during the term of a swap transaction,[20] any further losses would reduce (dollar-for-dollar) the notional amount of the relevant Credit Default Swap Agreement and the principal balance payable on the related Aflac Notes at maturity or early termination, as well as the interest payable in the meantime.  However, if losses did not reach the tranche attachment point, there would be no writedown of the Aflac Notes, Beryl would not be required to make any loss payments, and Aflac would be entitled to receive full repayment of principal at the maturity of

---

[20]  The "term" of the Credit Default Swap Agreement is from the date of the Confirmation (also the date of the issuance and purchase of the related Aflac Notes) to the scheduled maturity date or – as occurred for the swap agreements here – the date of early termination.

the Aflac Notes. In fact, losses under all of the swap transactions here were, at termination, and continue to be significantly below the tranche attachment point.

The scheduled termination of the respective swap transactions corresponded with the maturity of the Aflac Notes. The final exchange was to be the payment by LBSF to Beryl of the outstanding principal amount of the Aflac Notes (reflecting any principal write-down caused by losses above the tranche attachment point, had that occurred), in return for the transfer by Beryl to LBSF of the redemption proceeds of the Collateral, which generally was selected to mature shortly before the Aflac Notes. The contract provisions described below requiring LBSF to post LBSF Credit Support, as well as application of the LBSF Credit Support to the "Unwind Costs," were designed to achieve the equivalent outcome for Beryl (and thereby the holder of the Aflac Notes) as would have occurred at maturity, if instead the swap transactions terminated early due to an LBSF default. Specifically, those provisions were to shield Beryl from the market value and currency exchange risks that could arise if the Collateral had to be sold before maturity as a result of early termination of the swap transaction due to a default by LBSF.

As is customary in swap transactions, each Credit Default Swap Agreement provided that if either Beryl or LBSF defaulted under that agreement, the non-defaulting party could terminate the swap transaction. If a swap transaction was terminated early by LBSF due to a default by Beryl, then LBSF or Beryl, as applicable, would have owed a payment (the "Termination Payment") equal to the cost or gain to the non-defaulting party if it were to enter into an equivalent swap transaction on the date of termination. This type of valuation is called a "mark-to-market" determination. However, if LBSF is the defaulting party, the Conditions provide that neither party owes a termination payment: "such termination payment **shall be deemed to be zero** in the event that the [Credit Default Swap Agreement] is terminated due to the

occurrence of an Event of Default … where [LBSF] is the Defaulting Party" (the "Termination Payment Provision").  (*See,* Series Condition 40, clause (iii), Weber Decl. Ex. 7 at 16, Ex. 10 at 16, Ex. 13 at 15-16, Ex. 16 at 16) (emphasis added)

Under each Credit Default Swap Agreement, the specified events of default with respect to LBSF include (i) failure to pay amounts due, (ii) filing for bankruptcy or becoming insolvent, and (iii) failure to comply with any other agreement or obligation under the ISDA Documents.[21]   Accordingly, if LBSF had breached a provision that did not relate to its insolvency or financial condition, it still would have been subject to termination without any Termination Payment.[22]  Thus, the Termination Payment Provision was not based upon or triggered solely by bankruptcy events, although that happened to be what occurred in this case, nor was it designed to be punitive.  Rather, it was necessary to protect the special purpose note issuer so that high investment grade ratings could be assigned to the structures, as discussed below.

---

[21]   These are the Events of Default specified in Section 5(a) of the ISDA Master Agreement, clauses (i), (ii) and (vii), and made applicable to LBSF in the Schedule.

[22]   Similarly, the Credit Default Swap Agreement, section 5.5, provides for LBSF's payment rights to be subordinated to the holder of the Aflac Notes (this is referred to in the Security Arrangement documents as the "Noteholder Priority") not only if an Event of Default had occurred, but also if there was a "Tax Event" where LBSF is the sole "Affected Party."

> 5.5      **Application of Moneys Received**:  the Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:
>
> Swap Counterparty Priority unless (i) an Event of  Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), in which case Noteholder Priority shall apply.

(*See,* Weber Decl. Ex. 1 at 5, Ex. 2 at 5, Ex. 3 at 5-6, and Ex. 4 at 7, § 5.6 )  Because no Termination Payment is payable to LBSF, and the respective tranche attachment points were never reached, there are no amounts owed to LBSF under the Credit Default Swap Agreements to be subordinated to the Aflac Notes.  Therefore, although the Noteholder Priority applies due to the LBSF default, the distinction between Swap Counterparty Priority and Noteholder Priority is without effect in this case.

The Termination Payment Provision, or its substantive equivalent, is customary in swap transactions between institutional counterparties, such as LBSF, and special purpose entities, such as Beryl, whose securities, such as the Aflac Notes, are to receive an investment grade rating. These provisions are part of the web of structural features and conditions required by the rating agencies to protect special purpose issuers of rated debt securities from the counterparty risk that could arise due to default by the institutional counterparty.[23] The most immediate impact of a default by the institutional counterparty would be the interruption in cashflows (the Fixed Amounts) necessary to keep the rated notes from defaulting, which in itself is an unacceptable risk for securities receiving the highest ratings by the rating agencies.[24] But the primary risk these provisions address is that a default by such an institutional swap counterparty would expose the special purpose entity (and the holder of the notes issued by that entity) to a mark-to-market of the swap transaction.[25]

A mark-to-market of a credit default swap reflects the market view, at a given time, of the likelihood, timing and severity of losses that may occur in a reference portfolio, as well as other relevant factors, such as interest rate and currency exchange risks. It is only a forecast based on a financial model, market conditions and available data and may be subject to extreme volatility due to intangibles such as prevailing mood or breaking news. The valuation

---

[23]  *See generally,* Structured Finance Ratings, Criteria for Rating Synthetic CDO Transactions, Standard & Poor's, September 2003, available at http://www2.standardandpoors.com/spf/pdf/fixedincome/ syntheticcriteria_092004.pdf?vregion=us&vlang=en; Moody's Approach to Rating Corporate Collateralized Synthetic Obligations, Moody's Investors Services, Apr. 24, 2009, available at http://www.moodys.com/moodys/cust/research/MDCdocs/20/2007400000590359.pdf? search=5&searchQuery=Moody; Global Rating Criteria for Synthetic CDOs, Fitch Ratings, March 2009, available at http://www.fitchratings.com/creditdesk/reports/report_frame.cfm?rpt_id=428408.

[24]  Standard & Poor's, *supra* note 23, at 31.

[25]  Standard & Poor's, *supra* note 23, at 33 ("The termination payment must therefore either be sized or subordinated to the rated noteholders in the priority of payments unless termination is caused due to default of the SPE, or in the case of a credit event where the SPE is the sole affected party. The alternative is to eliminate the responsibility to make such a payment[.]"); *see also* Moody's Investors Services, *supra* note 23, at 13; Fitch Ratings, *supra* note 23, at 12.

models used to provide quotes in the swap markets are not crystal balls, and the loss probabilities that may be perceived at one time do not necessarily translate into actual losses – unless, of course, the investor is required to make a mark-to-market payment at that time. That is the fundamental and important reason for provisions, like the Termination Payment Provision, designed to insulate special purpose issuers of rated debt (and their noteholders) from defaults by the institutional counterparties: to prevent exposure to larger, potentially substantially larger, losses than those that might ever actually occur in the reference portfolio. That is exactly the situation facing Beryl and, therefore, Aflac. Although the market conditions prevailing since Lehman's filing are the most adverse in many decades, actual credit losses under the swap transactions were at the time of termination, and are now, significantly less than the respective tranche attachment points.

Because the Plaintiffs' bankruptcy filings resulted in an LBSF event of default and an early termination of the Credit Default Swap Agreements, the amount of each Termination Payment was zero. Beryl became obligated under Base Condition 6(d)(ii) and Series Condition 38 to redeem the Aflac Notes. (Weber Decl. Ex. 5 at 81 (Base Condition 6(d)(ii)), Ex. 6 at 82 (Base Condition 6(d)(ii)), Ex. 7 at 11-12 (Series Condition 38), Ex. 10 at 11-12 (Series Condition 38), Ex. 13 at 11-12 (Series Condition 38), and Ex. 16 at 11-12 (Series Condition 38)) In an early redemption, Aflac is entitled to receive the outstanding principal and interest on the Aflac Notes (the "Early Redemption Amount"), up to the amount of the property held by Beryl after payment of the Trustee's fees and expenses. The early redemption is funded from the liquidation proceeds of the Collateral (or, at the election of the holder of the Aflac Notes, from the physical delivery of the Collateral) and other funds available to Beryl. In particular, where LBSF Credit Support has been provided, it is to be applied to cover the

"Unwind Costs" component of the Early Redemption Amount which, in the circumstances applicable here, is deemed to be an amount payable to Beryl equal to any shortfall in the value of the Collateral relative to the aggregate outstanding principal of the Aflac Notes.[26]

### 3. Termination of the swap transactions

Section 5(a)(vii) of the ISDA Master Agreement that is part of the Credit Default Swap Agreements provides that a bankruptcy filing by LBSF, the party to the agreements, or by LBHI, a "Credit Support Provider" under the agreements, is an event of default (the "Bankruptcy Termination Provision"). (*See, e.g.*, Weber Decl. Ex. 8 at 6-7, Ex. 11 at 6-7, Ex. 14 at 6-7, Ex. 17 at 6-7) Plaintiffs admit that their respective bankruptcy filings constituted separate events of default. (Aflac's Counterclaims and Plaintiffs' Answer ¶ 32)

Accordingly, Beryl had the right to, and did, terminate the swaps on October 10, 2008 (the "Termination Notice"). (Weber Decl. Ex. 23) This too is undisputed. (Aflac's Counterclaims and Plaintiffs' Answer ¶¶ 6, 35-36, 39, 45) Plaintiffs' sole challenge to the terminations is whether the Bankruptcy Termination Provision is legally enforceable. (*Id.* ¶ 32)

### 4. Unpaid fixed amounts and deficiencies in LBSF Credit Support

LBSF was required to make quarterly "Fixed Amount" payments to Beryl. Plaintiffs acknowledge this Obligation. (*See* Aflac's Counterclaims and Plaintiffs' Answer ¶ 54) LBSF paid these Fixed Amounts through June 2008, but did not make the payments due in September 2008 or for the partial payment period thereafter until the Early Termination Date. Plaintiffs do not deny that these payments were required, were not made and were guaranteed by LBHI. (*Id.*)

---

[26]   *See* Series Condition 44, Weber Decl., Ex. 7 at 19-21; Ex. 10 at 19-21; Ex. 13 at 19-21; Ex. 16 at 19-2.

Additionally, under the Credit Support Annex, when LBHI's short-term rating by S&P fell below a specified level, LBSF was required to transfer LBSF Credit Support sufficient (taken with the Collateral) for Beryl to satisfy the Aflac Notes upon an early termination.[27] Pursuant to the Guaranty, LBHI guaranteed LBSF's obligation to transfer LBSF Credit Support. Plaintiffs admit that well before LBHI filed its chapter 11 petition, it was downgraded below the level specified in two of the Credit Default Swap Agreements and, therefore, LBSF became obligated to, and did, transfer LBSF Credit Support under those agreements. (*See* Aflac's Counterclaims and Plaintiffs' Answer ¶ 56)

However, after LBHI's filing but before the Early Termination Date, (i) the value of the Collateral for the Credit Default Swap Agreements under which LBSF had transferred LBSF Credit Support deteriorated, so that LBSF was required to transfer additional LBSF Credit Support, and (ii) LBHI was downgraded further, so that LBSF was required to transfer LBSF Credit Support under the other two Credit Default Swap Agreements. None of these payments have been made since LBHI's bankruptcy filing, which exposes Beryl and Aflac to potentially significant losses (*i.e.*, even assuming the redemption of the Aflac Notes in accordance with the terms of the Security Arrangements).

Therefore, Plaintiffs are liable for the unpaid Fixed Amounts and the amount of the LBSF Credit Support that should have been posted but was not.

---

[27] Specifically, each Credit Support Annex requires LBSF to provide LBSF Credit Support in an amount equal to the sum of: (i) a set amount that is the estimated cost of liquidating the Collateral, (ii) a full quarterly Fixed Amount payment plus an additional "Grace Period Amount," and (iii) any excess of the outstanding principal balance of the Aflac Notes over the value of the Collateral. (*See* Weber Decl. Ex. 7 at 78, Ex. 10 at 78, Ex. 13 at 77-78, and Ex. 16 at 74-75)

## II.    ARGUMENT

### A.    Standards For Summary Judgment

Where the material facts are not genuinely disputed and one party is entitled to judgment as a matter of law, summary judgment is appropriate. *See* Fed. R. Civ. P. 56, as made applicable in this adversary proceeding by Fed. R. Bankr. P. 7056. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Such is the case here. Lehman and Aflac agree on the relevant contracts and transaction documents, and their only dispute is one of law – namely, the scope and application of various provisions of the Bankruptcy Code to those contracts.[28]

### B.    The Termination Of The Swap Transactions Under The Bankruptcy Termination Provision Was Valid And Effective.

Plaintiffs do not dispute that an Event of Default occurred under section 5(a)(vii) of the ISDA Master Agreement that is part of the Credit Default Swap Agreements as a result of the bankruptcy filings or that the swap transactions were terminated by Beryl on October 10, 2008. Lehman only disputes the enforceability of the Bankruptcy Termination Provision.

The Bankruptcy Termination Provision is rendered enforceable as a matter of law by Bankruptcy Code section 560. Section 560, quoted in full below,[29] provides that "[t]he

---

[28]    Summary judgment is often used to resolve disputes concerning the applicability and scope of Bankruptcy Code provisions, including the "safe harbors" applicable to derivatives contracts. *See Tese-Milner v. Moon* (*In re Moon*), 385 B.R. 541, 548-49 (S.D.N.Y. 2008); *Devon Mobile Communications Liquidating Trust v. Adelphia Communications Corp.* (*In re Adelphia Communications Corp.*), 2006 Bankr. LEXIS 4600 (Bankr. S.D.N.Y. Mar. 6, 2006); *see also Enron Creditors Recovery Corp. v. J.P. Morgan* (*In re Enron Creditors Recovery Corp.*), 2009 Bankr. LEXIS 1589, *24-26 (Bankr. S.D.N.Y. June 29, 2009) (considering applicability of section 546(e) safe harbor to certain derivatives transactions on summary judgment); *Interbulk Ltd., v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195 (Bankr. S.D.N.Y. 1999). Summary judgment is also appropriate for disputes concerning contract interpretation. *See, e.g., The Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (summary judgment appropriate on contract dispute where language at issue is unambiguous and has clear meaning); *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (same); *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 257 (2d Cir. 2002) (same).

[29]    11 U.S.C § 560 states:

**Contractual right to liquidate, terminate, or accelerate a swap agreement**

*exercise of any contractual right of any swap participant* . . . *to cause* the liquidation,

*termination*, or acceleration *of one or more swap agreements* because of a condition of the kind

specified in section 365 (e)(1) of this title" – so called *ipso facto* provisions[30] – "or to offset or

net out any termination values or payment amounts arising under or in connection with the

termination, liquidation, or acceleration of one or more swap agreements *shall not be stayed,*

*avoided, or otherwise limited by operation of any provision of this title* or by order of a court or

administrative agency in any proceeding under this title."  11 U.S.C § 560 (emphasis added).

Statutory interpretation begins with the plain language of the statute itself.  *United*

*States v. Ron Park Enters., Inc.*, 489 U.S. 235, 241 (1989).  "[W]hen a statute's language is plain,

the sole function of the courts – at least where the disposition required by the text is not absurd –

is to enforce it according to is terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank,*

---

The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365 (e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

[30]    11 U.S.C. § 365(e)(1) states:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

*N.A.*, 530 U.S. 1, 6 (2000) (citations omitted).  As shown below, section 560 clearly applies to Beryl's exercise of the Bankruptcy Termination Provision because each relevant definition and component of section 560 is met.  *See Calyon New York Branch v. Am. Home Mortgage Acceptance, Inc. (In re Am. Home Mortgage, Inc.)*, 379 B.R. 503, 516 (Bankr. D. Del. 2008) (if applicable definitions met, "safe harbor provisions apply, period.").

First, Beryl is undeniably a "swap participant" as defined in Bankruptcy Code section 101(53C):  "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor."  11 U.S.C. § 101(53C).  The term "swap agreement," in turn, is defined to include "any agreement, including the terms and conditions incorporated by reference in such agreement, which is…a total return, credit spread or credit swap, option, future, or forward agreement…"  11 U.S.C. § 101(53B)(A)(i)(vi).  Plaintiffs concede that the Credit Default Swap Agreements are credit swaps included in the definition of "swap agreement"[31] that were outstanding when they filed for bankruptcy and that, as a party to these agreements, Beryl qualifies as a "swap participant."  (*See, e.g.,* Complaint ¶¶ 1-2, 15, 19, 30)

Second, the Bankruptcy Termination Provision is a "contractual right" within the meaning of section 560.  The definition of "contractual right" is broad, and includes written provisions in a contract between the parties, as is the case here, as well as market practices, exchange rules and common law rights.  5 *Collier on Bankruptcy* ¶ 560.04[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.)  ("The source of swap agreement liquidation, termination and acceleration rights will often be a written agreement or other document, such as a customer agreement, master agreement or the terms and conditions printed on a confirmation of the

---

[31]    The Bankruptcy Code does not define the term "credit swap."  Courts and commentators agree, however, that a credit swap is a bilateral contract, whereby the buyer makes periodic payments to the seller and, in exchange, receives a payment if the referenced financial instrument defaults.  *See, e.g., Eternity Global Master*, 375 F.3d at 172-3; De Servigny & Jobst, *supra* note 12, at 418-19.

transaction"). The Bankruptcy Termination Provision, which appears in the ISDA Master Agreements, thus constitutes a "contractual right."

Finally, section 560's requirement of an *ipso facto* clause is also satisfied. Section 560 "permits the exercise of termination rights by a non-defaulting swap participant so long as the enforcement of those rights is first triggered because of a condition of the kind specified in section 365(e)(1)." *In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004). One such condition, specified in Section 365(e)(1)(B), is "the commencement of a case under" the Bankruptcy Code. 11 U.S.C. § 365(e)(1)(B). The Bankruptcy Termination Provision is a textbook example of such a condition because it permits Beryl, the non-debtor party, to terminate due to a bankruptcy filing by either LBHI or LBSF and, in fact, Plaintiffs' bankruptcy filings specifically were stated in the Termination Notice as grounds therefor.[32]

The Bankruptcy Termination Provision satisfies section 560, and thus was legally enforceable. Therefore, Aflac is entitled to summary judgment on Count I of its Counterclaim upholding the validity and effectiveness of the Termination Notice.

**C.     The Termination Payment Provision Is Enforceable Against LBSF.**

Since the termination of the swaps was valid and effective, the only remaining question is what flows as a consequence from that termination. Section 560 of the Bankruptcy Code, along with two related provisions, sections 362(b)(17) and 362(o), provide the answer – the rights and remedies of Beryl (and, therefore, Aflac) are fully enforceable and, accordingly, LBSF is not entitled to any Termination Payment. Plaintiffs, however, ignore the plain words and meaning of these statutes to argue that other provisions of the Bankruptcy Code, sections 365(e)(1) and 541(c)(1)(B), override the safe harbors for swap terminations and entitle them to a

---

[32]     *See In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005); *In re Child World*, 161 B.R. 354 (Bankr. S.D.N.Y. 1993). *See also* S. REP. No. 95-989, at 59 (1978).

payment of more than $165 million.  (*See* Complaint ¶1).  As explained below, Plaintiffs'

contentions are without merit.

>    *1.*    **Beryl's exercise of remedies under the Security Arrangements is**
>           **authorized by the safe harbors.**

Count II of Aflac's Counterclaims seeks a declaration that Beryl's exercise of

remedies under the Security Arrangements is permitted under sections 560, 362(b)(17) and

362(o) of the Bankruptcy Code.  Each section is discussed below.

>    a.    **Section 560**

Just as the Bankruptcy Termination Provision is enforceable by virtue of section

560, so too is the Termination Payment Provision, which provides that LBSF gets no ("zero")

Termination Payment if the swaps are terminated due to its default because of a bankruptcy

filing.  In the words of section 560, the Termination Payment Provision is:

- a "contractual right" (*see* Series Condition 40, clause (iii) in the Series Prospectus for
  each swap transaction, Weber Decl. Ex. 7 at 16, Ex. 10 at 16, Ex. 13 at 15-16, Ex. 16 at
  16)

- "of [a] swap participant" (Beryl)

- "to cause the liquidation, termination, or acceleration of one or more swap agreements"
  (each of the four Credit Default Swap Agreements)

- because of an *ipso facto* provision of the type described in section 365(e)(1) of the
  Bankruptcy Code

- which, therefore, "shall not be stayed, avoided, or otherwise limited by operation of any
  provision of [the Bankruptcy Code] or by order of a court[.]"

The swap termination here was because of the Lehman bankruptcy filings and, therefore, under

the plain and unambiguous provisions of section 560 and the Termination Payment Provision,

LBSF has no right to receive any Termination Payment whatsoever.

So how is it that Lehman seeks to "avoid[]," and asks the Court to "stay[]" and "otherwise limit[,]" the effect of the Bankruptcy Termination Provision and the Termination Payment Provision when section 560 says that cannot be done?  Simply enough: Plaintiffs just call the termination provisions something else.  Since the word "modify" and its derivations do not appear in the text of section 560, if Plaintiffs say (many times) that the contract terms they prefer to avoid are "*modification*" provisions, the safe harbor no longer protects any swap terminations where, as here, LBSF gets no payment:

> The contractual provisions do not fall within the limited "safe-harbor" for *ipso facto* clauses in swap agreements contained in 11 U.S.C. § 560 because that provision only protects "the liquidation, termination, or acceleration" of swap agreements or the "offset or net out" of the parties' positions under the agreements. The modification of LBSF's priority of payments as a result of its bankruptcy filing does not constitute a "liquidation, termination, or acceleration" of the agreement, and [*sic*] nor is it an "offset or net out" of the parties' positions.  Rather, by changing LBSF's priority of payments, the clause improperly modifies LBSF's rights under the contracts solely because of its bankruptcy filing, which §§ 365(e)(1) and 541(c)(1)(B) expressly forbid.

(Complaint ¶ 2)  The logic seems to be that if the swaps had not been terminated because of the bankruptcy filings, LBSF might otherwise one day have a right to be paid something under the swaps; and because the termination eliminates that theoretical possibility, LBSF's "rights" have been changed or "modified."

None of LBSF's rights have been changed in any way by the termination of the swaps, and none will be modified by Beryl enforcing the Credit Default Swap Agreements in accordance with their express terms which, in the case of an LBSF bankruptcy default and termination, say LBSF gets no Termination Payment.  Put differently, by getting a payment of "zero" upon such a termination, LBSF is receiving precisely what it bargained for.[33]  *See In re*

---

[33]     In the Drexel bankruptcy, the district court upheld the enforceability under state law of a similar (though not identical) swap termination provision, known as the "first method," in which the defaulting party is not entitled to receive any net amount otherwise determined to be payable to it in the close-out of a swap transaction.  *See In re Drexel Burnham Lambert Products Corp. v. Midland Bank PLC*, 1992 US Dist. LEXIS 21223. at *3-4

*Dean*, 174 B.R. 787, 790 -791 (Bankr. E.D. Ark.1994) (section 541(c)(1) does not apply where "rights, obligations, and restrictions existing pre-bankruptcy have not been forfeited, modified, or terminated…by the filing of the bankruptcy" but "[r]ather, the trustee has the same rights as the debtor under the agreement"; "property rights are [not] expanded" under section 541(c) "simply by virtue of the fact that the property belongs to the estate").

Section 560 expressly validates for swap transactions the very types of *ipso facto* clauses that, for other kinds of contracts, the statutes which Plaintiffs cite, sections 365(e)(1) and 541(c)(1)(B), prohibit. Therefore, the statutes on which Plaintiffs rely simply do not apply, and are explicitly overridden by section 560. Because Beryl's (and, therefore, Aflac's) exercise of its termination and associated rights under the swaps is expressly protected by section 560, Aflac is entitled to summary judgment on Count II of the Aflac Counterclaims.

### b. Sections 362(b)(17) and 362(o)

Beryl's exercise of its safe harbored right (exercisable by the Trustee, at the direction of Aflac as the holder of the Aflac Notes) to distribute the Collateral and the LBSF Credit Support to the Trustee and Aflac is further supported by section 362(b)(17) of the Bankruptcy Code which states, in pertinent part, that the automatic stay does not apply to

> the exercise by a swap participant … of any contractual right …
> under any security agreement or arrangement or other credit
> enhancement forming a part of or related to any swap agreement,
> or of any contractual right … to offset or net out any termination
> value, payment amount, or other transfer obligation arising under
> or in connection with 1 or more such agreements[.]

11 U.S.C. § 362(b)(17). And, under section 362(o), if the automatic stay does not apply, the Court also is expressly precluded from staying the exercise of such rights. *See* 11 U.S.C. § 362(o) ("The exercise of rights not subject to the stay arising under subsection

---

(S.D.N.Y. Nov. 10, 1992) (finding provision " not unconscionable or contrary to public policy … [and thus should cause] neither a penalty, a forfeiture nor an unjust enrichment").

(a) pursuant to paragraph…(17)…of subsection (b) shall not be stayed by order of a court…in any proceeding under this title").

Thus, a swap participant may exercise contractual rights under a security arrangement related to a swap agreement. Accordingly, without running afoul of the automatic stay, the Trustee (as directed by Aflac as the holder of the Aflac Notes), as the holder of the lien on the Collateral and other assets of Beryl, has the right to distribute all available assets, including the LBSF Credit Support, in accordance with the terms of the Security Arrangements to pay the Trustee's fees and expenses and then to redeem the Aflac Notes.

### D. Beryl Is Entitled To The Payment Of Accrued And Unpaid Amounts And To The Delivery Of LBSF Credit Support.

Plaintiffs admit that LBSF was obligated to pay Fixed Amounts and that LBHI guaranteed such amounts. (Aflac's Counterclaims and Plaintiffs' Answer ¶ 54). And Plaintiffs do not deny that, for each swap transaction, the Fixed Amount due and payable for September 2008 and thereafter up to the Early Termination Date, remains accrued and unpaid. Similarly, LBSF's obligation to provide LBSF Credit Support is straightforward and clear under the relevant language in each Credit Support Annex.

Accordingly, summary judgment for Aflac on Count III of the Aflac Counterclaims should be entered by granting a declaratory judgment that LBSF, and LBHI as guarantor, are liable for (i) Fixed Amounts accrued and outstanding under each Credit Default Swap Agreement as of the Early Termination Date, and (ii) the additional LBSF Credit Support that LBSF should have provided prior to the Early Termination Date, together with interest thereon.

**E.**    **Beryl May Reduce, By Recoupment, Any Amounts Payable To LBSF By LBSF's Unpaid Amounts.**

Lastly, Count IV of the Aflac Counterclaims seeks alternative relief which, if judgment is entered for Aflac on Counts I – III as it should be, will be rendered moot.

Aflac seeks in Count IV a declaration that, to the extent any non-subordinated amounts should be determined to be owing by Beryl to LBSF, such amounts should be reduced by amounts payable or deliverable by LBSF to Beryl. The defense of recoupment is available to Beryl to reduce any liability that Beryl may be determined to have to LBSF under the Credit Default Swap Agreement; Beryl is entitled to reduce, net, and/or recoup any moneys determined to be owed by Beryl to LBSF by the aggregate amounts described in Section II.D. above. *See In re McMahon*, 129 F.3d 93, 98 (2d Cir. 1997) (recoupment not subject to automatic stay; applied to uphold allow utility company to reduce amount owed by debtor through application of security deposit); *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2d. Cir. 2002) ("Recoupment is in the nature of a defense, the purpose of which is to do justice viewing one transaction as a whole") (*quoting Malinowski v. N.Y. State Dep't of Labor* (*In re Malinowski*), 156 F.3d 131, 133 (2d Cir.1998)). *See also Reiter v. Cooper*, 507 U.S. 258, 265, n.2 (1993) ("It is well settled, moreover, that a bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment").

Accordingly, Aflac is entitled to a declaratory judgment that any amounts determined to be payable by Beryl to LBSF must be reduced by the amount owed by LBSF to Beryl in respect of the accrued and unpaid Fixed Amounts, and the additional LBSF Credit Support that in each case LBSF was obligated to, and did not, pay or transfer, as applicable, to

Beryl, together with, in each case, interest thereon as provided in the respective Credit Default

Swap Agreement.

# CONCLUSION

For the reasons set forth above, Aflac is entitled to entry of summary judgment in its favor, on all counts of Aflac's Counterclaim, and against Plaintiffs on all counts of their Complaint.

Dated: New York, New York
       August 4, 2009

Respectfully submitted,

*/s/ Sally McDonald Henry*
Sally McDonald Henry
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile:  (212) 735-2000

-and-

Anthony W. Clark (admitted *pro hac vice*)
Robert A. Weber (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
Telephone:  (302) 651-3000
Facsimile:   (302) 651-3001

*Attorneys for Defendant and Counterclaim Plaintiff American Family Life Assurance Company of Columbus*

To:

Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

Eric A. Schaffer
David M. Schlecker
REED SMITH LLP
599 Lexington Avenue
New York, New York  10022
(212) 521-5400

Dennis Dunne
Dennis O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000