**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| | : Adversary Proceeding |
| -against- | : |
| | : No.: 09-01261 (JMP) |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS and BNY CORPORATE TRUSTEE SERVICES LIMITED | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS | : |
| | : |
| | : |
| Counterclaim Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : |
| | : |
| | : |
| Counterclaim Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPPOSITION OF AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS TO MOTION FOR SUMMARY JUDGMENT OF LEHMAN BROTHERS SPECIAL FINANCING INC. AND LEHMAN BROTHERS HOLDINGS INC.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Sally McDonald Henry

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
(302) 651-3000
Anthony W. Clark
Robert A. Weber

*Counsel for Defendant and Counterclaim Plaintiff American Family Life Assurance Company of Columbus*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................1

I.     STATEMENT OF FACTS ....................................................................................5

     A.     Introduction.............................................................................................5

     B.     Procedural Posture..................................................................................7

     C.     The Credit Swap Transactions ...............................................................8

II.    ARGUMENT.....................................................................................................21

     A.     Standards For Summary Judgment.........................................................23

     B.     LBSF Cannot Use The Bankruptcy Code To Reverse The
            Prepetition Effectiveness Of The Termination Payment and
            Unwind Costs Provisions And The Noteholder Priority. .........................23

     C.     The Zero Termination Payment and Unwind Costs Provisions And
            The Noteholder Priority Became Effective Prepetition And
            Therefore Remain Effective Postpetition. ...............................................26

     D.     The Noteholder Priority Must Be Upheld In Accordance With
            Section 510(a). ......................................................................................29

     E.     Aflac's Termination And Liquidation Of The Swap Transactions
            And Enforcement Of The Contracts Do Not Constitute A
            "Modification" And Are Protected By The Safe Harbor Provisions
            Of Section 560 Of The Bankruptcy Code.................................................31

     F.     Beryl's Exercise Of Remedies Under The Security Arrangements
            Is Authorized By The Safe Harbors. .......................................................34

     CONCLUSION ...........................................................................................44

*In re Advent Corp.*, 24 B.R. 612 (B.A.P. 1st Cir. 1982)..................................................24

*Allen Oil Co. v. Commissioner of Internal Revenue*, 614 F.2d 336 (2d Cir. 1980) ..........39

*America Freight System, Inc. v. Interstate Commerce Commission*, 179 B.R. 952
    (Bankr. D. Kan. 1995).................................................................................................25

*America Home Assurance Co. v. Hapag Lloyd Container Line, GmbH*, 446 F.3d
    313 (2d Cir. 2006).......................................................................................................23

*In re Anchor Resolution Corp.*, 221 B.R. 330 (Bankr. D. Del. 1998)..............................25

*In re Best Products Co.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994) .......................................30

*In re Bluman*, 125 B.R. 359 (Bankr. E.D.N.Y. 1990) .....................................................24

*Butner v. United States*, 440 U.S. 48 (1979)............................................................24, 25

*Calyon New York Branch v. America Home Mortgage Acceptance, Inc. (In re
    America Home Mortgage, Inc.)*, 379 B.R. 503 (Bankr. D. Del. 2008)......................32

*In re Carmania Corp.*, 154 B.R. 160 (S.D.N.Y 1993) ....................................................25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................23

*In re Central Medical Ctr., Inc.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) ........................25

*In re Chateaugay Corp.*, 130 B.R. 162 (Bankr. S.D.N.Y. 1991)....................................24

*In re Child World*, 161 B.R. 349 (Bankr. S.D.N.Y. 1993) ..............................................34

*Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636
    (Bankr. S.D.N.Y. 1992) .............................................................................................28

*Connecticut v. United States Department of the Interior*, 228 F.3d 82 (2d Cir.
    2000), *cert. denied*, 532 U.S. 1007 (2001)...............................................................39

*In re Cornwall Hill Realty, Inc.*, 128 B.R. 378 (Bankr. S.D.N.Y. 1991) ........................24

*COR Route 5 Co, LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373
    (2d Cir. 2008) ............................................................................................................24

*In re Credit Industrial Corp.*, 366 F.2d 402 (2d Cir. 1966)...............................................30

*In re Delta Air Lines*, 341 B.R. 439 (Bankr. S.D.N.Y. 2006)...........................................29

*Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.(In re Adelphia Commc'ns Corp.)*, 2006 Bankr. LEXIS 4600 (Bankr. S.D.N.Y. Mar. 6, 2006) ...............................................................................................................23

*Disabled in Action v. Hammons*, 202 F.3d 110 (2d Cir. 2000)........................................40

*In re Drexel Burnham Lambert Products Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992) .............................................................36

*In re Enron Corp.*, 306 B.R. 465 (Bankr. S.D.N.Y. 2004)................................................33

*Enron Creditors Recovery Corp. v. J.P. Morgan (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17 (Bankr. S.D.N.Y. 2009).............................................................23

*Enstar Group, Inc. v. Bank of New York (In re Amret, Inc.)*, 174 B.R. 315 (1994) (M.D. Ala. 1994) ...................................................................................................30

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168 (2d Cir. 2004).............................................................................11, 33

*Everett v. Judson*, 228 U.S. 474 (1913) ..........................................................................24

*In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988) ..............................................................24

*Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, _ U.S. _, 128 S. Ct. 2326 (2008) ...........................................................................................................24

*In re Fort Worth Osteopathic Hospital, Inc.*, 387 B.R. 706 (Bankr. N.D. Tex. 2008) ...................................................................................................................25

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000)....................................................................................................................30

*Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997) ...................................................................................................................24

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195 (Bankr. S.D.N.Y. 1999) .....................................................................................23

*LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*, 22 B.R. 556 (Bankr. S.D. Fla. 1982) ...............................................................................................................28

iii

*Lucente v. International Bus. Machine Corp.*, 310 F.3d 243 (2d Cir. 2002)...................23

*In re Margulis*, 323 B.R. 130 (Bankr. S.D.N.Y. 2005) ......................................34

*In re Maxwell Communications Corp. Plc (No. 2)* [1993] 1 W.L.R. 1402, 1405, 1420 .......................................................................................................30

*Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295 (2d Cir. 1997) ............................39

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984) ................................24

*In re Moore*, 99 B.R. 27 (Bankr. E.D. Cal. 1989) ............................................25

*Musso v. N.Y.S. Higher Education Services Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932 (Bankr. E.D.N.Y. 1993)........................................................25

*Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927 (Bankr. E.D.N.Y. 1994) .....................................................................................................28

*Official Comm. of Unsecured Creditors v. American Tower Corp. (In re Verestar)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...........................................10

*Perpetual Tr. Co., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009] W.L.R. (D) 262 (Ch. 2009) .................................................................................9, 26

*Pioneer Commercial Funding Corp. v. United Airlines, Inc. (In re Pioneer Commercial Funding Corp.)*, 122 B.R. 871 (S.D.N.Y. 1991) ...........................................27

*Rice v. Shoney's (In re Dean)*, 174 B.R. 787 (Bankr. E.D. Ark. 1994) ............................36

*Robinson v. Howard Bank (In re Kors, Inc.)*, 819 F.2d 19 (2d Cir. 1987) ......................30

*In re Schokbeton Industrial, Inc.*, 466 F.2d 171 (5th Cir. 1972)........................................24

*Sec. Mortgage Co. v. Powers*, 278 U.S. 149 (1928)........................................................26

*In re Seven Stars Restaurant, Inc.*, 122 B.R. 213 (Bankr. S.D.N.Y. 1990)......................27

*In re SSSL Realisations (2002) Ltd.* [2006] Ch. 610 ......................................................30

*State Bank of Hardinsburg v. Brown*, 317 U.S. 135 (1942) ...........................................26

*In re TTS, Inc.*, 158 B.R. 583 (D. Del. 1993)..................................................................24

*Tese-Milner v. Moon (In re Moon)*, 385 B.R. 541 (Bank. S.D.N.Y. 2008)......................23

iv

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63 (2d Cir. 2008) ...........................23

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007) ....................................................................................................25

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989)...................................32

*Universal Church v. Geltzer*, 463 F.3d 218 (2d Cir. 2006) ..............................................40

*In re Village Rathskeller, Inc.*, , 147 B.R. 665 (Bankr. S.D.N.Y. 1992) .........................30

*White v. Stump*, 266 U.S. 310 (1924) ...............................................................................24

*In re Worldcom, Inc.*, 343 B.R. 486, 499 (Bankr. S.D.N.Y. 2006)...................................24

# STATUTES, LEGISLATIVE HISTORY AND RULES

11 U.S.C. § 101(53B) ........................................................................6, 33

11 U.S.C. § 101(53C) ...........................................................................32

11 U.S.C. § 362(b) ..........................................................................*passim*

11 U.S.C. § 362(o) ................................................................................37

11 U.S.C. § 365(e) ..........................................................................*passim*

11 U.S.C. § 510(a) .........................................................................29, 30

11 U.S.C. § 541(a) .........................................................................23, 25

11 U.S.C. § 560 ...............................................................................*passim*

136 Cong. Rec. S7535 (June 6, 1990) ...............................................41

152 Cong. Rec. H7600 (2006) .............................................................42

2005 U.S.C.C.A.N. 88, 121 ...........................................................42, 43

Fed. R. Bankr. P. 7056...........................................................................23

Fed. R. Civ. P. 56 ..................................................................................23

H.R. Rep. No. 101-484, 101st Cong., (1990) ...........................*passim*

H.R. Rep. No. 109-31 (2005)........................................................41, 42, 43

H.R. Rep. No. 109-648 (2006) ............................................................42

Pub. L. No. 109-390 (2006) .................................................................41

Pub. L. No. 109-8 (2005) .....................................................................41

S. Hrg. 101-406 (1990)...............................................................40, 41, 42

S. Rep. No. 95-989, at 59 (1978)........................................................34

# TREATISES, ARTICLES AND OTHER PUBLICATIONS

*Are You Sailing in Safe Harbors? An Overview of Various Bankruptcy Code Safe-Harbor Protections*, 26-10 ABIJ 44, 88 (Dec. 2007 / Jan. 2008) .....................41

Arnaud De Servigny & Norbert Jobst, *The Handbook of Structured Finance*, 379-90 (2007) ................................................................................................. 10, 11, 33

Bryan A. Garner, *Black's Law Dictionary* 68 (17th ed. 1999)........................................29

5 Allan N. Resnick & Henry J. Sommer, *Collier On Bankruptcy* (15th ed. rev. 2009) ...................................................................................................*passim*

*Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev. 641, 657 (Winter, 2005).........................................................................................43

Fitch Ratings, *Global Rating Criteria for Synthetic CDOs*, March 2009, available at http://www.fitchratings.com/ creditdesk/reports/report_frame.cfm?rpt_id=428408)...................................... 5, 15, 16

Tom Freke, *Securitisation Yet To Recover From Lehman Fall*, Reuters News, Aug. 27, 2009, available at http://uk.reuters.com/article/ idUK-LNE57R00Q20090828 .........................................................................................4

Moody's Investors Services, *Moody's Approach to Rating Corporate Collateral-ized Synthetic Obligations*, Apr. 24, 2009, available at http://www.moodys.com/moodys/cust/research/MDCdocs/ 20/2007400000590359.pdf?search=5&searchQuery=Moody)............................ 15, 16

Satyajit Das, *Credit Derivatives, CDOs and Structured Credit Products*, 308, 407-8, 729-30 (3d ed. 2005).....................................................................................10

Securities Industry and Financial Market Association, *Global CDO Market Issu-ance Data*, available at http://www.sifma.org/research/pdf/CDO_Data2008-Q4.pdf .......................................................................................................9

Standard & Poor's, "*Structured Finance Ratings, Criteria for Rating Synthetic CDO Transactions*," September 2003, at 10................................................. 11, 15, 16

American Family Life Assurance Company of Columbus ("Aflac"), by and through its undersigned counsel, submits this response in opposition to debtors Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc.'s ("LBHI" and, together with LBSF, "Plaintiffs" or "Lehman") motion for summary judgment (the "Motion").

## PRELIMINARY STATEMENT

This action presents an important question: whether swap counterparties may rely on the plain language of Bankruptcy Code sections 362(b)(17), 362(o) and 560 – the "safe harbor" provisions applicable in bankruptcy to credit swaps – to terminate credit swaps postpetition in accordance with the agreement of the parties.  Contrary to the clear statutory mandates protecting the swaps here at issue, Lehman contends that the safe harbors are negated by sections 365(e)(1) and 541(c)(1).  The result Plaintiffs seek, in this case and others pending in this Court, is that tens of billions of dollars of swap-based investments marketed by Lehman affiliates to institutional and retail investors around the world should be rewritten to provide a windfall to Lehman.

Through artful pleading, Lehman seeks to turn Aflac's swaps on their head.  Plaintiffs' mantra is that the swap termination provisions are "unenforceable *ipso facto* clauses" by which Aflac seeks to "***improperly modify**[] **LBSF's right to priority of payments**" under the Aflac swap agreements.  (Complaint ¶ 1) (emphasis added)  This assertion – that Aflac seeks to change, to "modify," Lehman's payment rights by terminating the swaps – is made *ad nauseum* in the Complaint[1], as if simple repetition will make it so.  Plaintiffs' semantic strategy is repeated

---

[1]  *See, e.g.*, Complaint ¶ 1 ("The transactions provide for **modification** of LBSF's priority of payment rights when an 'Event of Default' has occurred … LBSF's right to payment priority is in imminent danger of being **modified** … [T]hese contractual provisions constitute unenforceable *ipso facto* clauses that inappropriately effect a **modification** (indeed here eradication) of [Plaintiffs'] interest in" the Aflac swaps.); *id.* ¶ 2 (referring to "[t]he **modification** of LBSF's priority of payments as a result of its bankruptcy filing," and arguing that the swap termination provision "improperly **modifies** LBSF's rights under the contracts solely because of its bankruptcy filing");

in the Motion,[2] but the reality is just the opposite.  LBSF's entitlements under the swap contracts were fixed ***prepetition***, as a result of LBHI's prior bankruptcy filing.

*id.* ¶ 3 ("***Modification*** of LBSF's payment priority also violates the automatic stay"); *id.* ¶ 4 (Plaintiffs seek to prevent Aflac from "effectuating the ***modification*** of or seeking to ***modify*** LBSF's payment priority"); *id.* ¶ 17 ("the payment priority LBSF otherwise receives under the Transaction Documents will be ***modified*** so that LBSF will be paid out in a lower priority to payments made to the noteholders solely as a result of its bankruptcy filing"); *id.* ¶ 21 ("If LBSF's right to payment priority is ***modified*** as a result of its bankruptcy filing, and Noteholder Priority is applied, LBSF would most likely receive no payments"); *id.* ¶ 22 ("LBSF … seek[s] a declaration that these provisions ***modifying*** LBSF's payment priority solely because of the commencement of its bankruptcy case are unenforceable *ipso facto* clauses"); *id.* ¶ 24 ("The provisions in the Transaction Documents ***modifying*** LBSF's right to priority of payment under the Transaction Documents as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses"); *id.* ¶ 27 ("the provisions in the Transaction Documents … [which] ***modify*** LBSF's property interest in the right to receive payments under the agreements … are unenforceable *ipso facto* clauses"); *id.* ¶ 29 ("the swap termination provision " improperly ***modifies*** LBSF's property interest"); *id.* ¶ 30 ("the provisions in the Swap Agreement ***modifying*** LBSF's payment priority are unenforceable"); *id.* ¶ 31 ("the Transaction Documents require BNY to ***modify*** LBSF's payment priority in violation of the Bankruptcy Code"); *id.* ¶ 32 ("the provisions in the Swap Agreement ***modifying*** LBSF's payment priority constitute unenforceable *ipso facto* clauses"); *id.* ¶ 34 ("The provisions ***modifying*** LBSF's payment priority as a result of its bankruptcy filing are not only unenforceable *ipso facto* clauses, but any action to enforce those provisions also violates the automatic stay"); *id.* ¶ 35 ("By ***modifying*** LBSF's payment priority, its property interests are being forfeited"); *id.* ¶ 36 ("the Transaction Documents require BNY to ***modify*** LBSF's payment priority in violation of the Bankruptcy Code"); *id.* ¶ 37 ("any ***modification*** of LBSF's payment priority under the Transaction Documents constitutes a willful violation of the automatic stay") (emphasis added in each).

[2]   *See, e.g.,* Motion ¶ 2 ("when an Event of Default by LBSF occurs, such as its bankruptcy filing, … the termination payment due to LBSF will be ***changed*** to zero, … [and] the definition of Unwind Costs is ***modified*** such that LBSF will receive no termination payment.  The Court should declare that these contractual provisions constitute unenforceable *ipso facto* clauses that inappropriately effect a ***modification*** (indeed, here eradication) of a debtor's interest in a contract solely because of a bankruptcy filing …. Any attempt to ***modify*** LBSF's payment priority and its right to receive payments also violates the automatic stay"); *id.* ¶ 3 ("The ***modification*** of LBSF's payment priority and its right to receive termination payments and Unwind Costs solely as a result of its bankruptcy filing"); *id.* ("by ***changing*** LBSF's priority of payments and its right to receive payments, the clauses improperly ***modify*** LBSF's rights under the contracts solely because of its bankruptcy filing"); *id.* ("A broad construction of the safe harbors to permit a ***modification*** of LBSF's right to receive payments is … contrary to the terms of the statute"); *id.* ¶ 9 ("after an Event of Default by LBSF, such as the commencement of its chapter 11 case, the Supplemental Trust Deeds applicable to the Transaction Documents provide that LBSF's payment priority would ***change*** from 'Swap Counterparty Priority' to 'Noteholder Priority.'"); *id.* ¶ 11 ("under all of the transactions, Condition 44 of the Terms and Conditions of the Notes ***modifies*** the calculation of the Early Redemption Amount after an Event of Default"); *id.* ("Condition 44 ***modifies*** the definition of the term Unwind Costs after an Event of Default such as LBSF's chapter 11 filing"); *id.* ¶ 12 ("the Transaction Documents have the effect of providing that the payment priority LBSF otherwise receives under the Transaction Documents will be ***modified***, solely as a result of its bankruptcy filing"); *id.* ¶ 17 ("these provisions ***modifying*** LBSF's payment priority and its right to receive termination payments and Unwind Costs solely because of the commencement of its bankruptcy case are unenforceable"); *id.* ¶ 19 ("***modification*** of LBSF's right to receive payments solely as a result of its bankruptcy"); *id.* ("by ***changing*** LBSF's priority of payments and its right to receive termination payments and Unwind Costs, the transactions improperly ***modify*** LBSF's economic rights under the contracts solely because of its status as a debtor. Permitting ***modification*** of a debtor's right to receive any payment does not further the policy underlying the safe harbors …. Rather, it severely 11 punishes the debtor by ***modifying*** the economic terms of its agreement"); *id.* ¶ 20 ("the *ipso facto* clauses in the Transaction Documents ***modify*** LBSF's property interest in receiving payments solely as a result of its chapter 11 filing"); *id.* ¶ 23 ("provisions in the Transaction Documents ***modifying*** LBSF's right to priority of payment and its right

Thus, Aflac does not seek to alter any of LBSF's rights under the swap contracts as they existed before its chapter 11 case was commenced. Rather, it is Plaintiffs who ask this Court to disregard LBHI's prior bankruptcy filing and dramatically modify the agreements to give LBSF new rights to payments for which it did not bargain, that were never agreed to by the

to receive termination payments and Unwind Costs solely as a result of its chapter 11 filing constitute unenforceable *ipso facto* clauses"); *id.* ("[n]one of those exceptions apply here to permit the *modification* of LBSF's payment priority and its right to receive termination payments and Unwind Costs"); *id.* ¶ 33 ("By *modifying* LBSF's right to priority of payment and its right to receive termination payments and Unwind Costs solely because of the commencement of LBSF's chapter 11 case, the provisions in the Transaction Documents constitute unenforceable *ipso facto* clauses"); *id.* ("The Supplemental Trust Deeds, in turn, *modify* LBSF's right to be paid prior to the noteholders after the occurrence of an Event of Default by *modifying* the priority of payments provisions from 'Swap Counterparty Priority' to 'Noteholder Priority,' thus requiring payment be made to noteholders first"); *id.* ("Conditions 40 and 44 … further penalize LBSF and effect an improper forfeiture of the property of the estate by providing that the 'termination payment shall be deemed to be zero,' calculating the Early Redemption Amount to eliminate the payment of Unwind Costs otherwise payable to LBSF, and otherwise *modifying* the definition of Unwind Costs to LBSF's detriment – all solely because the Transaction Documents define LBSF's chapter 11 filing as an Event of Default"); *id.* ¶ 34 ("the provisions in the Transaction Documents that *modify* LBSF's rights under the priority of payment provisions and its right to receive termination payments and Unwind Costs are unenforceable *ipso facto* provisions"); *id.* ¶ 40 ("section 541(c)(1)(B) would still apply and protect LBSF's interest in the property of its estate from being *modified* solely as a result of its chapter 11 filing"); *id.* ¶ 46 ("By *changing* LBSF's payment priority and its right to receive termination payments and Unwind Costs, the clauses improperly *modify* LBSF's economic rights under the contract and deprive it of a valuable property interest solely as a result of its bankruptcy filing"); *id.* ("By *modifying* LBSF's payment priority, providing that LBSF's termination payment is zero, *altering* the calculation of the Early Redemption Amount to exclude LBSF's Unwind Costs, and *changing* the definition of Unwind Costs to LBSF's detriment, LBSF's property interests are being forfeited because of 'the commencement of a case under this title.'"); *id.* ¶ 47 ("the Bankruptcy Code's safe harbors as a matter of law do not protect *modification* of the payment provisions here"); *id.* ¶ 63 ("allowing Beryl to *modify* (1) LBSF's payment priority, (2) the amount of the termination payment due, (3) the calculation of the Early Redemption Amount, and (4) the definition of Unwind Costs to LBSF's detriment in the Supplemental Trust Deeds could lay a precedent of permitting the enforcement of such provisions as a uniform matter"); *id.* ¶ 64 (referring to "Beryl's inability to enforce the modification provisions against LBSF"); *id.* ("The terms Aflac seeks to enforce do not preserve the positions of the parties as of the commencement of LBSF's bankruptcy case, but rather *drastically alter* the economic position and contractual rights of the debtor upon it seeking protection under the Bankruptcy Code"); *id.* at 36 n.14 ("LBSF does not question the validity of the termination notice itself, but rather the enforceability of the *modification* provisions that were triggered by the termination notice"); *id.* ¶ 66 ("section 362(b)(17) is an exception to the reach of the automatic stay and is not relevant here if the *modifications* are void as unenforceable *ipso facto* clauses that do not fall within the safe harbor exceptions of section 560"); *id.* ¶ 67 ("to permit Beryl to *modify* LBSF's payment priority, *change* the economic terms of the transaction, reduce the termination payment due to LBSF to zero, *alter* the calculation of the Early Redemption Amount to deprive LBSF of Unwind Costs, and *modify* the definition of Unwind Costs such that LBSF will receive no termination payment, would be in sharp contrast to traditional jurisprudence interpreting the Safe Harbor Provisions"); *id.* ¶ 68 ("where Beryl seeks to *alter* the economics of the transaction and completely deprive LBSF of payment, these purported *modifications* are clearly outside the stated and intended protections … [of] the Safe Harbor Provisions"); *id.* ¶ 69 (referring to "the provisions in the Swap Agreement modifying" LBSF's contract rights) (emphasis added in each).

parties, and which did not exist when LBSF filed for bankruptcy. Nothing in the law or equity even remotely supports such a result.

Plaintiffs argue that, if the Court rules against them on the issues presented here, "[t]he loss to the estate under hundreds of similar transactions could, according to estimates by LBSF, add up to in excess of $8 billion." (Motion ¶ 1) While Plaintiffs offer no evidence, much less undisputed evidence, to support the claimed amount, there is no doubt that the values involved in the swaps Lehman structured, sponsored and marketed all over the world are huge. But if those swaps are enforced by their terms, and in accordance with the safe harbors that Congress provided in the Bankruptcy Code, Lehman, which received substantial income and profits from the transactions it now seeks to rewrite and related activities, will have received exactly what it bargained for; the only parties who will have lost anything are those investors who, like Aflac, fully paid for the collateral backing the swaps and have seen their collateral devalued at least in part due to the Lehman bankruptcy, and who have now gone for more than a year – and counting – without receiving any interest on the highly-rated investments they bought from Lehman. Plaintiffs are in no position to argue the equities here.

Moreover, if the impact of rulings in this case on transactions not directly here in issue is to be considered, the Court should note that the global market for collateralized debt obligations is estimated to be in the hundreds of billons of dollars or more,[3] and Fitch, one of the primary rating agencies for these products, has announced that "[r]atings on global structured finance transactions with material derivative exposure to U.S. based counterparties may be adversely affected by pending litigation related to the Lehman Brothers bankruptcy filing …. The

---

[3] *See* Tom Freke, *Securitisation Yet To Recover From Lehman Fall*, Reuters News, Aug. 27, 2009, available at http://uk.reuters.com/article/ idUKLNE57R00Q20090828, Exhibit A to the October 23, 2009 supplemental transmittal declaration of Robert A. Weber filed herewith (cited as "Supp. Weber Decl.").

outcomes of the court cases in favour of Lehman will have clear rating implications for synthetic CDOs and other similar securitizations[.]"[4]  In other words, investors in such products involving U.S. swap counterparties could see the ratings downgraded and, whether or not downgraded, their investments devalued if the market perceives that the express contractual risk protections will not be honored by their terms in the U.S. courts.

Aware of the possibility of such consequences and the importance to U.S. institutions and investors of the global financial instruments and derivatives markets, Congress enacted the Bankruptcy Code safe harbors to protect the financial markets and their participants from the volatility that could cause heavy losses if swaps and other financial contracts could not be promptly closed out and settled due to a counterparty bankruptcy.[5]  Plaintiffs' arguments flatly contradict the clear statutory language and unambiguous Congressional intent and, therefore, should be rejected.  Instead, the Court should confirm the safe harbor protections for credit swaps mandated by Congress, deny Plaintiffs' Motion, and grant summary judgment to Aflac on its cross-motion for summary judgment permitting distribution of the collateral in accordance with the parties' express agreements.

## I.      STATEMENT OF FACTS

### A.    Introduction

At issue here are four credit default swap transactions (the "Credit Default Swap Agreements") entered into between January 2007 and July 2008.[6]  Each Credit Default Swap

---

[4]  August 14, 2009 Fitch Ratings press release entitled *Lehman Legal Challenge May Have Varying Impact on Global Structured Finance* (available at http: //www.fitchratings.com/creditdesk/press_releases/ de-tail.cfm?print=1&pr_id=503977 8/25/2009) (Supp. Weber Decl. Ex. B).

[5]  *See, e.g.*, H.R. Rep. No. 101-484, 101st Cong., at 2 (1990).

[6]  Copies of the transaction documents are attached as Exhibits 1-18 to the August 4, 2009 transmittal declaration of Robert A. Weber filed in support of Aflac's motion for summary judgment [D.I. 32] (cited as "Weber Decl.").

Agreement is a "credit swap" under Bankruptcy Code section 101(53B)(A)(i)(VI)[7] and is referred to in the market as a "credit default swap."  Aflac, the sole investor in the Credit Default Swap Agreements, paid more than $240 million and, in return, received interest-bearing notes (the "Aflac Notes") from the nondebtor swap counterparty, Beryl Finance Limited ("Beryl"), a Cayman Islands company set up by a Lehman affiliate for these types of transactions.  Aflac's investment was used by Beryl to purchase the securities which Beryl holds as collateral.

LBSF, a party to the swap agreements, filed its chapter 11 case on October 3, 2008.  However, several weeks before that, on September 15, 2008, LBHI,  which provided credit support and guaranteed LBSF's performance under the swap agreements, filed its own chapter 11 petition, which constituted an event of default under section 5(a)(vii) of the ISDA Master Agreements (defined below) that are part of the Credit Default Swap Agreements.[8]  Thus, if LBSF's rights under the swaps were "modified" or "changed," as Lehman argues, that occurred as a result of a separate default well before its own bankruptcy filing.[9]  This entitled Beryl to terminate the swap agreements and Aflac to receive the collateral supporting them.

---

[7]     Section 101(53B)(a)(i)(VI) provides that a "swap agreement" is "any agreement, including the terms and conditions incorporated by reference in such agreement, which is … a total return, credit spread or credit swap, option, future, or forward agreement …."

[8]     This Court already has held that the LBHI filing was an event of default under the ISDA Master Agreements to which Lehman was a party.  *See* Debtors' Motion Pursuant To Sections 105(a), 362 And 365 Of The Bankruptcy Code To Compel Performance Of Metavante Corporation's Obligations Under An Executory Contract And To Enforce The Automatic Stay (D.I. 3691 in Case No. 09-13555 (JMP)).  In its September 15, 2009 bench ruling on the motion to compel in the Metavante matter, the Court stated:

> It is clear that the filing of bankruptcy petitions by LBHI and LBSF constitute events of default under the Agreement. Specifically, Section 5(a)(vii) of the Agreement provides that it shall constitute an event of default should a party to the Agreement or any credit support provider of such party institute a proceeding seeking a judgment of insolvency or bankruptcy, or any other relief under any bankruptcy insolvency law or similar law affecting creditors' rights.

Transcript of Hearing, dated September 15, 2009, at 108: 12-19 (D.I. 5261).

[9]     Plaintiffs' Motion ignores the LBHI bankruptcy filing as a separate triggering event of default.

Accordingly, on October 10, 2008 (the "Early Termination Date"), Beryl terminated the swaps by delivering termination notices to LBSF. Beryl's termination notice identified each of the bankruptcy filings by LBHI and LBSF as discrete events of default. But one year later, solely because of Plaintiffs' improper threats and the subsequent filing of this lawsuit, Beryl still has not redeemed the Aflac Notes or caused the distribution of any of the underlying collateral to Aflac as required under the security arrangement for the Credit Default Swap Agreements.

The parties agree that the ***material*** facts here at issue – *e.g.*, the applicable agreements comprising the Credit Default Swap Agreements and related security arrangements, the existence of the events of default thereunder, and the termination of the transactions under the Credit Default Swap Agreements – are undisputed.[10] Accordingly, the issues presented are matters of law ripe for disposition on summary judgment under Fed. R. Civ. P. 56.

### B.    Procedural Posture

Plaintiffs filed their complaint against Aflac and the Trustee on June 3, 2009, docket item (hereafter, "D.I.") 1 ("Plaintiffs' Complaint"). Aflac filed an answer and counterclaim on June 15, 2009, a First Amended Answer and Counterclaim on July 2, 2009, and a corrected version of the same with consent of the parties on July 7, 2009, D.I. 16 (as amended and corrected, "Aflac's Counterclaim"). Also on July 7, 2009, the Trustee filed an answer and counterclaim, D.I. 12 ("Trustee's Counterclaim"). Plaintiffs filed their answer to Aflac's Counterclaim on July 13, 2009, D.I. 20 ("Plaintiffs' Answer"). On August 4, 2009, Aflac filed a motion for

---

[10]    While certain of the contract documents Plaintiffs attached to their Complaint and continue to refer to in their Motion are not the correct documents for the Aflac transactions, they appear to be substantially identical. In any event, the correct Transaction Documents are those attached to the Weber Declaration referred to in n.6, *supra*.

summary judgment. On September 25, 2009, Plaintiffs filed their Motion seeking summary judgment on Plaintiffs' claims in the Complaint.

### C. The Credit Swap Transactions

#### 1. Transaction documents

Each of the four Credit Default Swap Agreements and the related tranche of Aflac Notes is structured and documented similarly and consists of seven primary components, as follows:

      (i)      the Credit Default Swap Agreement;[11]

      (ii)      the Reference Portfolio (as defined below) for the swap transaction, identified in the Confirmation under the Credit Default Swap Agreement;

      (iii)      credit enhancements and support from Lehman for the benefit of Beryl and, consequently, Aflac as the holder of the Aflac Notes;[12]

      (iv)      the related Aflac Notes issued to Aflac by Beryl;[13]

      (v)      the Terms and Conditions of the Notes;[14]

---

[11]    The documents for each Credit Default Swap Agreement, identified in a series prospectus for the respective tranche of Notes (the "Series Prospectus") (Weber Decl., Exs. 7, 10, 13 and 16), are the 1992 International Swaps and Derivatives Association, Inc. Master Agreement between LBSF and Beryl (the "ISDA Master Agreement") (Weber Decl., Exs. 8, 11, 14 and 17), the Schedule to the ISDA Master Agreement (the "Schedule") (Weber Decl., Exs. 9, 12, 14 and 18), and the Credit Support Annex to the Schedule (the "Credit Support Annex") and the confirmation of the credit default swap transaction (the "Confirmation"); the forms of paragraph 11 of the Credit Support Annex and of the Confirmation are included in each Series Prospectus (Weber Decl., Ex. 7, 10, 13 and 16 ). Each Credit Default Swap Agreement also incorporates and is subject to the Conditions (as defined below). *See* Part 5(g) of each Schedule. (Weber Decl., Exs. 9, 12, 14 and 18 ).

[12]    These are LBHI's unconditional guaranty of all of LBSF's obligations under or relating to the Credit Default Swap Agreement (the "Guaranty"), and LBSF's obligation to transfer additional cash or securities (the "LBSF Credit Support") to Beryl as specified in the Credit Support Annex that is part of each Credit Default Swap Agreement. The form of the LBHI Guaranty appears in each Series Prospectus. (*See* Weber Decl., Ex. 7 at 80-81; Ex. 10 at 80-81; Ex. 13 at 80-81; Ex. 16 at 80-81).

[13]    The Aflac Notes are (i) the Series 2006-15 Tranche A JPY5,000,000,000 Synthetic Portfolio Notes Due 2016, (ii) the Series 2007-5 Tranche A JPY5,000,000,000 Synthetic Portfolio Notes Due 2017, (iii) the Series 2007-14 Tranche A JPY7,500,000,000 Synthetic Portfolio Notes Due 2017, and (iv) the Series 2008-7 Tranche A JPY10,000,000,000 Synthetic Portfolio Notes due 2018.

(vi)  the Collateral, as specified and defined in the respective Series Prospectus and consisting of highly-rated debt obligations purchased by Beryl with the proceeds of Aflac's investment; and

(vii)  a security arrangement among the Trustee, Beryl and LBSF (the "Security Arrangement").[15]

## 2.  Transaction Structure

Each Credit Default Swap Agreement and the related tranche of Aflac Notes and Security Arrangement together constitute an investment product known as a "credit-linked note" or "synthetic collateralized debt obligation," the market for which developed in the late 1990s and burgeoned from 2004 through 2007.[16]  Among other reasons, the product was desirable to investors because, by combining a credit derivative with structured finance techniques, it af-

---

[14]  These are the base conditions set forth in Schedule 2, Part C of the Principal Trust Deed (Weber Decl., Ex. 5-6), as modified and supplemented by the series-specific Terms and Conditions of the Notes set forth in the respective Series Prospectus (Weber Decl., Exs. 7, 10, 13, 16) (collectively, the "Conditions").  The Principal Trust Deed was initially entered into as of October 10, 2002 by the Trustee and Dante Finance Public Limited Company.  Beryl is a party with respect to particular tranches of notes that it issues.  The terms of the Principal Trust Deed (as in effect on the date referred to in the relevant Supplemental Trust Deed) are incorporated by reference in, and supplemented and modified by, the terms of the Supplemental Trust Deed for each tranche of the Aflac Notes.  (Weber Decl., Ex. 1 at 3; Ex. 2 at 3; Ex. 3 at 4; Ex. 4 at 3).  The Series Conditions are set forth at pp. 5-22 of each Series Prospectus.  (Weber Decl., Ex. 7 at 5-22; Ex. 10 at 5-22; Ex. 13 at 5-22; Ex. 16 at 5-22.  *See also Perpetual Tr. Co., Ltd., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009] W.L.R. (D) 262 (Ch. 2009).  (Weber Decl., Ex. 22, at 4, 7).  In that recent decision of the English High Court of Justice, the court construed documents substantially similar to those governing Aflac's transactions, and confirmed that the "Terms and Conditions of the Notes" specific to a series are those attached to the related Series Prospectus.

[15]  The Security Arrangement is embodied in a Supplemental Trust Deed and Drawdown Agreement among Beryl, the Trustee, LBSF and others (the "Supplemental Trust Deed") which incorporates by reference the relevant Principal Trust Deed (the Principal Trust Deed, as modified and supplemented by the Supplemental Trust Deed, the "Trust Deed").  (Weber Decl., Ex. 1 at 3; Ex. 2 at 3; Ex. 3 at 4; Ex. 4 at 3)  The Security Arrangement, among other things, provides for the pledge of the Collateral to the Trustee to secure Beryl's obligations to the holder of the Aflac Notes and to LBSF under the Credit Default Swap Agreement, and incorporates the Conditions.

[16]  *See, e.g.*, "Global CDO Market Issuance Data," prepared by the Securities Industry and Financial Market Association (citing Thomson Financial), *available at* http://www.sifma.org/research/pdf/CDO_Data2008-Q4.pdf (last accessed  Oct. 22, 2009).  The figures given for synthetic funded CDOs (like the Credit Default Swap Agreements and the Aflac Notes), rounded to the nearest hundred million dollars, are $37.2 billion in 2004, $65 billion in 2005, $66.5 billion in 2006, $48.5 billion in 2007 and $1.2 billion in 2008.  *Id.* at 1.

forded the opportunity to invest in a diversified portfolio for a specified term by acquiring a single, rated, fixed-income obligation, to do so in a short time with relative ease of execution, and to earn a higher yield than for a direct investment in the reference securities.[17]  The motivations for those who provided the products (like Lehman) differ by institution, but include hedging other activities, acting as intermediary on offsetting trades and taking positions as principal, and earning fees, spreads and other profits from those and related trading activities, such as selling the securities that collateralized the swaps.[18]

LBHI, together with its subsidiaries, was a market leader for these products, other types of collateralized debt obligation structures ("CDOs"), and other sophisticated structured products combining credit derivatives and structured finance techniques.[19]  The transactions in which Aflac invested were structured and privately placed by a Lehman affiliate, Lehman Brothers International Europe ("LBIE"),[20] and were structured to, and did, receive the highest, long-

---

[17]  *See generally* Arnaud De Servigny & Norbert Jobst, *The Handbook of Structured Finance*, 379-90 (2007).

[18]  *See* De Servigny & Jobst, *supra* n.17, at 385-86; *see also*, Satyajit Das, *Credit Derivatives, CDOs and Structured Credit Products*, 308, 407-8, 729-30 (3d ed. 2005).

[19]  *See, e.g.*, Lehman Brothers 2006 Annual Report (Weber Ex. 19) at 86:  "We are a market leader in mortgage- and asset-backed securitizations and other structured financing arrangements."  The Lehman Brothers 2007 Annual Report (Weber Ex. 20) at 103 notes that from 2006 to 2007 the total value of pledged collateral in special purpose entities involved in credit-linked notes relating to swaps of LBSF and affiliates grew from $10.8 billion to $15.7 billion.

[20]  Plaintiffs acknowledge that LBIE "created the Dante program" and drafted the Transaction Documents here in issue, but they contend that the identity of the drafter of a contract is irrelevant for bankruptcy purposes, citing *Official Comm. of Unsecured Creditors v. American Tower Corp. (In re Verestar)*, 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006).  (Motion at 12, n. 6)  One wonders why the case was cited, since in it, Judge Gropper never discussed or considered the relevance *vel non* of the identity of the drafter of the contract.  Here, the fact that Plaintiffs and their affiliate structured, drafted, marketed, sold and profited handsomely from the very financial products whose terms they now seek to disavow is plainly relevant.  Such highly inequitable conduct lies at the core of Aflac's affirmative defenses – unclean hands, equitable estoppel, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.  Thus, even if there were some merit to the contentions in the Motion, and there is not, Plaintiffs would not be entitled to summary judgment on their affirmative claim as a matter of law because of their inequitable conduct.

term debt rating ("AAA") assigned by Standard & Poor's ("S&P") for three of the tranches, and an S&P rating of "AA" for the fourth.[21]

A credit default swap is a bilateral financial contract in which one party (in this case, LBSF) makes periodic payments to another party (in this case Beryl) in exchange for a contingent payment if a specified credit event occurs to one or more referenced entities or securities; this is called "buying" and "selling" credit protection.[22]  The party selling protection (Beryl) is effectively investing in those specified entities or securities and taking the risk of their default.[23]  Credit default swaps and the note investments based on them can be structured with widely varying degrees of risk.[24]  When the swap is linked to a highly-rated, low-yielding note, such as the Aflac Notes, the investor expects to receive timely payments of interest and full principal at maturity, and the structures are designed by their promoters (like Lehman) and the rating agency to meet those expectations.[25]

Under each Credit Default Swap Agreement, LBSF and Beryl agreed to exchange certain payments based upon a hypothetical portfolio of corporate bonds that neither party was required to own (the "Reference Portfolio").  Each Reference Portfolio was comprised of the debt obligations of 100+ large companies ("Reference Entities").  Each tranche of Aflac Notes corresponds to a related Credit Default Swap Agreement, and the payment of interest and principal on the Aflac Notes depends upon the performance of the corresponding Reference Portfolio.  On

---

[21]   *See* page 2 of each Series Prospectus.  (Weber Decl. Exs. 7, 10, 13, 16)

[22]   *See Eternity Global Master Fund Ltd.  v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 172-73 (2d Cir. 2004).

[23]   *See* De Servigny & Jobst, *supra* n.17, at 419.

[24]   *Id*. at 383-84.

[25]   *See, e.g.*, Standard & Poor's, "Structured Finance Ratings, Criteria for Rating Synthetic CDO Transactions," September 2003, at 10, *available at* http://www2.standardandpoors.com/spf/pdf/fixedincome syntheticcriteria_092004.pdf?vregion=us&vlang=en (last accessed Oct. 22, 2009).

each quarterly payment date, LBSF had to make a payment (the "Fixed Amount") to Beryl for the credit protection it had purchased.  The Fixed Amount is calculated as a percentage of the swap notional amount, which is the same as the principal amount of the Aflac Notes, and Beryl used these payments by LBSF to pay interest to Aflac under the Aflac Notes.  LBSF was entitled to receive the periodic interest earned on the Collateral pledged by Beryl.

Other than LBSF Credit Support when applicable, the Collateral for each transaction - which was purchased with Aflac's investment - was the sole source of payment by Beryl for both its obligations to LBSF and the repayment of principal on the Aflac Notes.  Each swap transaction had a specified amount of losses that could occur in the Reference Portfolio, due to credit events with respect to Reference Entities, before any losses would be incurred by Beryl (and, by extension, the holder of the Aflac Notes).  This specified loss threshold is typically referred to in the synthetic CDO market as the "tranche attachment point."  If losses in the Reference Portfolio exceeded the tranche attachment point during the term of a swap transaction,[26] any further losses would reduce (dollar-for-dollar) the notional amount of the relevant Credit Default Swap Agreement and the principal balance payable on the related Aflac Notes at maturity or early termination, as well as the interest payable in the meantime.  However, if losses did not reach the tranche attachment point, there would be no writedown of the Aflac Notes, Beryl would not be required to make any loss payments, and Aflac would be entitled to receive full repayment of principal at the maturity of the Aflac Notes.  In fact, losses under all of the swap transactions here were, at termination, and continue to be, significantly below the tranche attachment point.

The scheduled termination of the respective swap transactions corresponded with the maturity of the Aflac Notes.  The final exchange was to be the payment by LBSF to Beryl of

---

[26] The "term" of the Credit Default Swap Agreement is from the date of the Confirmation (also the date of the issuance and purchase of the related Aflac Notes) to the scheduled maturity date or – as occurred for the swap agreements here – the date of early termination.

the outstanding principal amount of the Aflac Notes (reflecting any principal write-down caused by losses above the tranche attachment point, had that occurred), in return for the transfer by Beryl to LBSF of the redemption proceeds of the Collateral, which generally was selected to mature shortly before the Aflac Notes. The contract provisions described below requiring LBSF to post LBSF Credit Support, as well as application of the LBSF Credit Support to the "Unwind Costs," were designed to achieve the equivalent outcome for Beryl (and thereby the holder of the Aflac Notes) as would have occurred at maturity, if instead the swap transactions terminated early due to an LBSF default. Specifically, those provisions were to shield Beryl from the market value and currency exchange risks that could arise if the Collateral had to be sold before maturity as a result of early termination of the swap transaction due to a default by LBSF.

   As is customary in swap transactions, each Credit Default Swap Agreement provided that if either Beryl or LBSF defaulted under that agreement, the non-defaulting party could terminate the swap transaction. If a swap transaction was terminated early by LBSF due to a default by Beryl, then LBSF or Beryl, as applicable, would have owed a payment (the "Termination Payment") equal to the cost or gain to the non-defaulting party if it were to enter into an equivalent swap transaction on the date of termination. This type of valuation is called a "mark-to-market" determination. However, if LBSF is the defaulting party, the Conditions provide that neither party owes a termination payment: "such termination payment ***shall be deemed to be zero*** in the event that the [Credit Default Swap Agreement] is terminated due to the occurrence of an Event of Default … where [LBSF] is the Defaulting Party" (the "Termination Payment Provision"). (*See* Series Condition 40, clause (iii), Weber Decl., Ex. 7 at 16; Ex. 10 at 16; Ex. 13 at 15-16; Ex. 16 at 16) (emphasis added).

Under each Credit Default Swap Agreement, the specified events of default with respect to LBSF include (i) failure to pay amounts due, (ii) filing for bankruptcy or becoming insolvent, including a filing by LBHI, and (iii) failure to comply with any other agreement or obligation under the ISDA Documents.[27]  Accordingly, if LBSF had breached a provision that did not relate to its insolvency or financial condition (and indeed, it did by failing to make the payments due in September after LBHI's filing), it still would have been subject to termination without any Termination Payment.[28]  Thus, the Termination Payment Provision was not based upon or triggered solely by LBSF's bankruptcy event, nor was it designed to be punitive.[29]  Ra-

---

[27]  These are the Events of Default specified in Section 5(a) of the ISDA Master Agreement, clauses (i), (ii) and (vii), and made applicable to LBSF in the Schedule.

[28]  Similarly, the Supplemental Trust Deed, in section 5.5, provides for LBSF's payment rights to be subordinated to the holder of the Aflac Notes (this is referred to as the "Noteholder Priority") not only if an Event of Default had occurred, but also if there was a "Tax Event" where LBSF is the sole "Affected Party."

> 5.5     **Application of Moneys Received**:  the Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:
>
> Swap Counterparty Priority unless (i) an Event of  Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), in which case Noteholder Priority shall apply.

(*See* Weber Decl., Ex. 1 at 5; Ex. 2 at 5; Ex. 3 at 5-6; and Ex. 4 at 7, § 5.6).  Because no Termination Payment is payable to LBSF, and the respective tranche attachment points were never reached, there are no amounts owed to LBSF under the Credit Default Swap Agreements to be subordinated to the Aflac Notes.  Therefore, although the Noteholder Priority applies with effect from the LBHI filing, the distinction between Swap Counterparty Priority and Noteholder Priority is without consequence in this case.

[29]  Nor was Aflac's exercise of its termination rights punitive, considering the position in which it would have been indefinitely had it *not* terminated the swaps:  (i) Aflac would not get its bargained for interest; (ii) the defaulted notes would cause Aflac to recognize substantially higher capital charges; (iii) Aflac would be exposed to the risk of continued decline in the value of its collateral, and without the cushion that was supposed to have been provided by the bargained for additional credit support; and (iv) Aflac would be stuck with a swap counterparty and guarantor in bankruptcy, with all the attendant delay, uncertainty and expense.  In fact, given Lehman's unjustified actions to block Aflac's exercise of its contractual rights, Aflac already has suffered those consequences for more than a year.  Thus, Aflac terminated the swaps not opportunistically to get a windfall, since it expected to receive back all of its principal at maturity anyway, but, rather, as a rational effort – some might say it was Aflac's only choice – to get out of a bad situation and reinvest its funds.

ther, it was necessary to protect the special purpose note issuer so that high investment grade ratings could be assigned to the structures, as discussed below.

The Termination Payment Provision, or its substantive equivalent, is customary in swap transactions between institutional counterparties, such as LBSF, and special purpose entities, such as Beryl, whose securities, such as the Aflac Notes, are to receive an investment grade rating; indeed, as Lehman has acknowledged to this Court, such provisions are required by the rating agencies in order to achieve the investment grade rating that was so helpful to Lehman in marketing these transactions to investors.[30] These provisions are part of the web of structural features and conditions required by the rating agencies to protect special purpose issuers of rated debt securities from the counterparty risk that could arise due to default by the institutional counterparty.[31] The most immediate impact of a default by the institutional counterparty would be the interruption in cash flows (the Fixed Amounts) necessary to keep the rated notes from defaulting, which in itself is an unacceptable risk for securities receiving the highest ratings by the rating agencies.[32] But the primary risk these provisions address is that a default by such an institutional

---

[30]  *See Lehman Brothers Special Financing, Inc. v. Harrier Finance Limited*, Adv. Case No. 09-01241, Sept. 17, 2009 hearing transcript at 22 (Lehman counsel:  "provisions like this are put in only at the behest of the rating agency") (excerpt attached as Supp. Weber Decl. Ex. C)  Thus, notwithstanding Plaintiffs' labored exposition of "standard" practices for plain vanilla interest rate swaps (*see* Motion at 33-35), not structured finance transactions like the Aflac swaps, they know perfectly well that the provisions here in issue *are* the standard in the structured finance market.

[31]  *See generally* Standard & Poor's, Structured Finance Ratings, Criteria for Rating Synthetic CDO Transactions, *supra* n.25; Moody's Investors Services, Moody's Approach to Rating Corporate Collateralized Synthetic Obligations, Apr. 24, 2009, available at http://www.moodys.com/moodys/cust/research/MDCdocs/20/2007400000590359.pdf?search=5&searchQuery=Moody (last accessed Oct. 22, 2009); Fitch Ratings, Global Rating Criteria for Synthetic CDOs, March 2009, available at http://www.fitchratings.com/creditdesk/reports/report_frame.cfm?rpt_id=428408 (last accessed Oct. 22, 2009).

[32]  Standard & Poor's, *supra* n.25, at 31.

swap counterparty would expose the special purpose entity (and the holder of the notes issued by that entity) to a mark-to-market of the swap transaction.[33]

A mark-to-market of a credit default swap reflects the market view, at a given time, of the likelihood, timing and severity of losses that may occur in a reference portfolio, as well as other relevant factors, such as interest rate and currency exchange risks. It is only a fore-cast based on a financial model, market conditions and available data and may be subject to extreme volatility due to intangibles such as prevailing mood or breaking news. The valuation models used to provide quotes in the swap markets are not crystal balls, and the loss probabilities that may be perceived at one time do not necessarily translate into actual losses – unless, of course, the investor is required to make a mark-to-market payment at that time. That is the fundamental and important reason for provisions, like the Termination Payment Provision, designed to insulate special purpose issuers of rated debt (and their noteholders) from defaults by the institutional counterparties: to prevent exposure to larger, potentially substantially larger, losses than those that might ever actually occur in the reference portfolio.

That is exactly the situation facing Beryl and, therefore, Aflac. The mark-to-market valuation of the swaps here at issue moved significantly in Plaintiffs' favor following the LBHI bankruptcy filing, likely as a result of dramatic moves in the financial markets as a direct result of the filing itself. Nevertheless, although the market conditions prevailing since Lehman's filing are the most adverse in many decades, actual credit losses under the swap transactions were at the time of termination, and are now, significantly less than the respective tranche attachment points.

---

[33] Standard & Poor's, *supra* n.25, at 33 ("The termination payment must therefore either be sized or subordinated to the rated noteholders in the priority of payments unless termination is caused due to default of the SPE, or in the case of a credit event where the SPE is the sole affected party. The alternative is to eliminate the responsibility to make such a payment[.]"); *see also* Moody's Investors Services, *supra* n.23, at 13; Fitch Ratings, *supra* n.23, at 12.

Because Plaintiffs' bankruptcy filings resulted in an LBSF event of default and an early termination of the Credit Default Swap Agreements, the amount of each Termination Payment was zero. Beryl became obligated under Base Condition 6(d)(ii) and Series Condition 38 to redeem the Aflac Notes. (Weber Decl., Ex. 5 at 81 (Base Condition 6(d)(ii)), Ex. 6 at 82 (Base Condition 6(d)(ii)), Ex. 7 at 11-12 (Series Condition 38), Ex. 10 at 11-12 (Series Condition 38), Ex. 13 at 11-12 (Series Condition 38), and Ex. 16 at 11-12 (Series Condition 38)). In an early redemption, Aflac is entitled to receive the outstanding principal and interest on the Aflac Notes (the "Early Redemption Amount"), up to the amount of the property held by Beryl after payment of the Trustee's fees and expenses. The early redemption is funded from the liquidation proceeds of the Collateral (or, at the election of the holder of the Aflac Notes, from the physical delivery of the Collateral) and other funds available to Beryl. In particular, where LBSF Credit Support has been provided, it is to be applied to cover the "Unwind Costs" component of the Early Redemption Amount which, in the circumstances applicable here, is deemed to be an amount payable to Beryl equal to any shortfall in the value of the Collateral relative to the aggregate outstanding principal of the Aflac Notes.[34]

### 3.    Termination of the swap transactions

Section 5(a)(vii) of the ISDA Master Agreement that is part of the Credit Default Swap Agreements provides that a bankruptcy filing by LBSF, the party to the agreements, or by LBHI, a "Credit Support Provider" under the agreements, is an event of default (the "Bankruptcy Termination Provision"). (*See, e.g.*, Weber Decl., Ex. 8 at 6-7; Ex. 11 at 6-7; Ex. 14 at 6-7; Ex. 17 at 6-7) Plaintiffs admit that their respective bankruptcy filings constituted separate events of default. (Aflac's Counterclaims and Plaintiffs' Answer ¶ 32) However, in their Motion, other

---

[34]    *See* Series Condition 44, Weber Decl., Ex. 7 at 19-21; Ex. 10 at 19-21; Ex. 13 at 19-21; Ex. 16 at 19-2.

than acknowledging that LBHI filed its chapter 11 case on September 15, 2008 (Motion ¶ 6), two and a half weeks before LBSF filed, Plaintiffs completely ignore that the LBHI filing was, in and of itself, an event of default that triggered the swap provisions requiring that the Termination Payment would be zero and that the Noteholder Priority (discussed below) would apply.

Accordingly, Beryl had the right to, and did, validly terminate the swap transaction on October 10, 2008 (the "Termination Notice"). (Weber Decl., Ex. 23) This too is undisputed. (Motion at 3, n.2: "LBSF does not dispute the validity of Beryl's termination itself")

### 4. Noteholder Priority

If, as occurred here, there is an event of default as to which LBSF is the defaulting party, section 6.2 of the Principal Trust Deed[35] and section 5.5 of the Supplemental Trust

---

[35] Section 6.2 of each Principal Trust Deed provides in pertinent part as follows:

**Application of Moneys Received:** Subject to the provisions of each relevant Supplemental Trust Deed and sub-Clause 6.3, the Trustee shall apply all moneys received by it under this Principal Trust Deed and the relevant supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any Other Security document as follows:

    (i)    if "**Swap Counterparty Priority**" is specified in the relevant Supplemental Trust Deed:

    (A)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

    (B)    secondly, in payment or satisfaction of the fees costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent and/or the Custodian;

    (C)    thirdly, rateably in meeting the claims (if any) of the Swap Counterparty [*i.e.*, LBSF] under each Swap Agreement;

    (D)    fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

    (E)    fifthly, in payment of the balance (if any) to the issuer,

\* \* \*

Deed[36] applicable to each of the Credit Default Swap Agreements expressly provide that LBSF's payment rights, if any, are subordinated to those of the holder of the Aflac Notes. Because LBHI's bankruptcy filing on September 15, 2008 constituted an event of default, the Noteholder Priority was triggered at that time, and was in effect when LBSF filed its separate bankruptcy case nearly three weeks later.[37]

---

               (iii)     If "**Noteholder Priority**" is specified in the relevant Supplemental Trust Deed:

                     (A)     first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realizing any security and the Trustee's remuneration);

                     (B)     secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

                     (C)     ***thirdly, rateably in meeting the claims (if any) of the holders of Notes***, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

                     (D)     fourthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

                     (E)     fifthly, in payment of the balance (if any) to the issuer.

(Weber Decl., Ex. 5 at 11; Ex. 5 at 65; Ex. 6 at 12; Ex. 6 at 66) (emphasis added).

[36] Section 5.5 of each Supplemental Trust Deed (except for the Supplemental Trust Deed pertaining to the Series 2007-14 Tranche A JP47,500,000 Synthetic Portfolio Notes, where the pertinent provision is section 5.6) provides as follows:

> **Application of Moneys Received**: the Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the mortgaged Property as follows:

> Swap Counterparty Priority unless (i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (a defined in the ISDA Master Agreement), in which case Noteholder Priority shall apply.

(Weber Decl., Ex. 1 at 5; Ex. 2 at 5; Ex. 3 at 5; Ex. 4 at 6).

[37] The Unwind Costs provision also provides, *inter alia*, that no Termination Payment will be payable to a defaulting swap counterparty, Beryl will receive any shortfall between the principal amount of the Aflac Notes and the value of the Collateral, and the LBSF Credit Support is to be available for the payment of any such shortfall.

### 5. Unpaid fixed amounts and deficiencies in LBSF Credit Support

LBSF was required to make quarterly "Fixed Amount" payments to Beryl. Plaintiffs acknowledge this Obligation. (*See* Aflac's Counterclaims and Plaintiffs' Answer ¶ 54) LBSF paid these Fixed Amounts through June 2008, but did not make the payments due in September 2008 or for the partial payment period thereafter until the Early Termination Date. Plaintiffs do not deny that these payments were required, were not made and were guaranteed by LBHI. (*Id.*)

Additionally, under the Credit Support Annex, when LBHI's short-term rating by S&P fell below a specified level, LBSF was required to transfer LBSF Credit Support sufficient (taken with the Collateral) for Beryl to satisfy the Aflac Notes upon an early termination.[38] Pursuant to the Guaranty, LBHI guaranteed LBSF's obligation to transfer LBSF Credit Support. Plaintiffs admit that well before LBHI filed its chapter 11 petition, it was downgraded below the level specified in two of the Credit Default Swap Agreements and, therefore, LBSF became obligated to, and did, transfer LBSF Credit Support under those agreements. (*See* Aflac's Counterclaims and Plaintiffs' Answer ¶ 56)

---

This provision also is expressly triggered by an event of default under the Credit Default Swap Agreement, and thus was in effect when LBSF filed its separate bankruptcy case:

> The Unwind Costs shall be deemed to be an amount payable by the Swap Counterparty to the Issuer equal to the absolute value of the Aggregate Outstanding Principal Amount minus an amount in JPY equivalent to the proceeds from the sale or realisation of the Collateral (only if such calculation is positive) **if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement)**; provided that such Unwind Costs shall be paid from the Credit Support Balance under the Credit Support Annex and to the extent that the Credit Support Balance is available to cover such Unwind Costs.

Condition 44 (Weber Decl., Ex. 7 at 21-22; Ex. 10 at 21; Ex. 13 at 21; Ex. 16 at 21) (emphasis added).

[38] Specifically, each Credit Support Annex requires LBSF to provide LBSF Credit Support in an amount equal to the sum of: (i) a set amount that is the estimated cost of liquidating the Collateral, (ii) a full quarterly Fixed Amount payment plus an additional "Grace Period Amount," and (iii) any excess of the outstanding principal balance of the Aflac Notes over the value of the Collateral. (*See* Weber Decl., Ex. 7 at 78; Ex. 10 at 78; Ex. 13 at 77-78; and Ex. 16 at 74-75).

However, after LBHI's filing but before the Early Termination Date, (i) the value of the Collateral for the Credit Default Swap Agreements under which LBSF had transferred LBSF Credit Support deteriorated, so that LBSF was required to transfer additional LBSF Credit Support, and (ii) LBHI was downgraded further, so that LBSF was required to transfer LBSF Credit Support under the other two Credit Default Swap Agreements. None of these payments have been made since LBHI's bankruptcy filing, which exposes Beryl and Aflac to potentially significant losses (*i.e.*, even assuming the redemption of the Aflac Notes in accordance with the terms of the Security Arrangements).

Therefore, Plaintiffs are liable for the unpaid Fixed Amounts and the amount of the LBSF Credit Support that should have been posted but was not.[39] Aflac's clams for these matters are addressed in Aflac's summary judgment motion and related briefs.

## II.    ARGUMENT

Plaintiffs argue, in summary, that as a result of LBSF's bankruptcy filing, its rights to payment from Beryl and the Collateral were "***modified***" or "***changed***" because of *ipso facto* provisions in the swaps that are invalid under the Bankruptcy Code.[40] This argument is without merit.

First, and most fundamentally, Plaintiffs ignore LBHI's September 15, 2008 bankruptcy filing. That filing, and the resulting event of default, substantially and permissibly

---

[39]    Plaintiffs admit in their answer to Aflac's counterclaims that LBHI and LBSF were obligated to pay the Fixed Amounts and transfer credit support. (*See* Answer ¶¶ 54, 56). In a belated attempt to change course, Plaintiffs suggest in their Motion that these admitted facts should be subject to challenge because "the Transaction Documents contain certain ambiguities and errors with respect to these Aflac claims and do not reflect the parties' intent or standard commercial practice" and, as a result, Plaintiffs assert that "extrinsic evidence," "expert testimony" and "discovery" will be necessary, on ***these*** issues alone. (Motion at 3, n.2) Plaintiffs cannot contend that for purposes of ***their claims alone***, the contracts are accurate, valid (subject to their *ipso facto* claims) and susceptible to summary judgment, while at the same time arguing that the contracts are subject to material mistakes of fact, presumably, and rescission or reformation when it comes to Aflac's claims.

[40]    *See* nn.1, 2, *supra*.

impacted the rights of LBSF, which was not a debtor-in-possession at that time. Even if it could be said that LBSF previously had some "rights" under the swaps with respect to a positive Termination Payment or Unwind Costs or a distribution in accordance with the Swap Counterparty Priority, these were, at best, contingent interests, and the contract conditions required for those interests to ripen into enforceable rights has never occurred. Moreover, to the extent those contingent interests were "modified" in accordance with express contract provisions, that happened on September 15, 2008, when LBHI filed for bankruptcy, and not thereafter on October 3, 2008, when LBSF filed its own petition. Therefore, all of Plaintiffs' arguments fail, because they all depend on the factually incorrect premise that LBSF suffered some "change" or "modification" of its "rights" postpetition. In other words, immediately before its own petition date, LBSF's rights under the swaps were to receive a Termination Payment of zero and to receive distributions, if any, in accordance with the Noteholder Priority, and its obligations included the payment of Unwind Costs in conjunction with an early termination. Those rights and obligations have not been altered in any way postpetition.

Second, the relief sought by Aflac and opposed by Plaintiffs through their Motion – a declaration that Beryl may distribute the Collateral and the LBSF Credit Support in accordance with the parties' agreements – is required under the Bankruptcy Code's safe harbors. The plain statutory language and the unambiguous legislative history conclusively show that the safe harbors protect enforcement of the Termination Payment Provision and Beryl's obligation to distribute the Collateral and LBSF Credit Support to Aflac in accordance with the parties' agreements. In particular, the legislative record is replete with evidence (ignored by Plaintiffs) that Congress intended non-defaulting counterparties to be able to both terminate their swaps with

debtor **and** realize upon the collateral securing such swaps. Plaintiffs' interpretation of the Bankruptcy Code is unsupported, illogical and cannot be sustained.

Accordingly, for the reasons set forth below and in Aflac's summary judgment motion, Plaintiffs' Motion should be denied.

**A.      Standards For Summary Judgment**

Where the material facts are not genuinely disputed and one party is entitled to judgment as a matter of law, summary judgment is appropriate. *See* Fed. R. Civ. P. 56, as made applicable in this adversary proceeding by Fed. R. Bankr. P. 7056. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Such is the case here, but for Aflac, not Plaintiffs. The parties agree upon the relevant contracts and transaction documents, and their only material dispute is one of law – namely, the scope and application of various provisions of the Bankruptcy Code to those contracts.[41]

**B.      LBSF Cannot Use The Bankruptcy Code To Reverse The Prepetition Effectiveness Of The Termination Payment and Unwind Costs Provisions And The Noteholder Priority.**

Property of the estate, including both property interests and contract rights, is determined as of the petition date. 11 U.S.C. § 541(a)(1) (estate property consists of debtor's interests "as of the commencement of the case"). *See also* 5 Allan N. Resnick & Henry J. Sommer, *Collier On Bankruptcy* ("Collier") ¶ 541.02 (15th ed. rev. 2009) ("The most significant limitation

---

[41]      Summary judgment is often used to resolve disputes concerning the applicability and scope of Bankruptcy Code provisions, including the "safe harbors" applicable to derivatives contracts. *See Tese-Milner v. Moon* (*In re Moon*), 385 B.R. 541, 548-49 (Bank. S.D.N.Y. 2008); *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), 2006 Bankr. LEXIS 4600 (Bankr. S.D.N.Y. Mar. 6, 2006); *see also Enron Creditors Recovery Corp. v. J.P. Morgan* (*In re Enron Creditors Recovery Corp.*), 407 B.R. 17, 27-29 (Bankr. S.D.N.Y. 2009) (considering applicability of section 546(e) safe harbor to certain derivatives transactions on summary judgment); *Interbulk, Ltd. v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195 (Bankr. S.D.N.Y. 1999). Summary judgment is also appropriate for disputes concerning contract interpretation. *See, e.g., Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (summary judgment appropriate on contract dispute where language at issue is unambiguous and has clear meaning); *Am. Home Assurance Co. v. Hapag Lloyd Container Line, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (same); *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 257 (2d Cir. 2002) (same).

in determining the scope of property of the estate is one of timing . . . . [T]he bankruptcy estate consists of all of the debtor's legal and equitable property interests that existed as of the commencement of the case, that is, as of the time that the bankruptcy petition is filed."). Accordingly, under section 541, LBSF's alleged contractual rights to payment and to the Collateral must be determined as of October 3, 2008, when its bankruptcy petition was filed.[42]

Because LBSF's interests are confined to those which existed on its petition date, its bankruptcy filing cannot result in expanding those interests. *See, e.g., Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997); *In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984). A debtor has no greater contractual rights in bankruptcy than it would have outside of bankruptcy.[43] *See, e.g., In re Schokbeton Indus., Inc.*, 466 F.2d 171, 175 (5th Cir. 1972); *In re Advent Corp.*, 24 B.R. 612, 614 (B.A.P. 1st Cir. 1982); *In re TTS, Inc.*, 158 B.R. 583, 587 (D. Del. 1993) ("541 can provide the debtor's estate no greater interest in property after filing for bankruptcy

---

[42] Section 541 incorporates a broad array of prepetition interests in the estate, but relies upon applicable non-bankruptcy law to define such interests. 5 *Collier on Bankruptcy* ¶ 541.05 (Lawrence P. King, ed., 15th ed. Rev. 2004). The estate thus consists only of the debtor's rights and interests held on the petition date. *Id.; see also Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, _ U.S. _, 128 S. Ct. 2326, 2339 (2008) (court looks to applicable non-bankruptcy law to determine the debtor's property rights in assets); *Butner v. United States*, 440 U.S. 48, 53-55 (1979) (applying state law to determine debtor's interest in postpetition, pre-foreclosure rents). It thus has long been held that the petition date operates as a bright line "cleavage" date on which the debtor's interests in property pass into the estate. *See, e.g., White v. Stump*, 266 U.S. 310, 313 (1924) (petition date is the "point of time" which separates the "old situation from the new in the bankrupt's affairs"); *Everett v. Judson*, 228 U.S. 474, 479 (1913) ("We think that the purpose of the law was to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition is filed").

[43] Of course, a debtor has rights under section 365 of the Code to assume, assign or reject executory contracts, and Plaintiffs do contend that the Transaction Documents are executory contracts. (*See* Motion at 19-25) This contention is wrong. The Transaction Documents cannot be executory when the swap transactions themselves were properly terminated, as Plaintiffs concede, and where the only remaining obligations are the payment of money. *In re Chateaugay Corp.*, 130 B.R. 162, 165-66 (Bankr. S.D.N.Y. 1991) ("A debtor's obligation to pay money, standing alone, is insufficient to render a contract executory."); *In re Bluman*, 125 B.R. 359, 364 (Bankr. E.D.N.Y. 1990) (same); *In re Cornwall Hill Realty, Inc.*, 128 B.R. 378, 381 (Bankr. S.D.N.Y. 1991) ("If at the filing of the petition, all that remains to be performed under the contract is the obligation to pay money, the contract is not executory and may not be rejected."). Plaintiffs rely on *COR Route 5 Co, LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379 (2d Cir. 2008) and *In re Worldcom, Inc.*, 343 B.R. 486, 499 (Bankr. S.D.N.Y. 2006), but these cases are inapposite because in each, the contracts at issue had not been terminated or fully performed.

than the debtor had prior to filing."); *see also Musso v. N.Y.S. Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 941 (Bankr. E.D.N.Y. 1993) ("§ 541(a) was not designed to enlarge the debtor's rights against others beyond those existing at the commencement of the case."). Section 541 is not a tool by which a debtor may acquire broader rights or interests than it held outside of bankruptcy.[44] *In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 573 (Bankr. E.D. Mo. 1990) (denying confirmation of a proposed plan that would subordinate bondholders' interest in funds held by an indenture trustee).

Consistent with this rule, the *Butner* Court stated that a "bankruptcy court should take whatever steps are necessary" to ensure that a creditor receives "the same protection he would have under state law if no bankruptcy had ensued." 440 U.S. at 56. Among other things, this means that the intervention of bankruptcy should not deprive a creditor of a priority arising under state law. *Id.; see also Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007); *In re Carmania Corp.*, 154 B.R. 160, 165 (S.D.N.Y 1993) ("*Butner* stands for the proposition that [a creditor's] rights in this respect should not diminish or vanish due to the happenstance of bankruptcy….").

Accordingly, the interests of LBSF's estate are those that existed under the Transaction Documents on its petition date. LBSF cannot through bankruptcy expand those rights to claim a positive Termination Payment or Unwind Costs payment and Swap Counterparty Priority

---

[44] Section 541(c)(1) does not invalidate restrictions on a debtor's interest in property that apply *after* the property interest has passed to the bankruptcy estate; to the contrary, it merely facilities the transfer of such interest in property to the estate. *In re Moore*, 99 B.R. 27, 29 (Bankr. E.D. Cal. 1989) (§ 541(c)(1)(A) does not void any valid contractual provisions which would otherwise have the effect of restricting that interest; rather, § 541(c)(1)(A) voids only those restrictions which prevent transfer of debtor's property to estate). Once a property interest has passed to the estate, such interest remains subject to applicable limitations imposed by other sections of the Bankruptcy Code, applicable nonbankruptcy law, and the terms of the governing agreements. *Am. Freight Sys., Inc. v. Interstate Commerce Comm'n*, 179 B.R. 952, 959 (Bankr. D. Kan. 1995). *See also In re Fort Worth Osteopathic Hosp., Inc.*, 387 B.R. 706, 714 (Bankr. N.D. Tex. 2008) (section 541(c)(1) did not cause estate to have interest in insurance policy proceeds); *In re Anchor Resolution Corp.*, 221 B.R. 330, 338 (Bankr. D. Del. 1998) (estate lacked property interest in right to pay claim at discounted amount, and could only exercise such right by satisfying all attendant terms and conditions).

right that never arose and were lost prior to October 3, 2008, or to limit the application of the

LBSF Credit Support to pay Unwind Costs to Beryl.[45]  *5 Collier on Bankruptcy* ¶ 541.04, at 541-

11 (Lawrence P. King ed. 15th ed. rev. 2004) ("To the extent an interest is limited in the hands of

the debtor, it is equally limited as property of the estate").

      **C.**     **The Zero Termination Payment and Unwind Costs Provisions And The Noteholder Priority Became Effective Prepetition And Therefore Remain Effective Postpetition.**

      Each of the Termination Payment Provision requiring a zero payment, the Un-

wind Costs provision requiring the payment of Unwind Costs to Beryl, and the Noteholder Prior-

ity became effective automatically upon LBHI's bankruptcy filing on September 15, 2008.  As

explained above, the Transaction Documents are governed by and construed in accordance with

English law.  The English Court has previously held in the *Perpetual* case,[46] involving Plaintiffs,

the Trustee and similarly-documented swap transactions, that the Noteholder Priority took effect

upon LBHI's bankruptcy filing on September 15, 2008.[47]  Because the zero Termination Pay-

ment Provision, the Noteholder Priority and the Unwind Costs provision all took effect upon

LBHI's chapter 11 filing weeks before LBSF's petition date, the interests of LBSF's estate were

---

[45]   Interests lawfully extinguished prepetition cannot be resurrected by virtue of bankruptcy. *See State Bank of Hardinsburg v. Brown*, 317 U.S. 135, 138-39 (1942) (interest extinguished prepetition under state law cannot be revived; "if Congress intended that a bankruptcy might reach back into the past and bring under the court's jurisdiction a former interest in property, which, under state law, had irrevocably passed to a third person, it would have so stated in terms too clear to leave any doubt"). *See also Sec. Mortgage Co. v. Powers*, 278 U.S. 149, 157 (1928).

[46]   *Perpetual Tr. Co., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009] W.L.R. (D) 262 (Ch. 2009).

[47]   The English Court also found: "There is no determination of an unlimited interest in property owned by the insolvent at the commencement of the insolvency process by virtue of his insolvency." *Perpetual* at 21, ¶ 46. As LBSF did not have an unlimited interest, subject to forfeit upon condition of its insolvency, the proscription of forfeitures in section 541(c)(1), and of enforcement of *ipso facto* provisions in section 365(e)(1), of the Bankruptcy Code, are not applicable. LBSF never had a right to a Termination Payment, under the Swap Counterparty Priority or otherwise, in the first place – its right to such a payment never arose, and its rights do not expand postpetition.

limited accordingly, and those limitations remain effective today, notwithstanding Plaintiffs' effort, in the Motion, to ignore the existence and effect of the LBHI filing.

Because LBSF's rights to a zero Termination Payment and Noteholder Priority, and Beryl's rights under the Unwind Costs provision, were fixed well before LBSF's petition date, section 541(c)(1) is not implicated at all in this case. Section 541(c)(1)(B) provides that a debtor's interest in property becomes property of the estate notwithstanding a provision in a contract or under applicable non-bankruptcy law that is conditioned on the debtor's insolvency. The statute does not expand the rights LBSF held immediately prior to its bankruptcy petition under applicable non-bankruptcy law. Because LBSF's estate, as of the filing of the bankruptcy petition, had no right to a Swap Counterparty Priority distribution or a swap Termination Payment, or to limit Beryl's rights under the Unwind Costs provision, section 541(c)(1) simply does not apply.

For the same reason, application of the Termination Payment Provision, the Noteholder Priority, and the Unwind Costs provision does not violate the automatic stay of section 362(a)(3) of the Bankruptcy Code, which only precludes acts to obtain possession of or exercise control over estate property. As discussed above, property of LBSF's estate is determined as of October 3, 2008, in accordance with the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision. LBSF's bankruptcy does not create rights or claims that did not exist prepetition as a result of LBHI's filing. *See, e.g.*, *In re Seven Stars Rest., Inc.*, 122 B.R. 213, 218 (Bankr. S.D.N.Y. 1990) (debtor could not resurrect lease terminated prepetition because it never became property of the debtor's estate). It follows that application of the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision do not implicate (let alone violate) section 362(a)(3). *See Pioneer Commercial Funding Corp. v. United Airlines,*

*Inc. (In re Pioneer Commercial Funding Corp.)*, 122 B.R. 871, 877 (S.D.N.Y. 1991) (prepetition setoff of $3.5 million did not violate the automatic stay).

By the same logic, the ban on enforcement of certain *ipso facto* clauses under section 365(e)(1) also does not apply here. The statute relates only to rights affected "***after*** the commencement of the [bankruptcy] case." 11 U.S.C. § 365(e)(1)(B) (emphasis added). Here, however, the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision took effect well before LBSF's bankruptcy filing. When a non-debtor's rights are thus fixed prepetition, "section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract." *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992) (termination of franchise agreement one day prior to petition day did not violate section 365(e)(1); court had no power to reinstate franchise agreement even where termination was solely on account of impending bankruptcy filing); *see also Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927, 938 (Bankr. E.D.N.Y. 1994) (contractor did not violate section 365(e)(1) by terminating purchase orders three days prior to commencement of debtor's bankruptcy); *LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*, 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) ("There is no provision in the Bankruptcy Code which prohibits termination before bankruptcy of a contract on account of insolvency"). Section 365(e)(1) does not apply here because the Termination Payment Provision, the Noteholder Priority and the Unwind Costs provision became effective prepetition.

In sum, any ordering of the priorities and any other provisions in respect of rights upon termination that occurred before LBSF's chapter 11 filing and pursuant to the terms of the parties' agreement are beyond the scope of, and unaffected by, sections 362(a)(3), 365(e)(1) and 541(c) of the Bankruptcy Code.

**D.  The Noteholder Priority Must Be Upheld In Accordance With Section 510(a).**

LBSF and Aflac are competing claimants in respect of the Collateral.  Their relative rights to the Collateral are established in section 6.2 of the Principal Trust Deeds and section 5.5 of the Supplemental Trust Deeds.  Those provisions clearly state that LBSF's rights are subordinated to those of Aflac.  The parties' agreement to subordinate LBSF's rights in an event of default attributable to LBSF, including an LBHI bankruptcy filing, must be upheld pursuant to section 510(a) of the Bankruptcy Code.

Subordination agreements are enforceable in bankruptcy under section 510(a) "to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  The scope of section 510(a) is one of "unqualified breadth," and "if an agreement is a subordination agreement, it must be enforced according to its terms." *Collier* ¶ 510.03[2].  A "subordination agreement" is an agreement in which a party that otherwise holds "a senior interest agrees to subordinate that interest to a normally lesser interest."  Bryan A. Garner, *Black's Law Dictionary* 68 (17th ed. 1999).  Section 5.5 of the Supplemental Trust Deed squarely comes within the broad ambit of section 510(a).  *See, e.g.*, *In re Delta Air Lines*, 341 B.R. 439, 445 (Bankr. S.D.N.Y. 2006) ("Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress….") (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 10 (2000)).  Section 510(a) applies to subordination agreements between a debtor and third parties no less than to agreements between non-debtors.  *See Enstar Group, Inc. v. Bank of New York (In re Amret, Inc.)*, 174 B.R. 315, 319-20 (1994) (M.D. Ala. 1994) (enforcing debtor's subordination of claims against subsidiary pursuant to section 510(a)); *see also In re Village Rathskeller, Inc.*, 147 B.R. 665, 672-73 (Bankr. S.D.N.Y. 1992) (enforcing debtor's subordination of rights under lease to those of its landlord's mortgagee).  Where a subordination agreement is enforceable under non-bankruptcy law, it must be enforced according to its terms.

*See Robinson v. Howard Bank* (*In re Kors, Inc.*), 819 F.2d 19, 24 (2d Cir. 1987); *see also In re Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966)("A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have explicitly agreed not to accept them….") (internal quotations and citations omitted).

      The enforceability of a subordination agreement is determined by applicable non-bankruptcy law. *In re Best Products Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) (contract law applies under section 510(a)). The Supplemental Trust Deed is governed by English law, which enforces subordination agreements in accordance with their terms. For example, *In re Maxwell Communications Corp. Plc (No. 2)* [1993] 1 W.L.R. 1402, 1405, 1420 (citing, *inter alia*, 11 U.S.C. § 510(a) and *In re Credit Indus. Corp.*, 366 F.2d 402 (2d Cir. 1966)), recognized the general principle that subordination provisions in a trust deed are enforceable, and observed that it "would be a matter of grave concern if... English law alone refused to give effect to a contractual subordination" in the context of insolvency proceedings. *See also In re SSSL Realisations (2002) Ltd.* [2006] Ch. 610 (enforcing agreement subordinating debtors' intercompany claims to claims of a surety). Therefore, LBSF's contract to subordinate its rights pursuant to the Noteholder Priority and in accordance with section 6.2 of the Principal Trust Deed and section 5.5 of the Supplemental Trust Deed is an enforceable subordination agreement which must be upheld under Code section 510(a).

**E.** **Aflac's Termination And Liquidation Of The Swap Transactions And Enforcement Of The Contracts Do Not Constitute A "Modification" And Are Protected By The Safe Harbor Provisions Of Section 560 Of The Bankruptcy Code.**

Section 560 of the Bankruptcy Code, quoted in full below,[48] provides that "[t]he *exercise of any contractual right of any swap participant . . . to cause the liquidation, termination*, or acceleration *of one or more swap agreements* because of a condition of the kind specified in section 365 (e)(1) of this title" – so called *ipso facto* provisions[49] – "or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements *shall not be stayed, avoided, or oth-*

---

[48]   11 U.S.C § 560 states:

**Contractual right to liquidate, terminate, or accelerate a swap agreement**

The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365 (e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

[49]   11 U.S.C. § 365(e)(1) states:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

***erwise limited by operation of any provision of this title*** or by order of a court or administrative agency in any proceeding under this title." 11 U.S.C § 560 (emphasis added).

Statutory interpretation begins with the plain language of the statute itself. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). "[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (citations omitted). As shown below, section 560 clearly applies to Beryl's exercise of the Bankruptcy Termination Provision – which Plaintiffs concede was valid (*see* Motion at 3, n.2: "LBSF does not dispute the validity of Beryl's termination")[50] – to terminate and liquidate the swaps, because each relevant definition and component of section 560 is met. *See Calyon New York Branch v. Am. Home Mortgage Acceptance, Inc. (In re Am. Home Mortgage, Inc.)*, 379 B.R. 503, 516 (Bankr. D. Del. 2008) (if applicable definitions met, "safe harbor provisions apply, period.").

First, Beryl is undeniably a "swap participant" as defined in Bankruptcy Code section 101(53C): "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). The term "swap agreement," in turn, is defined to include "any agreement, including the terms and conditions incorporated by reference in such agreement, which is… a total return, credit spread or credit swap, option, future, or forward agreement…." 11 U.S.C. § 101(53B)(A)(i)(vi). Plaintiffs concede that the Credit Default

---

[50] By conceding that Beryl's termination of the swap transactions was permitted and proper under the Bankruptcy Termination Provision and section 560, Plaintiffs implicitly acknowledge that ***each*** of the relevant safe harbor definitions is met. Because the applicable definitions are the same, if the Bankruptcy Termination Provision is covered by the safe harbor of section 560, then so too are the Termination Payment Provision and the Unwind Costs provision.

Swap Agreements are credit swaps included in the definition of "swap agreement"[51] that were outstanding when they filed for bankruptcy and that, as a party to these agreements, Beryl qualifies as a "swap participant." (*See, e.g.*, Complaint ¶¶ 1-2, 15, 19, 30)

Second, the Bankruptcy Termination Provision is a "contractual right" within the meaning of section 560. The definition of "contractual right" is broad, and includes written provisions in a contract between the parties, as is the case here, as well as market practices, exchange rules and common law rights. 5 *Collier on Bankruptcy* ¶ 560.04[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("The source of swap agreement liquidation, termination and acceleration rights will often be a written agreement or other document, such as a customer agreement, master agreement or the terms and conditions printed on a confirmation of the transaction…"). The Bankruptcy Termination Provision, which appears in the ISDA Master Agreements, thus constitutes a "contractual right."

Finally, section 560's requirement of an *ipso facto* clause is also satisfied. Section 560 "permits the exercise of termination rights by a non-defaulting swap participant so long as the enforcement of those rights is first triggered because of a condition of the kind specified in section 365(e)(1)." *In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004). One such condition, specified in section 365(e)(1)(B), is "the commencement of a case under" the Bankruptcy Code. 11 U.S.C. § 365(e)(1)(B). The Bankruptcy Termination Provision is a textbook example of such a condition because it permits Beryl, the non-debtor party, to terminate due to a

---

[51] The Bankruptcy Code does not define the term "credit swap." Courts and commentators agree, however, that a credit swap is a bilateral contract, whereby the buyer makes periodic payments to the seller and, in exchange, receives a payment if the referenced financial instrument defaults. *See, e.g.*, *Eternity Global Master*, 375 F.3d 168, 172-73; De Servigny & Jobst, *supra* n.17, at 418-19.

bankruptcy filing by either LBHI or LBSF and, in fact, Plaintiffs' bankruptcy filings specifically were stated in the Termination Notice as grounds therefor.[52]

The Bankruptcy Termination Provision satisfies section 560, and thus was legally enforceable.

### F.    Beryl's Exercise Of Remedies Under The Security Arrangements Is Authorized By The Safe Harbors.

Since the termination of the swap transactions was valid and effective, the only remaining question is what flows as a consequence from that termination.  Section 560 of the Bankruptcy Code, along with two related provisions, sections 362(b)(17) and 362(o), provide the answer – the rights and remedies of Beryl (and, therefore, Aflac) are fully enforceable and, accordingly, LBSF is not entitled to any Termination Payment, and the Noteholder Priority and the Unwind Costs provision are in effect.  Plaintiffs, however, ignore the plain words and meaning of these statutes to argue that other provisions of the Bankruptcy Code, specifically sections 365(e)(1) and 541(c)(1)(B), override the safe harbors, and entitle them to a payment of more than $165 million.  (*See* Motion ¶¶ 1, 62)  As explained below, Plaintiffs' contentions are without merit.  Beryl's exercise of remedies under the Security Arrangements, including the Termination Payment Provision, the Unwind Costs provision and the Noteholder Priority, is permitted under sections 560, 362(b)(17) and 362(o) of the Bankruptcy Code.  Each section is discussed below.

#### 1.  Section 560

Just as the Bankruptcy Termination Provision is enforceable by virtue of section 560, so too are (i) the Termination Payment Provision, which provides that LBSF gets no ("zero") Termination Payment if the swaps are terminated due to a default triggered by the bankruptcy filing of either LBSF or LBHI, and (ii) the Unwind Costs provision, which requires a

---

[52]   *See In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005); *In re Child World*, 161 B.R. 349, 354 (Bankr. S.D.N.Y. 1993).  *See also* S. Rep. No. 95-989, at 59 (1978).

payment to Beryl in an amount equal to any shortfall between the principal amount of the Aflac

Notes and the value of the Collateral, if the swaps are terminated due to a default triggered by the

bankruptcy filing of either LBSF or LBHI, and provides that the LBSF Credit Support is to be

available for the payment of any such shortfall. In the words of section 560, each of the Termi-

nation Payment Provision and the Unwind Costs provision is:

- a "contractual right" (*see* Series Condition 40, clause (iii) in the Series Prospectus for each swap transaction, Weber Decl., Ex. 7 at 16; Ex. 10 at 16; Ex. 13 at 15-16; Ex. 16 at 16);

- "of [a] swap participant" (Beryl);

- "to cause the liquidation, termination, or acceleration of one or more swap agreements" (each of the four Credit Default Swap Agreements);

- because of an *ipso facto* provision of the type described in section 365(e)(1) of the Bank-ruptcy Code; and

- which, therefore, "shall not be stayed, avoided, or otherwise limited by operation of any provision of [the Bankruptcy Code] or by order of a court[.]"

As explained above, the swap termination here was because of the bankruptcy filings of both

LBHI and LBSF. Therefore, under the plain and unambiguous provisions of section 560 and the

Termination Payment Provision, LBSF has no right to receive any Termination Payment whatso-

ever, and Beryl has the right to payment of the Unwind Costs.

So how is it that Lehman seeks to "avoid[]," and asks the Court to "stay[]" and

"otherwise limit[,]" the effect of the Termination Payment Provision and the Unwind Costs pro-

vision when section 560 says that cannot be done? Simply enough: Plaintiffs just call the provi-

sions something else. Since the word "modify" and its derivations do not appear in the text of

section 560, if Plaintiffs say (many times) that the contract terms they prefer to avoid are "***modi-***

***fication***" provisions, the safe harbor no longer protects any swap terminations where, as here,

LBSF gets no payment:

The **modifications** of LBSF's payment priority and its right to receive termination payments and Unwind Costs solely as a result of its bankruptcy filing does not constitute a "Liquidation, termination, or acceleration" of the agreement, nor is it an "offset or net out" of the parties' positions. Rather, by **changing** LBSF's priority of payments and its right to receive payments, the clauses improperly **modify** LBSF's rights under the contracts solely because of its bankruptcy filing, which sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code expressly forbid…. A broad construction of the safe harbors to permit a **modification** of LBSF's right to receive payments is not only contrary to the terms of the statute, but would not serve Congress's purpose in enacting the safe harbors to promote "certainty" and liquidity" in the marketplace in the event one counterpart to the contract files for Bankruptcy protection.

(Motion ¶ 3) (emphasis added)  The logic seems to be that if the swaps had not been terminated because of the bankruptcy filings, LBSF might otherwise one day have a right to be paid something under the swaps; and because the termination eliminates that theoretical possibility, LBSF's "rights" have been "changed" or "modified."

None of LBSF's rights have been changed in any way by the termination of the swaps, and none will be modified by Beryl enforcing the Credit Default Swap Agreements in accordance with their express terms, which state that, in the case of an LBHI or an LBSF bankruptcy default and termination, LBSF gets no Termination Payment, Beryl has the right to an Unwind Costs payment, and the Noteholder Priority is in effect.  Put differently, by getting a payment of "zero" upon such a termination, being required to make an Unwind Costs payment, and maintaining its priority under the Noteholder Priority (each of which vested prepetition), LBSF is receiving precisely what it bargained for.[53]  *See Rice v. Shoney's* (*In re Dean*), 174 B.R. 787, 790-91 (Bankr. E.D. Ark. 1994) (section 541(c)(1) does not apply where "rights, obligations, and restrictions existing pre-bankruptcy have not been forfeited, modified, or terminated…

---

[53]    In the *Drexel* bankruptcy, the district court upheld the enforceability under state law of a similar (though not identical) swap termination provision, known as the "first method," in which the defaulting party is not entitled to receive any net amount otherwise determined to be payable to it in the close-out of a swap transaction.  *See In re Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223, at *3-4 (S.D.N.Y. Nov. 9, 1992) (finding provision "not unconscionable or contrary to public policy … [and thus should cause] neither a penalty, a forfeiture nor an unjust enrichment").

by the filing of the bankruptcy" but "[r]ather, the trustee has the same rights as the debtor under the agreement"; "property rights are [not] expanded" under section 541(c) "simply by virtue of the fact that the property belongs to the estate").

Section 560 expressly validates for swap transactions the very types of *ipso facto* clauses that, for other kinds of contracts, the statutes which Plaintiffs cite, sections 365(e)(1) and 541(c)(1)(B), prohibit. Therefore, the statutes on which Plaintiffs rely simply do not apply, and are explicitly overridden by section 560. Because Beryl's (and, therefore, Aflac's) exercise of its termination and associated rights under the swaps are expressly protected by section 560, the Motion should be denied, and Aflac is entitled to summary judgment on Lehman's claims.

## 2. Sections 362(b)(17) and 362(o)

Beryl's exercise of its safe harbored rights (exercisable by the Trustee, at the direction of Aflac as the holder of the Aflac Notes) to distribute the Collateral and the LBSF Credit Support to the Trustee and Aflac in accordance with the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision is further supported by section 362(b)(17) of the Bankruptcy Code which states, in pertinent part, that the automatic stay does not apply to

> the exercise by a swap participant … of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements[.]

11 U.S.C. § 362(b)(17). And, under section 362(o), if the automatic stay does not apply, the Court also is expressly precluded from staying the exercise of such rights. *See* 11 U.S.C. § 362(o) ("The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph … (17) … of subsection (b) shall not be stayed by order of a court … in any proceeding under this title").

Thus, pursuant to section 362(b)(17), a swap participant may exercise contractual rights (as such rights are defined in section 560), including such rights as provided under a security arrangement related to a swap agreement (*i.e.*, the Supplemental Trust Deed).[54] Section 560 defines the term "contractual rights" ***independently*** from what Plaintiffs characterize as limiting verbs that are set forth in that section (*e.g.*, terminate, liquidate, accelerate, setoff and net out). The definition thus provides as follows:

> As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

This broad definition includes both written and unwritten rules, agreements, resolutions, and business practices.

The "limiting verbs," however, are set out separately in the text of section 560, in an independent sentence which states: "The exercise of any contractual right of any swap participant or financial participant ***to cause the liquidation, termination, or acceleration*** of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title ***or to offset or net out*** any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall

---

[54]  An important distinction between the relief provided in sections 362(b)(17) and 560 is that the latter specifically addresses rights that flow from the exercise of an otherwise invalid *ipso facto* clause. Section 362(b)(17), on the other hand, does not refer to, and thus does not require, a swap participant to rely upon an *ipso facto* clause; to the contrary, such participant may exercise contractual rights under a security arrangement related to a swap agreement without regard to whether or not such rights flow from an *ipso facto* clause.

not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title."  (emphasis added)

So what did Congress mean in section 362(b)(17) when it provided that the exercise of a "contractual right (as **defined** in section 560)" was not subject to the automatic stay? Did Congress mean, by referencing the definition, to also incorporate the limiting verbs which section 560 separately applies to "contractual rights?"  Such a reading cannot be sustained; if Congress meant to capture in section 362(b)(17) not only the concept of "contractual rights" but also the independent limiting verbs of section 560, Congress could easily have said so, and drafted section 362(b)(17) to state that the stay does not apply to the exercise of "contractual rights (as defined in section 560) *to cause the termination, liquidation, or acceleration*."  But that is not what Congress wrote; to the contrary: it stated that a holder of "contractual rights (as defined in section 560)" – any and all contractual rights – may act in respect of a swap or security agreement free from the automatic stay.

Plaintiffs' reading of section 362(b)(17) treats the reference to the definition of "contractual rights" in section 560 as also capturing the limiting verbs set forth therein.  That reading is unsupported and contrary to the plain language of the statute, and should thus be rejected.[55]  Accordingly, the Court should conclude that section 362(b)(17) permits the Trustee (di-

---

[55] The construction of section 362(b)(17) proposed by Plaintiffs is also flawed because it renders portions of the section superfluous, and is thus contrary to well-established principles of statutory construction.  *See, e.g.*, *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 302 (2d Cir. 1997) ("[i]t is our duty 'to give effect, if possible, to every clause and word of [the] statute") (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)); *Connecticut v. United States Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000) (courts required to disfavor interpretations of statute which render language superfluous), *cert. denied*, 532 U.S. 1007 (2001); *Allen Oil Co. v. Comm'r of Internal Revenue*, 614 F.2d 336, 339 (2d Cir. 1980) ("[A] statute must, if reasonably possible, be construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless…..").  Under Plaintiffs' reading of the statute, the parenthetical "(as defined in section 560)" is sufficient to capture all of the limiting verbs set forth in section 560.  If that reading were correct, there would have been no need for Congress to specify the verbs "offset or net out" in section 362(b)(17), since those words are already applicable (under Plaintiffs' view) merely by virtue of the parenthetical.  Because Plaintiffs' construction of section 362(b)(17) would render portions of section 362(b)((17) superfluous, it should be rejected in favor of Aflac's construction, which gives effect to each word of the statute.

39

rected by Aflac, as the holder of the Aflac Notes), as the holder of the lien on the Collateral and other assets of Beryl, to cause the distribution of all available assets, including the LBSF Credit Support, in accordance with the terms of the Security Arrangements to pay the Trustee's fees and expenses and then to redeem the Aflac Notes.

### 3. Legislative history of the safe harbors

Plaintiffs contend that the legislative history shows that Congress intended the safe harbors to be rigid and narrowly construed. Plaintiffs highlight selected snippets of witness testimony from the Congressional hearing that predated the 1990 Code amendments for interest rate and foreign currency swaps.[56] (Motion ¶ 56) This record, however, when reviewed in full (*see* Supp. Weber Dec, Ex. D), demonstrates a very different Congressional intent:

- **Not one witness** testified that the safe harbor for swaps should be narrow or limited in any way to protect debtors.

- **Not one witness** testified that a debtor counterparty should be protected from "modification" of its payment priority rights under a swap that was being terminated due to the debtor's bankruptcy filing, or that sections 365(e)(1) and 541(c)(1) should be viewed as dispositive of conflicts with the safe harbors.

- **To the contrary, the witnesses testified instead** that the safe harbors would protect the financial markets from systemic risk by permitting nondebtor counterparties to quickly limit exposure through prompt termination and application of any collateral to amounts owed as a result of the debtor's default.

*See Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary*, 101st Cong., at 8, 61-62 (1989) (hereinafter "S. 396 Tr.") (Remarks of Sen. Grassley: "This amendment would go a long way toward ensuring that the failure of a participant will not unduly disrupt an extremely important market…."; Remarks

---

[56] In general, testimony of witnesses before Congress is of little value in construing subsequently enacted statutes. *See, e.g., Universal Church v. Geltzer*, 463 F.3d 218, 225 (2d Cir. 2006) (discussing that "testimony is an especially indirect method of deriving the understanding of the legislators" and that House Reports are more probative); *Disabled in Action v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy" provide most "authoritative and reliable materials of legislative history").

of Mr. Sinatra: "Conversely, the code must be a flexible document. . . . The volatile nature of the financial markets and the need for certainty and speed in quantifying exposure of its participants provide further public policy goals that Congress can base its passage of S. 396 on…."). Thus, Plaintiffs' suggestions that the safe harbors were intended to be narrowly construed are inconsistent with the statutory text and the legislative history, which instead demonstrate that Congress intended the safe harbors to be broad and flexible. Congress' intent to create broad, flexible safe harbors is further shown in the most recent amendments, which expanded covered transactions and were specifically designed to facilitate contractual netting among transactions that were previously omitted.[57]

Pertinent to the current dispute, the legislative history is replete with statements indicating that Congress specifically contemplated that non-debtor counterparties would avail themselves of the safe harbors to realize upon collateral pledged in connection with a swap agreement:

- "[T]he bill amends section 362(b) of the Bankruptcy Code … to provide that a setoff pursuant to a swap agreement between two parties is not automatically stayed … [and] permits the participant to make a final accounting of the net amount due from or owed to the debtor under any swap agreement, by offsetting any amounts due against any amounts owed … *[and] permits the swap participant to use any collateral previously pledged by the debtor to guarantee, secure, or settle any swap agreement."* H.R. Rep. No. 101-484, 4-5 (1990), *as reprinted* in 1990 U.S.C.C.A.N. 223, 226-27.

---

[57] Section 362(b)(17) was added to the Bankruptcy Code in 1990 to specifically protect swap transactions from the automatic stay. *See* 136 Cong. Rec. S7535 (June 6, 1990)(remarks of Sen. DeConcini) (noting that since enactment of modern Bankruptcy Code in 1978, Congress continually has intended to protect from the automatic stay securities contracts, commodities contracts, forward contracts and repurchase agreements to avoid disruption to financial markets, and swap agreements must receive comparable protection). Section 362(b)(17) was amended in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act and again in 2006 pursuant to the Financial Netting Improvements Act of 2006. *See* Pub. L. No. 109-8 (2005); Pub. L. No. 109-390 (2006). The 2006 amendments further clarify and protect the rights of swap participants to close out swap transactions and, in so doing, effectuate postpetition the realization upon collateral, including via setoff or netting rights. *See generally Are You Sailing in Safe Harbors? An Overview of Various Bankruptcy Code Safe-Harbor Protections*, 26-10 ABIJ 44, *88 (Dec. 2007 / Jan. 2008); H.R. Rep. No. 109-31 (2005), *as reprinted* in 2005 U.S.C.C.A.N. 88, 121 ("As amended, the definition of 'swap agreement' will update the statutory definition and achieve contractual netting across economically similar transactions").

- "Although in the majority of cases collateral is not provided in connection with a swap agreement, there are some collateralized swap agreements. *Under the bill, the counterparty will be able to terminate the swap agreement and liquidate any collateral that secures the unpaid obligation*." S. 396 Tr. at 107 (Responses of Messrs. Brickell and Perlstein) (emphasis added).

- "Because the relevant definitions include related security agreements, the references to 'setoff' in *these provisions*, as well as in section 362(b)(6) and (7) of the Bankruptcy Code, *are intended to refer also to rights to foreclose on*, and to set off against obligations to return, *collateral securing swap agreements*, master netting agreements, repurchase agreements, securities contracts, commodity contracts, or forward contracts. *Collateral may be pledged to cover the cost of replacing the defaulted transactions in the relevant market, as well as other costs and expenses incurred or estimated to be incurred for the purpose of hedging or reducing the risks arising out of such termination. Enforcement of these agreements and arrangements free from the automatic stay is consistent with the policy goal of minimizing systemic risk.*" H.R. Rep. No. 109-31 (2005), *as reprinted* in 2005 U.S.C.C.A.N. 88, 132 (emphasis added)

- "Broadly speaking, these safe harbor provisions allow certain types of creditors to exercise their self-help rights to terminate defined financial market contracts like swap agreements and exercise their setoff rights and *choose on how to deal with foreclosure on collateral free from the power of a receiver or bankruptcy trustee that would otherwise impair the exercise of those rights.*" 152 Cong. Rec. H7600 (2006) (statement of Rep. McHenry) (emphasis added).

- The 2006 amendments to section 362(b)(17) were intended "to protect enforcement, free from the automatic stay, *of collateral*, setoff or netting provisions in ... swap agreements.". H.R. Rep. No. 109-648, at 7 (2006) (Report of Committee on Financial Services) (emphasis added).

- Section 362(b)(17) as amended thus "protect[s], free from the automatic stay, all rights previously protected by Section 362(b)(6), (7) and (17), including *self-help foreclosure-on-collateral rights, setoff rights, and netting rights (including foreclosure on, and setoff against, cash and securities held to margin or secure claims for margin payments and settlement payments*....)." H.R. Rep. No. 109-648, at 7 (emphasis added)

These statements demonstrate that Congress intended, through the safe harbors, to provide a nondebtor counterparty with access to collateral securing a swap after a debtor's default.

The safe harbors also were drafted to include subsequent transactions using unforeseen structures that do not fit the letter of the Bankruptcy Code sections, but which are economically equivalent – further evidence that the safe harbors were intended to be broad. *See,*

*e.g.*, H.R. Rep. No. 109-31 (2005), *as reprinted* in 2005 U.S.C.C.A.N. 88, 121 ("The definition of 'swap agreement' originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured .... [The Bankruptcy Code] expands the definition of 'swap agreement' to include 'any agreement or transaction that is similar to any other agreement or transaction referred to [the Bankruptcy Code] and that is of the type that has been, is presently, or in the future becomes the subject of recurrent dealings in the swap markets").

Thus, Congressional intent was to provide flexible safe harbors to permit the full termination and liquidation of the swaps of the future, including any collateral that was pledged to secure them, as shown by the numerous references to collateral quoted above. Aflac submits that synthetic CDOs such as those here at issue are precisely the type of future swap permutation which Congress sought to protect through the broad definitions and expansive language of the safe harbors.[58]

Accordingly, Plaintiffs' Motion should be denied, and Aflac's cross motion for summary judgment to enforce the Credit Default Swap Agreements in accordance with their express terms should be granted.

---

[58] Congressional statements and the plain language of the relevant sections of the Bankruptcy Code indicate that Congress sought to remove judicial discretion in determining applicability of the safe harbors by providing transactions that fit within the broadened scope of the safe harbors with the relevant protections without further inquiry. *See, e.g., Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev. 641, 657 (Winter, 2005) (amendments to the safe harbor provisions "limit judicial discretion to assess the economic substance of financial transactions, even those that resemble ordinary loans or that retire a debtor's outstanding debt or equity [and] direct judges to apply a formalistic inquiry based on industry custom: a financial transaction is a 'swap,' 'repurchase transaction,' or other protected transaction if it is treated as such in the relevant financial market.").

# CONCLUSION

For the reasons set forth above, Plaintiffs' Motion should be denied.

Dated: New York, New York
      October 23, 2009

Respectfully submitted,

*/s/ Sally McDonald Henry*
Sally McDonald Henry
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

-and-

Anthony W. Clark (admitted *pro hac vice*)
Robert A. Weber (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

*Attorneys for Defendant and Counterclaim Plaintiff American Family Life Assurance Company of Columbus*

To:

Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

Eric A. Schaffer
David M. Schlecker
REED SMITH LLP
599 Lexington Avenue
New York, New York  10022
(212) 521-5400

Dennis Dunne
Dennis O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

596318.12-Wilmington Server 1A - MSW