**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Adversary Proceeding |
| -against- | : | |
| | : | No.: 09-01261 (JMP) |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS and BNY CORPORATE TRUSTEE SERVICES LIMITED | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS | : |
| | : |
| Counterclaim Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : |
| | : |
| Counterclaim Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUPPLEMENTAL DECLARATION OF ROBERT A. WEBER**
**IN SUPPORT OF MOTION OF AMERICAN FAMILY LIFE ASSURANCE**
**COMPANY OF COLUMBUS FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT OF LEHMAN BROTHERS SPECIAL**
**FINANCING INC. AND LEHMAN BROTHERS HOLDINGS INC.**

I, Robert A. Weber, declare as follows:

I am an attorney with the firm of Skadden, Arps, Slate, Meagher & Flom LLP,

counsel for Defendant American Family Life Assurance Company of Columbus ("Aflac"), and

am admitted *pro hac vice* in this adversary proceeding. I make this supplemental declaration in support of Aflac's motion for summary judgment in this adversary proceeding and in opposition to the motion of Lehman Brothers Special Financing Inc. And Lehman Brothers Holdings Inc. for summary judgment. I attach copies of the following documents:

| Exhibit | Document: |
|---------|-----------|
| A | Tom Freke, *Securitisation Yet To Recover From Lehman Fall*, Reuters News, Aug. 27, 2009, available at http://uk.reuters.com/article/ idUKLNE57R00Q20090828 |
| B | August 14, 2009 Fitch Ratings press release entitled *Lehman Legal Challenge May Have Varying Impact on Global Structured Finance* (available at http: //www.fitchratings.com/creditdesk/press_releases/ detail.cfm?print=1&pr_id=503977 8/25/2009 |
| C | Transcript of Sept. 17, 2009 hearing in *Lehman Brothers Special Financing, Inc. v. Harrier Finance Limited,* Adv. Case No. 09-01241 (excerpt) |
| D | Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 101st Cong. (1989) |

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Wilmington, Delaware
October 23, 2009

/s/ Robert A. Weber
Robert A. Weber (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

*Attorneys for Defendant and Counterclaim Plaintiff American Family Life Assurance Company of Columbus*

# EXHIBIT A



Print | Close this window

# Securitisation yet to recover from Lehman fall

Fri Aug 28, 2009 8:30am BST

By Tom Freke

LONDON (Reuters) - Europe's securitisation market is unlikely to recover until billions worth of assets tangled in the bankruptcy of Lehman Brothers are fixed, and any new deals are likely to have a much simpler structure.

The market at its peak sold hundreds of billions of dollars of complex debt packages secured against anything from commercial property to ticket sales at football stadiums, but was shattered by the credit crunch.

The collapse of Lehman -- one of the market's largest players -- further hurt the market, leaving financiers eager to find ways to restart the flow of the profitable deals.

Recent weeks have seen tentative signs of recovery, with a small number of low-risk deals sold to investors.

"Securitisation will come back -- it's too good a technique to be abandoned," said Conor Downey, a finance expert at law firm Paul Hastings.

Before the credit crisis, banks made massive use of complex debt instruments to offload credit risk to financial markets, enabling them to lend more money and boost profits because they needed less regulatory capital.

But instruments such as asset-backed securities (ABS) and collateralised debt obligations (CDOs) were blamed for helping cause the credit crisis, because they obscured who ultimately held the risk and had to pay in case of trouble.

COUNTERPARTIES

Unpicking securitisations created by Lehman, which totalled about 40 billion euros when the bank collapsed in September last year, has shown how ill-prepared the market was for such unexpected events.

"It is incredibly complex because of the large number of different elements to coordinate, and due to the many ambiguities and discrepancies in the documents," said Elizabeth Goodall, a former Lehman employee who now works for advisory firm JC Rathbone, and who specialises in fixing securitisation transactions.

Many of Lehman's property-related securitisations had the bank originate the

transactions and also take counterparty roles, such as providing interest rate swaps, necessary to make the deals work, Goodall said.

The speed of Lehman's demise meant there was no time for new counterparties to be brought in, she said, leaving many deals in limbo, triggering rating downgrades and losses for investors.

Previous criteria for counterparties assumed bond issuers would have time for remedies to be pursued, for example an orderly replacement of a weakening counterparty.

Lehman's demise accelerated a review of counterparties by rating agency Fitch, which expects to launch new draft criteria by October.

Investors in new securitisation deals are likely to eschew the complex transaction structures seen during the credit boom, and instead focus on simpler deals where risk is more transparent, said Stuart Jennings at Fitch Ratings.

When investor demand for securitisation does return "it may essentially be back to square one structure-wise," he added. Straightforward ABS, where risk is easy to analyse will come back first. A recent structured finance deal backed by Tesco assets is an example, Jennings said.

But there is little demand for more complex investment vehicles such as CDOs, which are very hard to analyse because of their layered structure and because they often cross-invest in similar structures that are hard to understand.

Many investors are heavily exposed to deals stemming from the boom years, whose value is now in doubt.

"One reason there is no demand is investors don't know what's happened to their current holdings," said Rathbone's Goodall.

"I expect they won't start ploughing money into new deals until they get more certainty on what they have lost or not lost," Goodall said.

COURTS

The complexity of many securitisation deals from the boom years makes it more likely the courts will be forced to adjudicate between different interested parties.

Participants in Dante, a Lehman-designed securitisation deal, have been to the London and New York courts after a disagreement over who should be repaid first.

Billions of dollars of other so-called synthetic CDOs -- layered structures whose underlying assets often are credit default swaps -- could be affected by the case, which could also have a wider impact on the whole of the securitisation market, rating agency Fitch said.

Other banks also put together complex securitisation deals that have proved

difficult to unwind. Last week an investor in an RBS-designed securitisation, Epic Industrious, went to the High Court seeking to block the sale of a portfolio of commercial property assets.

(Editing by Jon Loades-Carter)

© Thomson Reuters 2009. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

# EXHIBIT B



## Fitch: Lehman Legal Challenge May Have Varying Impact on Global Structured Finance

14 Aug 2009 9:00 AM (EDT)

Fitch Ratings-New York/London-14 August 2009: Ratings on global structured finance transactions with material derivative exposure to U.S. based counterparties may be adversely affected by pending litigation related to the Lehman Brothers bankruptcy filing, according to Fitch Ratings.

Related cases are being heard in both the UK courts and the U.S. bankruptcy courts and specifically relate to provisions that subordinate swap termination payments to the rated noteholders as a mitigant to counterparty default risk in synthetic CDOs. A final outcome favourable to the Lehman bankruptcy estate (Lehman) could have implications not only for synthetic CDOs, but for global SF transactions generally due to the widespread use of the subordination provisions within securitisation structures. The ultimate outcome and timing for resolution of the court cases remains uncertain at this stage, thus any potential rating action is by no means inevitable or imminent.

The cases currently in the courts relate to synthetic CDOs with credit default swap (CDS) contracts. Issuance proceeds from a synthetic CDO note are usually invested in highly rated, liquid collateral to satisfy protection payments under the CDS or to repay note principal at final maturity. The CDO is governed by the transaction documents, which typically includes administration of accounts and application of monies, and is administered by the trustee. Non-payment of interest or principal or bankruptcy filing of the swap counterparty are defined as termination events for the CDS contract, which in turn triggers an early termination of the structured finance transaction under the documentation. Under the CDS contract a final swap termination payment is due and based on the mark-to-market of the CDS when it is terminated. With the CDS contract terminated, the only remaining asset of the trust available to satisfy any potential swap termination payment and repayment of the CDO notes is the proceeds in the collateral account.

Structured finance note issuers and investors identified the potential for loss to noteholders due to counterparty default risk at the early stages of using derivatives in securitisation. The transactions were structured such that any derivative termination payments from the SF transaction to the defaulted counterparty were then structurally subordinated to the repayment of the noteholders in the priority of payments to mitigate this risk.

In assigning ratings to SF transactions, Fitch's global rating criteria also recognized this risk and states that where termination payments are applicable and rank senior to rated noteholders, the ratings of the notes would be capped at the credit quality of the derivative counterparty. However, most securitisation transactions were structured in line with the industry convention such that derivative termination payments were subordinated and therefore the notes were eligible to achieve a rating higher than that of the counterparty.

'The outcomes of the court cases in favour of Lehman will have clear rating implications for synthetic CDOs and other similar securitizations,' said Managing Director Kevin Kendra. In a UK case however, a ruling recently confirmed the validity of the contractual subordination under English law. Lehman has appealed the English court's decision. In a US case a motion to dismiss has been denied and a trial date has been set for September. If the rulings are ultimately in favour of Lehman, and no other counterparty risk mitigants are present in the transactions, then Fitch will cap the credit ratings of notes in synthetic SF transactions to the credit rating of the CDS counterparty where the counterparty may be subject to US bankruptcy proceedings.

While the potential impact on Fitch's ratings is most pronounced in SF transactions where the termination of the derivative contract triggers a termination of the securitization (usually synthetic transactions) this feature is also prevalent in other SF transactions where the role of the derivative is mainly for hedging purposes within the structure. In these instances, the termination of the derivative contract does not trigger a termination of the securitization, but may also result in termination payments being due to the counterparty at a senior level in the priority of payments. However, other factors such as the size of the derivative position in the context of the SF transaction overall and the potential appointment of a possible replacement counterparty may provide some mitigants. Consequently the potential rating implication of the pending cases will depend on the specifics of each transaction, as well as the ruling by the respective courts.

Fitch will continue to monitor the ongoing litigation and provide additional comment once further information is available.

Contact: Olivier Vincens +44 (0)20 7417 4221; Andreas Wilgen +44 (0)20 7417 6332, London; Kevin Kendra +1-212-908-0760, New York.

Media Relations: Julian Dennison, London, Tel: +44 020 7682 7480, Email: julian.dennison@fitchratings.com; Sandro Scenga, New York, Tel: +1 212-908-0278, Email: sandro.scenga@fitchratings.com.

Fitch's rating definitions and the terms of use of such ratings are available on the agency's public site, 'www.fitchratings.com'. Published ratings, criteria and methodologies are available from this site, at all times. Fitch's code of conduct, confidentiality, conflicts of interest, affiliate firewall, compliance and other relevant policies and procedures are also available from the 'Code of Conduct' section of this site.

Copyright © 2009 by Fitch, Inc., Fitch Ratings Ltd. and its subsidiaries.

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Lead Case No. 08-13555(JMP)

Adv. Case Nos. 09-01241 and 09-01032

- - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

          -against-

HARRIER FINANCE LIMITED, a.k.a. RATHGAR CAPTIAL CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Plaintiff,

          -against-

BALLYROCK ABS CDO 2007-1 LIMITED,

                    Defendant.

          -and-

BLACKROCK MORTGAGE INVESTORS MASTER FUND, L.P.,

                    Counter-Defendant.

- - - - - - - - - - - - - - - - - - -x

     (cont'd. on next page)

1

2                    U.S. Bankruptcy Court

3                    One Bowling Green

4                    New York, New York

5

6                    September 17, 2009

7                    2:03 p.m.

8

9    B E F O R E:

10   HON. JAMES M. PECK

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Gotshal for the debtors.  I'd like to start by addressing a

2    question that Your Honor had for Ms. Gallagher which I believe

3    was:  Absent the clause that we seek to invalidate would there

4    be a payment that was due upon termination to LBSF?  And the

5    answer to that is yes.  If you look at -- and I apologize I

6    don't have copies, Your Honor, but I can read into the record

7    and tell you where to find it.  If you look at Ms. Gallagher's

8    declaration that she filed and you look at Exhibit B which is

9    the confirmation, Your Honor, which is the amended and restated

10   schedule, the execution copy, Exhibit B.

11        THE COURT:  Rather than hunt through my book I'll

12   just listen to you.

13        MR. SLACK:  Okay.  Your Honor, Section 6(3), which

14   talks about payments on early termination, lists a whole

15   schedule of things that are paid.  And then (4)(i) specifically

16   deals with the fact that there would be a payment owed to LBSF

17   absent the -- what I'll call the flip or the invalidation of

18   their right to get that payment.

19        THE COURT:  What's the amount of that payment?

20        MR. SLACK:  Excuse me?

21        THE COURT:  What is the amount of that payment?

22        MR. SLACK:  The amount of that payment, as of the

23   time we filed the complaint, and we haven't recalculated it,

24   was 55 million -- was the value at that time, your Honor, out

25   of the, I think, approximately 300 that was paid.  So there was

1    still money that would have gone out to Harrier but we would

2    have been paid our 55 million at that time.

3           Your Honor, there's no dispute, I think, among the

4    parties today that New York law has a doctrine that invalidates

5    penalty provisions as unenforceable.  And what's important, I

6    think, is there's been a lot of discussion about the fact that

7    this was negotiated between sophisticated parties, that there

8    were agreements.

9           And there's one thing which is common amongst all of

10   the cases that we cite, and that is there are in fact contracts

11   that were negotiated, many of them with sophisticated parties,

12   but all of them agreed on provisions that a court ultimately

13   found was invalid.  And so the fact that you have negotiation,

14   and here there were obviously negotiations to address the swap.

15   What I would say, Your Honor, another question that you had,

16   and obviously it's not in our complaint but I think what

17   discovery will show is that provisions like this are put in

18   only at the behest of the rating agency.  So they're

19   essentially forced upon the parties, they're certainly not

20   actively agreed to, absent that kind of rating agency pressure.

21   But again, that's not in our complaint but I think that's what

22   you'll find is the genesis for those provisions.

23          THE COURT:  Let's just -- I mean, we're off topic,

24   but let me just follow through on that comment because it's

25   something that I've been giving some thought to.  These

# EXHIBIT D

# INTEREST SWAP

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## COURTS AND ADMINISTRATIVE PRACTICE

OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

### ONE HUNDRED FIRST CONGRESS

FIRST SESSION

ON

# S. 396

A BILL TO AMEND TITLE II OF THE UNITED STATES CODE, THE
BANKRUPTCY CODE, REGARDING SWAP AGREEMENTS

APRIL 11, 1989

**Serial No. J–101–10**

Printed for the use of the Committee on the Judiciary





DEPOSITORY

9 0 - 1 2 8 P

U.S. GOVERNMENT PRINTING OFFICE

24–834 ±₸

WASHINGTON : 1990

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

## COMMITTEE ON THE JUDICIARY

JOSEPH R. BIDEN, Jr., Delaware, *Chairman*

EDWARD M. KENNEDY, Massachusetts
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
HOWELL HEFLIN, Alabama
PAUL SIMON, Illinois
HERBERT KOHL, Wisconsin

STROM THURMOND, South Carolina
ORRIN G. HATCH, Utah
ALAN K. SIMPSON, Wyoming
CHARLES E. GRASSLEY, Iowa
ARLEN SPECTER, Pennsylvania
GORDON J. HUMPHREY, New Hampshire

MARK H. GITENSTEIN, *Chief Counsel*
DIANA HUFFMAN, *Staff Director*
TERRY L. WOOTEN, *Minority Chief Counsel*
R.J. DUKE SHORT, *Minority Staff Director*

---

## SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE

HOWELL HEFLIN, Alabama, *Chairman*

HOWARD M. METZENBAUM, Ohio
HERBERT KOHL, Wisconsin

CHARLES E. GRASSLEY, Iowa
STROM THURMOND, South Carolina

KAREN KREMER, *Chief Counsel*
SAM GERDANO, *Minority Chief Counsel*

(II)

# CONTENTS

## STATEMENTS OF COMMITTEE MEMBERS

Heflin, Hon. Howell, a U.S. Senator from the State of Alabama...........................
Grassley, Hon. Charles E., a U.S. Senator from the State of Iowa .......................
Thurmond, Hon. Strom, a U.S. Senator from the State of South Carolina..........

## PROPOSED LEGISLATION

S. 396, a bill to amend title II of the United States Code, the bankruptcy code, regarding swap agreements ...................................................................................

## CHRONOLOGICAL LIST OF WITNESSES

Panel consisting of Mark C. Brickell, chairman, International Swap Dealers Association, New York, NY, accompanied by William J. Perlstein, Wilmer, Cutler & Pickering, Washington, DC; John J. Jerome, partner, Milbank, Tweed, Hadley & McCloy, New York, NY; Frank G. Sinatra, of counsel, Bingham, Englar, Jones & Houston, and member, American Bankruptcy Institute, Washington, DC; and Doug Comer, Akin, Gump, Strauss, Hauer & Feld, and member, American Bankruptcy Institute, Washington, DC.........

## ALPHABETICAL LIST AND MATERIAL SUBMITTED

Brickell, Mark C.:
    Testimony ..................................................................................................................
    Prepared statement .................................................................................................
        Attachments—Letters to Hon. Charles Schumer, U.S. House of Representatives, Washington, DC, from:
            Paul Allen Schott, Chief Counsel, Comptroller of the Currency, Administrator of National Banks, Washington, DC, January 11, 1989................................................................................................
            L. William Seidman, Chairman, Federal Deposit Insurance Corp., Washington, DC, January 6, 1989...............................................
                Enclosure: FDIC staff discussion paper responding to Congressman Schumer's November 4 letter requesting comment on issues relating to swap contracts and proposed revisions to the U.S. Bankruptcy Code ....................................
            Alan Greenspan, Chairman, Board of Governors of the Federal Reserve System, Washington, DC, January 23, 1989 .....................
                Enclosures: Federal Reserve staff responses to questions posed by Congressman Schumer regarding swap agreements .............................................................................................
Comer, Doug:
    Testimony ..................................................................................................................
Jerome, John J.:
    Testimony ..................................................................................................................
    Prepared statement .................................................................................................
    Letter to the Subcommittee on Courts and Administrative Practice, May 19, 1989.................................................................................................................
Perlstein, William J.:
    Testimony ..................................................................................................................
    Memorandum for Senator Heflin (with exhibits), May 23, 1989....................

Sinatra, Frank G.:
      Page
    Testimony ..................................................................................................................... 61
    Prepared statement ...................................................................................................... 63

## QUESTIONS AND ANSWERS

Responses of Mark C. Brickell to written questions from:
    Senator Heflin................................................................................................................ 103
    Senator Grassley .......................................................................................................... 117
    Senator Thurmond........................................................................................................ 120
Responses of William J. Perlstein to written questions from:
    Senator Heflin................................................................................................................ 103
    Senator Thurmond........................................................................................................ 116
Responses of John J. Jerome to written questions from:
    Senator Heflin................................................................................................................ 123
    Senator Thurmond........................................................................................................ 126
Responses of Frank G. Sinatra to written questions from Senator Thurmond ... 129
Responses of Doug Comer to written questions from Senator Heflin.................... 131

# INTEREST SWAP

### TUESDAY, APRIL 11, 1989

U.S. SENATE,
SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 2:13 p.m., in roo
SD–226, Dirksen Senate Office Building, Hon. Howell Heflin (chai
man of the subcommittee) presiding.

Also present: Senator Grassley.

### OPENING STATEMENT OF HON. HOWELL HEFLIN, A U.S.
### SENATOR FROM THE STATE OF ALABAMA

Senator HEFLIN. The subcommittee will come to order. I wou
like to welcome you to the first hearing of the Subcommittee (
Courts and Administrative Practice in the 101st Congress.

Today, the subcommittee will hear testimony on the need fi
changes in the Bankruptcy Code as it pertains to the treatment
interest rate and currency swap agreements. S. 396 was introduce
by Senator DeConcini on February 9, 1989, and has been cospo
sored by the ranking member of this subcommittee, Senator Gras
ley.

Last Congress, similar legislation, S. 2279, passed the Senate J
diciary Committee and the full Senate. However, the legislativ
session closed before the House was able to act on the bill.

Swap transactions have become a very important tool in fina
cial risk management. The parties to swap transactions includ
commercial banks, thrift institutions, insurance companies, corp
rations, and U.S. and foreign government-sponsored entities.

There is concern that if one of the parties to a swap agreemei
files for bankruptcy under the current Bankruptcy Code, the no
defaulting party is left with a substantial risk and, depending (
the size of the swap agreement, could cause a rippling effect whic
would undermine the stability of the financial markets.

Many of the parties to swap agreements cannot become debto:
under the Bankruptcy Code, but they can benefit from alleviatir
the uncertainty of how specific provisions within the Bankrupt(
Code will be applied.

I can fully understand the concern about the potential ripp
effect if the nondefaulting party is left to shoulder the financi
risk, but it is also important to examine the policy underlying tl
Bankruptcy Code and to be certain of the possible impact of th
legislation on all affected parties.

I would ask each of the witnesses to summarize their statements. Their full statements will be made a part of the record. We appreciate your willingness to participate in these hearings and look forward to your testimony.

Senator Grassley, do you have an opening statement?

Senator GRASSLEY. Yes, I would like to have it printed in the record in toto.

[A printed copy of S. 396 and the prepared statement of Senator Grassley follow:]

II

101ST CONGRESS
1ST SESSION

# S. 396

To amend title II of the United States Code, the bankruptcy code, regarding swap agreements.

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 9 (legislative day, JANUARY 3), 1989

Mr. DeConcini (for himself and Mr. Grassley) introduced the following bill; which was read twice and referred to the Committee on the Judiciary

# A BILL

To amend title II of the United States Code, the bankruptcy code, regarding swap agreements.

1     *Be it enacted by the Senate and House of Representa-*

2 *tives of the United States of America in Congress assembled,*

3 That section 101 of title 11, United States Code, is amended

4 by—

5         (1) redesignating paragraphs (49), (50), and (51)

6     as paragraphs (51), (52), and (53) respectively; and

7         (2) inserting between paragraphs (48) and (51), as

8     redesignated herein, the following:

9             "(49) 'swap agreement' means an agreement,

10             including terms and conditions incorporated by

2

1 reference therein, which is a rate swap agree-
2 ment, basis swap, forward rate agreement, inter-
3 est rate future, interest rate option purchased,
4 forward foreign exchange agreement, rate cap
5 agreement, rate floor agreement rate collar agree-
6 ment, currency swap agreement, cross-currency
7 rate swap agreement, currency future, currency
8 option purchased (including any option to enter
9 into any of the foregoing) or any other similar
10 agreement or combination thereof, and a master
11 agreement for any of the foregoing together with
12 all supplements shall be considered one swap
13 agreement;

14 "(50) 'swap participant' means an entity
15 that, on any day during the period beginning 90
16 days before the date of the filing of the petition,
17 has an outstanding swap agreement with the
18 debtor;".

19 SEC. 2. Section 362(b) of title 11, United States Code,
20 is amended by—

21 (1) striking out "or" at the end of paragraph (12);
22 (2) striking out the period at the end of paragraph
23 (13) and inserting in lieu thereof "; or"; and
24 (3) inserting at the end thereof the following:

3

1       "(14) under subsection (a) of this section, of

2   the setoff by a swap participant, of any mutual

3   debt and claim under or in connection with one or

4   more swap agreements that constitutes the setoff

5   of a claim against the debtor for any payment due

6   from the debtor under or in connection with swap

7   agreements against any payment due to the

8   debtor from the swap participant under or in con-

9   nection with the swap agreements or against

10  cash, securities, or other property of the debtor

11  held by or due from such swap participant to

12  guarantee, secure or settle swap agreements.".

13  SEC. 3. Section 546 of title 11, United States Code, is

14  amended by adding at the end thereof the following:

15      "(g) Notwithstanding sections 544, 545, 547,

16  548(a)(2) and 548(b) of this title, the trustee may not

17  avoid a transfer under a swap agreement, made by or

18  to a swap participant, in connection with a swap

19  agreement and that is made before the commencement

20  of the case, except under section 548(a)(1) of this

21  title.".

22  SEC. 4. Section 548(a)(2) of title 11, United States

23  Code, is amended by—

24      (1) striking out "and" at the end of subparagraph

25  (B);

4

1    (2) striking out the period at the end of subpara-
2    graph (C) and inserting in lieu thereof "; and"; and
3    (3) adding at the end thereof the following:

4        "(D) a swap participant that receives a
5        transfer in connection with a swap agreement, as
6        defined in section 101(49) of this title, takes for
7        value to the extent of such transfer.".

8    SEC. 5. Section 553(b)(1) of title 11, United States
9    Code, is amended by inserting "362(b)(14)," after
10    "362(b)(7),".

11    SEC. 6. Subchapter III of chapter 5 of title 11, United
12    States Code, is amended by adding at the end thereof the
13    following:

14    **"§ 560. Contractual right to terminate a swap agreement**

15    "The exercise of any contractual rights of a swap par-
16    ticipant to cause the termination of a swap agreement be-
17    cause of a condition of the kind specified in section 365(e)(1)
18    of this title or to set off or net out any termination values or
19    payment amounts arising under or in connection with one or
20    more swap agreements shall not be stayed, avoided, or other-
21    wise limited by operation of any provision of this title or by
22    order of a court or administrative agency in any proceeding
23    under this title. As used in this section, the term 'contractual
24    right' includes a right, whether or not evidenced in writing,

5

1 arising under common law, under law merchant or by reason

2 of normal business practice.''.

○

STATEMENT OF SENATOR CHARLES E. GRASSLEY
BEFORE THE SUBCOMMITTEE ON COURTS
OF THE SENATE JUDICIARY COMMITTEE ON S. 396
A BILL TO AMEND TITLE 11, U.S. CODE, REGARDING SWAP AGREEMENTS


I WOULD LIKE TO THANK CHAIRMAN HEFLIN FOR SCHEDULING THIS FIRST SUBCOMMITTEE HEARING OF THE 101ST CONGRESS ON S. 396, A BILL INTRODUCED BY SENATOR DE CONCINI AND MYSELF, TO PROTECT THE CONTRACTUAL RIGHTS OF PARTIES TO INTEREST RATE AND CURRENCY SWAP AGREEMENTS.

SWAP AGREEMENTS ARE USED BY NUMEROUS FINANCIAL INSTITUTIONS TO MANAGE THEIR EXPOSURE TO INTEREST RATE AND CURRENCY EXCHANGE RISKS. TYPICALLY, THESE AGREEMENTS PROVIDE FOR ONE PARTY TO MAKE PAYMENTS BASED ON A FLOATING RATE WHILE THE OTHER PAYS ON A FIXED RATE. THIS ALLOWS A THRIFT, FOR EXAMPLE, WHICH HAS FIXED RATE MORTGAGES AS ASSETS, TO HEDGE AGAINST A RISE IN THE COST OF ITS FLOATING RATE DEPOSIT LIABILITIES. BOTH THE FEDERAL HOME LOAN BANK BOARD, AND THE FSLIC, AMONG OTHERS, HAVE ENCOURAGED THRIFTS TO UTILIZE SWAPS TO REDUCE INTEREST RATE EXPOSURE. THIS MAKES ESPECIALLY GOOD SENSE AT A TIME WHEN THRIFTS ARE UNDER SEVERE FINANCIAL PRESSURE.

THE SWAP MARKET HAS EXPERIENCED SHARP GROWTH DURING THIS "INFANT" STAGE OF DEVELOPMENT. YET SWAP DEALERS AND OTHER PARTICIPANTS IN THIS MARKET HAVE EXPRESSED CONCERN ABOUT UNCERTAINTY OVER THE TREATMENT OF SWAPS UNDER THE BANKRUPTCY CODE, WHEN ONE PARTY TO A SWAP FILES FOR PROTECTION UNDER THE CODE. THIS BILL ATTEMPTS TO ADDRESS THIS UNCERTAINTY.

THE BILL WOULD ADD PROVISIONS ADDRESSING THE CONTRACTUAL RIGHTS OF SWAP PARTICIPANTS TO TERMINATE AND LIQUIDATE THEIR OBLIGATIONS ON A TIMELY BASIS SHOULD ONE PARTICIPANT FILE FOR BANKRUPTCY. THIS AMENDMENT WOULD GO A LONG WAY TOWARD ENSURING THAT THE FAILURE OF A PARTICIPANT WILL NOT UNDULY DISRUPT AN EXTREMELY IMPORTANT FINANCIAL MARKET. THE BILL FOLLOWS AN APPROACH THAT WAS ADOPTED AS FAIR AND REASONABLE IN 1982 FOR SECURITIES, FUTURES AND COMMODITIES CONTRACTS, AND IN 1984 FOR REPURCHASE AGREEMENTS. THE APPROACH FOLLOWED IN EACH CASE, AND IN S. 396, IS TO MINIMIZE RISK AND DISLOCATION TO FINANCIAL MARKETS AFTER A BANKRUPTCY.

THE BANKRUPTCY OF A SWAP MARKET PARTICIPANT COULD CAUSE SIGNIFICANT MARKET DISRUPTION. THIS ARISES FROM THE RISK THAT AN OUTSTANDING SWAP TRANSACTION WOULD BE HELD OPEN DURING THE BANKRUPTCY, DESPITE CONTRACTUAL PROVISIONS FOR ITS TERMINATION. ALSO, THERE IS THE RISK THAT A DEFAULTING PARTY (OR A TRUSTEE) IN BANKRUPTCY COULD ASSUME FAVORABLE SWAP TRANSACTIONS AND REJECT UNFAVORABLE ONES -- SO-CALLED "CHERRY PICKING" -- EVEN THOUGH THE SWAP CONTRACT CALLS FOR LIQUIDATION

OF THESE OBLIGATIONS BY NETTING. THE EXPOSURE CREATED BY THESE RISKS TAKES ON SPECIAL SIGNIFICANCE IN A VOLATILE MARKET.

SENATE BILL 396 RESOLVES THESE CONCERNS BY TAKING THE SAME APPROACH FOLLOWED FOR SECURITIES CONTRACTS, FORWARD CONTRACTS AND REPURCHASE AGREEMENTS. THE BILL ENSURES THAT, UPON A BANKRUPTCY FILING BY ONE PARTY, THE OTHER PARTY CAN CLOSE OUT ALL EXISTING SWAP TRANSACTIONS WITH THE BANKRUPT PARTY WITHOUT HAVING TO KEEP THE TRANSACTION OPEN UNDER THE CODE. THE BILL ALSO ENSURES THAT ALL TRANSACTIONS BETWEEN TWO PARTIES CAN BE NETTED OUT, AS PROVIDED FOR IN THE SWAP AGREEMENT, TO DETERMIN A SINGLE NET TERMINATION VALUE. FINALLY, IT PROTECTS ORDINARY SWAP PAYMENTS AGAINST EXPOSURE TO PREFERENCE AVOIDANCE ACTIONS DURING THE BANKRUPTCY PROCEEDING.

MR. CHAIRMAN, THIS IS AN EXCEEDINGLY COMPLEX AREA OF COMMERCIAL LAW AND BANKRUPTCY. I COMMEND YOU FOR SCHEDULING THESE HEARINGS EARLY ON IN THIS SESSION, SO THAT WE CAN AGAIN MOVE THE BILL THROUGH THE SENATE IN TIME FOR THE HOUSE TO ACT IN A SIMILAR WAY.

Senator GRASSLEY. First, I want to emphasize that you already have my cosponsorship. I believe this legislation is significant because if there is a bankruptcy involving these transactions, it will lead to a great deal of market distortion. We ought to do whatever we can to prevent that from happening.

Second, I want to mention that this legislation has passed the Senate more than one time already. I hope that we can do everything possible, Mr. Chairman, to see that we get the attention of the House of Representatives on this legislation. Maybe the new leadership of the House Judiciary Committee will make passage more likely than before. But if the House will not pass it, then I hope we take whatever action we can to see that it is amended to some other bill that will pass so that we are successful this time in getting the bill to the President, and getting his signature on it as well.

Mr. Chairman, I thank you for your leadership in holding this hearing. I am able to stay for the first half hour and then I will probably leave questions to be answered in writing.

Senator HEFLIN. Thank you, Senator Grassley.

We have one panel consisting of Mr. Mark Brickell, chairman of the International Swap Dealers Association; Mr. William Perlstein, of Wilmer, Cutler & Pickering in Washington, DC; Mr. John Jerome, of Milbank, Tweed, Hadley & McCloy in New York; Mr. Frank G. Sinatra, president of Rebound Management, Inc.; and Mr. Doug Comer of Akin, Gump, Strauss, Hauer & Feld here in Washington, DC. Mr. Comer is a member of the American Bankruptcy Institute.

Mr. Brickell, would you want to start?

**PANEL CONSISTING OF MARK C. BRICKELL, CHAIRMAN, INTERNATIONAL SWAP DEALERS ASSOCIATION, NEW YORK, NY, ACCOMPANIED BY WILLIAM J. PERLSTEIN, WILMER, CUTLER & PICKERING, WASHINGTON, DC; JOHN J. JEROME, PARTNER, MILBANK, TWEED, HADLEY & McCLOY, NEW YORK, NY; FRANK G. SINATRA, OF COUNSEL, BINGHAM, ENGLAR, JONES & HOUSTON, AND MEMBER, AMERICAN BANKRUPTCY INSTITUTE, WASHINGTON, DC; AND DOUG COMER, AKIN, GUMP, STRAUSS, HAUER & FELD, AND MEMBER, AMERICAN BANKRUPTCY INSTITUTE, WASHINGTON, DC**

### STATEMENT OF MARK C. BRICKEL

Mr. BRICKELL. Thank you, Senator Heflin. As chairman of the International Swap Dealers Association, or ISDA, I am pleased to submit this statement in support of S. 396. I have with me today our counsel on this matter, William J. Perlstein, of the Washington, DC, firm of Wilmer, Cutler & Pickering, and also present in the hearing room are other members of ISDA's board of directors.

We urge this committee to support these amendments to the Bankruptcy Code and to clarify the treatment of interest rate swaps, currency swaps, and forward foreign exchange agreements.

These amendments have attracted broad support from the financial community and from regulatory institutions. S. 396 extends the same protections enacted by Congress in the 1982 and 1984 securities, commodities, and repurchase agreement amendments, and

this legislation is virtually identical to legislation passed wi
unanimous consent by the Senate Judiciary Committee on Octob
5, 1988, and thereafter by the full Senate.

Companion legislation will be introduced in the House of Repr
sentatives by Congressmen Schumer, Fish, and Synar, and favc
able action by the House is expected this session.

Interest rate and currency swap agreements are a widely us
risk management tool in the world financial markets. Their pop
larity is attested to by ISDA's estimates of swap market volun
Our surveys indicate that the worldwide swap market exceeds $1
trillion in notional principal amount.

In a typical single currency interest rate swap, one party agre
to make periodic payments based on a fixed rate of interest to
counterparty, who, in return, makes periodic payments based on
floating rate.

Payments are calculated based on a hypothetical principal, or r
tional amount, and payments amounts are typically netted (
common payment dates. The principal, or notional amounts gene
ally are not transferred and the term of swap transactions gener;
ly ranges from 1 to 12 years.

Through such arrangements, financial institutions, governmen
and corporations manage their exposure to changes in intere
rates and foreign currency values. For example, an entity that us
floating rate liabilities to fund fixed-rate assets, like a thrift ins
tution, has substantial interest rate exposure. When rates rise, t
firm may suffer losses as the cost of its floating rate liabilities ris
above the fixed return on its assets.

To hedge this risk and lock in a positive spread between the ra
it receives on its assets and the cost of its liabilities, that firm c
enter into an interest rate swap in which it makes fixed-rate pa
ments, and those payments can be funded by the firm's fixed-ra
assets, and receives floating rate payments, which can be used
meet any increase in the cost of its floating rate liabilities.

Swap transactions like the one I have described are used by
nancial and nonfinancial institutions around the world, includi
commercial banks, thrift institutions, insurance companies, dom
tic and multinational corporations, international organizations li
the World Bank, and U.S. and foreign government-sponsored en
ties.

These transactions are not, however, used in a retail sense, sin
the average size of a swap transaction is in the range of $24 m
lion.

The market is served by active dealers in the world's princiį
financial centers, who will often act as principals entering ir
transactions themselves and creating, thereby, a portfolio of swaị
By standing ready to enter into swaps with any qualified party
any time, swap dealers provide important liquidity for the sw
market.

Most swap transactions between two counterparties are doc
mented under a single master swap agreement, and under tl
agreement a swap dealer, such as a commercial or investme
bank which has a number of dealings with one counterparty, w
document the transactions with its counterparty.

Whenever these two parties enter into a new transaction, they will set forth the particular notional amount and the payments terms for that transaction in a supplemental confirmation under the master agreement.

As the swap market has grown, participants have become increasingly concerned about the possible impact of the Federal Bankruptcy Code on certain of the critical provisions of these master swap agreements.

One of the fundamental provisions of most swap agreements is that, upon termination of the agreement for default, including the commencement of a case under the Bankruptcy Code, all transactions encompassed by the master swap agreement terminate.

This provision permits the nondefaulting party to close out transactions with a party that is unlikely to fulfill its obligations. Without the benefit of this provision, the nondefaulting party would be required to remain exposed to interest rate or currency fluctuations, not knowing if the debtor will assume or reject the agreement.

A second fundamental provision of the standard swap master agreement provides that at the time of termination, a single net value will be calculated for all of the outstanding transactions under the master agreement, and the defaulting party will owe this market value to the nondefaulting party. In this way, any potential liability of a defaulting party is reduced by the value of any swap transactions that favored that defaulting party.

These provisions are used by sophisticated swap counterparties to reduce their risk of loss if a counterparty defaults. But the protections of the netting provisions will only work if, in the event of a bankruptcy, the nondefaulting party is able to terminate all transactions under the relevant agreement and net the positive and negative exposures to the defaulting party.

The nondefaulting party could face substantial market exposure if the automatic stay barred it from terminating all outstanding transactions and forced it to hold open those transactions with the debtor, particularly in a volatile market.

Moreover, the nondefaulting party could suffer unexpected and perhaps substantial losses if, contrary to the express agreement of the parties to the master swap agreement, the defaulting party or its bankruptcy trustee could selectively assume certain favorable transactions while rejecting those unfavorable to it.

Imposing potential losses like these on nondefaulting parties is contrary to the contractual provisions of the agreements and would materially increase the potential risk associated with all swap transactions.

ISDA believes that under the existing statutory provisions and case law, netting would be enforced under the Bankruptcy Code. But this issue has never been expressly addressed by a court and, accordingly, cannot be entirely free from doubt.

If netting is not allowed and the debtor is permitted to cherry-pick, the potential exposure for nondefaulting parties is materially increased, which could undermine the basic functioning of this $1.5 trillion market.

For these reasons, ISDA supports the enactment of S. 396 t extend to swap and foreign exchange transactions the same protec tions enacted by Congress in 1982 and 1984 for securities, commod ities, and repurchase agreements.

Thank you.

[The prepared statement of Mr. Brickel follows:]

STATEMENT OF

Mark C. Brickell, Chairman

INTERNATIONAL SWAP DEALERS ASSOCIATION

IN SUPPORT OF S.396

April 11, 1989

As Chairman of the International Swap Dealers
Association, Inc. ("ISDA"), I am pleased to submit this Statement
in support of S.396. I have with me today our counsel on this
matter, William J. Perlstein of the Washington, D.C. firm of
Wilmer, Cutler & Pickering.

We urge this Committee to support these amendments to
the Bankruptcy Code, which will provide needed protections for
interest rate and currency swap and forward foreign exchange
agreements. This critical legislation, introduced by Senator
Dennis DeConcini of Arizona and Senator Charles Grassley of Iowa
on February 9, 1989, has attracted broad support throughout the
financial community. Virtually identical legislation was passed
with unanimous consent by the Senate Judiciary Committee on
October 5, 1988, and thereafter by the full Senate. Companion
legislation will be introduced in the House of Representatives by
Congressman Charles Schumer and favorable action by the House is
expected this Session.

Interest rate and currency swap agreements are a rapidly
growing and vital risk management tool in the world financial
markets. It is estimated that in excess of $1 trillion in swap
transactions are currently outstanding. Financial institutions,
governmental entities and corporations use swaps to minimize

exposure to adverse changes in interest and currency exchange rates. Currency swap and forward foreign exchange transactions also play an important role in international trade as a means of hedging against currency fluctuations. Swap dealers provide a critical source of liquidity to the entire swap market by often acting as principals in swap transactions.

As the swap market has grown, participants have become increasingly concerned about the possible impact of the federal Bankruptcy Code on certain of the critical provisions of swap agreements. One of the fundamental provisions of most swap agreements is that, upon termination of the agreement for default, including the commencement of a case under the Bankruptcy Code, all transactions encompassed by the agreement terminate. This provision permits the counterparty to close out transactions with a party that is unlikely to fulfill its obligations. Without the benefit of this provision, the counterparty would be required to remain exposed to interest or currency rate fluctuations without knowing if the debtor will assume or reject the agreement. The standard swap agreement also provides that, at the time of termination, there will be a determination of a single net settlement amount for all outstanding transactions, and the defaulting party will pay any settlement amount due the nondefaulting party.1/

---

1/      Following more than a year of effort, the International Swap Dealers Association, Inc. ("ISDA"), an organization of leading commercial, merchant and investment banks, developed standard form swap agreements for use in both U.S. dollar and
(continued...)

- 2 -

Participants in the swap market are concerned that, if a counterparty files for bankruptcy, the automatic stay and other provisions of the Bankruptcy Code could be interpreted to bar the implementation of these critical contractual provisions. These bankruptcy-related issues create uncertainty among potential participants in swap and forward foreign exchange transactions, creating a risk that, particularly in periods of volatility, the liquidity of the market will be restricted by concern about the effect of certain Bankruptcy Code provisions.

Congress has for many years recognized the need for certainty and speed in the treatment of securities and other similar financial transactions in bankruptcy. Both the former Bankruptcy Act and the Bankruptcy Code have for many years contained special stockbroker and commodity broker provisions. In 1982 and 1984 Congress further recognized the needs of the securities and commodities markets for certainty and speed by enacting broad protections for securities, commodities, and forward contracts and for repurchase agreements. These amendments have worked well in practice and have provided needed certainty about the treatment of these financial transactions in the event of the bankruptcy of a counterparty.

_____

1/          (...continued)
multicurrency swaps. The two standard form agreements operate substantively in the same manner with regard to default and termination. The standard form swap agreements developed by ISDA were published in early 1987 and are already widely used throughout the commercial world. A brief description of ISDA is appended to this Statement.

- 3 -

The protections contained in S.396 closely parallel the 1982 and 1984 amendments.2/ This legislation would ensure that a bankruptcy filing by a party to a swap or forward foreign exchange agreement would not prevent a counterparty from exercising critical contractual rights. These include the counterparty's right to terminate the agreement, liquidate its position by determining a single net termination value, and foreclose on any collateral it holds. The legislation would also, like the earlier amendments, eliminate the concern about potential preference exposure of swap participants under the Bankruptcy Code. Finally, the legislation presents no risk of abuse, in light of the financial sophistication of all parties to these transactions and the movement toward standard industry documentation based on the formats developed by ISDA and other groups of market participants.

The principal banking regulators recognize the need for this type of assured treatment of swap transactions. On January 30, 1989, John Douglas, General Counsel of the Federal Deposit Insurance Corporation, released an opinion stating that, in the case of bank insolvencies under the jurisdiction of FDIC,

---

2/      Indeed, it is widely believed that forward foreign exchange contracts are currently covered by the forward contract provisions of the Bankruptcy Code. The lack of clarity in certain definitional provisions has, however, given rise to a desire for certainty that currency swaps and forward foreign exchange contracts will be treated consistently. A forward foreign exchange contract is an agreement to exchange, at a future date, a certain amount in one currency for a certain amount of a second currency (e.g., x dollars for y pounds). A currency swap agreement covers a series of such exchanges on specified future dat

the courts would permit immediate termination of swap
transactions and would enforce the netting provisions of swap
agreements. A copy of Mr. Douglas' opinion is attached to this
Statement. In addition, the FDIC, the Federal Reserve Board and
the Office of the Comptroller of the Currency were each asked to
review S.2279, the predecessor to S.396 passed by this Committee
and the full Senate last year, and to analyze the Bill's effect on
insured institutions. Each agency responded favorably about the
Bill's effect on the swap market and on the institutions regulated
by each agency. Copies of these analyses have been provided to
this Committee.

ISDA urges this Committee to support enactment of this
legislation. Swap agreements are a critical financial management
tool for numerous governmental, corporate and financial
institutions, and are particularly essential to thrift
institutions. In recognition of the importance of this
legislation, it has received the support of the Board of
Governors of the Federal Reserve System, the New York
Clearinghouse Association, the Securities Industry Association,
the Federal National Mortgage Association ("Fannie Mae"), the
Association of the Bar of the City of New York, and such
institutions as Carteret Savings Bank (Morristown, New Jersey),
City Federal Savings Bank (Bedminster, New Jersey), Altus Bank
(Mobile, Alabama), Greyhound Corporation (Phoenix, Arizona),
Valley National Bank of Arizona (Phoenix, Arizona), Sonat Inc.
(Birmingham, Alabama), and Blount, Inc. (Montgomery, Alabama).

- 5 -

Prompt enactment of this legislation will serve to ensure that these institutions can continue to utilize swap agreements to protect their financial investments.

I. THE INTEREST RATE AND CURRENCY SWAP MARKETS

A. Background

The swap market plays a vital role in providing participants in the capital markets the opportunity to reduce their exposure to currency and interest rate fluctuations. ISDA has compiled statistics showing that the dollar volume of outstanding swap transactions exceeded $1 trillion at the end of 1987, and that about $300 billion in new agreements were entered into in the first six months of 1988. ISDA thus estimates that the worldwide swap market exceeds $1.5 trillion in notional principal amount.

A typical single-currency interest rate swap transaction involves an agreement where one party agrees to make periodic payments based on a fixed rate while the other agrees to make periodic payments based on a floating rate. Payments are calculated on the basis of a hypothetical principal (or "notional") amount and payment amounts are typically netted (even in the absence of any default) on common payment dates. The principal or notional amounts generally are not transferred. The term of swap transactions generally ranges from one to twelve years.

Swap transactions are widely used by institutions, including thrift institutions, to manage mismatches between their assets and liabilities. For example, an entity that has substantial short-term floating rate liabilities and long-term relatively fixed rate financial assets has substantial interest rate exposure. In a rising interest rate environment, the entity may suffer losses as the cost of its short-term floating rate liabilities rises above the fixed return on its assets. To hedge this risk and "lock in" a positive spread between the rate it receives on its assets and the rate it is required to pay on its liabilities, that entity can enter into an interest rate swap agreement in which it will make fixed rate payments (which can be funded by its fixed rate assets) and will receive floating rate payments (which will rise or fall along with its floating rate liabilities).

A simple example will show how a typical interest rate swap agreement works. Company A (which could be a thrift, for example) agrees to make payments based on a fixed rate to Bank B, which agrees to make payments to Company A based on a variable rate index, such as the London Interbank Offered Rate (known as LIBOR). In this example, A pays 11%, B pays LIBOR + 1/2%, and the principal or notional amount is $50 million. Payment dates are every six months. If LIBOR averages 9% during a payment period, at the end of six months A owes B $2.75 million, B owes A $2.375 million, and the net amount owed by A to B is $.375 million. If interest rates rise so that LIBOR averages 11%

during a payment period, A still owes B $2.75 million, but B now owes A $2.875 million, for a net amount owed to A of $.125 million. If A is a thrift, whose liabilities (its deposits) rise as interest rates rise, the swap allows it to "lock in" its cost of funds so that it receives increasing payments under the swap agreement to offset its increasing cost of funds when interest rates rise.

An entity with a relatively low credit rating not only can reduce its market risk through a swap transaction but can also lower its borrowing costs by entering into swaps with an entity with a higher credit rating. Certain institutions, either because of better credit ratings or better market recognition, have a comparative advantage in borrowing in the fixed-rate markets. Other institutions may be unable to obtain long-term fixed rate financing at acceptable rates, but will be able to obtain short-term floating-rate funds. Through the use of swaps, however, thus type of institution will often be able to obtain access to favorable long-term fixed rates. Because the credit exposure on a swap (where principal payments are not exchanged) is relatively small compared to a traditional loan of principal, entities with higher credit ratings are often more willing to enter into long-term swaps than long-term loans with lower-rated entities.

Swap transactions are utilized by a wide range of financial and nonfinancial institutions. The swap market is a worldwide market with active dealers in the world's principal

- 8 -

financial centers. The participants in this market include commercial banks, investment banks, thrift institutions, insurance companies, domestic and multi-national corporations, foreign governments, international organizations like the World Bank, and U.S. and foreign government-sponsored entities. This is not, however, a retail product, as the average size swap transaction is in the range of $24 million.

A party to a swap transaction may enter into a swap directly with another principal end-user. More commonly, however, it enters into a swap with a commercial or investment bank that acts as a dealer in swaps. The dealer will often act as a principal, creating a "portfolio" of swaps. By standing ready to enter into swaps with any qualified party at any time, swap dealers provide important liquidity for the swap market.

B.    The Master Agreement

The principal risk of loss under swap agreements arises if one party defaults and there has been a shift in interest or currency exchange rates. The primary means for parties to swap transactions to minimize their exposure to each other is through the use of a single master agreement, with each individual transaction governed by that agreement. Thus, a swap dealer, such as a commercial or investment bank, which has a number of dealings with one counterparty, will have one master agreement with that party. Whenever the parties enter into a new transaction with each other, they will set forth the particular notional amount and

- 9 -

payment terms for each individual transaction in a supplemental confirmation under the master agreement.

Upon termination of a swap agreement for default, the defaulting party will owe the market value of the agreement to the nondefaulting party. The standard form agreements developed by ISDA and used by the financial community provide in such a case for the netting of termination values for all swap transactions under the agreement. In this way, any potential liability of a defaulting party is reduced by the value of any swap transactions that favored that party. Forward foreign exchange dealers similarly are developing arrangements expressly to provide for the netting of all exposures.

The protections of the netting provisions only work if, in the event of a bankruptcy, the nondefaulting party is able to terminate all transactions under the relevant agreement and net the positive and negative exposures to the defaulting party. The nondefaulting party could face substantial market exposure if the automatic stay barred it from terminating all outstanding transactions and forced it to hold open all transactions with the debtor, particularly in a volatile market. Moreover, the nondefaulting party could suffer unexpected and perhaps substantial losses if, contrary to the express agreement of the parties, the defaulting party (or its bankruptcy trustee) could selectively assume certain favorable transactions while rejecting those unfavorable to it (i.e., "cherrypick"). Imposing these potential losses on nondefaulting parties not only is contrary to

- 10 -

the contractual provisions, but would materially increase the potential risk associated with all swap transactions.

Although ISDA believes that under existing statutory provisions and case law netting should be enforced under the Bankruptcy Code, the issue has never been expressly addressed by a court and, accordingly, cannot be entirely free from doubt. If netting is not allowed -- and the debtor is permitted to cherry-pick -- the potential exposure for nondefaulting parties is materially increased, which could undermine the basic functioning of the swap market especially in periods of market volatility.

For these reasons, ISDA supports enactment of S.396 to extend to swap and forward foreign exchange transactions the same protections enacted by Congress in the 1982 and 1984 securities, commodities, and repurchase agreement amendments.

## II. PROPOSED CHANGES

The changes to the Bankruptcy Code contained in S.396 address three specific problems. These are (a) the impact of the automatic stay on the enforcement of the contractual rights to terminate a defaulted contract and to net positive and negative exposures with one counterparty, (b) the assurance that no other order of the court will block the right to terminate, and (c) the impact of the Bankruptcy Code on normal prebankruptcy activities, such as the setoff of mutual claims and debts and the potential exposure of ordinary prebankruptcy transfers to later preference recovery. The changes contained in the bill to deal with these

- 11 -

issues closely parallel those enacted in 1982 and 1984 by Congress for securities contracts, commodity contracts, forward contracts, and repurchase agreements. The same reasons that led Congress to enact those amendments support the proposals put forward in S.396.

A.    Automatic Stay Provisions

The automatic stay of Section 362 of the Bankruptcy Code bars a party from taking any action to interfere with property of the bankruptcy estate. It is possible that a bankruptcy court could interpret this provision to stay a nondefaulting party from taking action to terminate a swap or forward foreign exchange agreement with a debtor, to net offsetting exposures, or to foreclose on any collateral securing swap obligations, at least without first obtaining authority from the bankruptcy court.

Obtaining such authority necessarily takes some time, often many weeks or months; in a case of a sizeable institution or dealer, obtaining early access to court is virtually impossible. Any delay in obtaining authority to terminate outstanding transactions and to net offsetting exposures would create unreasonable risks for the nondefaulting party. The interest rate and currency exchange markets often move rapidly and, given the substantial volume of transactions, any type of delay following a bankruptcy filing could impose substantial risks of loss on the participants in the market.

- 12 -

Following a default, and absent a stay, a prudent
counterparty would immediately terminate all transactions with a
debtor so as to fix its exposure, would liquidate any collateral
it holds, and would simultaneously enter into new transactions to
hedge that exposure. The possibility that the automatic stay
would prevent such termination and liquidation -- possibly for
weeks or months -- creates the threat of a substantial increase in
the nondefaulting party's exposure to loss and greatly
complicates any effort to hedge that exposure.

The unfairness of this result can be shown by an
example. First assume that two parties had entered into a single
interest rate swap transaction under a master agreement. Assume
also that the defaulting party receives fixed rate payments and
makes floating rate payments based on a notional amount of $50
million. If that party files for relief under the Bankruptcy
Code, absent the potential application of the automatic stay the
nondefaulting party could terminate the agreement, determine and
fix its exposure based on then-current interest rates, foreclose
on any collateral securing the defaulting party's obligations (and
return any excess), and enter into a new transaction to replace
the terminated transaction and hedge its exposure.

The situation is far more uncertain if the stay applies
and prevents termination of the agreement by the nondefaulting
party. If the nondefaulting party were certain that the debtor
would reject the agreement, it would hedge its exposure by
entering into a new transaction and lock in its position; its

- 13 -

damages would be determined by the cost of the new transaction
based on then-current interest rates. On the other hand, if the
nondefaulting party were certain that the debtor would perform, i
need do nothing. But if the stay applies, the counterparty canno
know if the debtor will assume or reject the agreement. The
uncertainty as to whether the transaction will be assumed would
likely force the nondefaulting party to hedge its exposure,
thereby incurring the cost of a new transaction and depriving it
of the benefits of its original bargain. But its risk of loss
does not end there. If the nondefaulting party were a dealer, it
would likely have hedged the original transaction by entering int
an offsetting agreement with a third party. When the debtor
defaults and files for bankruptcy relief, the dealer immediately
becomes exposed to a potentially uncovered open position since th
offsetting agreement remains in effect while the agreement with
the debtor is in limbo. And until the debtor decides whether to
assume or reject its agreement with the dealer, a decision that
the debtor may not make for a number of months, the stay will
impose upon the dealer the continuing risk of being left with an
uncovered open position.

The risks of cherry-picking can be shown by a second
example. Assume that two parties had entered into two
transactions under a single master agreement. As is often the
case, the parties are on opposite sides in the two transactions,
so that the defaulting party receives fixed rate payments under
the first transaction and variable rate payments under the second.

- 14 -

Assume further that each transaction has a current market value of $1 million. In these circumstances, the net position between the parties is zero and if both transactions were terminated simultaneously, no payment would be made by either party.

Now assume that one of the parties becomes the subject of a case under the Bankruptcy Code. If the court failed to give effect to the termination and netting provisions of the master swap agreement, the debtor arguably could assume the favorable transaction, while rejecting the unfavorable transaction. The debtor's estate would then continue to receive payments from the nondebtor under the favorable transaction, while the nondebtor would be left with a prepetition unsecured claim for damages with respect to the rejected transaction, a claim which may never be paid.

Congress has long recognized the need for certainty and speed in the volatile securities and financial markets. Section 60e of the former Bankruptcy Act (11 U.S.C. § 96e) provided special treatment for stockbroker bankruptcies, creating a separate fund for stockbroker customers with priority over general creditors. These provisions were carried forward into the stockbroker and commodity broker provisions of Chapter 7 when the Bankruptcy Code was enacted in 1978.

As new financial instruments have been developed, Congress has recognized the need to amend certain aspects of the Bankruptcy Code in order to continue to provide the necessary speed and certainty in complex financial transactions. In 1982

and again in 1984 Congress amended Section 362 to exempt the
termination and setoff of mutual debts and claims arising under
securities contracts, commodity contracts, forward contracts or
repurchase agreements. The 1982 amendments were "intended to
minimize the displacement caused in the commodities and securities
markets in the event of a bankruptcy affecting these industries,"
recognizing the "potential volatile nature of the markets." 128
Cong. Rec. H 261 (daily ed. Feb. 9, 1982). The same rationale
supported the 1984 amendments.

ISDA supports the proposal in S.396 to extend these
protections to swap and forward foreign exchange agreements for
the same reasons that they were provided for securities
contracts, commodity contracts, forward contracts and repurchase
agreements. Permitting the prompt termination of these
agreements, the exercise of netting rights, and recourse to any
collateral securing the debtor's obligations reduces the potential
market impact of a bankruptcy filing by allowing immediate action
as contemplated by the standard agreements. This exception to
Section 362 of the Bankruptcy Code does not interfere with the
basic operation of the Bankruptcy Code, since the Code already
preserves the right of setoff, although requiring a court hearing.
The volatility of the interest rate and currency exchange markets
makes the risk of delay pending such a court hearing unreasonable
and detrimental both to the debtor, which could incur additional
losses if open transactions turn unfavorable, as well as to the
nondefaulting party.

- 16 -

B. Right to Terminate

Both the 1982 and the 1984 amendments provide that the contractual right of a nondefaulting party to terminate a securities contract, forward contract, commodity contract or repurchase agreement will not be stayed by any order of the bankruptcy court or otherwise under the Bankruptcy Code. This provision essentially assures counterparties that they will not be exposed to an effort by a bankruptcy trustee to assume these agreements under Section 365 of the Bankruptcy Code.

Proposed Section 560 to the Bankruptcy Code, as set forth in S.396, provides a similar assurance for swap participants. In a volatile interest and currency exchange rate environment, a requirement that the counterparty keep open transactions awaiting such a decision risks imposing additional losses either on the nondefaulting party or on the debtor's estate at a time when the estate should be reducing its market exposure.

The right to terminate open transactions is particularly needed in light of the nature of the financial markets. As Congress recognized at the time of the 1982 and 1984 amendments, counterparties could be faced with substantial losses if forced to await a bankruptcy court decision on assumption or rejection of financial transaction agreements. Unlike ordinary leases or executory contracts, where the markets change only gradually, the financial markets can move significantly in a matter of days. It is not reasonable or fair to impose the risks of market changes

- 17 -

on counterparties while a debtor and the court decide whether a debtor can cure, assume and provide adequate assurance of future performance of such agreements. There is a clear need for Congress to assure counterparties that they will be able to terminate these agreements and exercise contractual liquidation and netting rights if a party to the agreement files for bankruptcy relief.

### C. Setoff and Preference Provisions

The 1982 and 1984 amendments provide that ordinary transfers made or setoffs effected under a securities, commodities, or forward contract or a repurchase agreement immediately before a bankruptcy case cannot be set aside by a bankruptcy trustee. This is an exception to the preference provisions of Section 547 and to the preference provision of the setoff statute (section 553(b) (1)), which generally discourages setoffs before bankruptcy in ordinary commercial transactions.

The exception created by the 1982 and 1984 legislation recognizes that protections for payments made and setoffs effected under securities and other financial agreements are needed in order to preserve the functioning of the market. Similarly, in swap and foreign exchange transactions, it is important to eliminate any concern that Bankruptcy Code provisions could be read to preclude the exercise of contractual rights of

- 18 -

prebankruptcy netting or setoff.<u>3</u>/ This is particularly
important to swap participants since netting is the normal,
intended course of dealing in swap transactions unlike ordinary
commercial transactions, where setoff is an extraordinary remedy.
While the setoff preference provision of section 553(b) (1) is
designed to discourage bank account setoffs that may precipitate
a bankruptcy filing, its operation in the swap market could
materially interfere with the customary operation of that market.
For these reasons, swap and forward foreign exchange transactions
should be granted the same exception from ordinary preference
rules and from the preference provisions of section 553(b) (1) as
Congress has accorded securities contracts and other financial
agreements.

---

<u>3</u>/     As discussed above ISDA believes that under existing
statutory provisions and case law, standard netting provisions
ought to be given effect. The question, however, has never been
expressly addressed by a Court and, accordingly, is not entirely
free from doubt.

INTERNATIONAL SWAP DEALERS ASSOCIATION, INC.

The International Swap Dealers Association, Inc. ("ISDA") is an international organization of commercial, investment and merchant banks that act as dealers in interest rate and currency exchange ("swap") transactions. The purposes of ISDA include the promotion of practices conducive to the efficient conduct of the business of its members in rate swaps and related transactions; the creation of a forum for the discussion of issues of relevance to participants in the swap market; the representation of the common interests of its members before legislative and administrative bodies and international or quasi-public institutes, boards and other bodies; and the encouragement of the development and maintenance of an efficient and productive market for swaps.



**Comptroller of the Currency**
**Administrator of National Banks**

Washington, D.C. 20219

January 11, 1989

The Honorable Charles E. Schumer
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Schumer:

This is in response to your letter dated November 4, 1988,
requesting the views of the Office of the Comptroller of the
Currency on proposed changes to Title 11 of the United States
Code (the "Bankruptcy Code"), 11 U.S.C. § 101 *et seq.*, that
would affect the treatment of swap agreements. As a general
matter, the OCC would favor this legislation. The OCC is
generally supportive of the use of contractual netting
provisions or processes for interest rate and exchange rate
contracts which are designed to reduce counterparty risk.

EXTENT OF NATIONAL BANK PARTICIPATION IN SWAP MARKETS

National banks are active participants in the swap agreements
markets, including interest rate and currency swaps, forward
rate agreements, interest rate options, forward foreign exchange
agreements and other similar instruments. In the interest rate
and currency swap market, which now amounts to approximately
$1.1 trillion according to a July 1988 study by the
International Swap Dealers Association, a number of commercial
banks are among the leading market participants. According to a
September 1988 survey by *Euromoney*, of the top ten rated swap
houses, six were U.S. banks. Three of these--Security Pacific,
Citibank, and Chase Manhattan--were national banks.

The OCC has examined the extent of national bank participation
in the interest rate swap agreements market and has found that
there has been a slight increase in participation over the past
year. Of the 385 national banks with assets of $1 billion or
more, 192, or roughly 50 percent, are involved in interest rate
swaps. In the aggregate, the notional value (the amount of
principal underlying a swap agreement contract) of the interest
rate swaps of these 192 banks totalled roughly $360 billion
dollars as of June 30, 1988.

IMPACT ON CAPITAL STANDARDS

You inquired whether the proposed changes, or modifications to the capital standards that might result from such changes, cou reduce the amount of capital required to be held by commercial banks or their subsidiaries against swap agreements. We do no believe that this is the case because capital requirements wil only be reduced to the extent that a bank's risk is reduced.

Under the current capital requirements regulations, there is n specific requirement that capital be maintained against swap contracts. On March 15, the OCC proposed risk-based capital guidelines, part of a multilateral effort to revise the definition of capital and to standardize capital requirements, including a proposal that capital be maintained against all sw contracts.

In drafting the risk-based capital guidelines, the issue has arisen as to how to deal with netting. Netting is the process by which the parties to a swap agreement determine, at the expiration of the agreement, who owes whom how much, by subtracting the rate of return from one transaction from the rate of return on the other, or others. The OCC originally di not recognize any form of netting in its proposed risk-based capital guidelines, but received much negative comment urging that capital should only be required against the net amount of all contracts with a single counterparty. Taking note of thes criticisms, the Cooke Committee, the multilateral committee overseeing the effort to standardize capital requirements, decided to recognize "netting by novation", meaning that any obligation between two counterparties is automatically merged with all other obligations between the two, and legally substituted by one single net amount for all previous gross obligations. At the present time, only foreign exchange contracts with the same currency and value date qualify for th definition of netting, since these are the only contracts for which authoritative legal opinions exist that a trustee in bankruptcy will not be able to "cherry-pick" the various obligations. Without the proposed amendments to the Bankruptc Code, it is possible that the trustee would affirm only those contracts where the debtor is "in the money" and disaffirm contracts on which the debtor owes money to the bank.

The proposed amendments to the Bankruptcy Code could have the effect of expanding the definition of netting in the risk-base capital guidelines. The definition of "swap agreement" contained in the proposed legislation encompasses various type of interest rate and foreign exchange contracts, as well as master agreements. It is arguable that the proposed legislati would constitute sufficient authority for the OCC to state at some future date that all swap agreements that fit within the Code's definition only need to have capital maintained against the net amount. Due to the international ramifications of risk-based capital requirements, the OCC may not be able to ma such a determination unilaterally.

While it is quite possible that the amendments may have the effect of reducing the amount of capital that commercial banks will be required to hold against interest rate and foreign exchange contracts, capital requirements would only be reduced to the extent that a bank's risk is reduced. The bank's true credit risk is only a portion of the net amount of all swap agreements. Therefore, the reduction in required capital would not constitute an appreciable risk to the safety and soundness of commercial banks participating in the swaps markets. In fact, the opposite is true because the proposed legislation would reduce the potential loss to a bank when its counterparty to a swap contract fails.

IMPACT OF LOWERED CAPITAL REQUIREMENTS ON MARKET DEVELOPMENT

In response to your third question, concerning the impact of lower capital requirements for swap agreements under a revised risk-based capital proposal on the swap markets, it is unlikely that commercial banks will appreciably increase their swap market activities.

The international risk-based capital framework is designed to capture only credit risk and to establish minimum levels of capital for each institution. Bank supervisors, including the OCC, retain the right to require additional capital for individual banks in recognition of the inherent risk exposure associated with each of the bank's activities, including involvement in the swap agreement markets. Other risk exposures that are not covered by risk-based capital requirements, such as market risk and operational risk, can be recognized when banks are establishing their internal counterparty lines.

IMPACT OF PROPOSED CHANGES ON EFFORTS BY REGULATORY AGENCIES TO MINIMIZE COST TO DEPOSIT INSURANCE FUNDS OF BANK FAILURES

The proposed legislation is not expected to have an impact on the OCC's ability to act to minimize the cost to the deposit insurance funds of bank failures.

HOW SWAP AGREEMENTS ARE TREATED IN BANK FAILURES UNDER CURRENT LAW

Concerning the question of how swap agreements are treated in bank failures under current law, there is no answer; the issue has not arisen in the courts. The proposed legislation would not affect a situation in which a national bank fails because national banks are not subject to the Bankruptcy Code. Where a national bank is in receivership, the FDIC would determine how to dispose of the swap agreement. Where a nonbank failed, and a bank was a counterparty to a swap agreement, the legislation would benefit a bank in the same manner as it would benefit any other counterparty, by providing for liquidation of the swap agreement and netting the proceeds accordingly.

- 4 -

**BENEFITS OF LEGISLATION**

This legislation will benefit national banks and other market participants. If swap agreements are treated in the same mann as securities contracts, commodities contracts, and repurchase agreements are under the Code, then the market in swap agreements will not be disadvantaged.

First, the proposed legislation would exempt swap agreements from the automatic stay provision of the Code. This feature would allow for immediate liquidation of a swap agreement when one party went into default. If such protection is not extend to the swap agreement market, severe financial disadvantage could result to the nondefaulting party if the agreements were stayed under the Code.

Second, the proposed legislation would put an end to so-called "cherry picking", the process by which a bankruptcy trustee ca affirm contracts on which the bankrupt stands to receive money while disaffirming contracts where monetary loss results. Suc a change could only serve to reduce risks in such markets and lead to more equitable results when and if a nonbank counterparty goes bankrupt.

Should you have any further inquiries on our views on this proposed legislation, please do not hesitate to contact us.

Sincerely,

Paul Allan Schott
Chief Counsel

 FEDERAL DEPOSIT INSURANCE CORPORATION, Washington DC 20429

OFFICE OF THE CHAIRMAN

January 6, 1989

Dear Mr. Schumer:

Thank you for your November 4 letter regarding the Federal Deposit Insurance Corporation's views on proposed changes to the U.S. Bankruptcy Code that would affect the treatment of swap agreements, including interest rate swap contracts and currency swap contracts. You requested the FDIC's comments with respect to several issues relating to the proposed changes. The enclosed staff discussion paper addresses the specific questions you raised.

There is a degree of uncertainty presently associated with the proper legal treatment of multiple swap arrangements between two identical parties under a master swap agreement. To our knowledge, no court has spoken definitively on this issue. Absent a definitive ruling or specific statutory language, in the event of bankruptcy of one counterparty, the trustee in bankruptcy may attempt to "cherry pick" among multiple swap contracts that the bankrupt party has with the same counterparty. This allows taking advantage of the financially advantageous contracts while avoiding the disadvantageous contracts. Our Legal Division is of the view, however, that a court would probably not permit such "cherry picking," but rather would uphold the netting provisions of the master swap agreement.

We believe that an explicit statutory provision governing the treatment of multiple swap arrangements between two counterparties is appropriate, and we generally support the legislation. We should point out, however, that the legislation will not directly affect insolvent entities not subject to the U.S. Bankruptcy Code such as commercial banks or foreign corporations.

Because of the ambiguities that exist at the present time regarding the proper treatment of multiple swap contracts, the risk-based capital framework recently endorsed by the Basle Supervisors' Committee does not currently permit the recognition of netting arrangements except where netting is accomplished through novation. The FDIC will continue to review this issue with other members of the Basle Committee and, if subsequent events support the validity of close-out netting arrangements in master swap agreements, consideration may be given to recognizing such arrangements for risk-based capital purposes. While, as noted above, the proposed legislation does not directly affect entities not subject to the Bankruptcy Code, the legislation will be helpful in bringing legal certainty to the issue.

We apologize for the delay in responding to your questions. Please feel free to contact us if we can be of further assistance to you in this matter.

With best wishes.

Sincerely,

L. William Seidman
Chairman

Honorable Charles Schumer
House of Representatives
Washington, D.C.  20515

Enclosure

FDIC STAFF DISCUSSION PAPER RESPONDING TO CONGRESSMAN SCHUMER'S
NOVEMBER 4 LETTER REQUESTING COMMENT ON ISSUES RELATING TO
SWAP CONTRACTS AND PROPOSED REVISIONS TO THE U.S. BANKRUPTCY CODE

Question 1 -- To what extent are insured banks participants in the swap
market? How significant is the swap agreements business to insured banks,
both in the aggregate and for the largest bank participants?

The larger U.S. banks are significant players in the swap markets. Based on
Call Reports filed with the three federal bank supervisory agencies, the
notional amount of interest rate swap contracts outstanding at FDIC-insured
banks increased from less than $200 billion at year-end 1985 to more than $715
billion by the end of 1987. If other major swap dealers such as investment
banking houses and foreign banks are included, the notional amount of
outstanding interest rate swaps likely exceeds $1 trillion. Among U.S. banks,
the swap market is dominated by a relatively small number of the larger
banking organizations. Based on September 1987 estimates, the 35 largest
banks accounted for 95 percent of the interest rate swap volume outstanding at
U.S. banks. With regard to foreign currency swaps, there is no separate
figure reported on the Call Reports; rather, the amount of currency swaps is
reported on a combined basis with all other "commitments to purchase foreign
currency or U.S. dollar exchange." However, the amount of currency swap
contracts outstanding is estimated to be less than one-fourth of the amount of
outstanding interest rate swap contracts. (Note: The notional amount of an
interest rate swap is used to calculate the amount of interest payments that
are periodically due or receivable under a swap contract -- it does not
represent the amount of potential credit exposure. The amount of such
exposure is only a fraction of the notional amount; however, when analyzing
the volume of outstanding swap activity, the notional amount is frequently
used as an indicator.)

Question 2 -- Will the proposed changes, or modifications to the capital
standards that would likely result from such changes, reduce the amount of
capital required to be held by commercial banks or their subsidiaries against
swap agreements? If so, would that reduction represent an appreciable
degradation in the safety and soundness of those institutions?

The proposed legislation may possibly minimize the potential credit risk
exposure for banks in those situations where a bank has multiple swap
transactions with the same counterparty, provided that the counterparty is
indeed subject to the U.S. Bankruptcy Code in the event it becomes insolvent.
However, banks also enter into swap arrangements with companies incorporated
in foreign countries and with other banks (both U.S. banks and foreign banks),
none of which is subject to the U.S. Bankruptcy Code. Even with the passage
of the proposed legislation, the application of the law to specific situations
may still leave some degree of uncertainty. In view of these considerations,
and in light of the risk-based capital framework recently endorsed by the
Basle Supervisors' Committee, it would not appear appropriate at this time to
recognize netting for risk-based capital purposes (except for netting through
novation). With respect to this issue, the July 1988 paper on risk-based
capital released by the Basle Committee stated that:

"banks may net contracts subject to novation, since it appears that
counterparty credit risk is genuinely reduced by the substitution of a
novated contract which legally extinguishes the previous obligation . . .
banks may not for the time being net contracts subject to close-out
clauses. The effectiveness of such agreements in an insolvency has not
yet been tested by the courts nor has it been possible to obtain
satisfactory legal opinion that liquidators would not be able to overturn
them. The Committee . . . would be prepared to reverse its conclusion if
subsequent decisions in the courts support the integrity of close-out
netting arrangements."

Thus, the passage of the proposed legislation itself will not resolve all the
issues relating to whether netting under master swap agreements should be
recognized for risk-based capital purposes. However, the U.S. banking
regulators, along with the other Basle Committee members, will continue to
assess this matter and, over time, will consider recognizing additional forms
of netting for risk-based capital purposes if subsequent court decisions
and/or statutory changes (both in the U.S. and abroad) clearly support the
validity of certain netting arrangements.

Question 3 -- If these changes can be expected to result in lower capital
requirements for swap agreements, what impact would such a change have on the
swap markets? If a greater volume of outstanding swap obligations might
result, what are the potential dangers to insured banks of a larger and more
active swap market?

Assuming that these netting arrangements are recognized for risk-based capital
purposes at some future date, it is conceivable that a given dollar amount of
capital would be able to support a greater amount of swap activity. The
ultimate impact on a swap dealer bank's profitability could be favorable if
the bank is able to obtain the same profit spread per swap contract on a
larger volume of swap transactions. However, part of that profit spread per
swap contract could also be lost if the proposed legislation is passed, since
at least some of the spread per contract is probably due to the present
uncertainties as to how netting arrangements would be treated by a bankruptcy
trustee or receiver in the event the counterparty becomes insolvent. Thus,
for larger banks that act as swap dealers, as the swap market becomes larger
and more efficient, the profit spreads on swaps may become thinner and more
competitive, even though the underlying interest, market and operational risks
to which the dealer banks are exposed remain essentially unchanged. However,
for end-user banks, a more efficient market will reduce the costs associated
with using swap contracts for hedging purposes and may therefore allow such
banks to initiate certain risk-reducing swap contracts that might otherwise be
too expensive.

Question 4 -- What impact might these changes have on the ability of the
Federal Deposit Insurance Corporation, the Office of the Comptroller of the
Currency, or other relevant agencies to act to minimize the cost to the
deposit insurance fund?

To the extent that the legislation supports netting arrangements under master
interest rate swap contracts, the potential for a U.S. bankruptcy trustee to
"cherry pick" among swap contracts with the same counterparty will be
minimized. Thus, if an FDIC-insured bank is the counterparty and holds both

favorable and unfavorable swap contracts with the bankrupt entity at the time of insolvency, the inability of a bankruptcy trustee to "cherry pick" would limit the bank's potential credit exposure to the bankrupt company to a "net" rather than a gross amount. Ultimately, if an FDIC-insured bank's credit risk exposure to such counterparties is reduced, the potential risk of loss to which the FDIC insurance fund is exposed will also be minimized. On the other hand, if the FDIC, as a receiver of a failed bank, were able to "cherry pick" among multiple swap contracts with the same counterparty, collections for the failed bank's estate could be maximized and the ultimate loss incurred by the FDIC insurance fund for that failed bank would be reduced. (Note: As mentioned in the answer to question 2 above, failed banks are not subject to the U.S. Bankruptcy Code.)

Question 5 -- How are swap agreements treated in bank failures under the current law? Would these proposed modifications to the Bankruptcy Code cause the treatment to change?

We have been unable to discover any legal precedents relating to the treatment of swap agreements involving insolvent banks. This presumably arises from the fact that no banking institution with significant obligations under swap agreements has yet failed. Furthermore, the liquidation of any of the predominantly large banks involved in the swap market would be prohibitively expensive unless a significant portion of the failed bank's assets and liabilities, including those arising under swap agreements, were transferred to an acquiring bank under circumstances in which all outstanding transactions remained in force. However, in the absence of such a transfer, we believe that the counterparties to an insolvent bank under a series of swap transactions conducted pursuant to one or more master swap agreements would legally be able to set off their claims against the countervailing claims of the bank, thereby achieving the same result as is intended by the proposed legislation.

Question 6 -- What changes would you propose to improve the legislation as currently drafted?

The FDIC staff has no specific recommendations at this time as to the appropriate statutory language to use for the proposed change to the U.S. Bankruptcy Code.

Question 7 -- What are the potential dangers to insured banks and other market participants of not acting on this legislation?

Some degree of uncertainty will remain as to how multiple swap contracts with the same counterparty will be treated under the U.S. Bankruptcy Code if the proposed legislation is not acted upon. In view of this uncertainty, the swap market may not expand as fast or become as efficient as might otherwise have been possible. Internal counterparty credit limits established by dealer banks may need to be lower, and the profit spreads received by swap dealers on individual swap contracts may need to be higher, than would have been required had the possibility of "cherry picking" been eliminated. From the viewpoint of a bank as an end-user, failure to pass the proposed legislation may prevent to some extent the swap market from becoming a more efficient market, thereby resulting in higher costs to end-users for entering into swap contracts than would have been incurred if the legislation were passed.



BOARD OF GOVERNORS
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

January 23, 1989

ALAN GREENSPAN
CHAIRMAN

The Honorable Charles E. Schumer
House of Representatives
Washington, D.C.   20515

Dear Congressman:

Thank you for your letter of November 4 requesting the views of the Board on proposed changes to Title II of the United States Code that would affect the treatment of swap agreements, including interest rate swap contracts and currency swap contracts.

Your letter poses a number of important questions that need to be answered to assess the desirability of this proposal:  the extent to which banking organizations are participants in the swap agreements market; the effect of the proposed changes on capital adequacy, the safety and soundness of banks, and bank failures; and the impact of the changes on the ability of the relevant banking agencies to control bank failures and to minimize the cost of bank failures to the deposit insurance funds.

The staff has developed detailed answers to these questions and I have enclosed the results of the analysis. Our overall assessment is that the proposed changes would reduce potential risks to the banking system arising from swap agreements and would increase the efficiency of the marketplace as a whole.

I hope that the enclosed responses are helpful in your analysis of the proposed legislation.  Please let me know if we can be of further assistance.

Sincerely,

Enclosures

Federal Reserve Staff Responses to
Questions Posed by Congressman Schumer
Regarding Swap Agreements

Question 1: (a) 'To what extent are commercial banks and bank
holding companies participants in the swap agreements markets?
(b) How significant is the swap agreements business to banks and
bank holding companies, both in the aggregate and for the largest
bank and bank holding company participants in particular?

Banks and bank holding companies (BHCs) regularly
report the notional principal outstanding of all interest rate
swap contracts in their Call Reports. At the end of June 1988,
the top 500 U.S. BHCs, ranked by total assets, reported combined
notional principal outstanding on a consolidated basis of $770
billion. The top 50 BHCs accounted for 93 percent of this amount
($722 billion) and the top 10 accounted for 85 percent ($653
billion).

Notional principal on an interest rate swap represents
the base for calculating interest payments. However, the
notional principal generally is not exchanged in an interest rate
swap and, therefore, is not directly related to the risk
exposures stemming from swap contracts.

The major U.S. commercial banks and their holding
companies are among the most important of swap dealers; they are
also end users. The other major swap dealers include securities
firms, foreign banks, and a few insurance companies.

The relative importance of the major swap dealers can
be gleaned by comparing data provided by the International Swap
Dealers Association (ISDA) and the Call Report data. The ISDA
data include notional principal outstanding for virtually every
major swap dealer worldwide.

The most recent ISDA data (for year-end 1987) indicate
that the notional principal of interest rate swaps on the books
of members amounted to $890 billion. Swaps reported in the Call
Report on the same date by the 10 U.S. BHC ISDA members accounted
for about 60 percent of this amount.

U.S. banks are also major dealers in currency swaps.
However, the currency swap market is less than 25 percent of the
size of the interest rate swap market (as measured by notional
values) and, while there are no definitive data available, it is
likely that U.S. banks play a relatively less important role in
currency swaps.

Economies of scale in measuring, hedging, and
monitoring risk are important in the swap business.
Consequently, swap activity is heavily concentrated in the
largest U.S. banking organizations.

It is difficult to assess the direct contribution of
the swaps business to bank profitability since swap income
typically is not reported in publicly available sources.
Clearly, however, interest rate and currency swaps have become a
significant source of income at most major U.S. banking
organizations. Moreover, the ability of U.S. banks to make
markets in swaps has become integral to their ability to compete
in markets for other financial instruments.

Finally, most major banks and probably about 200
smaller banks use swaps for their own internal interest rate and
foreign currency exposure management. Effective management in
these areas can also enhance bank profitability.

Question 2: Will the proposed changes, or modifications to the
capital standards that would likely result from such changes,
reduce the amount of capital required to be held by bank holding
companies, commercial banks, or their subsidiaries against swap
agreements? If so, would that reduction represent an appreciable
degradation in the safety and soundness of those institutions?

By providing the legal authority to offset claims
between counterparties in swap transactions, the proposed changes
to the federal bankruptcy laws could reduce the amount of
counterparty credit exposure in these transactions and thereby
reduce the amount of capital required under the proposed
risk-based guidelines. Under existing laws, banks face the risk
that bankruptcy trustees may be able to "cherry-pick" among

outstanding agreements and choose to honor only those contracts
that are favorable to the bankrupt party. If that flexibility
were removed and trustees were required to acknowledge
unfavorable agreements, as well, the risks to the banks as
performing counterparties would be reduced. Accordingly,
contractual arrangements could be created that would legally
reduce the obligations outstanding to the net amounts between
counterparties. In this case, the volume of swap agreements that
the banking organizations would be required to report (and
against which the capital requirements would apply) could
decline. Provided the risks are indeed reduced, requiring a
banking organization to hold commensurately less capital than
proposed should not result in any degradation in its safety and
soundness.

It is important to note, however, that many of these
contracts are subject to foreign laws and also that the proposed
risk-based capital standards represent an international
agreement. Consequently, whether the U.S. banking agencies would
modify their capital standards to recognize any changes in U.S.
bankruptcy laws would still rest largely upon the legal value of
the netting agreements under foreign laws and upon the
willingness of other participants in the Basle Capital Accord to
modify the international capital standards. In the past,
differences among national laws have presented serious problems
to accepting netting agreements, such as those contained in the
model contracts prepared by the International Swap Dealers
Association. In short, clarifying U.S. laws on this issue would
be an important and necessary step toward reducing capital
requirements for swap transactions from the proposed level, but
its effectiveness would be limited by existing foreign laws.

The Basle Supervisors' Committee is on record that it
will continue to assess risks arising from interest rate swap
agreements, and that it will seek to modify the international
capital standards if circumstances in that market change. The

Federal Reserve will participate in those on-going reviews and
will ensure that the status of participant claims under U.S.
bankruptcy laws is understood by the Basle group.

Question 3: If these changes can be expected to result in lower
capital requirements for swap agreements, what impact would such
a change have on the swap markets? If a greater volume of
outstanding swap obligations might result, what are the potential
dangers to banks or bank holding companies of a larger and more
active swap market?

        If capital requirements on outstanding interest rate
swaps were reduced, banks would be able to create more swaps; the
swap market would be able to expand; and competition in the
market should increase. Bank profit margins, however thin at
present, would presumably decline further because of the
potentially greater competition and the lower capital cost that
would apply to a given volume of outstanding swaps.

        It is difficult to determine what additional risks, if
any, a larger swap market would present to the banking industry.
If the swaps were created, priced, and managed prudently, an
expanded swap market might produce virtually no additional risks
to the banks. Indeed, to the extent swaps accomplish their
intended function of transferring market risks to parties best
prepared to absorb them, the risks to the banking industry (and
to business, in general) could decline. In any event, though,
clarifying the legal status of netting agreements should only
reduce risks to participants in the swap markets by providing
them with greater certainty about their risks.

        As a final consideration, one should note that any
reduction to capital requirements brought about by changes to
U.S. bankruptcy laws would be reductions from the proposed
risk-based capital requirements, not from current levels. Under
the current primary capital standards, U.S. banking organizations
are not explicitly required to maintain any specific level of
capital on their exposure to swap transactions. Consequently,
the resulting standards would still be stronger and more prudent

than the present standard. Moreover, to the extent the revised laws actually reduce risks inherent in swaps, a commensurate reduction in capital standards would be needed in order to avoid imposing higher capital requirements than would then be justified.

Question 4: What impact might these changes have on the ability of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, or other relevant agencies to act to control and cushion bank failures, and to minimize the cost to the deposit insurance funds of bank failures?

Since banks cannot be debtors under the Bankruptcy Code (the "Code"), the amendments would not have a direct effect on the management of bank failures by federal regulators. While it is conceivable that these rules might ultimately be applied (by analogy) to the insolvency of institutions not explicitly covered by the Code, it is not clear that they would be. (See answer to Question 5 below.) Whether or not the changes would apply directly to a bank insolvency, however, it is clear that the amendments would operate to prevent banks and the financial markets from suffering some of the potential spillover effects of the insolvency of a swap counterparty subject to the Code. Major players in the swap market that are currently eligible to be debtors under the Code include investment banks, corporate end-users, and foreign banks and insurance companies not engaged in banking or insurance activities in the United States.

Under the Code, solvent counterparties are subject to the possibility of being forced to honor unfavorable contracts while waiting in line with other creditors for payment on favorable contracts. To the extent that the trustee of an insolvent counterparty to a swap agreement is permitted to "cherry-pick" among individual swap transactions subject to a given master agreement, the impact of an insolvency may spread to solvent counterparties, including banks. If the legislation is approved, however, the potential for cherry-picking would be

eliminated, and the solvent counterparty would owe or be owed a single net obligation.

Also, with respect to the automatic stay provisions, market risk to a bank with an insolvent swap counterparty would be reduced as a result of the bank's ability to give immediate effect to the termination provisions of the swap agreement upon the commencement of a case under the Code. Accordingly, it seems clear that the proposed legislation could result in a reduction in risk to the banking system from the insolvency of nonbank swap counterparties. Also, to the extent that an insolvent bank has swap transactions with an insolvent nonbank counterparty subject to the Code, the FDIC as receiver of the bank would be in a better position to realize upon a favorable contract quickly and efficiently under the proposed amendments.

Question 5: How are swap agreements treated in bank failures under current law? Would these proposed modifications to the Bankruptcy Code cause that treatment to be changed?

Banks, insurance companies, and thrift institutions are among the institutions not subject to insolvency proceedings under the Code. Accordingly, the proposed modifications would not directly affect the treatment of swap agreements in the event of bank failure, except to the extent that the rules applicable under the Code are applied by analogy.

No cases have specifically addressed the treatment of swap agreements in a bank failure. If the bank failure were addressed via a purchase and assumption transaction, however, it is likely that any obligations under an existing swap transaction would be assumed along with all other obligations of the failed bank. If, alternatively, the failed bank were liquidated, the swap transaction would likely be handled under the receivership powers of the FDIC. Unlike the Code, the law applicable to FDIC receiverships does not provide for either an automatic stay or the power to assume or reject executory contracts (i.e.,

contracts with some performance still due on both sides).
Nevertheless, the FDIC as receiver may very well have the ability
to exercise "cherry-picking" powers similar to those available to
trustees under the current language of the Code.

Question 6: What changes would you suggest to improve the
legislation as currently drafted?

We think the legislation as written serves the limited
purposes intended by the drafters, especially since it closely
tracks the language currently in the Code with respect to
repurchase agreements and securities contracts. We would make
the following additional recommendation, however, we would
suggest that the current Code be modified to make it absolutely
clear that Federal Reserve Banks are "financial institutions" for
the purposes of section 362(b)(6) of the Code. This section
currently exempts financial institutions from the automatic stay
provisions of the Code with respect to the setoff of mutual debts
under securities contracts.

Pursuant to authorization by the Federal Open Market
Committee, the Federal Reserve Banks lend United States
government securities to government securities dealers to cover
delivery fails in the market. In the event that a borrower under
such a securities lending arrangement were to default, the
Federal Reserve might desire to liquidate the securities held as
collateral in order to limit its risk. While it is our opinion
that the best argument in such an event would be that Federal
Reserve Banks are covered under the existing language of section
362(b)(6), we feel that it would be beneficial at this juncture
to clarify the matter. Without the addition of clarifying
language, there would be some uncertainty as to whether the
Federal Reserve can sell the securities collateralizing these
loans during the period of the automatic stay, without the prior
approval of the Bankruptcy Court.

Question 7:  What are the potential dangers to commercial banks, bank holding companies, and other market participants of not acting on this legislation?

To date, swap counterparty defaults have been rare and the actual effect of close-out provisions in master agreements has not been tested in the courts.  Consequently, as you note, considerable uncertainty exists among swap market participants as to the enforceability of such provisions in the event of counterparty bankruptcy.  This uncertainty, in turn, can lead to excessive risk taking or market inefficiencies or both.

If indeed the close out provisions under master agreements are not enforceable, then market participants are exposed to greater credit risk on their swap portfolios than the amount indicated by the net exposure as defined under master agreements.  The risk-based capital guidelines are intended to assure that banking organizations hold capital sufficient to support this higher level of credit risk.  However, other market participants may not maintain adequate capital or other financial support for the risks they have taken.

In contrast, if the close out provisions of swap master agreements are enforceable in the event of counterparty bankruptcy, some swap market participants may be operating inefficiently.  Those swap market participants who do not trust the enforceability of master agreements may be unnecessarily limiting their participation in swap activities.  For these market participants, internal counterparty limits or the level of capital perceived necessary to support these activities may be unnecessarily constraining.

In the absence of precedential court rulings or legislative clarification of the enforceability of close out provisions, the uncertainty will continue.  In turn, the prospects for either excessive risk taking and/or for market inefficiencies will grow pari passu with the growth of the swap market.

Senator HEFLIN. Mr. Perlstein.

## STATEMENT OF WILLIAM J. PERLSTEIN

Mr. PERLSTEIN. Mr. Chairman, Mr. Grassley, I would like to ad dress three issues that are addressed in S. 396 that help to resolv the concerns raised by Mr. Brickell's testimony.

These issues are, first, providing relief from the potential impac of the automatic stay on the enforcement of the contractual right to terminate a defaulted contract and to net positive and negativ exposures with one counterparty; second, establishing a ban o court orders that could block the right to terminate; and, third, a suring that normal prebankruptcy activities such as the netting of mutual claims and debts and other prebankruptcy transfers, wi not be later challenged as preferential payments under the Banl ruptcy Code.

Each of the sets of changes set forth in S. 396 closely parall changes enacted in 1982 and 1984 by this committee and the fu Congress to protect securities contracts, commodities contracts, fo: ward contracts, and repurchase agreements. For the reasons se forth in Mr. Brickell's testimony, these protections should be e; tended to swap agreements.

Addressing first the automatic stay, that is section 362 of th Bankruptcy Code which bars any party from taking action to inte: fere with property of a bankruptcy estate. If a swap agreemer were construed to be an executory contract that the debtor ca assume or reject, then the automatic stay could be interpreted t bar termination of a swap agreement and to bar the netting of of setting exposures without first obtaining court authority.

It is unrealistic to expect rapid access to a court to obtain suc authority. Even in the simplest chapter 11 case, it can take week: perhaps even months, to get a court to order a debtor to assume c reject an executory contract.

In a major case—for example, a major swap dealer or a majc end user—it would not be unusual for a bankruptcy court t permit the debtor until the plan of reorganization is confirmed t make the decision whether to assume or reject. That can obviousl take years.

Enforcement of the stay would require the counterparty to kee the agreement open while the debtor decides whether to assume o reject. In a volatile market, the requirement of maintaining a open position under an agreement that the debtor later reject could impose substantial and significant losses on a counterpart;

The scenario imposed by the automatic stay is entirely contrar to what a dealer would do outside of bankruptcy. Absent impositio of a stay, the dealer would terminate the defaulted agreemen would fix the amount of his exposure by pricing a new agreemen and would enter into that new agreement to hedge his exposur

But the stay blocks the dealer's ability to take that action, sinc the dealer can't know if the debtor will assume or reject the agre ment. If the dealer knew that the debtor would reject the agree ment, the dealer would find a replacement swap, as it would d outside of bankruptcy.

If the dealer knew that the debtor would assume and perform, the dealer would not need to take any action. But with a stay in effect, the dealer cannot know what the debtor will do and the dealer does not know how to protect its position.

Moreover, dealers do not maintain open, exposed positions. Thus, a dealer who has an agreement with a debtor almost certainly will have entered into a second or hedged transaction at the time that it undertook the original transaction with the debtor.

For example, if the dealer was receiving variable rate payments from the debtor, the dealer would have entered into a second transaction under which the dealer will pay variable rates to a third party.

When the debtor files for bankruptcy, the dealer, of course, remains obligated to continue to pay variable rates under that second agreement with the third party. If the dealer knew that the debtor would not perform its agreement to pay variable rates to the dealer, the dealer would know that it must find a replacement agreement under which it would receive variable rates that it would then pay to that third party.

But the uncertainty about the debtor's intentions caused by the stay leaves the dealer unable to know if it can and should hedge that existing transaction. By providing that the stay does not apply to swap transactions and that the dealer can close out existing positions with the debtor, the bill provides needed certainty to swap participants.

As Mr. Brickell also mentioned, swap participants need protection against cherry-picking. This is the fear that a bankruptcy trustee could try to assume certain swap transactions while rejecting others.

It is not unusual for a dealer to have a number of transactions with an end user all under one master agreement. Assume a simple example where each party owes the other $1 million under various transactions, so there is a net position of zero.

If the bankruptcy trustee is able to assume those particular transactions that favor the debtor, such as those that pay the debtor variable rates in a rising interest rate environment, while rejecting the unfavorable ones under which the debtor has to pay out variable rates, then netting does not work.

The dealer could then be forced to continue to pay the debtor on those certain transactions favoring the debtor while being left with an unsecured prepetition claim for the rejected transactions, even though the net position at the time of default was zero. By providing that all transactions under a master agreement constitute a single agreement, the bill prevents such cherry-picking.

Let me mention two other provisions of the bill. One is section 560 that bars the court from interfering with the right to close out existing agreements. This provision tracks sections 555 through 559 that Congress has previously enacted to protect other financial transactions.

Second, the bill protects ordinary swap transactions from later challenge under preference and setoff provisions of the Bankruptcy Code. Unlike ordinary prebankruptcy setoff, netting is the ordinary course of dealing in a swap transaction. Ordinary netting and marking to market of collateral should not be subject to later pref-

erence challenge, and like existing law with respect to repurchas
agreements, securities contracts and commodities contracts, the bi
would extend such protections to swap transactions.

Thank you very much for the opportunity to be able to addres
this committee.

## STATEMENT OF JOHN J. JEROME

Mr. JEROME. Good afternoon, Senator Heflin, Senator Grassley
Thank you for the opportunity of permitting me to testify toda

I appear before the committee as a bankruptcy practitioner wit
27 years of experience, having been involved in hundreds of case
most of them the major cases in this country.

While I believe that the issues that have thus far been referre
to that arise under the Bankruptcy Code will most probably be de
cided in favor of the nondebtor swap counterparty, the hard realit
is that there is built into the code as it is currently written, witt
out this exception that is being urged today, a great potential fo
litigation, and that, of course, gives rise to uncertainty.

This committee and Congress, I think, have an opportunity to ri
the code of the uncertainty that is built into it as it is currentl
written by enacting S. 396. If that uncertainty is removed, that wil
result in a more efficient market, and a more efficient market wil
result in lower costs for the end user.

Counterposed against the certainty that American businesse
who use this particular tool ought to have and are entitled to is th
theoretical possibility that I would like to address myself to, and
that is the possibility that somehow or other, a chapter 11 debto
who has a swap will somehow or other be deprived of a significan
right.

I have been in hundreds of cases and I have searched my min
and I can't really think of a single instance where interest protec
tion for a debtor had any particular significance or relevance in a
chapter 11.

We have to first start with the proposition that in chapter 1
people don't generally get paid in full. All of the debt is acceler
ated. If all of the debt is accelerated and you have a mass of unse
cured creditors, the general rule in chapter 11 is you don't get any
postpetition interest.

If there isn't any postpetition interest to be protected, there isn'
any rationale whatsoever for insisting upon the uncertainty tha
exists in the code in order to protect a theoretical and, I think
nonexistent right.

There is one possibility, one exception, where a debtor migh
want to acquire interest rate protection as a chapter 11 debtor
under the code, and that is where he reinstates debt that has beer
accelerated.

But, here, Senator, the fact of the matter is that in most cases
that I have been involved in where there has been reinstatement—
and those cases are few and far between—the reinstatement results
from the loan agreement having very favorable and low rates.

Here again, I think, as a practical matter, as opposed to a theo
retical matter, there isn't any real rationale for interest rate pro
tection for a chapter 11 debtor. The only thing that I can think of

that a debtor would acquire as a benefit from not clearing up the record and providing the certainty which I think is required here is the possibility that a debtor with a swap can gamble, can play the market by delaying affirmance, assuming that affirmance applies here at all and is litigated in favor of the debtor. But if he is given a right to gamble and/or if he is given a right to cherry-pick as a result of favorable results in litigation, I don't happen to believe that that result would be what the Congress of the United States intended for debtors under title 11 of the United States Code.

Now, counterposed against these theoretical possibilities, which I would characterize really as nonexistent in terms of benefits, is the need for certainty and the fact that that certainty will lower costs for, among others, marginal debtors who might not otherwise be able to, without this certainty, avail themselves of this particular tool.

Thank you very much, Senator.

[The prepared statement of Mr. Jerome follows:]



April 11, 1989

Good afternoon. My name is John J. Jerome and I am
the Chairman of the Bankruptcy and Financial Restructuring
Department of the national law firm of Milbank, Tweed,
Hadley & McCloy. I have been practicing law in this field
for approximately twenty-seven years. My firm is located in
New York, Washington and Los Angeles, as well as abroad, and
has represented debtors, major creditors and other parties
in interest in many of the large bankruptcy proceedings
filed in the last several decades. I am an Adjunct
Professor of Law at New York Law School. I am a member of
the National Bankruptcy Conference, although I am not
speaking on its behalf today. I am also a member of the
Subcommittee on Bankruptcy and Reorganization of the
Association of the Bar of the City of New York.

I am here today to express my support for S. 396, a
bill introduced by Senators DeConcini and Grassley to amend
title 11 of the United States Code with respect to the
treatment of swap agreements in bankruptcy cases. The bill
is designed to clarify and standardize the treatment that
swap agreements will receive in a bankruptcy case. It will
reduce the likelihood of the complex and costly litigation
that otherwise is likely to be involved in each bankruptcy
case involving swap agreements.

Swap agreements have developed into a pervasive and valuable tool for managing financial risk for both borrowers and investors. The legislation is designed to ensure that swap agreements receive similar treatment in bankruptcy cases to other, analogous risk management tools, such as commodities contracts, securities contracts and repurchase contracts, and to reduce the uncertainty that currently confronts swap participants. Enactment of this legislation is likely to lead to increased reliability in financial markets, which may be reflected in wider availability of swap agreements and lower costs for capital borrowing in general.

Three general problems exist under the Bankruptcy Code for swap agreements. The first is the problem of permitting a debtor to assume or reject such agreements during the course of a bankruptcy case. The problem arises because the Bankruptcy Code gives a debtor (with certain exceptions) an indeterminate period, limited only by the date of confirmation of a plan of reorganization, to assume or reject executory contracts. Thus, a debtor may in effect be permitted an open-ended option not contemplated by the original agreement.

Although a debtor's ability to assume or reject contracts is a useful tool in bankruptcy, it was generally contemplated for use in respect of contracts that relate to

the debtor's main lines of business. The decision to assume
or reject is more directly related to the reorganization of
a business enterprise. Contracts for "financial
accommodations" are excluded from the assumption or
rejection process; however, there is no definitive view on
whether a swap agreement is such a contract. Nevertheless,
an interest rate swap agreement is an asset/liability
management tool which may have little to do with the
debtor's reorganization prospects. In fact, most debtors
that file for protection under Chapter 11 do not pay their
unsecured creditors interest on pre-bankruptcy obligations
and would therefore not have a need for interest rate
protection.

     In most instances, interest rate swap agreements,
which relate to asset/liability interest rate risk
management, will have little applicability to confirmation
of a plan of reorganization where assets and liabilities are
restructured and where postpetition interest is not paid.
On the other hand, it is important for nondebtor
counterparties to have the certainty that the debtor will
not decide on assuming or rejecting its swap agreements for
reasons inconsistent with the financial rationale for swap
agreements. Such certainty will provide the same stability
in the marketplace for this particular asset/liability
management tool that is currently provided for analogous

4

financial instruments, such as securities contracts,
commodities contracts and repurchase contracts.

The second problem with swap agreements under the
Bankruptcy Code arises because often a debtor has more than
one swap transaction with a swap provider--usually under a
master agreement. In those cases, if a nondebtor
counterparty is not permitted to terminate the swap
agreement and all of the swap transactions entered into
pursuant to it, the debtor is in a position whereby it might
be permitted to assume swaps that are positive to it and
reject swaps that are negative to it, a process commonly
known as "cherry-picking." This process is certainly not
contemplated by the forms of swap agreements currently in
use, nor does it fulfill any policy under the Bankruptcy
Code.

Whether a debtor could succeed in such "cherry-
picking" would depend on the outcome of litigation as to
whether the master swap contract is a single, indivisible
contract covering multiple transactions or a series of
separate contracts. The potential for such litigation,
again, gives rise to great uncertainty in the marketplace,
although most practitioners believe the better view under
today's law is that "cherry-picking" would not be permitted
under a properly drafted master agreement. If such "cherry-
picking" were permitted, it would obviously put a nondebtor

counterparty at a disadvantage which is not contemplated by the swap contract. Fear of "cherry-picking" is likely to have a negative impact on the ability of debtors with weak credit standing to obtain interest rate protection agreements at any cost, particularly in a volatile interest rate environment.

Once again, it is noted that the assumption or rejection of swap agreements does not further the policy behind Chapter 11 reorganizations because such contracts are not generally integral to the reorganization process. The bill proposes to resolve this second problem by permitting a nondebtor counterparty to terminate multiple swap agreements and net the damages from individual swap transactions, pursuant to the terms of such agreement.

The third problem arising under the Bankruptcy Code in respect of swap agreements arises in those situations where the swap agreements are collateralized and periodically "marked-to-market" under the terms of the swap agreement. There is some fear that the payments (or further collateralization) made to mark the contract to market might be voidable under the preference, fraudulent transfer, or setoff provisions of the Bankruptcy Code. Although such payments should not be voidable under these provisions because they were made for "new value", it would be appropriate to ensure certainty in the matter by amending

the Bankruptcy Code as suggested by the proposed
legislation. A similar problem was addressed in connection
with the margin payments under commodities and securities
contracts and solved in the same manner as now proposed for
collateralization of swap agreements. The bill would amend
various provisions of the Bankruptcy Code to ensure that
mark-to-market collateral transfers and netting payments are
not, in the absence of intentional fraud, voidable under the
preference, fraudulent conveyance or setoff provisions of
the Bankruptcy Code.

　　　The policy concerns that led Congress to enact
similar legislation in 1982 and 1984 with respect to
commodities contracts, securities contracts and repurchase
contracts also seem to be present in respect of swap
agreements, namely assurance of certainty and, therefore,
efficiency and liquidity in the marketplace in respect of
specialized financial risk management tools. When the
earlier legislation was enacted, swap agreements were a
relatively new form of financial arrangement. Today the
swap agreement has fulfilled a need in the American
marketplace to hedge against fluctuating interest rates and,
to that extent, is a positive commercial development which
should be encouraged. These amendments are designed to
modify provisions of the Code only insofar as is necessary
to facilitate the efficient use of these swap agreements.

The amendments are analogous to and in general have no more
extensive effect than those which were made to foster a
similar utilization of commodities contracts, securities
contracts and repurchase agreements. Accordingly, the
policy question presented to Congress today is basically the
same as the policy question that arose in connection with
similar instruments. I believe that Congress acted wisely
in amending the Bankruptcy Code in connection with
commodities contracts, securities contracts and repurchase
agreements. For the same policy reasons, I support passage
of S. 396.

## STATEMENT OF FRANK G. SINATRA

Mr. SINATRA. Mr. Chairman, Senator Grassley, I also appreciate the opportunity to testify here today. My invitation was extended through the American Bankruptcy Institute. However, I do not express the views or opinions of that organization, which does not take positions on legislative matters pending before the Congress.

I would hope to address some of the policy implications of this committee's considered actions on S. 396. My first and most frequently recurring thought, as Senator Heflin mentioned in his opening statements, in reviewing S. 396 involves the divergence it takes from basic concepts in the Bankruptcy Code; that is, the granting of certain extraordinary powers to the debtor or the trustee in furtherance of the rehabilitation of the debtor. Such powers are grounded in significant policy considerations.

Conversely, the code must be a flexible document. It must be adapted to significant changes in the marketplace. The importance and growth of currency and interest rate swap agreements as a vital risk management tool, I think, are well recognized by the members of this subcommittee.

I think similar uncertainties are incurred by all creditors of chapter 11 debtors as a result of another party to a contract having filed for a bankruptcy. The question here, I believe, is has the case been made for significantly different treatment of aggrieved creditors of swap dealers under the code.

To the extent Congress perceives a beneficial policy interest to be realized in enhancing the growth and efficient administration of the swap market, I believe inherent protections resulting from the homogeneous nature of the swap market participants justifies enactment of S. 396.

Should this committee desire further assurances with respect to the adequate regulation of the swap market and the absence of abuses occurring in the marketplace, it may wish to refer this legislation to the Banking Committee for findings in that regard.

The Swap Dealers Association has standardized substantially the nature of swap transactions through form agreements. As a result, corporations and financial institutions taking part in the market do so with knowledge of the risks and rewards. They compete on a level playing field. They are sophisticated parties. S. 396 would not treat market participants differently.

Congress has in the past recognized the need for consistency in the operation and regulation of financial intermediaries, which has become critical to preserving the public's faith in the safety and soundness of the banking system.

The 1982 and 1984 amendments to the code to exempt the termination and setoff of debts arising under securities contracts, forward contracts, commodity contracts, and repurchase agreements, I think, lay considerable precedent for Congress taking action positively on S. 396.

The volatile nature of the financial markets and the need for certainty and speed in quantifying exposure of its participants provide further public policy goals that I believe the Congress can base its passage of S. 396 on.

The support of bank regulatory authorities for the positive consideration of S. 396 lends additional credence to the reliance of our financial institutions on swap transactions as a means of controlling exposure to volatile interest rate swings and currency fluctuations.

These institutions need to fix their exposure upon the default of a counterparty to a swap transaction and, further, the ability to proceed to hedge against future exposures resulting from such default.

Thus, despite the significant diversion from basic tenets of the code that S. 396 takes, I believe there are substantial public policy goals to be achieved in its passage by this subcommittee and the full Senate. I thus respectfully urge its positive consideration by this committee.

Thank you.

[The prepared statement of Mr. Sinatra follows:]

STATEMENT OF

FRANK G. SINATRA, ESQ.

REBOUND MANAGEMENT, INC.

NEW YORK, NEW YORK

**April 11, 1989**

Mr. Chairman, distinguished members of this Subcommittee, I am pleased to have this opportunity to testify here today on the implications of Senate Bill 396 originally co-sponsored by Senators DeConcini and Grassley.

Although my invitation to provide testimony was extended as a result of my membership in the American Bankruptcy Institute and a member of its Legislative Committee, I do not represent the views or opinions of that organization which, as a basic policy, does not take positions on legislative matters pending before Congress. I do not represent any clients with an interest in this legislation, nor do I have any proprietary interest in the outcome of this committee's consideration of S. 396.

Having served as a Legislative Assistant in the Senate primarily responsible for issues under the jurisdiction of the Committee on Banking Housing and Urban Affairs, I hope to assist this Subcommittee in surveying the various policy implications of its considered actions on S.396.

Through my experience as a bankruptcy practitioner and current service as a trustee and an examiner in various Chapter 11 cases pending in the U.S. Bankruptcy Court for the Southern District of New York, I hope to lend some thoughts as to the practical effects of S.396 on the administration and disposition of bankruptcy proceedings in accordance with the legislative intents of the code.

My first and frequently recurring thought in reviewing S.396 involves the prima facie divergence it promotes from concepts central to the overall intents of the Bankruptcy Code: that is, the ultimate rehabilitation of the debtor and the granting of certain extraordinary powers to the debtor or trustee in furtherance of this goal. Such powers are grounded in significant policy considerations which should not be cast aside summarily at the urging of special interests.

Conversely, the Bankruptcy Code, like the Constitution, in order to endure, must be adapted to significant changes in circumstances in the market place, taking cognizance of special situations where the facts support appropriate revision or reinterpretation.

Indeed, I think we all take cognizance of the enormous growth and importance of the market in interest rate and currency swaps as a vital risk management tool. Savings and loans, banks and other financial intermediaries have placed an increasing reliance on this particular instrument apparently to some

derivative benefit of our beleaguered deposit insurance funds and
thus, ultimately, the average taxpayer.

The uncertainties and inefficiencies in the swap market
that are alluded to and presumably occur as a direct result of
current Bankruptcy Code provisions apparently have not chilled
willing participants in swaps agreements. Similar uncertainties
exist in any arms-length commercial transaction where the threat
of a bankruptcy filing by one party may virtually wreak havoc on
its most deeply involved creditors. It can not be argued that the
stay and avoidance provisions of the Bankruptcy Code from which the
swap dealers seek relief, place certain creditors of bankruptcies
outside the swap marketplace at a considerable disadvantage in
determining, with certainty, what actual exposure exists. Has the
case been made for significantly different treatment for aggrieved
creditors of swap dealers under the Bankruptcy Code?

To the extent this Congress perceives a beneficial policy
interest to be realized in enhancing the growth and efficient
administration of the swap market, I believe inherent protections
resulting from the relatively homogenous nature of swap market
participants. In addition, significant Congressional precedents
provide adequate justification for enactment of the provisions
of S.396, despite its promotion of separate treatment for this
class of creditors. Should this subcommittee desire further
assurances with respect to the adequate regulation of the swap
market and the absence of abuses occurring in the marketplace, it

may wish to refer this legislation to the Banking Committee for findings in that regard.

The International Swap Dealers Association (ISDA) has substantially standardized the nature of basic U.S. dollar and multicurrency swap transactions through its successful promotion of form agreements detailing the rights and duties of parties to such transactions.

As a result, those corporations and financial institutions taking part in the market do so with knowledge of the risks and rewards. Participants share relatively equal bargaining power and sophistication and, thus, compete on a level playing field. Collectively, and without any noticeable opposition, the industry has petitioned Congress for greater certainty and predictability with respect to the legal and, thus, the economic consequences of a default as a result of a bankruptcy by any party. The requested amendments would treat all market participants equally, giving no one player an advantage over another.

Congress has, in the past, and, perhaps, more so in the current environment, recognized the need for consistency in the operation and regulation of our financial intermediaries which has become critical to preserving the public's faith in the safety and soundness of the banking system. In 1982 and 1984 Congress amended Section 362 of the bankruptcy code to exempt the termination and setoff of debts arising under securities contracts, forward

contracts, commodity contracts and repurchase agreements. On both
occasions Congress, in overriding previous bankruptcy code
treatment of these situations, cited the volatile nature of such
financial markets and the need for certainty and speed in
quantifying the exposure of the participants, thereby
further assuring the efficient operation of those financial
markets. The same rationale exists for passage of S. 396.

The demonstrated support of bank regulatory authorities
for the positive consideration of S. 396 lends additional credence
to the growing reliance of our financial institutions on the swap
transaction as a means of controlling exposures to volatile
interest rate swings and currency fluctuations. The need of these
institutions to fix their exposure upon the default of a
counterparty to a swap transaction and, further, the ability to
proceed to hedge against future exposures resulting from such
default are vital to the continuity of an entity's risk management
plan.

Thus, despite a significant diversion from basic tenets
of the bankruptcy code, I believe a substantial, if not
compelling public policy goals will be achieved in providing
additional stability to the market in currency and interest rate
swaps through the enactment of S. 396. I respectfully urge its
positive consideration by this Committee and the full Senate.

Senator HEFLIN. Mr. Comer, we are glad to see you back here. Mr. Comer is a former chief counsel to the Subcommittee on Courts. We appreciate your attendance today.

## STATEMENT OF DOUG COMER

Mr. COMER. Thank you, Mr. Chairman. It is certainly a wonderful opportunity to appear before the Subcommittee on this matter. I appear also at the request of the American Bankruptcy Institute. Although I am an associate at the firm of Akin, Gump, Strauss, Hauer & Feld, I am not appearing on behalf of the firm or on behalf of any client of the firm. Thus, I am not expressing any interest in this legislation on behalf of any party that has been involved in either the legislation or in the swap markets.

I am also a member of the legislative committee of the ABI, although I am not necessarily here to represent a position of the legislative committee. But I was requested by the ABI to testify for the purpose of providing some insight, if I could, into the comparability of S. 396 to previous legislation that this subcommittee and the judiciary committees in the Senate and the House considered in 1982 and 1984.

I think the chairman has already heard adequate testimony with regard to the comparability of the provisions in S. 396 to the two pieces of legislation that were done in 1982 and 1984. I would just add a couple of very brief observations, if I could, to what has already been said.

I think that the fundamental, underlying reason for this legislation and the purpose which justifies the special provisions contemplated for swap transactions is the longstanding need to protect the liquidity of financial markets and, specifically, securities markets—an interest which Congress has recognized as far back as the Chandler Act in 1938, certainly, again, with the Reform Act in 1978 and with the 1982 and 1984 amendments.

Every provision of S. 396 compares very closely with the provisions that were adopted in 1982 for forward contract agreements and in 1984 for repurchase agreements. In that vein, I would suggest to the committee one analogy which maybe reduces this somewhat from the very technical level that the other witnesses have spoken to.

I think it would be fair to say that in 1982 and 1984, one of the primary issues that was under consideration and studied by the committee in the course of the bankruptcy legislation that was enacted during those periods of time was the question of bailments.

We looked at that issue not only in regard to financial instruments, repurchase agreements, forward contracts, but also, of course, agricultural products, as I am sure the chairman may recall. There were substantial questions at the time about grain elevator bankruptcies, and so forth.

These transactions that we have been discussing are essentially bailments of financial instruments done for the purpose of hedging exposure and risk. In that regard, Congress, in the code and in its predecessor enactments, has always recognized the interest of the bailor in obtaining a rapid and efficient termination of the bail-

ment when the bailment no longer suited the interests of the par
ties.

The parties that are involved in swap agreements certainly con
template under the master agreements that are used by the Swa]
Dealers Association and similar agreements a quick and easy ter
mination of the swap agreement when the underlying circum
stances justify that.

The termination is done according to a mark-to-market type o
system which leaves little or no uncertainty as to the respective in
terests of the parties. In the same way that the Congress strived t(
provide that type of protection for bailors in other areas in 198:
and 1984, I believe that S. 396 is very closely analogous to thos(
situations and, of course, the language reflects that.

In that regard, I would refer the chairman's attention to a lettei
that was forwarded by the ABI to the staff of the subcommittee, ir
which was expressed the view that S. 396 is essentially philosophi
cally consistent in structure, format and intent with the previou:
work that has been done by the committee on these types of prob
lems.

Senator HEFLIN. Thank you.

The purpose of section 362 of the Bankruptcy Code providing fol
an automatic stay is not only for the protection of the debtor, bui
also for the protection of creditors to prevent the piecemeal dis
mantling of the debtor's property.

How does exempting parties of swap agreements from the auto
matic stay affect the rights of other creditors?

Mr. PERLSTEIN. I will take the first shot at that, Senator Heflin
and then I am sure Mr. Jerome will have comments as well.

As Mr. Jerome said, the swap agreement is different than othei
assets that are protected by section 362; to take an example, a leasє
is a clear asset, the right to use. A swap agreement is a hedging
transaction, and it is a hedging transaction generally against otheɪ
liabilities that the debtor has to protect against, such as a bond
that the debtor may be paying out on.

As Mr. Jerome said, bankruptcy accelerates all debt obligations
and, with very rare exceptions, those debt obligations are complete-
ly restructured under the Bankruptcy Code. A long-term or, actual-
ly, a medium-term variable-rate note can be made into a long-term
fixed-rate note with different payment terms, with different inter-
est rates, even with different collateral.

So the need for preserving a hedging agreement in that circum-
stance is minimal or nonexistent. It is nonexistent except for the
rare case, as Mr. Jerome put it, where you assume a debt obliga-
tion.

In that case, if you do assume it and you reorganize a company,
you can go out and get a new swap. There is obviously no reason
why a debtor that has reorganized will not be able to go out and
get a new swap agreement to protect the debt instrument that it
may have assumed.

But the normal midsized bankruptcy case, in my experience, will
take 2, 2½ years to reorganize. The *Manville* case took about 6. In
that circumstance, to say to a swap dealer that they have to keep
the swap open while the debtor decides whether to assume or reject
imposes mammoth risks on the dealer, particularly if the debtor

decides at the last minute, as it always is free to do, that it is going to now decide that it will not reinstate the debt instrument that it thought it was going to need to hedge, but because of a change in interest rates it is now going to enter into a new debt agreement.

So it is a very different sort of asset. You are not dismembering the debtor's estate in any meaningful way. What you are doing is terminating the hedge and allowing the debtor to enter into a new hedge once it has decided what its debt structure looks like.

Mr. JEROME. Senator, I would like to supplement Mr. Perlstein's observations by noting that in my statement filed with this committee, I call your attention to the fact that section 362 is generally aimed at protecting the business structure of the chapter 11 debtor, and it is a very valuable tool which ought not to be lightly disregarded.

But this particular tool that we are talking about is not one which generally goes to the structure, the innards of the debtor's business. A swap is an asset/liability management tool like cash management bank accounts are asset/liability management tools. It, the swap, does not go to the structure of the business.

The reality, as I have pointed out in my testimony, is that in virtually all cases in chapter 11 the need for interest rate protection is a fiction because you don't pay, for the most part, postpetition interest.

In those singular theoretical exceptions where there might be a reinstatement of the debt and where the debtor wants rate protection, the debtor is able to go out in the marketplace and buy rate protection, just like he can go out into the marketplace and borrow money in chapter 11 or outside of chapter 11.

The fact is that if this legislation is passed and certainty is brought to bear here, the costs to that particular debtor will probably be lower than they will be with the uncertainty that currently exists under the code.

So when I, as a practitioner, compare the benefits of the certainty which this legislation is going to bring—and by the way, Senator, I want to emphasize the fact that I think that the nondebtor counterparty in the litigation is going to prevail.

But the certainty, getting rid of litigation—this is such a litigious country that we live in, we should take opportunities to get rid of litigation when we can. If those issues are dealt with by this committee, it seems to me weighing the certainty and the efficiencies and the savings of costs against the theoretical possibility that some debtor somewhere in the next millennium might want to have this swap affirmed, I think there is absolutely no contest, no debate whatsoever, because that same debtor—assuming that he does exist, that same debtor can go out and buy the swap probably at a lower cost at any time in order to rehabilitate himself.

Mr. COMER. Senator, I would like to make one brief comment on what Mr. Perlstein and Mr. Jerome have said. I think that clearly the underlying purpose of section 362 is to ensure that the estate is adequately protected while the trustee sorts out the financial affairs of the debtor, and so forth.

If anything, the net settlement procedures of the swap agreement and permitting that to go forward is beneficial to the estate in that it minimizes the potential of later claims arising from the

cherry-picking problem. And in that sense, it is consistent with the underlying purpose of section 362, which is the protection of the estate.

Senator HEFLIN. Banks are major players in the swap market How have swap agreements been treated when a bank has failed? Many of these participants, of course, such as banks and thrift in stitutions, can't file under the Bankruptcy Code. How would this legislation benefit these and similar financial institutions?

Mr. PERLSTEIN. There are a number of answers to that, Senator Heflin.

Number 1, it benefits them to the extent that they are the coun terparty who will be able to close out the transaction. So a bank who is lending to a company that files for bankruptcy will have the benefit of being able to use this legislation.

Number 2, a large number of the dealers are, in fact, investment banks—Salomon Brothers, First Boston, Drexel Burnham and the other investment banks—who are subject to chapter 11. They are not commercial banks or thrifts.

We have attached to Mr. Brickell's testimony a letter from the general counsel of the FDIC, John Douglas, who stated in an opinion that he authored earlier this year that in his view as general counsel of FDIC, courts supervising bank liquidations should enforce the netting and the termination provisions of the standard swap agreement.

That, of course, is not binding, but that is from the general counsel of the chief regulator of the banks.

In addition, as the Senator well knows, his colleagues will be marking up starting tomorrow the FSLIC bill. There are provisions in the President's bill that ISDA, the Public Securities Association, and others have provided to FDIC that we understand FDIC will add to the President's bill that would track this language, track S. 396, and put it into the FSLIC bill as to thrift and bank receiverships.

So we do have the prospect, with a little bit of luck, that we will have uniform treatment by the end of this year as to all potential receiverships and bankruptcies, because we have the bankruptcy bill as to nonbanking institutions, Mr. Douglas' letter as to FDIC-insured institutions, and the President's bill as to thrift institutions.

Mr. JEROME. I might add, Senator, that I am not aware that the thrift institutions or banking institutions or broker-dealers, for that matter, who are not in a bankruptcy proceeding necessarily get the benefit of section 362; that is to say, there is no automatic stay and there ought to be, therefore, termination as a matter of law.

Senator HEFLIN. The term "swap agreements" as defined in S. 396 encompasses numerous financial transactions. What is the common thread in each of these kinds of transactions that qualifies them for this kind of treatment under the Bankruptcy Code? Is there a more succinct definition of a swap agreement to clearly define the term?

Mr. BRICKELL. Mr. Chairman, these agreements generally share the characteristic that they are entered into by end users or by

dealers as a tool for managing exposures to changes in interest rates or fluctuations in the comparative value of foreign currencies.

The fact that the financial market has given these types of arrangements many different individual names should not obscure the fact that they have in common that fundamental characteristic.

I think it is worth noting that the language for this definition is based on a definition of interest rate and currency management contracts which was originally used by the Federal Reserve and by the Bank for International Settlements in capital adequacy guidelines which they put forth last year.

Senator HEFLIN. We have several questions. Rather than having the hearing go on for a lengthy time, we will submit written questions to each of you and ask you, if you will, to promptly send back answers to them.

I also have a statement from Senator Thurmond to be entered in the record.

[The prepared statement of Senator Thurmond follows:]

STATEMENT BY SENATOR STROM THURMOND (R-S.C.) BEFORE THE
SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE.  REFERENCE,
HEARING ON S.396, A BILL TO AMEND THE BANKRUPTCY CODE REGARDING
SWAP AGREEMENTS.  SD-226, TUESDAY, APRIL 11, 1989, 2:00 P.M.

MR. CHAIRMAN:

We are here today to consider S.396, a bill introduced by
Senator DeConcini and Senator Grassley which would amend the
Bankruptcy Code in relation to swap agreements when a
bankruptcy petition is filed.  This legislation, if enacted,
would provide protection for the operation of interest rate and
currency swap agreements when one of the parties files for
bankruptcy relief.

Specifically, S.396 would amend Section 362 of the
Bankruptcy Code to exempt swap agreements from the automatic
stay provisions and amend Section 546 so that transactions
under swap agreements cannot be set aside by a trustee in
bankruptcy.  Additionally, this legislation would create a new
Section 560 which provides that a non-defaulting party to a
"swap" transaction will not be stayed by an order of the
bankruptcy court.

As we consider amending the Federal Bankruptcy Code, it
must be done so only after comprehensive study because any
modification may substantially affect the rights and
liabilities of all parties to a bankruptcy proceeding.
Therefore, S.396 should receive this Committee's careful
consideration.

I look forward to hearing from all of our distinguished
panelists as to the possible ramifications of this legislation.

Senator HEFLIN. There are also questions from Senator Thurmond to be answered.

[Questions and answers appear at the end of this hearing.]

Senator HEFLIN. I would ask each of you to separately give us an illustration of what a swap agreement is, where you have a fixed rate and where you have a variable rate, and how a swap takes place. You can put characters in the illustration and let them be the various parties. Then provide an example illustrating an instance in which the bankruptcy problem arises that would be helped by this legislation.

In other words, you have actual interest rates. Let us just put it for $100,000 that is involved in a loan, and you have illustrations at a prime rate for your fixed rate and a variable—you can pick out whatever variable rate you wish—describing how the swap occurs. And then that gives us an idea of what a swap agreement is, and then provide what you think would be a situation where the Bankruptcy Code needs to be amended by this act which would remedy what you consider the most pertinent problem.

I think maybe if we could get five different answers on that and five different illustrations, I think it would be helpful. This is a very complicated era. We will be explaining this to a great number of people as this bill is considered in markups.

Thank you very much, and we will submit these questions in writing.

Mr. PERLSTEIN. Thank you, Senator.

Mr. JEROME. Thank you, Senator.

[Whereupon, at 3 p.m., the subcommittee was adjourned.]

[Illustrations of swap agreements, subsequently submitted for the record, follow:]

WILMER, CUTLER & PICKERING
2445 M STREET, N. W.
WASHINGTON, D. C. 20037-1420

TELEPHONE (202) 663-6006
FACSIMILE (202) 293-0074,
293-5929, 429-4930, 429-9693
TELEX 440239 WCPI UI,
892402 WICHING W3H
ABA NET ABAI354
SOURCE WCPOOI

EUROPEAN OFFICE
4 CARLTON GARDENS
PALL MALL
LONDON SWIY 3AA, ENGL
TELEPHONE OII (44) 639-
FACSIMILE OII (44) 639-
TELEX 8813918 WCP LC

WILLIAM J. PERLSTEIN
DIRECT LINE (202)
663-6274

May 23, 1989

MEMORANDUM FOR SENATOR HOWELL HEFLIN

FROM:    William J. Perlstein

RE:      Interest Rate Swap Agreements

        This memorandum briefly describes the operation of a
typical interest rate swap agreement.

        1.    Assume that a thrift institution has $100 million
in variable rate deposits (which are liabilities owed by the
thrift) and $100 million in fixed rate 10% mortgages (which are
assets of the thrift).  If interest rates rise, the thrift will
be exposed since the cost of its liabilities (the deposits) will
increase while the cash flow from its fixed-rate assets (the
mortgages) remains the same.

        2.    In order to hedge against that interest rate
exposure, the thrift will enter into an interest rate swap
agreement under which it will make fixed rate payments and will
receive rate payments based on a variable rate index.

        a.    In our example, the thrift (Company A) enters
into a $100 million swap agreement with a dealer (Company B)
whereby the thrift pays based on a fixed rate of interest while it
receives payments based on a variable rate index.

        b.    Assume that fixed rates are at 9%, while
variable rates are at 8.5% at the time of the initial swap
agreement.  If rates remain unchanged, at the end of six months A
will owe B $4,500,000 ($100 million x 9% ÷ 2), B will owe A
$4,250,000 ($100 million x 8.5% ÷ 2), and A will pay B a net of
$250,000.

        c.    If variable rates increase to 10.5%, without a
swap agreement the thrift would lose money since its assets would
continue to yield 10% while it will have to pay 10.5% for its
deposits.  But under the swap agreement, the thrift would receive
payments from the dealer to offset that increased liability.  In
our example, A will still owe B $4,500,000 (since that payment is
based on a fixed rate), but B will owe A $5,250,000 ($100 million
x 10.5% ÷ 2), for a net payment from B to A of $750,000 at the end
of six months.  This net margin, when added to the thrift's own
10% fixed rate portfolio, gives it the funds it needs to pay to
its variable rate depositors.  The thrift has successfully hedged
against a rise in interest rates.

        3.    Under a typical swap agreement, the only payment
that is exchanged between the two parties is the net amount owed
by one party to the other.  In the example set forth in
subparagraph c. above, the thrift would receive a net annual
payment of 1.5% on $100 million, or $750,000 every six months.
The fact that the $100 million principal on which the interest
rate payments are calculated is not in fact exchanged reduces the
exposure of both parties and allows lower interest rate cost since
less risk is involved.



International Swap Dealers Association. Inc

# INTEREST RATE
# SWAP AGREEMENT

Dated as of............................

...................................    **and**    ...................................

have entered and/or anticipate entering into one or more transactions (each a "Rate Swap Transaction"). The parties agree that each Rate Swap Transaction will be governed by the terms and conditions set forth in this document (which includes the schedule (the "Schedule")) and in the documents (each a "Confirmation") exchanged between the parties confirming such Rate Swap Transactions. Each Confirmation constitutes a supplement to and forms part of this document and will be read and construed as one with this document, so that this document and all the Confirmations constitute a single agreement between the parties (collectively referred to as this "Agreement"). The parties acknowledge that all Rate Swap Transactions are entered into in reliance on the fact that this document and all Confirmations will form a single agreement between the parties, it being understood that the parties would not otherwise enter into any Rate Swap Transactions.

Accordingly, the parties agree as follows:

1.    **Interpretation; Code of SWAPS**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Agreement.

(b)    *Code of SWAPS.* This Agreement and each Rate Swap Transaction are subject to the Code of Standard Wording, Assumptions and Provisions for Swaps, 1986 Edition (as published by the International Swap Dealers Association, Inc.) (the "Code"), and will be governed in all relevant respects by the provisions set forth in the Code, without regard to any amendments to the Code subsequent to the date hereof. The provisions of the Code are incorporated by reference in, and shall be deemed to be a part of, this document and each Confirmation, as if set forth in full in this document or in that Confirmation. This Agreement constitutes a Rate Swap Agreement as that term is used in the Code.

(c)    *Inconsistency.* In the event of any inconsistency between the provisions of this document and the Code, this document will prevail. In the event of any inconsistency between the provisions of any Confirmation and this document, such Confirmation will prevail for the purpose of the relevant Rate Swap Transaction.

2.    **Payments**

(a)    *Obligations and Conditions.* Subject to the payment basis specified below and the other terms and conditions set forth or incorporated by reference in this Agreement (including without limitation Article 10 of the Code) or in a Confirmation, with respect to each Rate Swap Transaction, each party will make each

Copyright © 1987 by International Swap Dealers Association, Inc

payment specified in that Confirmation as being payable by it by transfer of the relevant amount in freely transferable funds to the account of the other party specified for that Rate Swap Transaction. Unless otherwise provided in a Confirmation, the Fixed Amount or Floating Amount applicable to a Payment Date will be the Fixed Amount or Floating Amount calculated with reference to the Calculation Period ending on, but excluding, the Period End Date (or in the case of the Final Calculation Period, the Termination Date) that coincides with, or corresponds to, that Payment Date.

(b) *Change of Account.* Either party may change its account to another account in the country originally specified, by giving notice to the other party at least five days prior to a Payment Date for which such change applies.

(c) *Netting.* The obligations of the parties under this Section 2 will be calculated and payable on the basis of Net Payments. The parties may, if so specified in the Schedule or otherwise, apply Net Payments—Corresponding Payment Dates to their respective obligations under this Section 2 with effect from the date so specified; *provided that,* in such case, Net Payments—Corresponding Payment Dates will apply separately to each Office through which a party makes and receives payments as set forth in Section 10.

### 3. Representations

The representations of the parties (other than those relating to tax matters, if any) are specified below and will be deemed to be repeated at the times set forth in Section 15.1 of the Code:

(a) Basic Representations;

(b) Absence of Certain Events, which in the case of an event or condition that has occurred, is continuing;

(c) Absence of Litigation; and

(d) Accuracy of Specified Information.

### 4. Agreements

The agreements of the parties (other than Tax Covenants, if any) are specified below:

(a) Each party agrees to deliver to the other party any documents specified in the Schedule or a Confirmation as soon as practicable or by the date specified in the Schedule or such Confirmation;

(b) Each party agrees to Maintain Authorizations and Comply with Laws, but in the case of Section 16.1(f)(i) of the Code only to the extent that each party agrees to use all reasonable efforts; and

(c) Each party agrees to pay any stamp, registration, documentation or similar tax ("Stamp Tax") levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organized, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

### 5. Events of Default and Termination Events

The Events of Default and Termination Events with respect to each party are specified below. The occurrence of any Event of Default or Termination Event with respect to a Specified Entity of a party will constitute an Event of Default or Termination Event with respect to such party.

(a) *Events of Default.*

(i) Failure To Pay following a Cure Period of three Business Days After Notice;

(ii) Breach of Covenant following a Cure Period of thirty days After Notice;

(iii) Credit Support Default which in the case of Section 11.7(b)(i) of the Code is continuing after any applicable grace period has elapsed;

(iv) Misrepresentation;

(v) Default Under Specified Swaps;

(vi) If Cross-Default is specified in the Schedule as applying to the party, such term will mean: (1) the occurrence or existence of an event or condition in respect of such party or any applicable Specified Entity under one or more agreements or instruments relating to Specified Indebtedness of such party or any such Specified Entity in an aggregate amount of not less than the Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming

2

capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or (2) the failure by such party or any such Specified Entity to make one or more payments at maturity in an aggregate amount of not less than the Threshold Amount under such agreements or instruments (after giving effect to any applicable grace period);

(vii) Bankruptcy, which will mean the occurrence of any of the following events with respect to a party or any applicable Specified Entity:

such party or any such Specified Entity (1) is dissolved; (2) becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for the winding-up or liquidation of the party or any such Specified Entity, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for the winding-up or liquidation of the party or such Specified Entity or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up or liquidation; (6) seeks or becomes subject to the appointment of an administrator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (regardless of how brief such appointment may be, or whether any obligations are promptly assumed by another entity or whether any other event described in this clause (6) has occurred and is continuing); (7) any event occurs with respect to the party or any such Specified Entity which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (6) (inclusive); or (8) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

other than in the case of clause (1) or (5) or, to the extent it relates to those clauses, clause (8), for the purpose of a consolidation, amalgamation or merger which would not constitute a Merger Without Assumption; or

(viii) Merger Without Assumption, which will mean that a party consolidates or amalgamates with, or merges into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party under this Agreement by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document relating to this Agreement fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

**(b)** *Termination Events.*

(i) Illegality;

(ii) Tax Event, which will mean either:

(1) the party (which will be the Affected Party) will be required on the next succeeding Payment Date to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 19.1(b) of the Code (except in respect of default interest) as a result of a Change in Tax Law; or

(2) there is a substantial likelihood that the party (which will be the Affected Party) will be required on the next succeeding Payment Date to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 19.1(b) of the Code (except in respect of default interest) and such substantial likelihood results from an action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the Trade Date of such Rate Swap Transaction (regardless of whether such action was taken or brought with respect to a party to this Agreement);

(iii) Tax Event Upon Merger, which will mean, the party (the "Burdened Party") on the next succeeding Payment Date will either (1) be required to pay to the other party an additional amount in

3                                                                                          ISDA 1987

respect of an Indemnifiable Tax under Section 19.1(b) of the Code (except in respect of d interest) or (2) receive a payment from which an amount has been deducted or withheld for account of any Indemnifiable Tax in respect of which the other party is not required to p; additional amount, in either case as a result of a party consolidating or amalgamating with, or me into, or transferring all or substantially all its assets to, another entity (which will be the Aff Party) where such action does not constitute a Merger Without Assumption; or

(iv) If Credit Event Upon Merger is specified in the Schedule as applying to the party, such will mean that such party ("X") consolidates or amalgamates with, or merges into, or transfers ; substantially all its assets to, another entity and such action does not constitute a Merger Wit Assumption but the creditworthiness of the resulting, surviving or transferee entity (which will b Affected Party) is materially weaker than that of X immediately prior to such action.

(c) Other provisions with respect to Events of Default and Termination Events are as follows:

(i) Limited Early Termination will apply to all Termination Events other than Credit Event t Merger.

(ii) If an event or circumstance which would otherwise constitute or give rise to an Eve: Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an E of Default.

## 6. Early Termination

(a) *Right to Terminate Following Event of Default.* A party entitled to designate an Early Termin Date in respect of an Event of Default may do so by giving notice to the other party of the Early Termin Date not more than 20 days prior to the date so designated (which date may not be earlier than the date notice is effective); *provided, however,* that Immediate Early Termination will apply with respect to an E of Default under Section 5(a)(vii) and, in the case of an Event of Default under clause (4) thereof, the 1 Termination Date shall be deemed to have occurred as of the time immediately preceding the instituti the relevant proceeding or the presentation of the relevant petition.

(b) *Right to Terminate Following Termination Event.*

(i) *Notice.* Upon the occurrence of a Termination Event, an Affected Party will, promptly becoming aware of the same, notify the other party thereof, specifying the nature of such Termin: Event and the Affected Transactions relating thereto. The Affected Party will also give such information to the other party with regard to such Termination Event as the other party reasonably require.

(ii) *Transfer to Avoid Termination Event.* Notwithstanding Section 18.3 of the Code, if eith( Illegality under Section 11.8(a)(i) of the Code or a Tax Event occurs and there is only one Aff( Party, or if a Tax Event Upon Merger occurs and the Affected Party is the Burdened Party Affected Party will as a condition to its right to designate an Early Termination Date us reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incid expenses) to transfer within 20 days after the Affected Party gives notice under Section 6(b)(i) a rights and obligations under this Agreement in respect of the Affected Transactions to another ( offices, branches or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to effect within such 20 day period, whereupon the other party may effect such a transfer within 30 after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upor prior written consent of the other party, which consent will not be withheld if such other p: policies in effect at such time would permit it to enter into swap transactions with the transferee o terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 11.8(a)(i) of the Code or a Tax E occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agree( within 30 days after notice thereof is given under Section 6(b)(i) on action that would cause Termination Event to cease to exist.

(iv) *Right to Terminate*. Notwithstanding Section 11.6 of the Code, if:

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i), or

(2) an Illegality under Section 11.8(a)(ii) of the Code or a Credit Event Upon Merger occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event, or the party which is not the Affected Party in the case of a Credit Event Upon Merger, will be the party entitled to designate an Early Termination Date. Such party may designate an Early Termination Date in respect of all Affected Transactions by giving notice not more than 20 days prior to the date so designated (which date may not be earlier than the date such notice is effective).

(c) *Effect of Designation*. Upon the effectiveness of notice designating an Early Termination Date (or the deemed occurrence of an Early Termination Date), the obligations of the parties to make any further payments under Section 2 in respect of the Terminated Transactions will terminate, but without prejudice to the other provisions of this Agreement.

(d) *Calculations*. The amount calculated as being payable under Section 6(e) will be due on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or deemed to occur as a result of an Event of Default) and not later than the day which is two Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such notice shall specify the account for payment.

Such amount will be paid together with (to the extent permitted under applicable law) interest thereon from (and including) the relevant Early Termination Date to (but excluding) the relevant due date, calculated as follows:

(i) if notice is given designating an Early Termination Date or if an Early Termination Date is deemed to occur, in either case as a result of an Event of Default, at the Default Rate; or

(ii) if notice is given designating an Early Termination Date as a result of a Termination Event, at the Default Rate minus the Default Spread.

Such interest will be computed on the basis of Compounding using daily Compounding Dates, as if the rate specified were a Floating Rate, such period were a Calculation Period and the amount due were a Notional Amount.

(e) *Payments on Early Termination*.

(i) *Amount Payable*. The amount payable in respect of an Early Termination Date will be calculated as follows:

(1) If there is a Defaulting Party, the Defaulting Party will pay to the other party the excess, if a positive number, of (A) the sum of (i) the amount determined in accordance with Agreement Value—Limited Two Way Payments, calculated on the basis of Aggregation (or, if the Aggregate Market Quotation calculated in determining such amount is less than zero, the amount by which such Aggregate Market Quotation is less than zero, expressed as a negative number) and (ii) the Unpaid Amounts due to the other party over (B) the Unpaid Amounts due to the Defaulting Party; and

(2) if an Early Termination Date occurs as a result of a Termination Event, the payment to be made will be the amount equal to (A) the sum of (i) the amount determined in accordance with Agreement Value—Limited Two Way Payments, calculated on the basis of Aggregation and (ii) the Unpaid Amounts due to the party ("X") entitled to receive a payment under clause (i) minus (B) the Unpaid Amounts due to the other party ("Y"). If the resulting amount is a positive number, Y will pay such amount to X. If the resulting amount is negative, X will pay the absolute value of such amount to Y; and

(3) for purposes of the foregoing clauses (1) and (2), if Market Quotation is not, or cannot be, determined with respect to a Rate Swap Transaction, the alternative measure of damages with respect to such Rate Swap Transaction will be Indemnification—Limited Two Way Payments; *provided that*, (A) in the case of clause (1)(A)(i) above, the amount, if any, by which Loss is less than zero will be given effect and (B) in the case of a Termination Event

5                                                                    ISDA 1987

where there is only one Affected Party, Indemnification—Limited Two Way Payments will b computed without regard to the Loss of the Affected Party.

(ii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date is deemed t occur as a result of Immediate Early Termination, the amount determined under Section 6(e)(i) wi be subject to such adjustments as are appropriate and permitted by law to reflect any payments mad by one party to the other under this Agreement (and retained by such other party) during the perio from the relevant Early Termination Date to the date for payment determined under Section 6(d).

(iii) *Pre-Estimate of Loss.* The parties agree that the amounts recoverable under this Section 6(e are a reasonable pre-estimate of loss and not a penalty. Such amounts are payable for the loss o bargain and the loss of protection against future risks and except as otherwise provided in thi Agreement neither party will be entitled to recover any additional damages as a consequence of sucl losses.

### 7. Transfer

Subject to Section 6(b) and to any exception provided in the Schedule, neither this Agreement nor an: interest or obligation in or under this Agreement may be transferred by either party without the prior writte: consent of the other party (other than pursuant to a consolidation or amalgamation with, or merger into, o transfer of all or substantially all its assets to, another entity) and any purported transfer without sucl consent will be void.

### 8. Contractual Currency

All payments under this Agreement will be made in Dollars. In connection with a demand for payment c any additional amount under Section 18.1 of the Code, it will be sufficient for a party to demonstrate that i would have suffered a loss had an actual exchange or purchase been made.

### 9. Miscellaneous

(a) *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the partie with respect to its subject matter and supersedes all oral communications and prior writings with respec thereto.

(b) *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effectiv unless in writing and executed by each of the parties or confirmed by an exchange of telexes.

(c) *Survival of Obligations.* Except as provided in Section 6(c), the obligations of the parties under thi: Agreement will survive the termination of any Rate Swap Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies anc privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies anc privileges provided by law.

(e) *Confirmations.* A Confirmation may be executed in counterparts or created by an exchange of telexes substantially in the form of the letter or telex attached hereto as Exhibit I (or in such other form as the parties may agree), which in either case will be sufficient for all purposes to evidence a binding supplement to this Agreement. Any such counterpart or telex will specify that it constitutes a Confirmation.

### 10. Multibranch Parties

If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receiv payments under any Rate Swap Transaction through any of its branches or offices listed in the Schedul (each an "Office"). The Office through which it so makes and receives payments for the purpose of any Rat Swap Transaction will be specified in the relevant Confirmation and any change of Office for such purpos requires the prior written consent of the other party. Each Multibranch Party represents to the other part that, notwithstanding the place of payment, the obligations of each Office are for all purposes under thi: Agreement the obligations of such Multibranch Party. This representation will be deemed to be repeated b1 such Multibranch Party on each Trade Date.

### 11. Credit Support Document

If a Credit Support Document is specified with respect to a party in the Schedule, the obligations of sucl party under this Agreement and in respect of each Rate Swap Transaction will be secured or guaranteed ir accordance with the provisions of that Credit Support Document.

6

## 12. Tax Matters

(a) *Representations and Covenants.* The parties make the following Tax Covenant: Give Notice of Breach of Payee Tax Representation or Tax Covenant. In addition, the parties make the Payee Tax Representations, the Withholding Tax Representation and the Tax Covenants specified in the Schedule. In addition, at all times during the Term of any Rate Swap Transaction, each party makes to the other party, and to any Specified Entity of the other party, the representations specified in the Schedule as "Payor Tax Representations". Unless otherwise specified (i) all Payee Tax Representations, Payor Tax Representations, the Withholding Tax Representation and all Tax Covenants made by a party will apply to each Office of the party and (ii) all Payee Tax Representations will be subject to the occurrence of a Change in Tax Law.

(b) *Exempt From Withholding.* If used for purposes of specifying the Withholding Tax Representation of a party in the Schedule, "Exempt from Withholding" will have the meaning set forth in the Code; *provided that,* such representation will apply to the jurisdiction from or through which a payment is made, as well as the jurisdictions specified in Section 19.3 of the Code.

(c) *Recognized Bank.* If used for purposes of specifying Payee Tax Representations or Payor Tax Representations of a party in the Schedule, "Recognized Bank" means the party represents that it is a bank recognized by the United Kingdom Inland Revenue as carrying on a bona fide banking business in the United Kingdom, is entering into this Agreement in the ordinary course of such business and will bring into account payments made and received under this Agreement in computing its income for United Kingdom tax purposes.

(d) *Provide U.S. Tax Forms if Required.* If used for purposes of specifying Tax Covenants of a party in the Schedule, "Provide U.S. Tax Forms if Required" means that the party agrees to complete, accurately and in a manner reasonably satisfactory to the other party, and to execute and deliver to the other party, a United States Internal Revenue Service Form 4224, or any successor form, in respect of any payments received or to be received by that party in connection with this Agreement that are effectively connected or otherwise attributable to its conduct of a trade or business in the United States (i) before the first payment date on which any such payment is or may be so connected or attributable, (ii) promptly upon reasonable demand by the other party, and (iii) promptly upon learning that any such form previously provided has become obsolete or incorrect.

## 13. Service of Process

Each party irrevocably appoints the party specified in the Schedule, if any, as its agent for service of process. If for any reason a party's agent for service of process is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute agent for service of process acceptable to the other party. The parties irrevocably consent to service of process given in accordance with the notice provisions of Article 14 of the Code and this Agreement. Nothing in this Section will affect the right of either party to serve process in any other manner permitted by law.

## 14. Definitions

As used in this Agreement:

*"Affected Transactions"* means (a) with respect to any Termination Event to which Limited Early Termination applies under Section 5(c)(i) of this Agreement, all Rate Swap Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Rate Swap Transactions.

*"Default Rate"* means a rate per annum determined in accordance with the Federal Funds Floating Rate Option plus the Default Spread, using daily Reset Dates. For purposes of Section 10.3 of the Code, the Default Rate will be applied on the basis of Compounding as if the overdue amount were a Notional Amount and using daily Compounding Dates, and interest will accrue and be payable before as well as after judgment.

*"Default Spread"* will have the meaning specified in the Schedule.

7                                                                            ISDA 1987

*"Illegality"* will have the meaning set forth in Section 11.8 of the Code; *provided that*, if an event that would otherwise constitute an Illegality results from a breach by the party of its obligations under Section 16.1(f)(i) of the Code, such event will not be deemed to be an Illegality.

*"Indemnifiable Tax"* will have the meaning set forth in the Code; *provided that*, (a) references to the recipient of a payment shall be considered also to refer to a person related to the recipient and (b) the last clause of the definition of "Indemnifiable Tax" in Section 19.5(d) of the Code shall be considered to refer to a Credit Support Document as well as a Rate Swap Agreement

*"law"* means, with respect to tax matters, any treaty, law, rule or regulation, as modified by the practice of any relevant governmental revenue authority.

*"Specified Entity"* will have the meaning set forth in the Schedule.

*"Specified Indebtedness"* means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Swap"* means any rate swap or currency exchange transaction now existing or hereafter entered into between one party to this Agreement (or any applicable Specified Entity) and the other party to this Agreement (or any applicable Specified Entity).

*"Terminated Transactions"* means (a) with respect to any Early Termination Date occurring as a result of a Termination Event, all Affected Transactions and (b) with respect to any Early Termination Date occurring as a result of an Event of Default, all Rate Swap Transactions, which in either case are in effect as of the time immediately preceding the effectiveness of the notice designating such Early Termination Date (or, in the case of Immediate Early Termination, in effect as of the time immediately preceding such Early Termination Date).

*"Unpaid Amounts"* owing to any party means, with respect to any Early Termination Date, the aggregate of the amounts that became due and payable (or that would have become due and payable but for Section 10.2 of the Code or the designation or occurrence of such Early Termination Date) to such party under Section in respect of all Terminated Transactions by reference to all Calculation Periods ended on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, together with (to the extent permitted under applicable law and in lieu of any interest calculated under Section 10.3 of the Code interest thereon from (and including) the date such amount became due and payable or would have become due and payable to (but excluding) such Early Termination Date, calculated as follows:

(a)  in the case of amounts that became so due and payable by a Defaulting Party, at the Default Rate; and

(b)  in the case of all other such amounts, at the Default Rate minus the Default Spread.

Such interest will be computed on the basis of Compounding using daily Compounding Dates, as if the rate specified were a Floating Rate, such period were a Calculation Period and the amount due were a Notional Amount.

IN WITNESS WHEREOF the parties have executed this document as of the date specified on the first page of this document.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
            (Name of party)                             (Name of party)

By: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         By: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Name:                                                          Name:

Title:                                                          Title:

84

EXHIBIT 1

*Heading for Letter*

[Letterhead of Party]

[Date]

Rate Swap Transaction

[Name and Address of Party]

*Heading for Telex*

**Telex**

**Date:**

**To:** [Name and Address of Party]

**From:** [Name of Party]

**Subject:** **Rate Swap Transaction**

Dear :

The purpose of this [letter agreement/telex] is to set forth the terms and conditions of the Rate Swap Transaction entered into between us on the Trade Date referred to below. This [letter/telex] constitutes a "Confirmation" as referred to in the Rate Swap Agreement specified below.

1. This Confirmation supplements, forms a part of, and is subject to, the Interest Rate Swap Agreement dated as of [date] (the "Rate Swap Agreement") between you and us. All provisions contained or incorporated by reference in the Rate Swap Agreement shall govern this Confirmation except as expressly modified below.

2. The terms of the particular Rate Swap Transaction to which this Confirmation relates are as follows:

Notional Amount: $

Trade Date:

Effective Date:

Termination Date:

Fixed Amounts:

| | |
|---|---|
| Fixed Rate Payor: | [name of party] |
| Fixed Rate Payor Payment Dates [or Period End Dates, if Delayed Payment or Early Payment applies]: | [    ], subject to adjustment in accordance with the [Following/Modified Following/Preceding] Banking Day convention |
| Fixed Amount [or Fixed Rate and Fixed Rate Day Count Fraction]: | |

Floating Amounts:

| | |
|---|---|
| Floating Rate Payor: | [name of party] |
| Floating Rate Payor Payment Dates [or Period End Dates, if Delayed Payment or Early Payment applies]: | [    ], subject to adjustment in accordance with the [Following/Modified Following/Preceding] Banking Day convention |

9 ISDA 1987

Floating Rate for initial Calculation Period:

Floating Rate Option:

Designated Maturity:

Spread:                        [plus/minus]     %

Floating Rate Day Count Fraction:

Reset Dates:

[Rate Cut-off Dates:]

[Method of Averaging:]             [Unweighted Average Rate/ Weighted Average Rate]

Compounding:                 Applicable/Inapplicable

[Compounding Dates:]

[Calculation Date:]

Other provisions:

[3.           agrees to provide the following Credit Support Document [or agrees to provide th following in accordance with [specify Credit Support Document]:]

---

### Closing for Letter

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the cop of this Confirmation enclosed for that purpose and returning it to us.

Very truly yours,

By: _____
    Name:
    Title:

Accepted and confirmed as
of the date first written:

By: _____
   Name:
   Title:

---

### Closing for Telex

Please confirm that the foregoing correctly sets forth the terms of our agreement by a return telex t [name of party] substantially to the following effect:

"We acknowledge receipt of your telex dated          with respect to a Rate Swap Transactio between [name of party] and [name of party] with a Notional Amount of        and Termination Date of         and confirm that such telex correctly sets forth the terms of ou agreement relating to the Rate Swap Transaction described therein. Very truly yours, [name of party], b (specify name and title of authorized officer)."

Very truly yours,

By: _____
    Name:
    Title:

## SCHEDULE

#### to the

#### Interest Rate Swap Agreement

dated as of . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

between. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **and** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
         **("Party A")**                              **("Party B")**

1. **Definitions**

(a) *"Default Spread"* means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(b) *"Specified Entity"* means in relation to Party A for the purpose of:

Section 5(a)(iii) and (iv) and 5(b)(i), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Section 5(a)(v), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Section 5(a)(vi), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Section 5(a)(vii), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

and in relation to Party B for the purpose of:

Section 5(a)(iii) and (iv) and 5(b)(i), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Section 5(a)(v), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Section 5(a)(vi), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Section 5(a)(vii), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(c) *"Specified Swap"* will have the meaning specified in Section 14 unless another meaning is specified

here: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. **Payments**

(a) The Calculation Agent will be . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(b) If indicated here, Net Payments—Corresponding Payment Dates will apply with effect from the date

of this Agreement: ____

3. **Representations**

*"Accuracy of Specified Information"* in respect of a party will apply to the information which is

required to be delivered by it under Section 4 of this Schedule, unless otherwise specified below . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

4. **Agreements**

For the purpose of Section 4(a), the documents to be delivered (other than tax forms) are:

| Party required to deliver document | Document | Date by which to be delivered |
|---|---|---|
| . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . . . . . |
| . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . . . . . |
| . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . . . . . . . . . . |

           **ISDA 1987**

5.  **Events of Default**

(a)  The *"Cross-Default"* provisions of Section 5(a)(vi) will/will not* apply to Party A
                                                                  will/will not* apply to Party B

   If such provisions apply:

   *"Specified Indebtedness"* will have the meaning specified in Section 14 unless another meaning is

   specified here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   *"Threshold Amount"* means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(b)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not* apply to Party A
                                                                       will/will not* apply to Party B

6.  **Transfer**

   Exceptions to the Transfer provisions of Section 7, if any, are . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7.  **Addresses for Notices**

   Address for notices or communications to Party A:

   Address: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   Attention. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   Telex No.: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Answerback: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   (For all purposes/only with respect to Rate Swap Transactions through that Office*.)

   Address for notices or communications to Party B:

   Address: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   Attention: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   Telex No.: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Answerback: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   (For all purposes/only with respect to Rate Swap Transactions through that Office*.)

8.  **Specification of Multibranch Party**

   Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: . . . . . . . . . . .

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: . . . . . . . . . . .

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

* Delete as applicable

9. **Specification of Credit Support Document**

10. **Tax Matters**

(a)  Party A:                                    (b)  Party B:

    (i)  *Payee Tax Representations*

        ____ Eligible for Treaty Benefits*
        ____ Ordinary Business Use
        ____ Qualify as Business Profits
        ____ Effectively Connected
        ____ Recognized Bank
        ____ Other (specify)

    (i)  *Payee Tax Representations*

        ____ Eligible for Treaty Benefits*
        ____ Ordinary Business Use
        ____ Qualify as Business Profits
        ____ Effectively Connected
        ____ Recognized Bank
        ____ Other (specify)

    (ii)  *Payor Tax Representations*

        ____ Recognized Bank
        ____ Other (specify)

    (ii)  *Payor Tax Representations*

        ____ Recognized Bank
        ____ Other (specify)

    (iii)  *Withholding Tax Representation*

        ____ Exempt from Withholding

    (iii)  *Withholding Tax Representation*

        ____ Exempt from Withholding

    (iv)  *Additional Tax Covenants*

        ____ Provide Form 1001
        ____ Provide Form 4224
        ____ Provide Tax Forms
        ____ Provide U.S. Tax Forms if Required
        ____ Other (specify)

    (iv)  *Additional Tax Covenants*

        ____ Provide Form 1001
        ____ Provide Form 4224
        ____ Provide Tax Forms
        ____ Provide U.S. Tax Forms if Required
        ____ Other (specify)

      *"Specified Treaty"* means...........................................
.........................................................................

11. **Agent for Service of Process**

Party A appoints as its agent for service of process ...........................................
.........................................................................

Party B appoints as its agent for service of process...........................................
.........................................................................

12. **Other Provisions**

ISDA 1987

101st CONGRESS
1st SESSION

# S. 396

To amend title II of the United States Code, the bankruptcy code, regarding
swap agreements.

---

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 9 (legislative day, JANUARY 3), 1989

Mr. DeCONCINI (for himself and Mr. GRASSLEY) introduced the following bill;
which was read twice and referred to the Committee on the Judiciary

---

# A BILL

To amend title II of the United States Code, the bankruptcy
code, regarding swap agreements.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  That section 101 of title 11, United States Code, is amended

4  by—

5             (1) redesignating paragraphs (49), (50), and (51)

6       as paragraphs (51), (52), and (53) respectively; and

7             (2) inserting between paragraphs (48) and (51), as

8       redesignated herein, the following:

9                  "(49) 'swap agreement' means an agreement,

10           including terms and conditions incorporated by

2

1 reference therein, which is a rate swap agree-
2 ment, basis swap, forward rate agreement, inter-
3 ~~est rate future,~~ *commodity swap,* interest rate option purchased,
4 forward foreign exchange agreement, rate cap
5 agreement, rate floor agreement, rate collar agree-
6 ment, currency swap agreement, cross-currency
7 rate swap agreement, ~~currency future,~~ currency
8 option purchased (including any option to enter
9 into any of the foregoing) or any other similar
10 agreement or combination thereof, and a master
11 agreement for any of the foregoing together with
12 all supplements shall be considered one swap
13 agreement;

14     "(50) 'swap participant' means an entity
15 that, on any day ~~during the period beginning 90~~
16 ~~days~~ before the date of the filing of the petition,
17 has an outstanding swap agreement with the
18 debtor;".

19 SEC. 2. Section 362(b) of title 11, United States Code,
20 is amended by—

21     (1) striking out "or" at the end of paragraph (12);
22     (2) striking out the period at the end of paragraph
23 (13) and inserting in lieu thereof "; or"; and
24     (3) inserting at the end thereof the following:

**3**

1                    "(14) under subsection (a) of this section, of
2           the setoff by a swap participant, of any mutual
3           debt and claim under or in connection with one or
4           more swap agreements that constitutes the setoff
5           of a claim against the debtor for any payment due
6           from the debtor under or in connection with swap
7           agreements against any payment due to the
8           debtor from the swap participant under or in con-
9           nection with the swap agreements or against
10          cash, securities, or other property of the debtor
11          held by or due from such swap participant to
12          guarantee, secure or settle swap agreements.".

13     SEC. 3. Section 546 of title 11, United States Code, is
14 amended by adding at the end thereof the following:

15          "(g) Notwithstanding sections 544, 545, 547,
16          548(a)(2) and 548(b) of this title, the trustee may not
17          avoid a transfer under a swap agreement, made by or
18          to a swap participant, in connection with a swap
19          agreement and that is made before the commencement
20          of the case, except under section 548(a)(1) of this
21          title.".

22     SEC. 4. Section 548(a)(2) of title 11, United States
23 Code, is amended by—

24          (1) striking out "and" at the end of subparagraph
25          (B);

**4**

1        (2) striking out the period at the end of subpara-
2   graph (C) and inserting in lieu thereof "; and"; and
3        (3) adding at the end thereof the following:

4            "(D) a swap participant that receives a
5            transfer in connection with a swap agreement, as
6            defined in section 101(49) of this title, takes for
7            value to the extent of such transfer.".

8     SEC. 5. Section 553(b)(1) of title 11, United States
9 Code, is amended by inserting "362(b)(14)," after
10 "362(b)(7),".

11     SEC. 6. Subchapter III of chapter 5 of title 11, United
12 States Code, is amended by adding at the end thereof the
13 following:

14 **"§ 560. Contractual right to terminate a swap agreement**

15     "The exercise of any contractual rights of a swap par-
16 ticipant to cause the termination of a swap agreement be-
17 cause of a condition of the kind specified in section 365(e)(1)
18 of this title or to set off or net out any termination values or
19 payment amounts arising under or in connection with one or
20 more swap agreements shall not be stayed, avoided, or other-
21 wise limited by operation of any provision of this title or by
22 order of a court or administrative agency in any proceeding
23 under this title. As used in this section, the term 'contractual
24 right' includes a right, whether or not evidenced in writing,

5

1 arising under common law, under law merchant or by reason

2 of normal business practice.''.

○

MILBANK, TWEED, HADLEY & McCLOY

1 CHASE MANHATTAN PLAZA

NEW YORK, N. Y. 10005

212-530-5000
CABLE: MILTWEED NEW YORK
RAPIFAX 100: 530-5219
I. T. T. 422962 423893
W. U. 12-5595

NIPPON PRESS CENTER BUILDING
2-1 UCHISAIWAI-CHO 2-CHOME
CHIYODA-KU, TOKYO 100

ALEXANDRA HOUSE
16 CHATER ROAD
HONG KONG

1 COLLEGE HILL
LONDON EC4R 2RA, ENGLAND

INTERNATIONAL SQUARE BUILDING
1825 EYE STREET, N.W.
WASHINGTON, D. C. 20006

1903/04 SHELL TOWER
50 RAFFLES PLACE
SINGAPORE 0104

515 SOUTH FIGUEROA STREET
LOS ANGELES, CA 90071

JOHN J. JEROME
PARTNER
DIRECT DIAL NUMBER
(212) 530-5652

May 19, 1989

United States Senate
Committee on the Judiciary, Subcommittee
  on Courts and Administrative Practice
223 Hart Senate Office Building
Washington, D.C. 20510

Attention:  Ms. Karen Kremer, Chief Counsel
            to Senator Howell Heflin

       Re:  S. 396--Examples Submitted to Demonstrate Utility
            of Proposed Amendments to the Bankruptcy
            Code With Respect to Swap Transactions

Senators:

            I am responding to your request, at the April 11, 1989
hearing, for submission of an example of how the proposed swap
amendments could prevent certain results that are inconsistent
with underlying policies of the Bankruptcy Code.  I believe that
the most important aspects addressed by the bill are the
possibilities of unfair prejudice to a nondebtor resulting from
(1) delay by a debtor in deciding whether to assume or reject a
swap transaction or agreement, and (2) selective assumption and
rejection of swap transactions by a debtor that would otherwise
be prohibited by the applicable master swap agreement (commonly
referred to as "cherry-picking").  These problems stem from the
potential treatment of swap agreements as assumable executory
contracts under the Bankruptcy Code, notwithstanding a bona fide
argument to the contrary.  While the better view is that a
nondebtor counterparty should ultimately prevail in effecting
termination of the swap and preventing "cherry-picking," the
current lack of certainty will do severe damage in the interim.

95

The enactment of S. 396 at this time would prevent this damage from occurring.

I would like to illustrate the aforementioned problems through the use of two hypothetical examples (the first example has two variations). The interest rates used in the examples an the periods in which they are calculated are not chosen because they are typical for the market but, rather, because they allow for easy calculation and thus a better illustration of the problem.

## Introduction

Interest rate swap agreements are contracts under whic the parties agree to pay each other either a fixed or a floating rate of interest on a hypothetical or "notional" amount of principal. The obligations of the parties are governed by the terms of the relevant swap agreement and generally no payments o principal are made by either party.

Swap agreements that contemplate only one swap transaction and common payment dates usually require a series of payments over a period of time on a particular periodic payment date consisting of the amount that the paying party's interest obligation for the period prior to such payment date computed at an agreed rate exceeds that of the other computed at an agreed rate, when computed on the notional amount. Usually one agreed rate is fixed and the other floating so that the computation of the floating amount for any interest period can be made only at the end of such period.

Multiple swap transactions occurring over time between the same parties are often governed by the terms of a master agreement. The master agreement is likely to require only one payment for the net amount owed between the parties when amounts become due on the same payment date for more than one swap transaction. When payment dates do not coincide, the party owin money with respect to a particular swap transaction is required to make payment on the corresponding payment date. In the event of a default by one party and termination by the other party, th master agreement will typically provide that the nondefaulting party may elect to recover damages that take into account the market value of swap transactions that are favorable to it and subtract the market value of swap transactions that are not favorable to it. This process of setting off the market values of various swap transactions is referred to as "damage-netting."

Example 1
(Unfairness of Debtor's Delay)

As of June 1, 1985, C's productive assets generally
yield a fixed rate of return of 15%. C's loans incurred in
respect of financing its assets are subject to a floating
interest rate. Because C would like to protect itself from
rising interest rates which could approach or exceed its rate of
return on assets, C decides to enter the swap market in order to
lock in a positive spread between its rate of return on assets
and its cost of funds and thereby limit the danger that its
business could become unprofitable as a result of rising interest
rates. D is a swap dealer that would like to hedge its position
with respect to a swap it entered into with another party under
which D is required to pay a fixed rate of interest in return for
a floating rate. Therefore, C and D each may benefit from entry
into one or more interest rate swap transactions.

On June 1, 1985, C and D decide to enter into an
interest rate swap agreement that contemplates a single swap with
common payment dates. Pursuant to the terms of the swap
agreement, C agrees to pay D the fixed interest rate of 10% at
the end of each year, over a five year period. That rate is to
be applied to a notional amount of $100,000,000. In return for
C's promise, D agrees to pay C the floating or variable interest
rate at the end of each year, over the same five-year period.
The variable interest rate is also applied to the same notional
amount of $100,000,000. The variable interest rate is 8% at this
time.

On June 1, 1988, D, who is not a bank or savings and
loan association and who may be a debtor under the Bankruptcy
Code, files a chapter 11 bankruptcy petition. At that time the
floating interest rate is 11% and the fixed rate available on
similar transactions in the swap market is 12%. Thus, D was
obligated to pay C $1,000,000 on the petition date. All prior
amounts due under the swap agreement were paid. The filing of
such petition prevents C from collecting payment and from
terminating the contract (assuming it is treated as an executory
contract that is not a contract for financial accommodation),
notwithstanding the language of the swap contract that would
permit such actions. D chooses to see what happens to interest
rates before attempting to assume or reject the swap agreement.

## Scenario #1 (risk of covering position)

On June 1, 1988, C decides that it better enter into a
similar swap with another party to hedge its exposure and avoid

the risk that interest rates might remain the same or rise and
the debtor may therefore reject the contract, leaving C with a
larger unsecured damage claim and, to the extent the unsecured
claim is not paid in full, exposed to the very risk C sought to
avoid by entering into the swap agreement with D in the first
place (i.e., rising interest rates).

By June 1, 1989, interest rates have declined
significantly; the floating rate is 7% and the fixed rate for
similar new swaps is 9%. As a result, C owes D $3,000,000 less
the $1,000,000 owed by D to C, or a total of $2,000,000 upon
assumption of the contract by D. Additionally, C owes its new
counterparty $5,000,000.

Had C known D would assume the contract C would have
saved $5,000,000 by not entering into a similar swap with a new
counterparty. Had the interest rates changed in the other
direction, C would only receive from the debtor a larger
prepetition claim, which is unlikely to be paid in full, even
though much of C's damages were actually incurred after the
filing of the bankruptcy petition. Although other creditors in a
bankruptcy case may be faced with a similar risk, the risk is
magnified for swap participants due to the volatility of their
contract. Other assets are more likely to maintain substantially
their value during the course of a bankruptcy case and for that
reason need not receive the same treatment that the bill would
provide for swaps. It is important to note that the proposed
legislation would still leave the nondebtor counterparty with
only an unsecured claim for the net amount of payments owed to it
by the debtor.

## Scenario #2 (risk of not covering position)

On June 1, 1988, C does not wish to risk entering into
another swap transaction because it fears that floating rates may
drop substantially and then it could be subject to liability to
both the debtor, if, as is likely, the debtor assumes the
contract, and to its counterparty to the new swap.

On June 1, 1989, the floating rate is 13% and the
current fixed rate offered on similar new swaps is 15%. Because
the debtor would be liable for a new payment of $3,000,000, it
chooses to reject the contract and thereby leave C with a total
unsecured claim of $4,000,000 ($1,000,000 for 1988 and $3,000,000
for 1989) plus the cost of replacing the swap by entering the
swap market and obtaining a swap agreement with the same
provisions for a period equal to the remaining term of the
original swap, which is unlikely to be paid in full. If C were
able to terminate the swap contract with D as of the petition

date, C would have felt free to enter into a similar swap with a counterparty that was likely to pay the full amount of any indebtedness incurred to C and thus C's unsecured claim against the debtor would be in the amount of $1,000,000 plus the market value as of the petition date of a swap with the same terms and the same remaining period, and C would receive a payment from its new counterparty of $1,000,000. Thus, by not covering its position C suffers a loss, resulting from the debtor's delay in determining whether to assume or reject the agreement, to the extent that the increase in its unsecured claim is worth less than a $1,000,000 payment from a new counterparty. C will be held liable for the full amount of interest rate changes in D's favor, while C only stands to gain a fraction of the amount of any interest rate changes in its favor (it is for this reason that a nondebtor counterparty is likely to terminate a swap contract in situations where the debtor is unlikely to pay its unsecured claims in full). To the extent that C's unsecured claim is increased, other unsecured creditors, generally, stand to receive a smaller distribution from the debtor's estate.

In either scenario, it is clear that the harm caused by delay is much more severe for C, the counterparty, than it is to D, the debtor. The debtor is permitted a windfall to the extent it is allowed to assume positive changes for full value and reject negative changes and incur an actual loss that amounts only to a fraction of the damages suffered by C and to which C would ordinarily be entitled, under the terms of the swap agreement. There is no need to permit such delay because D would generally not need interest rate protection since the filing of a bankruptcy petition, in most cases, prevents unsecured creditors from receiving interest after the filing date (secured creditors can only obtain such interest up until the time that their claim plus interest reaches the value of their collateral). Permitting such delay, in effect, gives the debtor an option on a swap. This may result in a windfall to the debtor and force the nondebtor counterparty to suffer the consequences.

## Resolution of the Problem of Unfair Delay by S. 396

S. 396 would resolve the unfairness caused by the delay illustrated in the above scenarios by permitting C, the nondebtor counterparty, to (1) exercise its contractual right to terminate the swap agreement, (2) fix the amount of its unsecured claim for damages, and (3) cover its position in the market by entering into a similar swap with a counterparty who will fully perform its obligations under the contract, regardless of the direction of the changes in the volatile interest rate market. These changes will not protect the nondebtor counterparty from the risk that it will receive less than 100% of its damages that occurred

through the filing of the petition. With respect to such damages
the nondebtor counterparty will be in the same position as every
other creditor. However, the proposed legislation would ensure
that the counterparty is not forced to suffer further damages,
after the filing of the petition, for which it is not likely to
be fully compensated. Such treatment is fair, particularly in
light of the general lack of need by debtors for interest rate
protection and the gravity of the risk exposure of nondebtor
counterparties resulting from the volatile nature of the interest
rate swap market.

**EXAMPLE 2**
(Unfairness of "Cherry-picking" by the Debtor)

C and D are swap dealers and serve their customers by
providing them with interest rate protection through agreements
to swap fixed interest rates for floating interest rates and
floating interest rates for fixed interest rates. As dealers, C
and D are not involved in the swap market to speculate on
interest rates. Therefore, for every swap transaction they
enter into, they generally enter into a similar swap with another
party in which they take the opposite position. For example, if
C enters into a swap agreement with one party whereby it agrees
to pay a fixed rate of interest on a particular notional amount
in exchange for variable rate payments on the same amount, C is
likely to enter into a transaction with another party whereby it
agrees to pay a variable rate of interest on the same notional
amount in exchange for fixed interest payments on that amount.
By taking such action, a swap dealer minimizes its own exposure
to interest rate fluctuations.

C and D intend to enter into swap transactions with
each other frequently so they may cover their positions in the
market after entering into interest rate swaps with their
customers. As a result, C and D enter into a standard form of
master agreement that is intended to govern their present and
future dealings with each other on June 1, 1984. The terms of
the master agreement (the "Agreement") provide that the parties
will enter into swaps with each other from time to time (each
such swap, a "Swap Transaction") and will execute and exchange a
document (each such document, a "Confirmation") setting forth the
particular terms of each Swap Transaction. The Agreement
provides that each Confirmation shall constitute a supplement to
and form a part of the Agreement.

In the event of termination based on a default, such as
a payment default or an insolvency default, the Agreement
provides for the termination of all Swap Transactions under the
Agreement. Upon termination, both parties to the Agreement are

relieved of their obligation to make scheduled payments in
respect of all Swap Transactions. The nondefaulting party would
have its damages calculated by computing a lump sum pursuant to a
formula set forth in the Agreement that will be payable by the
defaulting party to the nondefaulting party if it would result in
payment of an amount to the nondefaulting party. The lump sum is
computed by adding the amounts already owing to the nondefaulting
party under the Swap Transactions to the amount that reflects the
netting of positive (payable to the nondefaulting party) and
negative (payable by the nondefaulting party) market values
associated with the parties' future scheduled payment obligations
in respect of each Swap Transaction. Through the netting
process, the defaulting party is given credit for the negative
market value of any Swap Transaction under which it would, absent
the default, have been entitled to receive payments from the
nondefaulting party, even though the nondefaulting party would
not, by virtue of the conditional payment obligation provisions
set forth in the Swap Agreement, otherwise have been obligated to
make such payments.

Pursuant to the terms of the Agreement and the
Confirmations executed pursuant thereto, C and D enter into the
following Swap Transactions on the following dates. On June 1,
1985, C agrees to pay D the current fixed interest rate of 10%
at the end of each year, over a five-year period, when applied to
a notional amount of $100,000,000, in return for D's agreement to
pay C the variable interest rate when applied to the same
notional amount and over the same period. On June 1, 1986, D
agrees to pay C the current fixed interest rate of 9% at the end
of each year, over a five-year period, when applied to a
notional amount of $100,000,000, in return for C's agreement to
pay D the floating interest rate when applied to the same
notional amount over the same period. On June 1, 1987, C agrees
to pay D the current fixed interest rate of 9% at the end of
each year over a five-year period, when applied to a notional
amount of $100,000,000, in return for D's agreement to pay C the
floating interest rate applied to the same notional amount over
the same period.

On June 1, 1988, D files a chapter 11 bankruptcy
petition and does not make the net payment due to C on this date.
All prior payments were made by each party. As of this date, the
floating interest rate is 11% and the current fixed rate
available on similar transactions in the swap market is 12%.

Pursuant to the terms of the Agreement, C would be able
to terminate all Swap Transactions as of this date and perform
the process of netting to determine the amount of its damage
claim. Pursuant to such procedure C would have an unsecured

claim against D for the net amount of $1,000,000 owing between
the parties as of such date plus the net amount owing to it in
respect of the market values of the Swap Transactions based on
their remaining terms.  C also would be relieved of any payment
obligations to D.  However, the Bankruptcy Code may be
interpreted to prevent such termination and, if the Agreement is
not held to be a single, executory agreement that must be assumed
or rejected as a whole, to prevent such netting.  If the
Bankruptcy Code were interpreted in this manner, it would permit
D to "cherry-pick" by assuming Swap Transactions that are
favorable to D while at the same time rejecting those Swap
Transactions that are unfavorable to it.  Such would be contrary
to the Agreement.

        In this case, D would attempt to assume the
Confirmation entered into on June 1, 1986 and reject the Swap
Transactions entered into on June 1, 1985 and June 1, 1987.  If D
is permitted to do this and C is not permitted to setoff its
claim against the debtor, D may compel C to pay it in full on the
assumed transaction and leave C with an unsecured prepetition
claim for damages on the unassumed Swap Transactions that may be
worth substantially less than the amount that C is required to
pay D.  Such an interpretation of the Bankruptcy Code would
severely prejudice C and deprive C of the benefits for which it
bargained.  In addition, C would suffer the same adverse
consequences of a delay in D's decision to assume or reject the
Swap Transactions that were illustrated in Example 1.

### Resolution of the "Cherry-picking" Problem by S. 396

        S. 396 would resolve the unfairness of "cherry-picking"
by giving full effect to the Agreement's termination and netting
of damages provisions.  Of course, the amendments contemplated by
S. 396 are not limited to master swap agreements and would
prevent "cherry-picking" by a debtor in any multiple swap
situation.  Although damage-netting may ultimately be held
permissible under the current text of the Bankruptcy Code, S. 396
would remove the vast uncertainty that currently faces swap
participants.  ﹀To the extent that C has a claim against D after
netting is performed, such claim would still be treated as an
unsecured claim under the amendments proposed by S. 396.

### CONCLUSION

        I believe S. 396 will provide stability and certainty
in the swap market and prevent severe prejudice to nondebtor
counterparties without unjustifiably burdening debtors' efforts
to reorganize.  As I have previously indicated, many of the
results contemplated by the bill could be achieved through a fair

interpretation of the Bankruptcy Code. Nevertheless, legislation
is necessary to remove the great uncertainty as to how courts
will interpret the Bankruptcy Code and, therefore, treat swap
transactions.

Enclosed herewith please find my responses to the
questions of Senators Heflin and Thurmond. Please let me know if
I can be of further assistance to you.

Respectfully,

John J. Jerome

QUESTIONS AND ANSWERS

---

RESPONSES OF MARK C.BRICKELL AND WILLIAM J. PERLSTEIN
TO WRITTEN QUESTIONS FROM SENATOR HEFLIN

Question #1.    Would it not be more prudent to amend the Code
based on the attributes of certain financial
transactions instead of responding to the concerns
of the swap industry alone?

Answer.    This question raises an excellent point that the
ISDA carefully considered before proposing the swap
amendments to the Bankruptcy Code.  As the
Committee is aware, the Bankruptcy Code has been
amended to provide protection for similar financial
contracts such as repurchase agreements, securities
contracts, commodities contracts and forward
contracts.  It was our conclusion that it would be
difficult if not impossible to develop an amendment
that would encompass sophisticated financial
transactions while excluding more routine
transactions intended to be subject to the
Bankruptcy Code.  We did not believe that a more
general definition could be developed that would
apply only to sophisticated financial transactions.
We also note that the thrift reform bill passed by
the Senate (S.774) utilizes the definitions from
the Bankruptcy Code for securities contracts,

commodities contracts, forward agreements, and repurchase agreements, and the definition from S.396 for swap agreements, in developing exemptions from the general operation of that Act.

Question #2.   In the proposed new section 560 of the bill, "contractual rights" are to be treated based in part on "normal business practice." Is there any regulation of this industry that establishes what "normal business practice" is or should be?

Answer.   The swap industry is not subject to direct regulation. A number of the dealers and end users in the swap market are subject to regulation by various regulatory agencies, such as the Comptroller of the Currency, the FDIC, and the Federal Reserve Board. The term "normal business practice" is used in Section 559 of the Bankruptcy Code concerning repurchase agreements. "Normal business practice" in the swap industry can be determined, at least in part, by reference to the standard interest rate swap agreement developed by ISDA. A copy of that agreement is attached as Exhibit A to this Response. Although participants in the market are free to use their own form of agreement, it is our understanding that the forms

- 2 -

adopted by ISDA are generally used in the industry.

Question #3.    At the hearing, witnesses seemed to discount the
                possibility of the small manufacturer who might
                engage in a swap transaction on a limited basis to
                protect his financial transactions.  Rather,
                testimony focused on the large scale swap
                arrangements.  The use of swap transactions has
                increased dramatically over the past few years.
                Are we being shortsighted in not recognizing the
                potential use of the swap agreement by individuals
                who might in fact be unable to reorganize without
                the ability to assume or reject the swap agreement,
                and make use of collateral that has been extended?

Answer.         As the testimony indicated, the swap market is not
                one in which individuals participate.  The average
                size of a dollar interest rate swap transaction
                during 1987 was $22 million.  In addition, it is
                highly unlikely that the assumption or rejection of
                a swap agreement would affect the reorganization of
                any debtor.  Rejection of the swap agreement will
                not be an issue, since allowing a counterparty to
                terminate the agreement is essentially the same as
                allowing the debtor to reject it.  The issue of

- 3 -

assumption is also unlikely to arise in many, if
any, cases. Most swap transactions undertaken by
corporations are intended to hedge against
interest rate or currency rate changes. Parties
usually undertake a swap transaction to hedge
against the risk of another transaction in which
they are engaged. For example, a party which has
issued floating rate notes in the public debt
markets could utilize a swap agreement to hedge
against increasing interest rates.

The filing of a bankruptcy petition changes
that party's entire financial structure. Debtors
do not pay interest after the filing of bankruptcy,
so the debtor would not need the swap transaction
to hedge against rising interest rates. A
bankruptcy filing has the effect of accelerating
all long-term debt. In the rare case where a
debtor is able to reorganize and elects to
reinstate a particular debt obligation, that debtor
will be able to enter into a new swap agreement at
the time that it confirms its plan of
reorganization. Since the debtor will not have had
the obligation to pay current interest during the
case, it will not have needed the swap during that
time.

- 4 -

Finally, the question refers to the use of collateral. Although in the majority of cases collateral is not provided in connection with a swap agreement, there are some collateralized swap agreements. Under the bill, the counterparty will be able to terminate a swap agreement and liquidate any collateral that secures the unpaid obligation. Under prevailing law any excess collateral not needed to pay that party's claim will be returned to the bankruptcy estate. While the question refers to the "use of collateral that has been extended," that collateral would not be available to the debtor in a bankruptcy case anyway. In a traditional secured debt transaction, the secured creditor retains the collateral during the case or must be provided with substitute collateral. The debtor is not able to recover collateral from a secured creditor without providing replacement collateral.

Question #4. S.396 is designed to amend the Bankruptcy Code to treat swap agreements in substantially the same manner as securities, futures and forward contracts are treated under current law. Since you support parallel treatment of swap agreements, interest rate and currency futures under bankruptcy law,

- 5 -

could you advise me whether swaps and these futures
instruments are subject to identical or parallel
regulatory requirements under federal law. Please
describe for me the regulatory requirements
applicable to swap agreements and futures contracts
and identify any differences that exist in federal
regulation concerning these types of instruments.

Answer.        Futures contracts are regulated by the Commodity
               Futures Trading Commission. The principal
               difference between futures contracts and forward
               contracts are that futures contracts are traded on
               an exchange where they are regulated by the CFTC,
               while forward contracts are not traded on an
               exchange and are not so regulated. As mentioned
               earlier, a number of the bank regulatory agencies,
               including the Comptroller of the Currency and the
               Federal Reserve Board exercise regulatory
               supervision over member institutions with respect
               to swap agreements.

Question #5.   S.396 defines "swap agreements" to include, among
               other things, an "interest future" and a "currency
               future." Are swap agreements and futures
               instruments functionally equivalent as a matter of
               economics, like the definition indicates? As

                              - 6 -

opposed to defining each of the transactions
outlined within the definition of swap agreements
as outlined in S.396, could you provide a succinct
definition of a swap transaction than indicate how
the other transactions differ from swap
transactions?

Answer.    ISDA does agree, as the question suggests, that it
would be preferable to delete the references to
future agreements from the definition of swap
agreement since futures agreements are regulated by
the CFTC while swap agreements are not. For this
reason, we request the deletion of both terms from
the provision of S.396. We have included an
amended version of S.396 with this Response making
these and other technical changes. The definition
in the enclosure is virtually identical to the
definition of swap agreement as contained in FIRREA
in the form recently passed by the House Banking
Committee. We will seek to have FIRREA, S.396 and
a companion bill in the House of Representatives,
H.R.2027, amended so that all the legislation
contains identical definitional terms.

Question #6.    Are swap transactions secured by collateral? If
so, what happens to the collateral in the case of

- 7 -

the bankruptcy of one of the parties to the
agreement under S.396?

Answer.    Some percentage of swap agreements are secured by
collateral, although it is our understanding it is
less than a majority of all outstanding swap
agreements.  Under the bill, as under existing
legislation governing securities and other
financial transaction agreements, a party holding
collateral would be entitled to liquidate that
collateral to pay itself for the damages it incurs
as a result of the termination of the swap
agreement.  For example, if a party to a swap
agreement files for bankruptcy and the counterparty
terminates the agreement, the counterparty would
calculate the net amount due it as of the date of
the termination.  This would be calculated based on
the relative value of the swap agreement based on
the level of interest rates.  The nonbankrupt party
would liquidate collateral it held, such as
government securities, in a commercially reasonable
manner, would credit the proceeds against the
amount of its damages and costs, and would turn
over any remaining proceeds to the bankruptcy
estate.  This is the same procedure used by
counterparties to commodities contracts, securities

contracts, forward contracts, and repurchase
agreements under current law.

Question #7.     Could and should this legislation be limited to
those situations whereby the filing of bankruptcy
by one of the parties to a swap agreement threatens
the stability of an entire financial market?

Answer.          We do not believe that the legislation could or
should be so limited.  The stability of the
financial markets depends on an assurance of speed
and certainty.  In the absence of such assurances,
parties will not provide credit to financially
troubled institutions.  Any credit that is provided
will become more expensive and will require the
provision of more collateral.  The stability of the
market can be threatened by the perception that a
major participant is in financial risk.  By the
time that perception becomes widespread, it is
virtually impossible (and at a minimum, extremely
expensive) to restore stability to the market.  We
do not believe that any court or any bankruptcy
trustee will be in a position to predict accurately
the likelihood of such a perception becoming
widespread.  We believe that it would be very

- 9 -

unwise for the Congress to take such a risk or to
impose such a responsibility on the courts.

Question #8.    Would an anti-cherry picking provision alone be
sufficient to correct the problem under the
Bankruptcy Code?

Answer.    The risk of cherry picking -- allowing the trustee
to assume favorable transactions while rejecting
unfavorable ones -- is a major concern about the
current law.  Cherry picking not only presents an
actual risk to parties but undermines the basic
agreement of the parties concerning the netting of
mutual debts and obligations.

It would not be sufficient, however, to limit
S.396 only to cherry picking.  The assurance of the
ability to close out transactions with a bankrupt
counterparty is equally important to participants.
Without this assurance, a counterparty would be
left with the risk that the bankruptcy trustee
would leave open outstanding transactions for
months or years while interest rates fluctuated,
only deciding whether to assume or reject the
agreements at the time that a plan of
reorganization is confirmed.  Even if cherry
picking were prohibited, the nonbankrupt

- 10 -

counterparty would be unable to protect itself
against changes in interest rates since it would
not know if the trustee was going to assume or
reject its agreements.

The nonbankrupt counterparty also needs the
ability to liquidate any collateral that it holds.
In most cases this collateral, such as government
securities, will itself be subject to changes in
value based on changes in interest rates. In a
time of rising interest rates, this collateral
generally will decrease in value. In a situation
where a bankruptcy trustee ultimately determines to
reject an agreement, a bar on allowing the
counterparty to liquidate the collateral may have
cost the counterparty a large percentage of the
value of the collateral if interest rates have
risen during that time.

Question #9.    Section 4 of S.396 protects transfers in connection
with a swap agreement. Why is this particular
section necessary? Doesn't it prevent the court
from examining the terms of a swap agreement?

Answer.    This section tracks existing law with respect to
commodities contracts, securities contracts,
forward agreements, and repurchase agreements. It

- 11 -

assures counterparties that payments made in the
last 90 days before bankruptcy will not be subject
to challenge as preferential transfers. Although
payments made on settlement dates should be
characterized as ordinary business transactions,
some courts have maintained that payments made
under long-term debt instruments do not qualify for
the exception for ordinary business transactions.
If this line of cases were applied to swap
agreements, any payment received in accordance with
the terms of the swap agreement in the last 90 days
before a bankruptcy filing could be challenged as a
preferential transfer under Section 547 of the
Bankruptcy Code. The remainder of Sections 3 and 4
of the Bill protect against claims that swap
agreements violate the fraudulent conveyance
provisions of the Bankruptcy Code. Existing law
already protects securities contracts, commodities
contracts, forward agreements and repurchase
agreements from such attacks. The bill does not
prevent a bankruptcy court from examining the
transaction if there is evidence of actual fraud,
since Section 548(a)(1) will remain applicable to
swap agreements.

Question #10.   Is section 6 of the Bill patterned after another
                section of the Code?

Answer.         This section is patterned on the similar provisions
                in Sections 555 and 556 and 559 of the Bankruptcy
                Code.   Section 6 assures the right of the swap
                participant to terminate the agreement, set off or
                net out termination values or payment amounts
                under the agreement, and liquidate any collateral
                held under an applicable security arrangement.   The
                term "contractual right" contained in Section 6 is
                patterned after Section 559 of the Bankruptcy Code.

RESPONSE OF WILLIAM J. PERLSTEIN TO WRITTEN
QUESTION FROM SENATOR THURMOND

Question.    It has been suggested that the automatic stay
             provision of the Bankruptcy Code could be
             interpreted to bar immediate termination of
             outstanding swap transactions.  Has this issue been
             litigated in the past, and if so, what was the
             result?

Answer.      There has been no direct decision concerning swap
             agreements.  The closest analogy arose in
             connection with repurchase agreements in the
             Lombard-Wall case, where a bankruptcy court did
             suggest that the automatic stay would prevent the
             termination of outstanding repurchase agreements.
             It was that decision that ultimately led to the
             enactment of the repurchase agreement amendments in
             1984, now Section 559 of the Bankruptcy Code, on
             which S.396 is closely patterned.

- 14 -

RESPONSE OF MARK C. BRICKELL TO WRITTEN QUESTIONS

FROM SENATOR CHARLES E. GRASSLEY

Question.       In your testimony, you noted that swap participants

have become increasingly concerned about the

possible impact of bankruptcy laws on swap

agreements.  I agree as a theoretical matter;

that's why I support S.396.  However, whatever

uncertainty there may be, the effect on the swaps

market appears limited, given the sharp growth in

this $1 trillion industry.  As you were quoted in

the December 8, 1988 edition of American Banker:

> "Greater certainty in the regulatory
> environment for swaps and related products has
> added to dealer confidence, making the
> products more accessible to end users and
> contributing to growth."

How do you reconcile this obvious confidence in the

swaps market with the uncertainties you alluded to

in your testimony?  Please cite examples involving

particular swaps dealers.

Answer.         As the Senator points out, I indicated in

December 1988 that greater certainty about the

regulatory environment for swaps had spurred recent

growth in swap activity.  During 1987 and 1988 the

Basle Supervisors Committee of the Bank for

International Settlements developed Capital

Adequacy Guidelines for banking institutions.

- 15 -

These Guidelines are now being implemented by
national regulators in each country, including the
Federal Reserve Board and the FDIC in the United
States.

The first draft of the Guidelines contained
proposals which, in the view of many financial
institutions, overstated the probable credit risk
of entering into swap contracts. The rate of
growth of swap activity, especially currency swap
activity, slowed somewhat as a result. In the
discussions which followed, regulatory authorities
also came to the conclusion that the credit risk of
swaps should be measured in ways different than
they had initially proposed, and later versions of
the Guidelines reflected this fact. As a result,
growth in swap activity, particularly currency
swaps, increased. Therefore, the publication of
the Capital Adequacy Guidelines in final form
reduced uncertainty about one aspect of swap
regulation, and it was to this particular event
that I referred on December 8, 1988.

Other types of uncertainties continue to
exist, particularly the treatment of the
termination and netting provisions of swap master
agreements in a bankruptcy proceeding. Until these
questions are resolved by the enactment of S.396

- 16 -

and the companion legislation introduced in the
House of Representatives, swaps dealers will have
difficulty measuring precisely their credit
exposure to other dealers and end-users under the
master agreements.  This affects all dealers, by
reducing liquidity in the swap market, and
ultimately harms end users whose access to swaps is
reduced as a result.

RESPONSE OF MARK C. BRICKELL TO WRITTEN

QUESTION FROM SENATOR THURMOND

Question.    Could you explain the process of "netting" as it
applies to the rights and liabilities of those who
are parties to a "master swap agreement"?

Answer.        Under a swap master agreement, parties
generally seek to reduce their credit exposure to
each other by structuring their obligations on a
net basis. Among other things, this means that the
parties agree that on any termination following a
default, the nondefaulting party must calculate its
damages on a net basis. This means that the amount
otherwise owed by the defaulting party in respect
of the swaps which favor the non-defaulting party
must be reduced by the value of the swaps which
favor the defaulting party. Example 1 shows how
this might work in practice.

In the example, two counterparties, Company A
and Company B, have executed two swaps under a
master agreement, and interest rates have moved in
a way which makes the first swap valuable to
Company B and the second swap valuable to Company
A. Termination of the swap contract due to the
bankruptcy of Company A will result in a loss to
Company B, since Company B's benefit from the

- 18 -

cancellation of Swap 2 is less than its loss from
the cancellation of Swap 1.

The netting provisions of the master agreemen
are intended to ensure that, following any default
all swaps under the Master are terminated and thei:
values are combined. As a result, though Company 1
is still damaged by the termination of the overall
contract, the net damage done to B is smaller, and
the claim in bankruptcy which it pursues against
Company A is less, than would have been the case il
the contractually agreed provisions of the Master
agreement were ignored and only Swap 1 were
terminated.

## EXAMPLE 1

COMPANY A                 10% Fixed------>          COMPANY B

Swap 1: A pays B
on a hypothetical
notional
principal of $10
million annually
for 5 years.  In
return, B pays A
a variable rate
of 6 month LIBOR
on the same
hypothetical
notional

6 month, LIBOR
<--------------

- 19 -

```
COMPANY A                8% Fixed              COMPANY B
                         <-------------

                         Swap 2: B pays A
                         8% on a
                         hypothetical
                         notional
                         principal of $5
                         million annually
                         for 4 years.  In
                         return, A pays B
                         6 month LIBOR on
                         the same
                         hypothetical
                         notional
                         principal.

                         6 month LIBOR
                         ------------->
```

If prevailing interest rates for 4 and 5 year swaps have moved from the 10% and 8% levels in the above examples down to 7%, terminating Swap 1 would cause a loss of $1,230,059 to Company B, since it is receiving 10% under Swap 1 while interest rates have fallen to 7%.  Terminating Swap 2 would benefit Company B, since the present value of payments it would make under a replacement swap at 7% is $169,360 less than its payments under Swap 2 at 8%.

By terminating both swaps and netting the claims, the net damages incurred by Company B are reduced.  Company B's claim against A is determined by netting the $1,230,059 damage claim by B under Swap 1 and the $169,360 benefit to B under Swap 2.  The total claim by B is a net of $1,060,699, compared to $1,230,059 if only Swap 1 were cancelled.  This is the intended benefit of the netting provisions of the master agreement.

RESPONSES OF JOHN J. JEROME, PARTNER
MILBANK, TWEED, HADLEY & McCLOY,
TO QUESTIONS OF SENATOR HEFLIN
REGARDING S. 396

Question 1

In addition to providing the Subcommittee with examp
of a swap transaction, could you please define the term swap
agreement in a succinct definition and if possible provide
distinctions between an interest swap transaction and the othe
financial transactions delineated in S. 396.

Response to Question 1

A swap agreement is an agreement that controls one c
more transactions between parties whereby the parties agree tc
terms that are designed to limit exposure to interest rate
fluctuations or currency rate fluctuations (which are largely
attributable to interest rate fluctuations).

Although the transactions delineated by S. 396 (rate
swap agreements, basis swaps, forward rate agreements, interes
rate futures, interest rate options purchased, forward foreign
exchange agreements, rate cap agreements, rate collar agreemen
currency swap agreements, cross-currency rate swap agreements,
currency futures, and currency options purchased) differ in th
technical mechanics of their operation, there is no meaningful
method of distinguishing their function from that of interest
currency rate swap transactions.  All of the transactions cove
by S. 396 are designed as risk management tools to protect the
parties to the transactions from interest rate or currency
exchange rate fluctuations.  Variations in currency exchange
rates are closely related to changes in interest rates that
relate to that currency.  Therefore, the transactions covered
S. 396 are of similar utility and should be covered by S. 396'
definition of a "swap agreement."

Question 2

You use the term "marked to market" in your testimor
Would you please explain this term.

Response to Question 2

The term "marked-to-market" refers to valuing credit
exposure under a swap transaction as of a particular date by
determining the cost of replacing the swap based on rate
movements as of such date.  With respect to collateralized swa

transactions, the market value of a replacement swap is
calculated from time to time so that the amount of collateral may
be adjusted to cover the same proportion of the obligation that
it covered prior to changes in interest rates.  Under the terms
of certain swap agreements, changes in interest rates will
require a party to post additional collateral to prevent
termination and netting of the swap agreement.

## Question 3

        Could and should this legislation be limited to those
situations whereby the filing of bankruptcy by one of the parties
to a swap agreement threatens the stability of an entire
financial market?

## Response to Question 3

        As a practical matter, it is unlikely that this
legislation could effectively be limited to situations where the
filing of a bankruptcy petition by one of the parties to a swap
agreement threatens the stability of an entire swap market.  Any
attempt to limit the proposed legislation in such a manner is
likely to lead to litigation on the issue of whether a particular
swap transaction is intended to be covered and result in delay
while a bankruptcy court rules on the issue.  Moreover, such a
limitation will leave participants in the swap market uncertain
as to the treatment they will receive in a bankruptcy case.  S.
396 as presently drafted would prevent such uncertainty,
litigation and delay.  Moreover, the stability of other markets
or industries may be affected by the abrogation of the terms of
swap agreements resulting from the bankruptcy of a counterparty
to a major participant in such markets or industries.

        In any event, the overall benefits to the swap market
of providing certainty with respect to a valuable risk management
tool would be abrogated by such a limitation.  Because swaps are
entered into to limit risk, the failure to adhere to the terms of
the swap, especially when coupled with the volatility of the
market, poses a substantial threat to nondebtor counterparties to
swap transactions.

        Moreover, uniform application of the legislation to all
swap transactions is likely to increase the availability of swaps
to businesses that otherwise could not engage in such
transactions to hedge or manage their exposure to interest rate
fluctuations.  Arguably, these businesses have the greatest need
for this type of risk management tool.

- 2 -

Lastly, limitation of the legislation would leave uncertainty as to the treatment of swap transactions under the current bankruptcy law. Many of the results contemplated by tl amendments proposed by S. 396 should arguably obtain under current law. However, the lack of authoritative case law on these issues leads to uncertainty which, to some extent, undermines the utility of swaps as a risk management tool. Congress, by enacting S. 396, can add predictability and stability to financial markets.

## Question 4

Would an anti-cherrypicking provision alone be sufficient to correct the problem under the bankruptcy code wit respect to interest swap agreements?

## Response to Question 4

The addition of an "anti-cherrypicking" provision alo would not eliminate the unfairness to a counterparty of delay b the debtor in deciding whether to assume or reject a swap agreement. Such delay subjects the nondebtor counterparty to undue risk of further damage in the volatile swaps market and makes it difficult, if not impossible, for the nondebtor counterparty to cover its position and prevent itself from incurring substantial damages after the filing of the bankruptcy case. This problem of delay is illustrated in my Example 1 whic is enclosed herewith.

**RESPONSES OF JOHN J. JEROME, PARTNER**
**MILBANK, TWEED, HADLEY & McCLOY,**
**TO QUESTIONS OF SENATOR THURMOND**
**REGARDING S. 396**

Question 1

     To what extent are commercial banks and other financial
institutions participants in swap agreement transactions?  How
significant is the swap agreement business to these financial
institutions?

Response to Question 1

     Commercial banks and other financial institutions
frequently participate in swap agreement transactions.  Swap
transactions are important to these institutions because they
enable them to hedge their own obligations and protect themselves
from volatile fluctuations in financial markets.  Commercial
banks also enter into these transactions as swap dealers that
serve as a credit intermediary between customers.

Question 2

     How are swap agreements treated under current law?
Would the modifications proposed by S. 396 cause that treatment
to be modified substantially, and if so are there any parties
that would be adversely affected by such modification?

Response to Question 2

     The treatment of swap agreements and transactions under
current law is unclear.  I am not aware of any definitive case
law providing authority on the numerous issues that are raised as
a result of the filing of a bankruptcy petition by a swap
participant, including:  (1) whether swap agreements are
contracts for financial accommodations, under Bankruptcy Code
subsections 365(c)(2) and 365(e)(2), which are not subject to
assumption by the debtor and which may be terminated pursuant to
the terms of the agreement as a result of the filing of a
bankruptcy case or the insolvency or financial condition of the
debtor at any time before the closing of the bankruptcy case,
(2) whether swap agreements require material performance on both
sides, other than the payment of money by the Debtor, so that
they constitute executory contracts that the debtor has a right
to assume or reject, (3) whether actions taken pursuant to swap
agreements in the 90 days prior to bankruptcy, such as netting,
are within any of the exceptions to the preference section of the
Bankruptcy Code, including the exceptions for the

contemporaneous exchange of new value and for transactions in t
ordinary course of business pursuant to ordinary business terms
and (4) whether a master swap agreement constitutes a single
executory contract so that assumption of such agreement require
assumption of the benefits and the burdens of the agreement and
therefore, the assumption of both positive and negative swap
transactions (the better view is that a bankruptcy court ought
give effect to the default, termination and damage-netting
provisions of a master swap agreement under current law but it
took seven law firms 43 pages to reach that conclusion in a
Memorandum to the Bank of England and the Board of Governors of
the Federal Reserve System; a copy of that Memorandum is
enclosed).

Because of the uncertainty of the current bankruptcy
law's treatment of swap agreements, it is difficult to say
whether the modifications proposed by S. 396 would cause the
treatment of swap agreements to be modified substantially. In :
view, the best interpretation of current law would yield many o
the results contemplated by S. 396. In any event, the
modifications proposed by S. 396 would alleviate the potential
for great prejudice to nondebtor counterparties without, in mos
cases, causing any significant prejudice to debtors. Debtors a
unlikely to suffer substantial prejudice because debtors, as a
general rule, do not require interest rate protection during
their bankruptcy cases since postpetition interest is rarely
awarded to unsecured creditors.

The legislation would prevent debtors from delaying
their decisions to assume or reject (if they are deemed to have
right to assume or reject) swap agreements, while they wait to
see if there are any favorable changes in the volatile swap
market that will influence their decisions. Preventing debtors
from such delay results in fixing the nondebtor's claim against
the estate and enables the nondebtor counterparty to take actio1
to cover its position to prevent further damages.

### Question 3

Would enactment of this legislation, or failure to do
so, have any impact upon the current savings and loan crisis?

### Response to Question 3

Enactment of this legislation will benefit savings an?
loan institutions by protecting the integrity of their use of
swap agreements as a risk management tool to hedge their exposu1
to volatile interest rate fluctuations. Although the legislatic

would not apply to financially troubled savings and loan institutions because they are not subject to treatment as a debtor under the Bankruptcy Code, the legislation would benefit them and protect their interests when their counterparty files a petition for relief under the Bankruptcy Code.  The propensity for savings and loan institutions to participate in a high volume of long-term, fixed-rate mortgage loans renders them especially sensitive to volatile interest rate fluctuations and makes interest rate swap transactions an important tool for them to manage their exposure.

The same rationale that supports the amendments to the Bankruptcy Code proposed by S.396 also supports enactment of similar legislation with respect to statutes governing the liquidation or reorganization of entities that may not be debtors under the Bankruptcy Code (including such entities as banks and savings and loan associations).

**Frank G. Sinatra**

Responses to Questions Submitted by
U.S. Senator Thurmond

Questions for Mr. Sinatra from Senator Thurmond:

1. Mr. Sinatra, could you explain what distinguishes "swap agreement" contracts from other contracts and why any differences would justify special treatment in relation to the automatic stay provisions in the Bankruptcy Code?

1. The "swap agreement" is inherently no different than any other contract, broadly speaking.

What distinguishes "swap agreements" from other commercial contracts is the context in which they are negotiated and executed.

First, the usual parties to swap transactions are most often financial intermediaries or larger corporations of a substantially homogeneous sophistication and equal bargaining power. These parties upon entering into such contracts do not bargain for the untoward benefits that might accrue to them as potential subjects of a proceeding under the U.S. Bankruptcy Code, i.e., stay and avoidance powers.

Rather, participants in the swap market bargain for certainty during the term of the agreement and at its termination.

To the extent the participants in the swap market are comprised of financial intermediaries which enjoy the benefits of federal deposit insurance, significant policy considerations distinguish swap contracts from standard commercial contracts in that the stability and smooth operation of the financial markets may be impaired by the imposition of bankruptcy code protections afforded other debtors.

Of course, "swap dealers" (those making markets in swap transactions) would most immediately and visibly benefit from passage of S.396. Such entities may hold positions or exposures in a substantial number of swap transactions. The ability to set firm boundaries around such potential exposures is obviously crucial in determining the extent to which such parties will partake in such market making roles.

This committee of its own right, or by concurrent referral to the Banking Committee, may wish to further explore the actual breadth of current and potentially future participants in the swap markets and their respective interests therein, to determine if the swap transaction might at some time become more broadly utilized by participants of substantially lesser bargaining power and, thus, perhaps warrant the protections currently afforded other debtors under the U.S. Bankruptcy Code.

Questions for Panel I Submitted by Senator Thurmond:

1. To what extent are commercial banks and other financial institutions participants in swap agreement transactions? How significant is the swap agreement business to these financial institutions?

1. It is my understanding that commercial banks are substantially involved in the swap market and the swap transaction has become an important risk management tool to such institutions.

As beneficiaries of federal deposit insurance, it is, I believe, incumbent on this Congress to determine the potential exposures of commercial banks in this regard and the adequate regulation thereof.

The broad support of S.396 contributed by the bank regulatory authorities lends substantial comfort on this issue. Again, the Banking Committee might lend additional views on this issue.

2. How are swap agreements treated under current law? Would the modifications proposed by S.396 cause that treatment to be modified substantially; and if so are there any parties that would be adversely affected by such modification?

2. Under current bankruptcy law, uncertainty exists as to the effects on respective parties to a swap transaction upon the default of one party due to it becoming a subject or proceeding under the code. Stay and avoidance provisions usually afforded a debtor could arguably allow a defaulting party significant advantages not bargained for in such transactions.

Modifications of the code contained in S.396 would arguably not adversely effect a defaulting party in that it would be left in no better a position than originally bargained for.

3. Would enactment of this legislation, or failure to do so, have any impact upon the current savings and loan crisis?

3. The inability of a savings and loan institution to fix its exposure against a defaulting party to a swap transaction could detrimentally impact such an institution under current bankruptcy law.

The enormous strain on the federal budget and the taxpayer as a result of the failure of countless savings and loans speaks strongly for revisions to the bankruptcy code contained in S.396 to provide greater certainty to the potential exposure of such institutions that utilize swaps as an important risk management tool.

## AKIN, GUMP, STRAUSS, HAUER & FELD

ATTORNEYS AT LAW

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

1333 NEW HAMPSHIRE AVENUE, N.W.

SUITE 400

WASHINGTON, D.C. 20036

(202) 887-4000

FAX (202) 887-4288

WRITER'S DIRECT DIAL NUMBER (202) 887-<u>4385</u>

4100 FIRST CITY CENTER
1700 PACIFIC AVENUE
DALLAS, TEXAS 75201-4618
(214) 969-2800

31 CURZON STREET
LONDON, WIY 7AE
(01) 409-1093

2100 ONE CONGRESS PLAZ.
111 CONGRESS AVENUE
AUSTIN, TEXAS 78701
(512) 499-6200

1500 INTERFIRST PLAZA
300 CONVENT STREET
SAN ANTONIO, TEXAS 7820
(512) 270-0800

3200 REPUBLICBANK CENT
700 LOUISIANA STREET
HOUSTON, TEXAS 77002
(713) 221-0101

May 30, 1989

Hon. Howell Heflin
Chairman, Senate Judiciary
   Subcommittee on Courts
SH 223 Hart S.O.B.
Washington, DC 20510

Dear Senator Heflin:

   I am returning herewith my answers to your questions numbers 1 & 2, submitted to the witnesses for written response by letter dated April 21.

   I believe that I answered Senator Thurmond's question regarding the comparability of provisions of S. 396 with existing provisions of the Code regarding repurchase agreements and forward contracts in my direct testimony.

   Other questions submitted by Senator Thurmond are more appropriately answered by other witnesses who appeared before the Committee.

   I would like to express again my appreciation for the opportunity to appear before the Subcommittee . I hope that my testimony regarding S. 396 was helpful to the Subcommittee's task of analyzing the proposed legislation.

Sincerely,

Doug Comer

ANSWERS BY WITNESS DOUG COMER TO QUESTIONS SUBMITTED

BY CHAIRMAN HEFLIN:

1)

No. Considering the volatility of securities markets, and the increased risk
for a swap participant that would result from the bankruptcy of a trading
partner, no arbitrary time limitation would provide the same degree  of
certainty of risk management that the ability to immediately terminate
provides.

1a)

There are other time limitations within the Code requiring action to protect
market risk exposure (such as provisions regarding the affirmation or termina-
tion of commercial leases), but few deal with markets as volatile as the securities .
markets. Regarding securities markets, the maximum time allowable for the
acceptance or rejection of executory  contracts to which a stockbroker is party
is 30 days (11 U.S.C. Sec. 744). This is in a liquidation proceeding under Chapter
7 that is managed by a court-appointed trustee, rather than by SIPC.  Other
provisions regarding the trustee's handling of customer securities are more strict.
For example, Section 748 requires the trustee to reduce all securities then held
by the dealer  to money as soon as is practicable after the date of the order for
relief, consistent with good market practice. And, securities held in customer name
are to be promptly delivered to the customer except where there is a negative net
claim situation (Section 751).

Section 748's directive to reduce securities to money value as soon as is practicable
is reflective of the desirability of  "mark to market" flexibility. However, it applies
only to the liquidatio of a stockbroker. In the event of the bankruptcy of a business
entity that is a participant to a swap aggrement, there is no requirement for
immediate liquidation presently in the Code. This is the gap that the legislation is
intended to cover, by assuring the automatic stay provisions of the Code do not
limit the flexibility of participants to liquidate the agreement.

The bulk of swap agreements are designed to minimize exposure to interest rate
swings. There is no way, practically speaking, for a trustee to know that a particular
instrument which may favor the debtor today will favor the debtor tomorrow, given
the rapid fluctuations possible in the markets. Thus, trhe holding of a particular
instrument cannot be predicated upon any vbasis other than speculation as to
future behaviour  of the markets. Such speculation cannot benefit the estate in the
long term, particularly in light of the fadt that in most cases the trustee will
not be intimately familiar with these markets.

2)

It is true that the typical repurchase agreement has a very short time duration,
compared to some longer-term swap agreements. However, the swap agreements
can be, and frequently are, liquidated prior to term due to changes in the markets
to which the agreement relates. Thus, the durational term of the agreement is
not really relevant. The participants do not necessarily have the expectation that
the agreement will last to term — only that it will protect from certain market
conditions until those conditions change. When the conditions change, the swap
agreement — regardless of the maximum term incorporated therein — will be
liquidated and new transactions engaged in which reflect the new market con-
ditions. The parties simply mark to market price on the underlying instruments and
terminate the agreement.

Since a bankruptcy  proceeding would, under ordinary circumstances, inhibit the
ability of the non-debtor participant to liquidate due to the automatic stay, the
swap agreement loses its value as a market hedging instrument in the absence of
special provisions in the Code permitting immediate liquidation.

These considerations are the same that underlie the provisions of the Code dealing
with repurchase agreements and forward contracts.