WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x

In re:                                          :        Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*          :        Case No. 08-13555 (JMP)

                        Debtors.                 :

————————————————————————x

LEHMAN BROTHERS SPECIAL FINANCING INC. and :
LEHMAN BROTHERS HOLDINGS INC.

                        Plaintiffs,             :

-against-                                                Adversary Proceeding
                                                :        No.: 09-01261 (JMP)

AMERICAN FAMILY LIFE ASSURANCE COMPANY
OF COLUMBUS and BNY CORPORATE TRUSTEE
SERVICES LIMITED                                 :

                        Defendants.             :

————————————————————————x

AMERICAN FAMILY LIFE ASSURANCE COMPANY  :
OF COLUMBUS

                        Counterclaim Plaintiff,  :

-against-
                                                :

LEHMAN BROTHERS SPECIAL FINANCING INC. and :
LEHMAN BROTHERS HOLDINGS INC.

                        Counterclaim Defendants.  :

————————————————————————x

**LEHMAN BROTHERS SPECIAL FINANCING INC. AND LEHMAN BROTHERS**
**HOLDINGS INC.'S MEMORANDUM OF LAW IN OPPOSITION TO AMERICAN**
**FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS'S**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ i

Preliminary Statement ................................................................................................... 1

Argument ........................................................................................................................ 3

I.     The Zero-Payment Provision Is Not Enforceable Under Either Section 560 or Section 362(B)(17).......................................................................................... 3

     A.     Enforcement of the Zero-Payment Provision Is Beyond the Scope of Protections Afforded by Section 560 ................................................... 5

          1.     Enforcement of the Zero-Payment Provision Against a Debtor in Bankruptcy Is Unlawful Despite the Parties' Prepetition Agreement ............................................................................. 6

     B.     Section 362(b)(17) Does Not Protect the Enforcement of the Zero-Payment Provision ................................................................... 7

II.     Aflac Is Not Entitled to Summary Judgment on Any of Its Counterclaims ..................... 8

     A.     Count I of Aflac's Counterclaim Should Be Dismissed Because There Is No Case or Controversy ...................................................... 9

     B.     Aflac Is Not Entitled to Summary Judgment on Count II of Its Counterclaim Because the Safe Harbors Do Not Apply to the Modification of LBSF's Rights ................................................. 10

     C.     Aflac's Request for Summary Judgment on Count III Should Be Denied Because as a Matter of Law Aflac Is Not Entitled to Payments of Accrued and Unpaid Amounts or the Delivery of LBSF Credit Support ......................... 10

     D.     Aflac's Request for Summary Judgment on Its Alternative Claim in Count IV Should Be Denied for the Same Reasons as Count III and Because as a Matter of Law Aflac Is Not Entitled to Recoupment .......................................... 18

Conclusion and Relief Requested ................................................................................ 22

**CASES**

*Antaios Compania Naviera S.A. v. Salen Rederierna AB (The Antaios)*,
    [1985] A.C. 191, 201 (H.L.) ............................................................................16

*Calpine Energy Servs. v. Reliant Energy Elec. Solutions (In re Calpine Corp.)*,
    No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282 (Bankr. S.D.N.Y.
    May 7, 2009)........................................................................................................5, 6

*City of Milwaukee v. Milwaukee Civic Developments, Inc.*,
    71 Wis. 2d 647 (Wis. 1976) ..............................................................................20

*Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*,
    92 Civ. 3098, 1992 U.S. Dist LEXIS 21223 (S.D.N.Y. Nov. 10, 1992) .........6, 7

*FDIC v. Liberty Nat'l Bank & Trust Co.*,
    806 F.2d 961 (10th Cir. 1986) ..........................................................................20

*Guarino v. St. John Fisher College*,
    321 F. App'x 55, 57 (2d Cir. 2009) ...................................................................17

*Hellenic Lines, Ltd. v. United States*,
    512 F.2d 1196 (2d Cir. 1975)............................................................................12

*In re Enron*,
    306 B.R. 465 (Bankr. S.D.N.Y. 2004).................................................................5

*In re Malinowski*,
    156 F.3d 131 (2d Cir. 1998)......................................................................... 19-20

*Investors Comp. Scheme Ltd. v. West Bromwich Bldg. Soc'y*,
    [1998] 1 W.L.R. 896, 913 (H.L.) ......................................................................16

*Kings Terrace Nursing Home & Health Related Facility v.*
*New York State Dep't of Social Servs.*,
    Case No. 91 B 11478 (FGC), Adv. Pro. No. 94/8912A,
    1995 Bankr. LEXIS 157 (Bankr. S.D.N.Y. Jan. 26, 1995)...............................20

*Klein v. Tabatchnick*,
    610 F.2d 1043 (2d Cir. 1979)............................................................................17

*Lane v. Reid*,
    559 F.Supp. 1047 (S.D.N.Y. 1983).....................................................................9

*Mercy Hosp. v. N.Y. State Dep't of Soc. Servs.*,
    171 B.R. 490 (N.D.N.Y. 1994) ................................................................. 19

*Micro Design Group., Ltd. v. BDW Trading Ltd*,
    [2008] EWCA Civ 448 (C.A.) ................................................................. 16

*N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*,
    129 F.3d 93 (2d Cir. 1997) .......................................................... 19, 20, 21

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008) ................................................................. 17

*Reiter v. Cooper*,
    507 U.S. 258 (1993) ............................................................................. 19

*Tuvia Convalescent Ctr., Inc. v. Nat'l Union of Hosp. & Health Care Employees*,
    717 F.2d 726 (2d Cir. 1983) ................................................................. 10

*Univ. Med. Ctr. v. Sullivan*,
    973 F.2d 1065 (3d Cir. 1992) ............................................................... 19

*Victor Lalli Enter. v. Robert Lalli Enter.*,
    74 Civ. 387, 1978 U.S. Dist. LEXIS 16416 (S.D.N.Y. July 24, 1978) ........... 13

*Westinghouse Credit Corp. v. D'Urso*,
    278 F.3d 138 (2d Cir. 2002) .......................................................... 19, 21

## STATUTES, RULES, AND LEGISLATIVE MATERIALS

11 U.S.C. § 362(a) ..................................................................................... 6

11 U.S.C. § 362(b)(17) ..................................................................... *passim*

11 U.S.C. § 362(o) .................................................................................. 10

11 U.S.C. § 365(e) .................................................................................... 6

11 U.S.C. § 365(e)(1) ....................................................................... *passim*

11 U.S.C. § 541(c)(1)(B) ....................................................................... 2, 3

11 U.S.C. § 560 ............................................................................... *passim*

28 U.S.C. § 2201 ............................................................................... 20, 21

Bankruptcy Reform Act of 1999 (III), Hearing before the Subcomm. on Commercial & Admin. L. of the Comm. on the Judiciary House of Representatives, 106th Cong. 1st Sess. (1999) .................................................................................................................7

H.R. REP. NO. 109-31 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 190 ...............................5, 7

H.R. REP. NO. 101-484 (1990) .......................................................................................................7

S. REP. NO. 101-285 (1990) ...........................................................................................................5

## OTHER AUTHORITIES

1 CHITTY ON CONTRACTS ¶ 12-055 (30th ed. 2008) .....................................................................16

SIMON FIRTH, DERIVATIVES LAW & PRACTICE ¶ 12.033 (Sweet & Maxwell 2008) .....................15

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), and LBHI, by and through undersigned counsel, hereby file this memorandum of law in opposition to the motion for summary judgment filed by defendants American Family Life Assurance Corporation of Columbus ("Aflac") and in further support of the Plaintiffs' motion for summary judgment filed on September 25, 2009.

## PRELIMINARY STATEMENT

1.      LBSF and LBHI established in their motion for summary judgment that unenforceable *ipso facto* clauses in the four transactions at issue in this case would improperly eradicate LBSF's right to receive substantial payments it otherwise is owed, solely because it filed a petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The harm to LBSF's estate from the modification to debtors' payment rights is even greater under these transactions than those at issue in *Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Ltd.*, No. 09-01242 (JMP) (the "Saphir" case) because the Transaction Documents here add two *ipso facto* provisions not present in Saphir. In both cases, these provisions (1) modify LBSF's right to receive payments in priority over noteholders upon a bankruptcy Event of Default,[1] and (2) change the calculation of the "Early Redemption Amount" so that LBSF does not receive any of the "Unwind Costs" otherwise payable to it. Moreover, the contracts in this case also (3) alter the definition of Unwind Costs such that LBSF will receive no

---

[1] Capitalized terms have the same meaning herein as ascribed to them in LBSF's motion for summary judgment.

termination payment, and (4) specify that the termination payment due to LBSF will be zero. These provisions ensure that LBSF is not only impaired solely because of having to file a chapter 11 case, but will be completely deprived of any economic value under the swap agreements if these provisions are enforced. These provisions are classic *ipso facto* clauses, and as such, they are unenforceable.

2.      Aflac does not contend that these provisions are not *ipso facto* clauses proscribed by 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B).[2]  Rather, it contends that the safe harbors provided for in section 560 and section 362(b)(17) of the Bankruptcy Code immunize from challenge the modification of LBSF's rights under these *ipso facto* clauses. Aflac Mem. at 19-22. But, as LBSF and LBHI demonstrated in their motion for summary judgment, and again below, the modification of LBSF's payment priority and its right to receive Unwind Costs and the calculation of such Unwind Costs, solely as a result of its bankruptcy filing, as a matter of law does not constitute a "liquidation, termination, or acceleration" of a swap agreement, nor is it an "offset or net out" of the parties' positions thereunder.

3.      Beyond the two additional *ipso facto* provisions at play here, another distinction from the Saphir case exists. Unlike BNY, Aflac does not question LBSF's ongoing property interest in the collateral securing the notes. It does not do so because the Bankruptcy Code's safe harbors would be inapplicable if LBSF had no property interest in the collateral as BNY maintains. BNY is incorrect for the reasons discussed in LBSF's opposition brief in the Saphir case. Aflac is also incorrect because the safe harbors do not sanction the *ipso facto* provisions in this case.

---

[2] References herein to Aflac's memorandum of law in support of its motion for summary judgment are designated "Aflac Mem. at _."

4. Aflac takes issue with the use by LBSF and LBHI of the term "modification," contending that it is the Debtors who seek to modify the contracts. Aflac Mem. at 1-2 & n.1. Aflac misses the point. LBSF contends that the contracts improperly modify LBSF's property rights based upon its chapter 11 filing. Aflac ignores that the entire purpose of the Bankruptcy Code's prohibitions on *ipso facto* clauses is to deem such contractual provisions unenforceable, regardless of the parties' initial agreement to them. Congress, through its enactment of sections 365(e)(1) and 541(c)(1)(B), has announced in no uncertain terms that contractual agreements cannot be a shield against challenges to activities that in fact penalize a debtor solely because it has commenced a bankruptcy case.[3]

5. Aflac also seeks summary judgment on its counterclaim, Aflac Mem. at 15-24, but Aflac is entitled to neither summary judgment nor any relief on those claims as a matter of law, as discussed *infra* at ¶¶ 14-26.[4]

ARGUMENT

## I. THE ZERO-PAYMENT PROVISION IS NOT ENFORCEABLE UNDER EITHER SECTION 560 OR SECTION 362(B)(17).

6. Aflac argues that the so-called "Termination Payment Provision" is safe harbored and thus enforceable by sections 560 and 362(b)(17) of the Bankruptcy Code (the "Safe Harbor Provisions." Aflac Mem. at 18-22. Aflac defines this term to refer solely to the zero-payment

---

[3] The Court should not be swayed in the least by Aflac's contention that LBSF is stuck with its prepetition contractual agreement, that a counterparty "waived" all *ipso facto* Bankruptcy Code provisions, anymore than a contention that a debtor could effectively waive, by virtue of a prepetition contract, the protections of sections 544, 547, 548, or 553 concerning preferential payments, fraudulent transfers, and the requirement for mutuality for setoffs in the Bankruptcy Code.

[4] Aflac seeks to inject pure conjecture about LBSF's motivations regarding deal structure, credit risk, and economic consequences inherent in these transactions. Aflac Mem. at 6-12. The Court should either reject these unsubstantiated speculations or deny Aflac's motion on the grounds that genuine questions of material fact exist.

provision in Condition 40 of the notes.  *Id.* at 9-10, 19.[5]  Aflac does not contend that the payment-priority provision in section 5.5 of the Supplemental Trust Deeds is enforceable, but asserts that it is "without effect in this case" because there are no amounts owed to LBSF given the zero-payment provision.  *Id.* at 10 n.22.  Nor does Aflac bother to address Condition 44's changes to the calculation of the Early Redemption Amount and definition of, Unwind Costs in a manner that ensures LBSF receives neither a penny of Unwind Costs or termination payments it otherwise would be owed thereby depriving LBSF of the economic value of the swap agreement. *See* LBSF Mot. for Summ. J. at 7, 10-11.  Aflac ignores that each contractual provision has a separate effect and each must be independently analyzed under the Bankruptcy Code to determine whether it falls within the safe harbors.  Aflac's failure to provide the required analysis of whether, and failure to contend that, section 5.5 and Condition 44 fall within the Bankruptcy Code's safe harbors should lead the Court to assume safely that they do not.

7.    With respect to the zero-payment provision, Aflac contends (incorrectly as noted below) that section 560's safe harbors for the termination of swap agreements should extend to the provision.  Aflac Mem. at 18-20.  Further, Aflac maintains (incorrectly as noted below) that the protections in section 362(b)(17) for the exercise of contractual rights under security arrangements permit the issuer, Beryl Finance Limited (through BNY), to distribute the collateral.[6]  *Id.* at 21-22.  Aflac, is incorrect on both counts because sections 560 and 362(b)(17) are specific in their scope as to what rights are exercisable by swap participants under swap

---

[5] Therefore, for clarity, this memorandum will refer to Aflac's vague references to the "Termination Payment Provision" as the zero-payment provision.

[6] The transaction structure required LBSF to pay amounts and deliver collateral to Beryl, the swap counterparty: in turn, Beryl was obligated to transfer these amounts to Aflac pursuant to applicable payment schedules and hold collateral to secure LBSF's future payment obligations.  *See* Aflac First Am. Answer & Countercl. (Corrected) ¶¶ 2, 6.

agreements and they do not safe harbor the distribution of payments to the detriment of the debtor.

**A.    Enforcement of the Zero-Payment Provision Is Beyond the Scope of Protections Afforded by Section 560.**

8.    Section 560 clearly protects only "[t]he exercise of any contractual right . . . to cause the liquidation, termination, or acceleration of one or more swap agreements" or "to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements. . . ." 11 U.S.C. § 560. This reading is consistent with congressional purpose—only the rights to terminate and setoff were intended to be protected by section 560.  S. Rep. No. 101-285, at *3 (1990) (noting the importance of enforcing default termination provisions in standard swap agreements).  Congress maintained this purpose when it amended section 560 in 2005, "to allow the expeditious *termination* or *netting* of certain types of financial transactions."  H.R. Rep. No. 109-31, pt. 1 at 20 (2005) (emphasis added).  Moreover, in interpreting the scope of exercisable rights under the Safe Harbor Provisions, courts have recognized that section 560 does not provide swap participants with "unqualified rights," *In re Enron*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004), and that enforcement of rights under the Safe Harbor Provisions is limited only to those "terms that trigger termination" upon an event of default in section 365(e).  *See also Calpine Energy Servs. v. Reliant Energy Elec. Solutions (In re Calpine Corp.)*, No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282, at *6 (Bankr. S.D.N.Y. May 7, 2009) (holding similarly under analogous section 556).

9.    Aflac concedes that the exercise of rights under the zero-payment provision would not itself trigger termination or cause the termination of the Credit Default Swap Agreement; rather, it is "what flows as a consequence from that termination."  Aflac Mem. at 18.

In fact, Aflac's argument is simply that section 560 protects the "exercise of its termination *and associated rights under the swaps*." *Id.* at 21 (emphasis added). But the exercise of rights that "flow" subsequent to termination or that are "associated" with or "ancillary to" termination are undeniably beyond the bounds of the statute's safe harbors. *In re Calpine Corp.*, 2009 WL 1578282, at *7 (holding that provision in master agreement requiring debtor to dispute calculations within two days was unenforceable as "ancillary" to termination). Aflac's position, therefore, is wholly unsupportable by the clear language of the statute, legislative history, and controlling case law.

> **1.    Enforcement of the Zero-Payment Provision Against a Debtor in Bankruptcy Is Unlawful Despite the Parties' Prepetition Agreement.**

10.    Aflac argues that LBSF should be bound by the terms of the Supplemental Trust Deeds and the zero-payment provision as part of the parties' prepetition contractual bargain. Aflac Mem. at 20. What the parties bargained for prior to bankruptcy is irrelevant here—if Aflac's position were correct, then sections 365(e) and section 362(a) would never take effect and a debtor's entire estate could be stripped entirely of its assets upon, and as a consequence of, the filing of a bankruptcy petition. Rather, section 365(e) and 362(a) operate to prevent parties such as Aflac from depriving debtors of valuable assets and to allow the orderly administration of the debtors' estate for the benefit of all creditors. *See* LBSF Mot. for Summ. J. at 15-17.

11.    Aflac contends that its position is supported by the district court decision in the *Drexel* bankruptcy to enforce a one-way (first method) payment provision in a swap agreement. Aflac Mem. at 20, n.33 (citing *Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*, 92 Civ. 3098, 1992 U.S. Dist LEXIS 21223, at *3-4 (S.D.N.Y. Nov. 10, 1992)). But *Drexel* is readily distinguishable. First, the district court there did not consider the enforcement of the one-way calculation method against a debtor in bankruptcy or under the Bankruptcy Code, but rather

held only that it was not unconscionable or contrary to public policy. *Drexel Burnham Lambert Prods.*, 1992 U.S. Dist LEXIS 21223, at *3-4. Second, in *Drexel*, the calculation method was an integral part of the close-out calculations in the master agreement for the swap transaction prior to and simultaneously with termination. *Id.* Here, the zero-payment provision comes into effect only *subsequent* to termination, as a means of distributing amounts owed under the swap transactions and, thus, cannot be considered part of termination and close-out as required under section 560. It is clear that "termination" under section 560 means only close-out and calculation of sums due under the swap transactions. H.R. REP. NO. 101-484, at 3 (1990). "Closeout refers to the right to terminate a contract upon event of default and to compute a termination value due to or due from the defaulting party, generally based on the market value of the contract at that time." Bankruptcy Reform Act of 1999 (III), Hearing before the Subcomm. on Commercial & Admin. L. of the Comm. on the Judiciary House of Representatives, 106th Cong. 1st Sess. (1999), 170 (statement of Oliver Ireland). Aflac's attempted enforcement of the zero-payment provision is not part of its calculations of the market positions under the swaps—but rather is simply an unauthorized, after-the-fact, effort to reach beyond the protections of section 560 to enforce a provision that is merely an ancillary obligation that applies subsequent to termination, works serious injury to the Debtors and all of their creditors, and would undo the effects of termination and liquidation by depriving LBSF of the value of its positions, as calculated elsewhere under the swap agreements and in accordance with market conditions.

>    **B.** **Section 362(b)(17) Does Not Protect the Enforcement of the Zero-Payment Provision.**

12. Nor is Aflac's purported enforcement of the zero-payment provision permitted under section 362(b)(17) as an exception to the automatic stay for the exercise of a "contractual right . . . under any security agreement or arrangement or other credit enhancement." 11 U.S.C.

§ 362(b)(17); Aflac Mem. at 21-22.  As explained more fully in LBSF's motion for summary judgment, Congress intended section 362(b)(17) to "ensure[ ] that any such agreement, arrangement or enhancement is itself . . . eligible for treatment as such for purposes of termination, liquidation, acceleration, offset and netting under the Bankruptcy Code. . . ." H.R. REP. NO. 109-31, pt. 1, at 129 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 190 (emphasis added); *see* LBSF Mot. for Summ. J. at 37-39.  Congress did not intend for section 362(b)(17) to provide unlimited protection of the exercise of *any and all* contractual rights under a security agreement, as Aflac suggests.

13.     Accordingly, Aflac's putative "defenses" to Debtors' summary judgment motion, must fail as a matter of law.  We turn now to Aflac's counterclaims.

## II.     AFLAC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF ITS COUNTERCLAIMS.

14.     Not only does Aflac fail to demonstrate that the safe harbors apply to save it from summary judgment in favor of LBSF and LBHI, but Aflac has also failed to establish that it is entitled to summary judgment on any of its counterclaims.  Count I of Aflac's counterclaim merely seeks a declaration that the terminations of the swap transactions were effective.  *See* Aflac First. Am. Answer & Countercl. (Corrected) ¶¶ 34-40.  Given that LBSF already disposed of Count I in its reply to Aflac's counterclaim by explaining that LBSF does not challenge the validity of the terminations themselves (*See* LBSF Reply to Aflac First Am. Answer & Countercl. (Corrected) ¶¶ 34-35), Aflac's subsequent reproduction of its argument in favor of Count I is merely an attempt to create a dispute where none exists.  Count II of Aflac's counterclaim seeks protection under safe harbor provisions of the Bankruptcy Code.  *See* Aflac First. Am. Answer & Countercl. (Corrected) ¶¶ 41-52.  Count II has no merit for the reasons described above and in LBSF's motion for summary judgment.  *See supra* ¶ 18; LBSF Mot. for Summ. J. at 12-40.  Counts III and IV, respectively, seek payment of accrued and unpaid

amounts under the swap agreements, or alternate relief by way of recoupment. *See* Aflac First. Am. Answer & Countercl. (Corrected) ¶¶ 53-66. However, the payments sought in Counts III and IV either will already be accounted for as part of the termination payment and would constitute an improper double recovery for Aflac, or would exploit a drafting error in the English form of the Credit Support Annex that contradicts common sense and promotes an absurd result.

### A. Count I of Aflac's Counterclaim Should Be Dismissed Because There Is No Case or Controversy.

15.     Because there is no dispute between the parties regarding the actual termination of the swap transactions, Count I of Aflac's counterclaim is moot. In each of its two filings, Aflac has elaborated at considerable length on the effectiveness of this termination under the swap agreements and Bankruptcy Code section 560. *See* Aflac First. Am. Answer & Countercl. (Corrected) ¶¶ 34-40; Aflac Mem. at 15-18. But LBSF has already twice confirmed that it has not questioned or opposed the validity of the termination. *See* LBSF Reply to Aflac First Am. Answer & Countercl. ¶¶ 34-35; LBSF Mot. for Summ. J. at 3 n.2. In fact, as Aflac must concede, LBSF disputes not the termination itself but rather Aflac's claim that the safe harbor provisions of Bankruptcy Code sections 560 and 362(b)(17) support Aflac's purported modifications to LBSF's payment rights after termination. *See* Aflac Mem. at 15; LBSF Mot. for Summ. J. at 25-40. By ignoring LBSF's reply to its counterclaim and simply repeating its argument supporting Count I, Aflac's summary judgment motion fails to advance its position. If LBSF defeats Aflac's motion for summary judgment on its defenses, Count I of Aflac's counterclaim must be dismissed.[7]

---

[7] Because Count I of Aflac's counterclaim presents no actual dispute, Aflac cannot sustain its request for a declaratory ruling with respect to Count I. Second Circuit courts have held that a motion to dismiss is the proper vehicle for challenging a claim that raises no case or controversy. *See Lane v. Reid*, 559 F.Supp. 1047, 1049 (S.D.N.Y. 1983) (ruling that "[w]hether an Article III case or controversy exists goes to the question of the court's subject matter jurisdiction. A challenge to the court's subject matter jurisdiction is properly raised by a motion to

**B. Aflac Is Not Entitled to Summary Judgment on Count II of Its Counterclaim Because the Safe Harbors Do Not Apply to the Modification of LBSF's Rights.**

16.     In support of Count II of its counterclaim, Aflac argues that the safe harbors contained in Bankruptcy Code sections 560, 362(b)(17), and 362(o) protect the modifications that Aflac would effect upon LBSF's right to payments. Aflac Mem. at 19-22. This argument is unsound. As discussed both above and in LBSF's motion for summary judgment, neither the plain language nor the underlying legislative intent of these safe harbor provisions supports these purported modifications of LBSF's rights. *See supra* Part I; LBSF Mot. for Summ. J. at 25-40. Moreover, Aflac does not deny that the provisions in the Transaction Documents that contain these modifications are invalid *ipso facto* clauses that violate Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B) and would, if enforced, also violate the automatic stay triggered upon the commencement of LBSF's bankruptcy case. *See supra* ¶ 2; LBSF Mot. for Summ. J. at 12-25. For these reasons, summary judgment should be denied on Count II of Aflac's counterclaim.

**C. Aflac's Request for Summary Judgment on Count III Should Be Denied Because as a Matter of Law Aflac Is Not Entitled to Payments of Accrued and Unpaid Amounts or the Delivery of LBSF Credit Support.**

17.     Count III of Aflac's counterclaim demands payment of two different kinds of accrued and unpaid amounts, both arising out of obligations payable to Beryl prior to the termination of the swap transactions. The first type is comprised of "Fixed Amounts" that LBSF was required to pay to Beryl on a quarterly basis.[8] The second is comprised of additional

---

dismiss under Fed. R. Civ. P. 12(b)(1) and not by a Rule 12(c) motion for judgment on the pleadings since it is elementary that a court cannot render a judgment in a case which it has no power to entertain."); *Tuvia Convalescent Ctr., Inc. v. Nat'l Union of Hosp. & Health Care Employees*, 717 F.2d 726, 729 (2d Cir. 1983) (holding that the district court properly applied a Rule 12(b)(1) analysis in deciding the absence of a justiciable controversy). LBSF will file a separate motion to dismiss Count I of Aflac's counterclaim.

[8] "Fixed Amounts" are defined in section 5.1 of the 2003 ISDA Credit Derivatives Definitions, which are incorporated by reference into the Forms of Swap Confirmation that form part of each of the four swap agreements.

collateral (or "Credit Support") that the Credit Support Annexes accompanying each of the swap agreements obligated LBSF to transfer to Beryl upon any downgrade of LBHI's short-term rating below a specified level.  *See* Ex. A ¶ 2 (English Credit Support Annex); Aflac Decl. Ex. 7 at 76-77; *id.* Ex. 10 at 76-77; *id.* Ex. 13 at 76-77; *id.* at Ex. 16 at 73-74 (containing definitions of "Exposure," "Swap Premium Exposure," and "Costs Exposure").  But Aflac is not now entitled to either type of payment.  The Fixed Amounts it seeks will be accounted for in the ISDA Master Agreement's calculus of termination amounts.  While Aflac is not entitled to the additional Credit Support amounts it demands for the reasons set forth below, *see infra* ¶ 21, even if these amounts were recognized, they similarly would not be payable but would be accounted for in the ISDA Master Agreement's calculus of termination amounts.

18.     The Fixed Amounts were unpaid twice: once when due in September 2008, and again when they further accrued but were never transferred for the partial payment period from September 2008 to the Early Termination Date.  *See* Aflac First Am. Answer & Countercl. (Corrected) ¶ 54.  Aflac now seeks these payments, plus interest that accrued on each such unpaid obligation until the Early Termination Date.  *See* Aflac First Am. Answer & Countercl. (Corrected) ¶ 61; Aflac Mem. at 22.  But Aflac will recover these amounts through the workings of ISDA Master Agreement section 6(e)(i)(3), which sets forth a procedure to calculate payments to be made upon early termination due to an Event of Default.[9]  Under this provision, the total

---

*See* Aflac Decl. Ex. 7 at 26; *id.* Ex. 10 at 26; *id.* Ex. 13 at 26; *id.* at Ex. 16 at 26.  The Forms of Swap Confirmation also provide independent definitions for "Fixed Rate Payer Calculation Amount," "Fixed Rate," and "Fixed Rate Day Count Fraction," which when read together with the general definition contained in the 2003 ISDA Credit Derivatives Definitions § 5.1 more specifically define the obligation to pay Fixed Amounts under each of the swap agreements.  *See id.* Ex. 7 at 32-33; *id.* Ex. 10 at 32-33; *id.* Ex. 13 at 32-33; *id.* at Ex. 16 at 32-33.

[9] The Schedules to the ISDA Master Agreements governing each of the four swap arrangements provide that termination payments to be made pursuant to an Event of Default must follow the "Second Method and Market Quotation" procedure detailed in ISDA Master Agreement § 6(e)(i)(3).  *See* Aflac Decl. Ex. 9 § 1(i); *id.* Ex. 12 § 1(i); *id.* Ex. 15 § 1(i); *id.* Ex. 18 § 1(i).

termination payment includes a "Settlement Amount" payable to the Non-Defaulting Party, as well as various "Unpaid Amounts" that are added or subtracted therefrom. *See* Aflac Decl. Ex. 8 § 6(e)(i)(3); *id.* Ex. 11 § 6(e)(i)(3); *id.* Ex. 14 § 6(e)(i)(3); *id.* Ex. 17 § 6(e)(i)(3). The Settlement Amount, determined as the average of several bids to replace the Defaulting Party in the swap transaction, represents the market value of the swaps to the Non-Defaulting Party at the time of termination. *See id.* Ex. 8 § 14; *id.* Ex. 11 § 14; *id.* Ex. 14 § 14; *id.* Ex. 17 § 14 (defining "Settlement Amount").[10] Unpaid Amounts include past-due obligations under any Confirmations forming part of the swap agreements, which were left unfulfilled by either party during the transaction term: Unpaid Amounts owed to the Non-Defaulting Party are added to the Settlement Amount, while those owed to the Defaulting Party are subtracted from the Settlement Amount.[11] If the resulting amount is a positive number, it is payable by the Defaulting Party; if it is a negative number, the absolute value thereof is payable by the Non-Defaulting Party. As obligations arising out of the Swap Confirmations, the unpaid Fixed Amounts Aflac seeks qualify as Unpaid Amounts and thus will already be incorporated into the total termination payment. If allowed to collect these amounts separately in spite of their inclusion in the termination payment, Aflac would receive an impermissible double recovery. *See Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196, 1212 (2d Cir. 1975) (affirming the lower court's award of the cost of shipment of goods never delivered to their intended destination, but

---

[10] If the Settlement Amount so calculated yields a negative number, the swap has a market value in favor of the Defaulting Party. *See* Aflac Decl. Ex. 8 § 6(e)(i)(3); *id.* Ex. 11 § 6(e)(i)(3); *id.* Ex. 14 § 6(e)(i)(3); *id.* Ex. 17 § 6(e)(i)(3).

[11] Section 14 of the ISDA Master Agreement provides that Unpaid Amounts include all payments or obligations that were owed but never paid to either party during the transaction period under ISDA Master Agreement § 2(a)(i). *See* Aflac Decl. Ex. 8 § 14; *id.* Ex. 11 § 14; *id.* Ex. 14 § 14; *id.* Ex. 17 § 14. In turn, section 2(a)(i) of the ISDA Master Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it." *Id*. Ex. 8 § 2(a)(i); *id.* Ex. 11 § 2(a)(i); *id.* Ex. 14 § 2(a)(i); *id.* Ex. 17 § 2(a)(i). As a result, Unpaid Amounts include all unfulfilled obligations arising out of any Confirmations to the swap agreements.

reversing the lower court's award allowing recovery of prepaid freight on the grounds that it was duplicative of the shipment costs award); *Victor Lalli Enter. v. Robert Lalli Enter.*, 74 Civ. 387, 1978 U.S. Dist. LEXIS 16416, at *15 (S.D.N.Y. July 24, 1978) (declining to award actual damages to a plaintiff already entitled to receive equivalent amounts compensating for the same losses on the basis that such an award would constitute a double recovery). Accordingly, Aflac is not entitled to any of the unpaid Fixed Amounts that it claims.

19.    Although LBSF incurred obligations to transfer Credit Support to Beryl at several points during the transaction period, such obligations are accounted for in the termination payment and no additional obligations are owed. For example, when LBHI's short-term ratings were downgraded below the specified level prior to its bankruptcy filing, LBSF transferred additional Credit Support as required; however, on occasions between LBHI's bankruptcy filing and the Early Termination Date when LBHI's short-term rating declined further, corresponding additional Credit Support amounts were not transferred. *See* Aflac First. Am. Answer & Countercl. (Corrected) ¶¶ 55-58. Aflac now demands payment of amounts in respect of this unpaid additional Credit Support, plus interest that accrued on each such unpaid obligation until the Early Termination Date. *See id.* ¶ 61; Aflac Mem. at 22. But as with the Fixed Amounts, Aflac's argument is insupportable in light of the early termination payment provided for in the ISDA Master Agreement. Any Credit Support transferred by LBSF during the term of the swap agreements was intended to serve solely as collateral—security with respect to the obligations owed by LBSF to Beryl under the swaps. As discussed above, ISDA Master Agreement § 6(e)(i)(3) provides that upon termination Beryl—the Non-Defaulting Party—recoups the value against which that collateral was held in the form of the Settlement Amount, which represents the market value of the swaps to the Non-Defaulting Party at the time of termination. *See*

*supra* ¶ 18.  Because the Settlement Amount, plus or minus the net Unpaid Amounts, already ensures that Beryl will receive whatever amounts to which it may be entitled, the Transaction Documents treat any collateral previously posted as security for that value as an Unpaid Amount payable back to LBSF.[12]  Accordingly, the Credit Support that LBSF transferred to Beryl prepetition will factor into the termination payment as an Unpaid Amount that Beryl owes back to LBSF.  To the extent LBSF did not transfer an amount it was required to post, Beryl's obligation reflects that fact by requiring Beryl to return only what it actually received.  Moreover, Beryl's recovery of the value of its swaps in the form of the Settlement Amount should render any Credit Support owed but not transferred during the swap agreement term completely moot: unpaid collateral for a debt whose term has ended and that has already been repaid to the lender in full.  To require LBSF to transfer this collateral at this point would contradict both common sense and common business practice.

20.    Accordingly, ISDA Master Agreement section 6(c)(ii) provides that early termination of the swap agreements extinguishes all parties' outstanding obligations and replaces them with a single obligation to make a net termination payment under section 6(e): "Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made . . . [t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e)."  Aflac Decl. Ex. 8 § 6(c)(ii); *id.* Ex. 11 § 6(c)(ii); *id.* Ex. 14 § 6(c)(ii); *id.* Ex. 17 § 6(c)(ii).  As discussed above, section 2(a)(i) requires each party to fulfill

_____

[12] The Credit Support Annex provides that "[i]f an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e)."  Ex. A (English Credit Support Annex) ¶ 6.

payment and other obligations set forth in the Confirmations forming part of the swap agreements. *See supra* at 4 n.6. The English form of the ISDA Credit Support Annex defines itself as such a Confirmation. *See* Ex. A pmbl. (English Credit Support Annex) ("For the purposes of this Agreement . . . the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation)."). As a result, any Credit Support obligations to be performed after termination were extinguished upon Beryl's early termination of the swap agreements pursuant to section 6(c)(ii).

21.     However, in presenting this otherwise specious claim, Aflac relies on a curious drafting error in the English Credit Support Annex. Because this form defines itself as a Confirmation forming part of the swap transaction, *see supra* ¶ 20, any unpaid Credit Support obligations arising therefrom are treated as Unpaid Amounts upon termination. *See supra* at 4 n.6. Other ISDA form credit support documents do not define themselves as Confirmations: as a result, under such documents collateral obligations unpaid at termination do not become Unpaid Amounts payable to the counterparty under sections 2(a)(i) and 14 of the ISDA Master Agreement. *See* Ex. B (New York ISDA Credit Support Annex); Ex. C (English ISDA Credit Support Deed). The English Credit Support Annex is the only credit support form that, if read literally and without any context, requires a party to post new collateral for a debt that it has already repaid—an outcome so bizarre that it is likely unintentional. *See* Ex. D ¶ 12.033 (SIMON FIRTH, DERIVATIVES LAW & PRACTICE (Sweet & Maxwell 2008) (describing the English Credit Support Annex's treatment of collateral unpaid at termination as an Unpaid Amount as "a conclusion that cannot have been intended and must be put down to a drafting error.")).

22.     Despite this quirk of the English ISDA Credit Support Annex, Aflac is not at this point entitled to additional Credit Support for its swaps. It is well settled in English law that

detailed contract provisions must be interpreted according to common sense and common business practice rather than in a manner that produces an absurd result.[13]  *See Antaios Compania Naviera S.A. v. Salen Rederierna AB (The Antaios)*, [1985] A.C. 191, 201 (H.L.) (holding that "if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense"); *Micro Design Group., Ltd. v. BDW Trading Ltd.*, [2008] EWCA Civ 448 (C.A.) (following *Antaios Compania Naviera S.A.*'s approach favoring business common sense over an absurd or inequitable outcome resulting from the literal application of detailed contract language); *Investors Comp. Scheme Ltd. v. West Bromwich Bldg. Soc'y*, [1998] 1 W.L.R. 896, 913 (H.L.) (ruling that if judges examining a transaction document can "conclude from the background that something must have gone wrong with the language, the law does not require [them] to attribute to the parties an intention which they plainly could not have had"); 1 CHITTY ON CONTRACTS ¶ 12-055 (30th ed. 2008) (noting that "the principle that words must be construed in their ordinary sense is liable to be departed from where that meaning would involve an absurdity or would create some inconsistency with the rest of the instrument").  Allowing Aflac to recover additional amounts, under a collateral document, for value it will already recover through other means would certainly contradict business common sense, which dictates that neither LBSF nor LBHI should now owe Aflac any amount in respect of unpaid Credit Support.  *See* Ex. D ¶ 12.033.

23.    At the very worst for LBSF, summary judgment on Count III of Aflac's counterclaim should be denied on the grounds that genuine issues of material fact exist that are

---

[13] As LBSF has noted in its motion for summary judgment, the Transaction Documents are governed by English law.  *See* LBSF Mot. for Summ. J. at 4 n.3; Compl. Ex. B §§ 13.1, 13.2; *id.* Ex. C §§ 13.1, 13.2; *id.* Ex. D §§ 12.1, 12.2; *id.* Ex. E §§ 13.1, 13.2; *see also id.* Ex. A §§ 20.1, 20.2.

inherent in the complexities of the Transaction Documents' termination payment and Credit Support provisions. These require more detailed examination than can be performed at the summary judgment stage. Summary judgment is not appropriate "[w]here, as here, intelligent adjudication requires more than the use of lay knowledge and the resolution of a disputed issue hinges in large measure upon conflicting opinions and judgments of expert witnesses." *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178-79 (2d Cir. 2008) ("Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict in favor of the party against which summary judgment is contemplated."); *Guarino v. St. John Fisher College*, 321 F. App'x 55, 57 (2d Cir. 2009) (ruling that summary judgment was not warranted where a review of the record revealed sufficient evidence for a rational trier of fact to find in favor of the party opposing summary judgment). There is certainly enough evidence in the present case to indicate that Aflac should not be granted summary judgment due to a hyper-technical reading of a collateral document: to the contrary, expert testimony will be needed to address the English ISDA Credit Support Annex's treatment of unpaid Credit Support as an Unpaid Amount.[14] Because Aflac is entitled neither to unpaid Fixed Amounts nor to additional Credit Support, and because in any event the relevant swap agreement provisions call for more thorough analysis, this Court should not grant summary judgment to Aflac with respect to Count III of its counterclaim.

---

[14] Accordingly, LBSF will seek leave to amend its reply to Aflac's counterclaim to assert an affirmative defense of reformation.

**D. Aflac's Request for Summary Judgment on Its Alternative Claim in Count IV Should Be Denied for the Same Reasons as Count III and Because as a Matter of Law Aflac Is Not Entitled to Recoupment.**

24.     In Count IV, Aflac seeks alternative relief that it acknowledges will be moot if it succeeds on Counts I-III. Aflac Mem. at 23. Thus, Count IV is a last resort upon which Aflac will rely only if LBSF succeeds—as it should—on the merits of its claims and in its arguments opposing the first three counts of Aflac's counterclaim. But Count IV's claims for relief are based on the same faulty arguments that Aflac employs elsewhere: that Aflac is owed "accrued and outstanding Fixed Amounts under each Credit Default Swap Agreements [sic] as of the Early Termination Date," as well as "additional LBSF Credit Support that LBSF was obligated to have provided prior to and as of the Early Termination Date." Aflac First. Am. Answer & Countercl. (Corrected) ¶ 64. As discussed above, Aflac is not now entitled to any outstanding Fixed Amount payments because they will be accounted for by the termination payment provision set forth in ISDA Master Agreement § 6(e)(i)(3). *See supra* Part II.C. Furthermore, Aflac cannot now lay claim to additional Credit Support, as any obligation to transfer additional collateral as security for the value of Aflac's swaps was extinguished upon Beryl's designation of an Early Termination Date. *See supra* Part II.C. In other words, Count IV—like Count III—seeks amounts that will already be accounted for in the termination payment. Aflac is not entitled to this relief in any form, whether as a direct payment or as a further reduction in the debt that Aflac owes to LBSF.

25.     Moreover, recoupment does not entitle Aflac to any relief under Count IV of its counterclaim.[15] Where a plaintiff-debtor has asserted a claim against a bankruptcy defendant,

---

[15] Count IV of Aflac's counterclaim originally included a claim for setoff as well as recoupment. *See* Aflac First. Am. Answer & Countercl. (Corrected) ¶ 64. However, Aflac has since abandoned its setoff claim, *see* Aflac Mem. at 23-24), perhaps realizing that the imposition of an automatic stay blocks any subsequent assertion of setoff rights.

recoupment allows that defendant to present a counterclaim as long as the original claim and the counterclaim arise out of the same transaction. *See Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993) (stating that "a bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment"). If the defendant's counterclaim is successful, the amount judged owed to the defendant is subtracted from any amounts judged owed to the plaintiff-debtor. *See Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2d Cir. 2002) (holding that "recoupment means a deduction from a money claim through a process whereby cross-demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered" (internal citations omitted)). Because the doctrine of recoupment—an equitable remedy—is "a limited one and should be narrowly construed," *id.* at 147 (citing *In re McMahon*, 129 F.3d 93, 97 (2d Cir. 1997)), it is only applicable where the requirement that the defendant's counterclaim and the plaintiff-debtor's original claim are based in the same transaction is satisfied. *See In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998) (holding that "since recoupment is an equitable, non-statutory exception to the automatic stay, it should be limited in bankruptcy to cases in which 'both debts . . . arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations'" (citing *Univ. Med. Ctr. v. Sullivan*, 973 F.2d 1065, 1081 (3d Cir. 1992))). Thus, recoupment may only be raised in defense to a specific claim based in the same transaction, and not as an affirmative counterclaim arising out of different or multiple transactions. *See In re*

---

*See N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997) (noting that "a 'setoff' is subject to the automatic stay provision of 11 U.S.C. § 362"); *Mercy Hosp. v. N.Y. State Dep't of Soc. Servs.*, 171 B.R. 490, 494 (N.D.N.Y. 1994) (holding that 11 U.S.C. "[s]ection 362(a)(7) . . . renders the automatic stay applicable to the setoff of any debt owing to the debtor that arose before the commencement of the case under [the Bankruptcy Code] against any claim against the debtor") (internal citations omitted).

*Malinowski*, 156 F.3d at 133 (holding that "[r]ecoupment is in the nature of a defense, the purpose of which is to do justice viewing one transaction as a whole") (internal citations omitted). Count IV of Aflac's counterclaim, presented affirmatively and without reference to any specific claim raised by LBSF, broadly seeks Fixed Amounts and Credit Support arising out of a number of separate obligations pursuant to the swap agreements and so fails to meet the requirements for recoupment. Furthermore, the relief Aflac seeks is contingent—as discussed above, Aflac has in no way established that it is entitled to any additional amounts in respect of unpaid Fixed Amounts and Credit Support. *See supra* Part II.C. Recoupment cannot support a contingent claim based in unestablished liability. *See Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of Social Servs.*, Case No. 91 B 11478 (FGC), Adv. Pro. No. 94/8912A, 1995 Bankr. LEXIS 157, at *30 (Bankr. S.D.N.Y. Jan. 26, 1995) (ruling that defendant was not entitled to recoupment both because its claim was disputed and contingent and because the claims at issue arose from more than one transaction); *FDIC v. Liberty Nat'l Bank & Trust Co.*, 806 F.2d 961 (10th Cir. 1986) (noting that the "'general law of recoupment and setoff does not embrace contingent claims'" (citing *City of Milwaukee v. Milwaukee Civic Developments, Inc.*, 71 Wis. 2d 647, 661 (Wis. 1976))). Because Aflac's claim for recoupment is contingent, affirmative, and based in several separate obligations, it must be denied.

26. In this light, the cases that Aflac cites in its argument supporting Count IV of its counterclaim are inapposite. For example, the debtor in *In re McMahon* had delivered a prepetition deposit to his utility company as a condition of future receipt of utility service, but owed significantly more than the value of that deposit in unpaid bills at the time he filed for bankruptcy; the Second Circuit ultimately upheld the utility company's application of the deposit against the debtor's unpaid bills under the doctrine of recoupment. *See In re McMahon*, 129

F.3d at 95, 98.  But unlike the utility company in *McMahon*, which would have been unable to recover the amount owed it without recourse to the recoupment doctrine, whatever amounts Aflac may be entitled to will be reflected in the Settlement Amount portion of the termination payment.  To further calculate an Unpaid Amount in favor of Beryl with respect to unposted collateral would be purely double counting.  The *McMahon* decision is even less pertinent to the present case given the Second Circuit's strict confinement of its ambit to the utility context: "Because of the strict regulation of utilities, the special law of utility deposit ownership, and the unique public policy implications of the recoupment/setoff issue in bankruptcy in the utility context, nothing in this opinion should be interpreted to apply to non-utility creditors."  *Id*. at 99.

27.    More misplaced still is Aflac's reliance on *Westinghouse Credit Corp. v. D'Urso*, in which the Second Circuit actually *declined* to apply the recoupment doctrine because to do so would have undermined the transaction to which the parties had agreed: "We conclude that to apply the doctrine of recoupment now, in effect restructuring the transaction after the fact, would be inequitable, and we decline to do so."  278 F.3d at 149.  Unlike *In re McMahon*, this decision is directly on point where application of the recoupment doctrine in the present case would contradict the parties' agreement, which already provides for Aflac's recovery of any amounts to which it may be entitled through its termination payment provision.  And as in *Westinghouse Credit Corp.*, application of recoupment here would yield an inequitable result—an unmerited windfall for Aflac, comprised of an improper double recovery in the form of Fixed Amounts that will already be apportioned to Aflac elsewhere as well as additional Credit Support for a value that will already be repaid through other means.  As such, Aflac is not entitled to the declaratory judgment that it seeks in Count IV of its counterclaim.

## CONCLUSION AND RELIEF REQUESTED

28.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001 and 7056,

LBSF requests that this Court deny Aflac's motion for summary judgment and grant LBSF's

motion for summary judgment, including the following: (a) award LBSF summary judgment

disposing of this adversary proceeding in its entirety and enter final judgment, and (b) enter a

declaratory judgment declaring that the provisions in the Transaction Documents (1) modifying

LBSF's rights to priority of payments, (2) imposing a zero-payment provision upon termination,

(3) altering the calculation of the Early Redemption Amount and (4) changing the definition of

Unwind Costs as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses that

violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) and that LBSF is entitled to payment under

Swap Counterparty Priority, and any action to enforce the *ipso facto* provisions in the

Transaction Documents as a result of its bankruptcy filing violates the automatic stay under 11

U.S.C. § 362(a).

Respectfully submitted,


  */s/ Ralph I. Miller*
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession


Dated: New York, New York
       October 23, 2009