Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

and

David S. Cohen (admitted pro hac vice)
Adrian C. Azer (admitted pro hac vice)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | Case No. 08-13555 (JMP) |
| Debtors. | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : | |
| Plaintiffs, | : | |
| -against- | | Adversary Proceeding No.: 09-01261 (JMP) |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS and BNY CORPORATE TRUSTEE SERVICES LIMITED | : | |
| Defendants. | : | |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS | : | |

|                                              |   |
|----------------------------------------------|---|
| Counterclaim Plaintiff,                      | : |
| -against-                                    |   |
|                                              | : |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and   |   |
| LEHMAN BROTHERS HOLDINGS INC.                |   |
|                                              | : |
| Counterclaim Defendants.                     |   |
|                                              | x |

# JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC. ET AL. IN DEBTORS' OPPOSITION TO AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS'S MOTION FOR SUMMARY JUDGMENT

The Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in possession (collectively, the "Debtors"), hereby joins (the "Joinder") in Debtors' Opposition to American Family Life Assurance Company of Columbus's ("AFLAC") Motion for Summary Judgment ("Debtors' Opposition") in the above-captioned matter.[1] In support of its Joinder, the Committee respectfully states:

## BACKGROUND

1. <u>Bankruptcy Filing</u>. On September 15, 2009, LBHI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October 3, 2008 (the "Petition Date"), LBSF filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. <u>Debtors in Possession</u>. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases are being

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Debtors' Motion.

jointly administered pursuant to Bankruptcy Rule 1015(b) and this Court's order dated October 16, 2008.

3. <u>Committee</u>. The Committee is a committee duly appointed and organized under section 1102 of the Bankruptcy Code. The United States Trustee appointed the Committee on September 17, 2008. The Committee represents the interests of all unsecured creditors of each of the Debtors. The Committee is expressly authorized by statute to investigate the assets and liabilities of the Debtors, and is empowered to perform such other services as are in the interests of the unsecured creditors generally. <u>See</u> 11 U.S.C. § 1103(c).

4. <u>Adversary Proceeding</u>. On June 3, 2009, LBSF and LBHI filed a complaint (the "<u>Complaint</u>") commencing this adversary proceeding against American Family Life Assurance Company of Columbus ("<u>AFLAC</u>") and BNY Corporate Trustee Services Limited ("<u>BNY</u>") [Docket No. 1]. BNY filed its Answer and Counterclaims on July 6, 2009 [Docket No. 12]. AFLAC filed its Corrected First Amended Answer and Counterclaims ("<u>AFLAC Counterclaims</u>") on July 7, 2009 [Docket No. 16].

5. <u>Committee's Intervention</u>. On July 13, 2009, with the consent of all parties, the Committee submitted for the Court's approval its Stipulation and Consent Order Permitting Intervention of the Committee in the Adversary Proceeding. The Court so ordered the stipulation on July 16, 2009 [Docket No. 24].

6. <u>AFLAC's Motion for Summary Judgment</u>. On August 4, 2009, AFLAC filed a motion for summary judgment, statement of undisputed facts, supporting declaration, and supporting memorandum of law ("<u>AFLAC's Memorandum</u>")

(collectively, "AFLAC's Motion for Summary Judgment") [Docket Nos. 30-33] on the relief sought in AFLAC's Counterclaims.

7. Debtors' Opposition to AFLAC's Motion for Summary Judgment. On October 23, 2009, the Debtors filed Debtors' Opposition to AFLAC's Motion for Summary Judgment.

## THE COMMITTEE'S JOINDER

8. The Committee concurs with the statements of facts and arguments of law set forth in the Debtors' Opposition to AFLAC's Motion for Summary Judgment, and hereby joins and adopts the Debtors' Opposition to AFLAC's Motion for Summary Judgment for its own, the entirety of which is incorporated by reference herein. The Committee also incorporates by reference the arguments made in its Statement of Official Committee of Unsecured Creditors in Support of Debtors' Motion for Summary Judgment and in Opposition to BNY Corporate Trustee Services Limited Motion for Summary Judgment as filed in Lehman Bros. Special Financing Inc. v. BNY Corporate Trustee Services Ltd. (Docket No. 09-1242).

9. The Committee presents here one additional response to AFLAC's Motion for Summary Judgment. In its Memorandum, AFLAC asserts:

> None of LBSF's rights have been changed in any way by the termination of the swaps, and none will be modified by Beryl enforcing the Credit Default Swap Agreements in accordance with their express terms which, in the case of an LBSF bankruptcy default and termination, say LBSF gets no Termination Payment. Put differently, by getting a payment of "zero" in such a termination, LBSF if receiving precisely what it bargained for.

(See Aflac Mem. at 20.)

10. In support of this assertion, AFLAC states:

4

> In the Drexel bankruptcy, the district court upheld the enforceability under state law of a similar (though not identical) swap termination provision, known as the "first method," in which the defaulting party is not entitled to receive any net amount otherwise determined to be payable to it in the close-out of the swap transaction. See In re Drexel Burnham Lambert Products Corp. v. Midland Bank PLC, 1992 U.S. Dist. LEXIS 21223, at *3-*4.

(See id. n.33.)

11. The Drexel decision that AFLAC cites, however, is distinguishable from this proceeding in one important respect. In Drexel, Midland Bank terminated an interest rate swap agreement with Drexel Burnham Lambert Products Corporation ("Products") on February 16, 1990, three days after Drexel Burnham Lambert Group Inc., the guarantor of Products' obligations under the swap agreement, commenced a voluntary case under the Bankruptcy Code. (See Compl. ¶¶ 8, 16-17, In re Drexel Burnham Lambert Products Corp. v. Midland Bank PLC, No. 92-civ-3098 (S.D.N.Y. 1992) (a true and correct copy of which (without exhibits) is attached hereto as Exhibit 1).)

12. On the termination date, however, Products was not itself a debtor. Indeed, Products did not become a debtor in a case under the Bankruptcy Code until more than three months later, on May 29, 1990. (See Disclosure Statement, In re Drexel Burnham Lambert Group Inc., No. 09-10421 (Bankr. S.D.N.Y. 1991) (a true and correct copy of excerpts of which are attached hereto as Exhibit 2).) The Drexel decision therefore dealt with a prepetition, not a postpetition, termination of a swap agreement.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

5

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Committee hereby joins in the Debtors' Opposition to AFLAC's Motion for Summary Judgment, and respectfully requests that the Court enter an order denying summary judgment in favor of AFLAC and granting summary judgment in favor of the Debtors, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 23, 2009

                                        MILBANK, TWEED, HADLEY & M^cCLOY LLP

                                        By: */s/ Dennis Dunne*_____
                                        Dennis F. Dunne
                                        Wilbur F. Foster, Jr.
                                        Evan Fleck
                                        1 Chase Manhattan Plaza
                                        New York, NY 10005
                                        Telephone: (212) 530-5000

                                        David S. Cohen (admitted pro hac vice)
                                        Adrian C. Azer (admitted pro hac vice)
                                        1850 K Street N.W., Suite 1100
                                        Washington, DC 20006
                                        Telephone: (202) 835-7500

                                        Counsel for the Official Committee
                                        of Unsecured Creditors of Lehman Brothers
                                        Holdings Inc., et al.

# Exhibit 1

TENZER, GREENBLATT, FALLON & KAPLAN
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
(212) 573-4300
Joel M. Leifer (JL 5941)
Mark H. Moore (MM 8604)
Sandra D. Grannum (SG 6748)
Attorneys for Drexel Burnham
 Lambert Products Corporation




**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - -X

DREXEL BURNHAM LAMBERT PRODUCTS : 
CORPORATION,
                                 :
              Plaintiff,              91 Civ.
                                 :
       - against -                    **COMPLAINT**
                                 :
MIDLAND BANK, PLC,

              Defendant.
                                 :
- - - - - - - - - - - - - - - - -X

   Plaintiff Drexel Burnham Lambert Products Corporation ("Drexel Products"), by its undersigned attorneys, for its Complaint alleges upon knowledge as to itself and upon information and belief as to all other matters, as follows:

### Nature of Action

   1.  This is an action seeking a declaratory judgment that a provision in an Interest Rate Swap Agreement (the "Agreement") between Midland Bank PLC ("Midland") and Drexel Burnham Government Securities, Inc. ("Drexel GSI") (whose rights and responsibilities pursuant to the Agreement have been assigned to Drexel Products), providing for damages under certain circumstances, constitutes a penalty provision and is therefore

contrary to public policy and void. Plaintiff also seeks compensation from Midland for the market value of an interest rate swap between Drexel Products' and Midland's as of the date of termination of the Agreement by Midland.

## Parties

2. Plaintiff Drexel Products is a corporation formed under the laws of the State of Delaware which has its principal place of business in the State of New York.

3. Defendant Midland is a foreign corporation organized under the laws of the United Kingdom.

## Jurisdiction

4. Jurisdiction exists pursuant to 28 U.S.C. §1344(b).

## Venue

5. Venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

## Background

6. This action arises out of an Interest Rate Swap entered into by the parties. An interest rate swap (the "swap") is a hedging device which permits one party to exchange (or swap) one type of interest rate risk on an agreed or "notional" amount for another type of interest rate risk. As an example, Party A agrees to pay interest on an agreed notional amount to Party B at a floating rate (usually the London Interbank Offered Rate or "LIBOR") and Party B agrees to pay interest on the agreed notional amount at a fixed rate, for a fixed period of time. As interest rates fluctuate, Party A is "in the money", when based

upon then current interest levels, Party A will net larger interest payments on the notional amount over the term of the agreement. The amount by which a party is "in the money" (giving effect to current value discounts and other market factors) is the "value" of the swap to that party.

7. On April 17, 1986, Midland and Drexel GSI entered into an the Agreement. (annexed hereto as Exhibit A).

8. The Agreement provided that the parties were Midland and Drexel GSI with Drexel Burnham Lambert Group, Inc. as the Guarantor.

9. The Agreement provided, among other things, that payments would be subject to terms and conditions to be set forth or incorporated in Article 10.2(a) of the Code of Standard Wording, Assumption and Provisions for 1985 version (the "Code"). Agreement §3.

10. Section 10.2(a) of the Code, provided that a condition precedent to payment of any amount under the Agreement is that no Event of Default with respect to the other party has occurred.

11. The Agreement specified two alternative methods of calculating payments to the parties in the event of early termination. If neither party were in default of the Agreement, then the parties would be entitled to the value of their swaps plus any other unpaid monies owed them ("Agreement Value"). Agreement §19(b).

12. In the event of a "default" by one party, Section 19(a) of the Agreement provided that the parties would settle what would have been their future obligations provided, however, that settlement could only occur upon the demand of the non-defaulting party.

13. Upon information and belief Midland has interpreted Section 19(a) of the Agreement as providing that the Defaulting Party forfeits the Agreement Value of its Swap.

14. The Agreement specifies "Events of Default". Such events include the case where:

> The Guarantor (A) is dissolved, (B) fails or is unable to pay its debts generally as they become due, (C) commences a voluntary case in bankruptcy or any other action or proceeding for any other relief under any law affecting creditors' rights that are similar to a bankruptcy law. Agreement §15(b)(ii).

15. On August 14, 1987, Drexel GSI assigned its rights and responsibilities pursuant to the Agreement to Drexel Products. (Assignment annexed hereto as Exhibit B).

16. On February 13, 1990, Drexel Burnham Lambert Group, Inc. ("Drexel Group") filed for protection under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court Southern District of New York.

17. On February 16, 1990, Midland wrote to Drexel Products stating:

> an event of default with respect to yourselves has occurred pursuant to Section 15(B)(II) of the Agreement in consequence of which pursuant to Section 17 of the Agreement, all payment obligations under the agreement and the transactions have been terminated automatically.

> We shall treat the Agreement and the
> transaction accordingly. (Letter annexed
> hereto as Exhibit C).

18. At the time of Midland's purported termination of the Agreement, the Agreement Value of Drexel Products' Swap was $373,000.00

19. On October 2, 1991, Drexel Products wrote to Midland requesting it be paid the $373,000.00 Agreement Value.

20. To date, Midland has not paid Drexel Products any portion of the monies it owes Drexel Products.

21. Midland suffered no damages as the result of the filing by Drexel Group of a petition for relief pursuant to Chapter 11 of the Bankruptcy Code. The forfeiture of the Agreement Value of Drexel Products' Swap serves to penalize Drexel Products for The Chapter 11 filing by Drexel Group and is therefore in violation of the public policy of the State of New York.

### COUNT I
### (Declaratory Judgment)

22. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 with the same force and effect as if fully set forth herein.

23. Section 19(a) of the Agreement serves to deprive Drexel Products of monies the amount of which in no way relate to any damage suffered by Midland. Therefore, the invocation of Section 19(a) serves to penalize Drexel Products.

24. Section 19(a) of the Agreement should be declared a penalty clause contrary to public policy and, therefore, void.

## COUNT II
### (Unjust Enrichment)

25. Drexel Products repeats and realleges each and every allegation contained in paragraph 1 through 24 with the same force and effect as if fully set forth herein.

26. The value of Drexel Products' Swaps at the time the Agreement was terminated by Midland was $373,000.00. That sum is presently owing to Drexel Products.

27. Drexel Products has requested the return of such sums from Midland. Midland knew such sums were due and owing to Drexel Products, but has, nonetheless, failed to pay Drexel Products the monies owed it. Midland had therefore, been unjustly enriched by the sum of $373,000.00.

28. As a result thereof, Drexel Products has suffered damages in the amount of $373,000.00.

**WHEREFORE**, Plaintiff prays for judgment as follows:

(a) Declaring Section 19(a) of the Agreement a penalty clause contrary to public policy and, therefore, void;

(b) Awarding Drexel Products damages in the amount of $373,000.00 plus pre-judgment interest;

(c) Awarding reasonable attorneys fees, expenses and costs; and

(d) Awarding such other and further relief as the Court may deem just.

Dated: New York, New York
April 17, 1992

                                **TENZER, GREENBLATT, FALLON & KAPLAN**

By: *[signature]*
      Joel M. Leifer (JL 5941)
      The Chrysler Building
      405 Lexington Avenue
      New York, New York 10174
      (212) 573-4300

# Exhibit 2

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————X

In re                                :

THE DREXEL BURNHAM LAMBERT          :       Chapter 11 Case No.
  GROUP INC., et al.,
                                     :       90 B 10421 (FGC)

        Debtors.                     :

                                     :

————————————————————X



DEBTORS' DISCLOSURE STATEMENT PURSUANT TO SECTION 1125
OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

members of the Corporate Finance and High Yield Bond Departments were permitted to purchase, through investment partnerships, securities of the same issuers, on the same basis, as Drexel. See "Summary of the Joint Plan of Reorganization of the Debtors -- Establishment of the Plan Entities, Certain Reserves and Escrows and Description of Securities Issued Pursuant to the Plan -- DPI, DPI-A Corp. and DPI-B Corp."

2. Institutional Clients

Drexel traded and acted as a broker/dealer in the sale of equity and debt securities, including government securities, mortgage-backed securities ("MBS"), investment grade securities, high yield securities, convertible securities and municipal bonds for institutional clients. Drexel also provided its institutional clients with certain financial products, including instruments designed to reduce interest rate risk and exploit interest rate opportunities. These products included various types of ceiling and floor programs and interest rate swaps. Drexel's activities in this area were primarily conducted by Drexel Burnham Lambert Products Corp., a debtor-in-possession and a wholly-owned subsidiary of DBL Group ("Products").

Drexel underwrote offerings by United States based equity issuers in the European securities markets through Drexel Burnham Lambert International Incorporated, a debtor-in-possession and a wholly-owned subsidiary of DBL Inc.

3. Retail Customers

Through its retail operations, Drexel provided individual investors with broker/dealer, money management and other advisory services. On average, a de minimis percentage of the debt securities offered by Drexel in connection with any public offering was sold directly to its retail customers. Drexel also provided management and advisory services to several mutual funds and unit investment trusts. In April 1989, Drexel announced that it was disposing of, and subsequently did dispose of, its retail securities operation. See "Business Developments -- Events in 1989".

4. Commodities

Drexel participated in the domestic and international metals, foreign exchange, oil, futures and options markets. Drexel provided brokerage and trading facilities in the metal markets to producers, fabricators and dealers. These activities were conducted through DBL Trading and, to a lesser extent, DBL Inc., Drexel Burnham Lambert Limited ("DBL Limited"), Drexel Burnham Lambert Trade Finance Corporation ("DBL Trade Finance") and Drexel Burnham Lambert International N.V. (Curacao).

DBL Trading also engaged in currency and precious metals forward and leasing transactions. Essentially, foreign currencies or precious metals were deposited with DBL Trading under contracts providing for the currencies or precious metals to be returned at a set time with interest; DBL Trading was entitled, under these contracts, to utilize the deposited currencies or precious metals as it determined in its sole discretion until the date they were to be returned. DBL Trading's performance of these contracts typically was unconditionally guaranteed by DBL Group.

was approved as a member of the NYSE on May 29, 1990, when it purchased DBL Inc.'s seat on the NYSE, and obtained a temporary exemption from the requirement under the Exchange Act that a broker-dealer be a member of the NASD. On July 22, 1991, Acorn became an NASD member.

The process by which the remaining customer accounts were transferred to Acorn involved a number of steps. In coordination with SIPC and the NYSE, DBL Inc. proceeded to segregate from its other assets funds and securities that it held or was to receive from third parties for the account of its customers (the "Segregated Property"). All Customer Claims were to be satisfied out of the Segregated Property and, as a result, Customers would not be subject to filing proofs of claim before the bar date in connection with claims against DBL Inc.'s estate. DBL Inc. proposed to distribute the Segregated Property to its customers upon its realization, much as a SIPC trustee would do. DBL Inc. pursuant to an order of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, was authorized to utilize the Segregated Property on an ongoing basis to satisfy valid customer claims (the "Customer Claims Order"). Pursuant to the Customer Claims Order, customers were not required to file proofs of claim in connection with the chapter 11 case of DBL Inc. Rather, notice was provided under the Customer Claims Order to customers who filed claims with DBL Inc. with respect to the Segregated Property. Under the Customer Claims Order, DBL Inc. has periodically made distributions to customers of Segregated Property in satisfaction of any valid claim made pursuant to this procedure.

As a result of these actions on May 29, 1990, all but one of DBL Inc.'s customer accounts were transferred to Acorn and Acorn became a subsidiary of DBL Inc. with 5% of its stock continuing to be owned by DBL Group and 5% of its stock being purchased by GSI. DBL Inc. was prevented from transferring its account with Amcor Funding Corporation ("Amcor") to Acorn due to the terms of an order entered in Amcor's chapter 11 case. Immediately after such transfers occurred, on May 29, 1990, DBL Inc. commenced its chapter 11 case.

2. Other Subsidiaries Commencing Chapter 11 Cases on May 29, 1990 and GSI

On May 29, 1990, chapter 11 cases were commenced for various other Debtors: Drexel Burnham Lambert (Asia) Ltd., Drexel Burnham Lambert Caribe International Incorporated, First DBL Corporation, DBL Commercial Paper, Products, International, Investors, Holdings, MBI, Drexel Investment Holdings Inc., Deauville United Corporation, Drexel Burnham Lambert CP Inc., Double Oil and Gas Incorporated, Drexel Burnham Lambert Capital Group Inc. and BRR Incorporated (with DBL Inc., the "May 29th Debtors"). On June 20, 1990, GSI commenced its chapter 11 case.

These filings resulted from a number of events, including DBL Group's liquidity crisis, a loss of public and client confidence, the acceleration of the maturity of various debt obligations, the assertion of liabilities related to DBL Group's chapter 11 filing, and an increasing number of law suits and arbitrations in which one or more of the May 29th Debtors or GSI was named, or threatened to be named, as a defendant.

3. DBL Trading's Chapter 11 Case

On May 9, 1990, an involuntary petition under chapter 7 of the Bankruptcy Code was filed against DBL Trading by four creditors: National Bank of Yugoslavia, Nissho Iwai Corporation, Banco de Portugal, and Ultramar Energy Limited. Prior to that date, DBL Trading had been engaged in a wind down of its operations. See "Events in 1990 -- Wind-down -- Currencies and Commodities". After consultations with certain of its creditors, DBL Trading concluded that it would be in the best