**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------ x

In re:                                                  : Chapter 11
                                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  : Case No. 08-13555 (JMP)
                                                        :
                    Debtors.                            : (Jointly Administered)

------------------------------------ x

LEHMAN BROTHERS SPECIAL FINANCING     :
INC. and LEHMAN BROTHERS HOLDINGS INC.  :
                                                        :
                    Plaintiffs,                         :
                                                        : Adversary Proceeding
 -against-                                              :
                                                        : No.: 09-01261 (JMP)
AMERICAN FAMILY LIFE ASSURANCE         :
COMPANY OF COLUMBUS and                 :
BNY CORPORATE TRUSTEE SERVICES         :
LIMITED                                                 :
                                                        :
                    Defendants.                         :

------------------------------------ x

AMERICAN FAMILY LIFE ASSURANCE         :
COMPANY OF COLUMBUS                     :
                                                        :
                    Counterclaim Plaintiff,            :
                                                        :
 -against-                                              :
                                                        :
LEHMAN BROTHERS SPECIAL FINANCING     :
INC. and LEHMAN BROTHERS HOLDINGS INC.  :
                                                        :
                    Counterclaim Defendants.           :

------------------------------------ x

## REPLY BRIEF OF AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE, MEAGHER              SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP                                 & FLOM LLP
Four Times Square                          One Rodney Square
New York, New York 10036                   Wilmington, Delaware 19899
(212) 735-3000                             (302) 651-3000
Sally McDonald Henry                       Anthony W. Clark
                                           Robert A. Weber

*Counsel for Defendant and Counterclaim Plaintiff American Family Life Assurance Company of Columbus*

# TABLE OF CONTENTS

A.     Aflac Is Entitled To Summary Judgment On Count I Of Its Counterclaims Regarding The Validity And Effectiveness Of the Termination Notice ................ 3

B.     Summary Judgment For Aflac Is Proper On Count II Of Aflac's Counterclaims .................................................................................................... 4

      1.     The Relevant Contract Provisions. ........................................................... 5

              (A)     The Zero Termination Provisions .......................... 5

              (B)     The Noteholder Priority ......................................... 5

              (C)     The Unwind Costs ................................................. 6

      2.     LBSF Cannot Use The Bankruptcy Code To Reverse The Prepetition Effectiveness Of The Termination Payment and Unwind Costs Provisions And The Noteholder Priority. .......................... 6

      3.     The Termination Payment and Unwind Costs Provisions And The Noteholder Priority Became Effective Prepetition And Therefore Remain Effective Postpetition ................................................................. 10

      4.     The Noteholder Priority Must Be Upheld In Accordance With Section 510(a). ...................................................................................... 13

      5.     The Safe Harbors Protect Beryl's Termination And Liquidation Of The Swap Transactions And Enforcement Of The Contracts. ................. 16

              (A)     Section 560 ...................................................... 17

              (B)     Sections 362(b)(17) and 362(o) .......................... 24

              (C)     Legislative History Of The Safe Harbors ............. 26

              (D)     Plaintiffs Distort And Mischaracterize The Contract Provisions. ............................................ 30

              (E)     Section 560 Contemplates Payment And Application Of Collateral As Part Of The Liquidation Of A Swap Transaction. ................... 36

C.     Aflac Is Entitled To Summary Judgment On Count III Of Its Counterclaims .................................................................................................... 40

1.    Plaintiffs Are Liable To Beryl For Fixed Amounts And LBSF Credit Support .........................................................................40

2.    Lehman's Arguments in Opposition to Count III Lack Merit...................42

        (A)    The parties opted out of the mark-to-market procedure set forth in section 6(e)(i)(3) of the ISDA Master Agreement......................................42

        (B)    Aflac Does Not Rely Upon The Allegedly-Mistaken English Credit Support Annex. .............43

D.    Count IV Of Aflac's Counterclaims ....................................................45

# TABLE OF AUTHORITIES

## CASES

*In re Advent Corp.*, 24 B.R. 612 (B.A.P. 1st Cir. 1982) ..................................................7

*Air Line Pilots Association v. Shugrue* (*In re Ionosphere Clubs, Inc.*), 22 F.3d 403
    (2d Cir. 1994) ........................................................................................................16

*Allen Oil Co. v. Commissioner of Internal Revenue*, 614 F.2d 336 (2d Cir. 1980) ..........26

*America Freight System, Inc. v. Interstate Commerce Commission*, 179 B.R. 952
    (Bankr. D. Kan. 1995) .............................................................................................8

*In re Amcor Funding Corp.*, 117 B.R. 549 (Bankr. D. Ariz. 1990) .................................13

*In re Anchor Resolution Corp.*, 221 B.R. 330 (Bankr. D. Del. 1998) ..............................8

*Arthur Anderson LLP v. United States*, 544 U.S. 696 (2005) ..........................................36

*In re Best Products Co.*, 168 B.R. 35 (S.D.N.Y. 1994) ............................................14, 15

*In re Bill Heard Enterprises, Inc.*, 400 B.R. 813 (Bankr. N.D. Ala. 2009) .....................46

*Butner v. United States*, 440 U.S. 48 (1979) ................................................................7, 8

*Calpine Energy Servs., L.P. v. Reliant Energy Electric Solutions, L.L.C.* (*In re
    Calpine Corp.*), Adv. No. 08-1251(BRL), 2009 WL. 1578282 (Bankr.
    S.D.N.Y. May 7, 2009) ...........................................................................................20

*In re Carmania Corp.*, 154 B.R. 160 (S.D.N.Y 1993) ....................................................8

*In re Cent. Med. Ctr., Inc.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) ..................................7

*In re Child World*, 161 B.R. 349 (Bankr. S.D.N.Y. 1993) ..............................................21

*In re Commercial Fin. Servs., Inc.*, 268 B.R. 579 (Bankr. N.D. Okla. 2001) .................16

*Comp III, Inc. v. Computerland Corp.* (*In re Comp III, Inc.*), 136 B.R. 636
    (Bankr. S.D.N.Y. 1992) ..........................................................................................12

*Connecticut v. United States Department of the Interior*, 228 F.3d 82 (2d Cir.
    2000) ................................................................................................................26, 38

*In re Credit Indus. Corp.*, 366 F.2d 402 (2d Cir. 1966) .................................................15

*In re Delta Air Lines*, 341 B.R. 439 (Bankr. S.D.N.Y. 2006)..........................................14

*Disabled in Action v. Hammons*, 202 F.3d 110 (2d Cir. 2000)......................................27

*In re Drexel Burnham Lambert Products Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992) ...........................................................23

*In re Enron Corp.*, 306 B.R. 465 (Bankr. S.D.N.Y. 2004).......................................13, 21

*In re Enron Corp.*, 349 B.R. 96 (Bankr. S.D.N.Y. 2006)................................................20

*Enstar Group, Inc. v. Bank of New York* (*In re Amret, Inc.*), 174 B.R. 315 (M.D. Ala. 1994).....................................................................................................................14

*Eternity Global Master*, 375 F.3d 168 (2d Cir. 2004)....................................................19

*Everett v. Judson*, 228 U.S. 474 (1913)...........................................................................7

*In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988) ...............................................................7

*FDIC v. Four Star Holding Co.*, 178 F.3d 97 (2d Cir. 1999) ...........................................3

*Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, _ U.S. _, 128 S. Ct. 2326 (2008) ................................................................................................................7

*In re Fort Worth Osteopathic Hospital, Inc.*, 387 B.R. 706 (Bankr. N.D. Tex. 2008) ....................................................................................................................8

*Four Points Shipping & Trading, Inc. v. Poloron Israel, L.P.*, 846 F. Supp. 1184 (S.D.N.Y. 1994).......................................................................................................36

*Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426 (1991) ...............................3

*GMGRSST, Ltd. v. Menotte* (*In re Air Safety International, L.C.*), 336 B.R. 843 (S.D. Fla. 2005) .....................................................................................................14

*Garcia v. Shanahan*, 615 F. Supp. 2d 175 (S.D.N.Y. 2009) ...........................................38

*In re Holly's Inc.*, 140 B.R. 643 (Bankr. W.D. Mich. 1992)............................................14

*Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997) .......................................................................................................................7

*LJP, Inc. v. Royal Crown Cola Co.* (*In re LJP, Inc.*), 22 B.R. 556 (Bankr. S.D. Fla. 1982) ................................................................................................................12

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) ....................................................39

*Lengyel v. Sheboygan County*, 882 F. Supp. 137 (E.D. Wis. 1995)........................3

*In re Margulis*, 323 B.R. 130 (Bankr. S.D.N.Y. 2005) ....................................21

*In re Maxwell Communications Corp. Plc (No. 2)* [1993] 1 W.L.R. 1402, 1405, 1420 ..........................................................................................................15

*Mazzeo v. United States* (*In re Mazzeo*), 131 F.3d 295 (2d Cir. 1997) ...........26

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984) ..................................7

*In re Moore*, 99 B.R. 27 (Bankr. E.D. Cal. 1989) ...........................................8

*Musso v. N.Y.S. Higher Education Services Corp.* (*In re Royal Bus. Sch., Inc.*), 157 B.R. 932 (Bankr. E.D.N.Y. 1993)..........................................................7

*In re National Gas Distrib., Distribs.*, 556 F.3d 247 (4th Cir. 2009)..............36

*Nemko, Inc. v. Motorola, Inc.* (*In re Nemko, Inc.*), 163 B.R. 927 (Bankr. E.D.N.Y. 1994) ............................................................................................12

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989)........................3

*New York State Electric and Gas Corp. v. McMahon* (*In re McMahon*), 129 F.3d 93 (2d Cir. 1997) ......................................................................................46

*New York Stock Exch. v. Pickard & Co., Inc.*, 296 A.2d 143 (Del. Ch. 1972)................14

*In re Norsal Indus., Inc.*, 147 B.R. 85 (Bankr. E.D.N.Y. 1992) ......................46

*Official Committee of Unsecured Creditors v. American Tower Corp. (In re Verestar)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006)............................................30

*Perpetual Tr. Co., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009] W.L.R. (D) 262 (Ch. 2009) ....................................................................................10

*Perrin v. United States*, 444 U.S. 37 (1979) ....................................................4

*Pioneer Commercial Funding Corp. v. United Airlines, Inc.* (*In re Pioneer Commercial Funding Corp.*), 122 B.R. 871 (S.D.N.Y. 1991) ...........................12

*In re Racing Servs., Inc.*, 340 B.R. 73 (8th Cir. BAP N.D. 2006) ...................16

v

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976) ................................................ 16

*Rake v. Wade*, 508 U.S. 464 (1993) ............................................................................... 16

*Reiter v. Cooper*, 507 U.S. 258 (1993) .......................................................................... 45

*Rice v. Shoney's (In re Dean)*, 174 B.R. 787 (Bankr. E.D. Ark. 1994) ........................... 23

*Robinson v. Howard Bank* (*In re Kors, Inc.*), 819 F.2d 19 (2d Cir. 1987) ...................... 15

*In re SSSL Realisations (2002) Ltd.* [2006] Ch. 610 ...................................................... 15

*In re Schokbeton Industrial, Inc.*, 466 F.2d 171 (5th Cir. 1972) ....................................... 7

*Sec. Mortgage Co. v. Powers*, 278 U.S. 149 (1928) ......................................................... 9

*In re Seven Stars Restaurant, Inc.*, 122 B.R. 213 (Bankr. S.D.N.Y. 1990) ..................... 12

*State Bank of Hardinsburg v. Brown*, 317 U.S. 135 (1942) .............................................. 9

*In re TTS, Inc.*, 158 B.R. 583 (D. Del. 1993) .................................................................... 7

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549
     U.S. 443 (2007) ......................................................................................................... 8

*U.S. v. Ceja-Prado*, 333 F.3d 1046 (9th Cir. 2003) ......................................................... 3

*Universal Church v. Geltzer*, 463 F.3d 218 (2d Cir. 2006) ............................................. 27

*In re Village Rathskeller, Inc.*, 147 B.R. 665 (Bankr. S.D.N.Y. 1992) ........................... 15

*White v. Stump*, 266 U.S. 310 (1924) ............................................................................... 7

*In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427 (Bankr. N.Y. 1982) ................... 46

## STATUTES, LEGISLATIVE HISTORY AND RULES

11 U.S.C. § 101(53B) ........................................................................................... 18, 30, 31

11 U.S.C. § 101(53C) .................................................................................................... 18

11 U.S.C. § 103 .............................................................................................................. 15

11 U.S.C. § 107(a) ......................................................................................................... 15

11 U.S.C.§ 330(a)(1) ..................................................................................................... 15

11 U.S.C. § 342(b) ........................................................................15

11 U.S.C. § 363 ............................................................................15

11 U.S.C. § 365(b)(2)(B) ...............................................................15

11 U.S.C. § 366(a) .......................................................................15

11 U.S.C. § 503(b)(9) ...................................................................13

11 U.S.C. § 362(b)(17) .............................................................*passim*

11 U.S.C. § 362(o) ..............................................................17, 24, 38

11 U.S.C. §365(e)(1) ...............................................................*passim*

11 U.S.C. § 541 .......................................................................*passim*

11 U.S.C. § 560 .......................................................................*passim*

136 Cong. Rec. S7535 (June 6, 1990) ...........................................28

152 Cong. Rec. H7600 (2006) .......................................................29

2005 U.S.C.C.A.N. 88 ..................................................................29

1990 U.S.C.C.A.N. 223, 226-27 ....................................................28

H.R. Rep. No. 101-484 (1990) ......................................................28

H.R. Rep. No. 109-31 (2005) ........................................................29

H.R. Rep. No. 109-648 (2006) ......................................................29

Pub. L. No. 109-390 (2006) ..........................................................28

Pub. Law. 109-8 (2005) ..........................................................29, 38

S. Hrg. 191-396 (1989)...........................................................27, 28

# TREATISES, ARTICLES AND OTHER PUBLICATIONS

Arnaud De Servigny & Norbert Jobst, *The Handbook of Structured Finance*, 418-19 (2007) ..................................................................................................19

Fitch Ratings, *Lehman Legal Challenge May Have Varying Impact on Global Structured Finance* (August 14, 2009) ...................................................31

Bryan A. Garner, *Black's Law Dictionary* 68 (17th ed. 1999).........................................14

International Swaps and Derivative Association, Inc., Memorandum of Law, *Enforceability of the Termination, Close-Out and Multibranch Netting Provisions of the 1987, 1992 and 2002 ISDA Master Agreements* (Dec. 5, 2007)...............2

International Swaps and Derivative Association, Inc., Memorandum of Law, *Validity and Enforceability of Collateral Arrangements under the ISDA Credit Support Documents* (May 15, 2008)...........................................................5

5 Allan N. Resnick & Henry J. Sommer, *Collier On Bankruptcy* ¶ 510.03 (15th ed. rev. 2009)..........................................................................................14

5 Allan N. Resnick & Henry J. Sommer, *Collier On Bankruptcy* ¶ 541.02 (15th ed. rev. 2009)........................................................................................6, 9

5 Allan N. Resnick & Henry J. Sommer, *Collier On Bankruptcy* ¶ 550 (15th ed. rev. 2009) ...................................................................................19, 37

Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankruptcy Debtors and Bankruptcy Judges*, 13 Am. Bankr. L. Rev. 641 (2005) .............................................38

Simon Firth, *Derivatives Law & Practice* (Sweet & Maxwell, 2008) ............................44

Bruce H. White and Bryan L. Elwood*, Are You Sailing in Safe Harbors? An Overview of Various Bankruptcy Code Safe-Harbor Protections*, 26-10 ABIJ 44, 88..............................................................................................28

American Family Life Assurance Company of Columbus ("Aflac"), by and through its undersigned counsel, submits this reply brief in support of Aflac's motion for summary judgment, and in opposition to the motion for summary judgment ("Pl. Motion") filed by debtors Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI" and, together with LBSF, "Plaintiffs" or "Lehman").

## PRELIMINARY STATEMENT[1]

In Aflac's opening brief in support of its motion for summary judgment (D.I. 33) and in its brief opposing Lehman's cross-motion for summary judgment (D.I. 44), Aflac established that:

- Aflac's termination of the swap transactions[2] was proper;

- the bankruptcy filing by LBHI on September 15, 2008, two and a half weeks before LBSF's chapter 11 case was filed on October 3, 2008, was an event of default that *permissibly* triggered contract provisions under which then non-debtor LBSF became entitled to receive a Termination Payment and Unwind Costs (each defined below) of zero and subordinated payment priority, and became obligated to make an Unwind Costs payment to Beryl; and

- the Bankruptcy Code's safe harbors applicable to swap agreements, security agreements, and security arrangements apply here, as Congress intended, to permit Beryl's application of the Collateral – which consists of securities that Beryl bought with Aflac's investment of $240 million[3] – and other moneys held by Beryl in accordance with the written agreements of the parties.

---

[1] Aflac relies upon, and incorporates by reference, the factual summaries set forth at length in its prior briefs and in its Statement of Material Undisputed Facts. Capitalized terms not otherwise defined herein retain the definitions ascribed to them in Aflac's prior submissions.

[2] Count I of Aflac's counterclaim seeks a declaration that the termination was proper. Lehman now concedes the point and argues that this moots Count I and precludes a ruling thereon. As explained below, notwithstanding Lehman's mootness argument, Aflac is entitled to summary judgment on Count I.

[3] One ambiguous footnote in Plaintiffs' opposing brief (*see* Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc.'s Memorandum of Law in Opposition to American Family Life Assurance Company of Columbus's Motion for Summary Judgment, October 23, 2009 (D.I. 48) (cited as "Pl. SJ Opp. at __"), at 4, n. 6) may be read to suggest, incorrectly, that Lehman, not Aflac, funded Beryl's acquisition of the Collateral. There can be no genuine dispute that Aflac's investment of over $240 million in the Aflac Notes (paid in Japanese yen) was used by Beryl to purchase the securities that comprise the Collateral. Annex 1 to each Series Prospectus explicitly states that "[t]he net proceeds of the issue of the Notes . . . will be applied by the Issuer on the Issue Date to fund the purchase of the Collateral . . . ." (*See* Weber Decl., Ex. 7 at 23; Ex. 10 at 23; Ex. 13 at 23;

In opposition, Plaintiffs primarily rely upon a single semantic argument which they continue to recite endlessly: if the parties' contract rights are upheld as written, LBSF's rights will be improperly "***modified***" after, and solely as a result of, the filing of LBSF's bankruptcy petition. But no matter how many times Plaintiffs repeat the argument, it is easily disposed of by a simple, undisputed fact: weeks before LBSF's own filing, LBHI filed for bankruptcy. LBHI's filing constituted a separate and independent event of default that ***permissibly*** triggered the contract provisions that established LBSF's right to receive a zero Termination Payment, subordinated payment priority in accordance with the Noteholder Priority, and treatment of the LBSF Credit Support and Unwind Costs as determined under Series Condition 44. Because LBSF was not yet a debtor, none of the Code provisions upon which it now relies applied then, nor do they apply retroactively.

Nonetheless, in order to maximize Lehman's improper windfall, Plaintiffs urge the Court to selectively excise the critical contract provisions and replace them with others that, under the express language of the contracts, do not apply to an event of default caused by LBSF or LBHI – such as a mark-to-market valuation resulting in a Termination Payment to LBSF which would have applied only if an Event of Default had occurred with respect to Beryl or if certain termination events had occurred with respect to LBSF or Beryl, none of which ever happened.

Accordingly, for the reasons set forth below and in Aflac's prior briefs, the Court should grant summary judgment in favor of Aflac and against Plaintiffs.

---

Ex. 16 at 23; *see also* Complaint ¶ 20: "Aflac [is] the 100% owner of the Notes"). Aflac, as the party who invested over $240 million in reliance on the offering documents drafted and promoted by Lehman and its affiliates, and which Lehman now seeks to opportunistically rewrite to snare an improper windfall, is undeniably in a more equitable position than Lehman.

# ARGUMENT

## A. Aflac Is Entitled To Summary Judgment On Count I Of Its Counterclaim Regarding The Validity And Effectiveness Of The Swap Terminations.

Count I of Aflac's counterclaim seeks a declaration that the October 10, 2008 termination notice sent by Beryl to Lehman (the "Termination Notice") was valid and effective.[4] Although Plaintiffs initially disputed the validity and effectiveness of the swap terminations in this proceeding, they have now abandoned that position and concede that the swap terminations were valid and effective.[5] Plaintiffs contend that their change of position renders Count I "moot," so the Court should deny summary judgment on that claim for lack of subject matter jurisdiction and await Plaintiffs' yet-to-be-filed motion to dismiss. (Pl. SJ Op. at 9-10, n.7) Lehman's argument conveniently ignores the record and is without merit.

Federal jurisdiction is determined at the time suit is brought. *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991); *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989); *FDIC v. Four Star Holding Co.*, 178 F.3d 97, 100 (2d Cir. 1999) Thus, "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events[,]" *Freeport-McMoRan, Inc.*, 498 U.S. at 428, and a party cannot strategically manipulate the court's jurisdiction. *Lengyel v. Sheboygan County,* 882 F.Supp. 137, 138 (E.D. Wis. 1995). *See also U.S. v. Ceja-Prado*, 333 F.3d 1046, 1051, n.5 (9th Cir. 2003) (*citing Itel Containers Int'l Corp. v. P.R. Marine Mgmt., Inc.,* 108 F.R.D. 96 (D.N.J. 1985)) (sanctions may be awarded against party who attempts to manipulate jurisdiction).

The very first pleading in this action, Plaintiff's Complaint, shows that a ripe case or controversy existed as to whether the swap terminations were valid and effective. Thus,

---

[4]   *See* July 7, 2009 First Amended Answer and Counterclaims (Corrected) at 21-23 (D.I. 16) (cited as "Aflac's Counterclaim at ___").

[5]   *See* Pl. Motion at 3, n.2 ("LBSF does not dispute the validity of Beryl's termination"); *see also* Pl. SJ Opp. at 9.

Plaintiffs alleged: "On October 10, 2008, Beryl, as issuer of the Notes, **sent putative notices** to LBSF stating that LBSF's filing of its bankruptcy petition constituted an Event of Default under the ISDA Master Agreement." (Complaint ¶ 10) (D.I. 1) (emphasis added) Thereafter, when Aflac counterclaimed for a declaratory judgment as to the validity and effectiveness of the swap terminations, Plaintiffs specifically **denied** that Aflac "is entitled to a declaratory judgment that the termination of the swap transactions in accordance with the Credit Default Swap Agreements was valid, effective and not stayed by the Bankruptcy Code or otherwise"[6] and did not assert any affirmative defenses alleging that Count I was moot or that the Court lacked subject matter jurisdiction over the claim. And in the five months this proceeding has been pending, Plaintiffs have never moved to dismiss Count I.

Thus, there is no doubt that a justiciable case or controversy existed as to the validity and effectiveness of the swap terminations until Plaintiffs finally conceded the point in the summary judgment briefing. Accordingly, Aflac is entitled to summary judgment on Count I of its counterclaim.

**B.    Summary Judgment For Aflac Is Proper On Count II Of Its Counterclaim.**

The heart of this case concerns the scope of the Bankruptcy Code's safe harbor provisions applicable to swap agreements, security agreements and security arrangements, and the application of those provisions to LBSF's contract rights as of October 3, 2008, when it filed for bankruptcy. These issues are squarely presented by Count II of Aflac's counterclaim and Plaintiffs' Complaint, and the law permits only one conclusion: when LBSF filed its own petition two and a half weeks after LBHI filed, LBSF's contract rights already had been limited to

---

[6]    *See* Aflac's Counterclaim, and Plaintiffs' Reply To First Amended Counterclaims (Corrected) Of Plaintiff American Family Life Assurance Company of Columbus, July 13, 2009 (D.I. 20) (cited as "Plaintiff's Reply at ___"), at ¶ 40.

the right to receive a zero Termination Payment, a subordinated payment priority in accordance with the Noteholder Priority, and treatment of the LBSF Credit Support and Unwind Costs as determined by Series Condition 44.

## 1. The relevant contract provisions

For the Court's convenience, the relevant contract language is repeated below.

### (A) The Zero Termination provision

As is customary in swap transactions, each Credit Default Swap Agreement provided that if either Beryl or LBSF defaulted under that agreement, the non-defaulting party could terminate the transaction. If a swap transaction was terminated early by LBSF due to a default by Beryl, then LBSF or Beryl, as applicable, would have owed a payment (the "Termination Payment") equal to the cost or gain to the non-defaulting party if it were to enter into an equivalent swap transaction on the date of termination. This type of valuation is called a "mark-to-market" determination. However, if LBSF is the defaulting party, the Conditions[7] provide that neither party owes a Termination Payment: "such termination payment ***shall be deemed to be zero*** in the event that the [Credit Default Swap Agreement] is terminated due to the occurrence of an Event of Default . . . where [LBSF] is the Defaulting Party" (the "Termination Payment Provision"). (Emphasis added)

### (B) The Noteholder Priority

The Noteholder Priority applies as follows: [8]

---

[7] *See* Series Condition 40, clause (iii), Weber Decl., Ex. 7 at 16; Ex. 10 at 16; Ex. 13 at 15-16; Ex. 16 at 16.

[8] The Noteholder Priority is set forth in section 6.2(iii) of each Principal Trust Deed, and is elected as applicable to each series of Aflac Notes in section 5.5 of each Supplemental Trust Deed (except for the Supplemental Trust Deed pertaining to the Series 2007-14 Tranche A JP47,500,000 Synthetic Portfolio Notes, where the pertinent provision is section 5.6). (*See* Weber Decl., Ex. 1 at 5; Ex. 2 at 5; Ex. 3 at 5; Ex. 4 at 6) The Noteholder Priority election also is made in the same terms in Series Condition 40. *See* Series Condition 40, clause (ii), Weber Decl., Ex. 7 at 15; Ex. 10 at 14; Ex. 13 at 14; Ex. 16 at 15.

**Application of Moneys Received**: the Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement) or (ii) a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and [LBSF] is the sole Affected Party (as defined in the ISDA Master Agreement), in which case Noteholder Priority shall apply.

### (C)     The Unwind Costs

The Unwind Costs provisions are set forth in Series Condition 44, which states in pertinent part:[9]

The Unwind Costs shall be deemed to be an amount payable by [LBSF] to the Issuer equal to the absolute value of the Aggregate Outstanding Principal Amount minus an amount in JPY equivalent to the proceeds from the sale or realisation of the Collateral (only if such calculation is positive) if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement); provided that such Unwind Costs shall be paid from the Credit Support Balance under the Credit Support Annex and to the extent that the Credit Support Balance is available to cover such Unwind Costs.

**2.      LBSF cannot use the Bankruptcy Code to reverse the prepetition effectiveness of the Termination Payment and Unwind Costs provisions and the Noteholder Priority.**

Property of the estate, including both property interests and contract rights, is determined as of the petition date.  11 U.S.C. § 541(a)(1) (estate property consists of debtor's interests "as of the commencement of the case").  *See also* 5 Allan N. Resnick & Henry J. Sommer, *Collier On Bankruptcy* ("Collier") ¶ 541.02 (15th ed. rev. 2009) ("The most significant limitation in determining the scope of property of the estate is one of timing . . ..  [T]he bankruptcy estate consists of all of the debtor's legal and equitable property interests that existed as of the commencement of the case, that is, as of the time that the bankruptcy petition is filed").  Accord-

---

[9]     Weber Decl., Ex. 7 at 21-22; Ex. 10 at 21; Ex. 13 at 21; Ex. 16 at 21.

ingly, under section 541, LBSF's alleged contractual rights to payment and to the Collateral must be determined as of October 3, 2008, when its bankruptcy petition was filed.[10]

Because LBSF's interests are confined to those that existed on its petition date, its bankruptcy filing cannot expand those interests. *See, e.g., Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir. 1997); *In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984). A debtor has no greater contractual rights in bankruptcy than it would have outside of bankruptcy. *See, e.g., In re Schokbeton Indus., Inc.*, 466 F.2d 171, 175 (5th Cir. 1972); *In re Advent Corp.*, 24 B.R. 612, 614 (B.A.P. 1st Cir. 1982); *In re TTS, Inc.*, 158 B.R. 583, 587 (D. Del. 1993) ( section 541 "can provide the debtor's estate no greater interest in property after filing for bankruptcy than the debtor had prior to filing"); *Musso v. N.Y.S. Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 941 (Bankr. E.D.N.Y. 1993) ("§ 541(a) was not designed to enlarge the debtor's rights against others beyond those existing at the commencement of the case"). Section 541 is not a tool by which a debtor may acquire broader rights or interests than it held outside of bankruptcy. *In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 573 (Bankr. E.D. Mo. 1990) (denying confirmation of proposed plan that would subordinate bondholders' interest in funds held by indenture trustee).

Moreover, section 541(c)(1) does not invalidate restrictions on a debtor's interest in property that apply *after* the property interest has passed to the bankruptcy estate; to the con-

---

[10]  Section 541 incorporates a broad array of prepetition interests in the estate, but relies upon applicable non-bankruptcy law to define those interests. 5 *Collier on Bankruptcy* ¶ 541.05 (Lawrence P. King, ed., 15th ed. Rev. 2004). The estate thus consists only of the debtor's rights and interests held on the petition date. *Id.; see also Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, _ U.S. _, 128 S. Ct. 2326, 2339 (2008) (applicable non-bankruptcy law determines debtor's property rights in assets); *Butner v. United States*, 440 U.S. 48, 53-55 (1979) (applying state law to determine debtor's interest in postpetition, pre-foreclosure rents). It has long been held that the petition date operates as a bright line "cleavage" date on which the debtor's interests in property pass into the estate. *See, e.g., White v. Stump*, 266 U.S. 310, 313 (1924) (petition date is "point of time" which separates the "old situation from the new in the bankrupt's affairs"); *Everett v. Judson*, 228 U.S. 474, 479 (1913) ("We think that the purpose of the law was to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition [is] filed").

trary, it merely facilitates the transfer of such interest in property to the estate. *In re Moore*, 99 B.R. 27, 29 (Bankr. E.D. Cal. 1989) (section 541(c)(1)(A) does not void valid contractual provisions which would restrict debtor's interest; rather, statute voids only restrictions which prevent transfer of debtor's property to estate). Once a property interest has passed to the estate, it remains subject to limitations imposed by other sections of the Bankruptcy Code, applicable non-bankruptcy law, and the terms of the governing agreements. *Am. Freight Sys., Inc. v. Interstate Commerce Comm'n*, 179 B.R. 952, 959 (Bankr. D. Kan. 1995). *See also In re Fort Worth Osteopathic Hosp., Inc.*, 387 B.R. 706, 714 (Bankr. N.D. Tex. 2008) (section 541(c)(1) did not cause estate to have interest in insurance policy proceeds); *In re Anchor Resolution Corp.*, 221 B.R. 330, 338 (Bankr. D. Del. 1998) (estate lacked property interest in right to pay claim at discounted amount, and could only exercise such right by satisfying all attendant terms and conditions).

Consistent with these rules, the *Butner* Court stated that a "bankruptcy court should take whatever steps are necessary" to ensure that a creditor receives "the same protection he would have under state law if no bankruptcy had ensued." 440 U.S. at 56. Among other things, this means that the intervention of bankruptcy should not deprive a creditor of a priority arising under state law. *Id.; see also Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007); *In re Carmania Corp.*, 154 B.R. 160, 165 (S.D.N.Y 1993) ("*Butner* stands for the proposition that [a creditor's] rights in this respect should not diminish or vanish due to the happenstance of bankruptcy").

Accordingly, the interests of LBSF's estate are those that existed under the Transaction Documents on LBSF's petition date. In that regard, LBSF was never the owner of the Collateral under any of the Security Arrangements. Moreover, before October 3, 2008, LBSF's

interest as a beneficiary of a security interest in the Collateral held by the Trustee to secure Beryl's obligations owing under the Credit Default Swap Agreement had been limited as provided by the Termination Payment Provision, the Noteholder Priority and Series Condition 44, from the inception of the transactions and, in any event, no later than LBHI's September 15, 2008 bankruptcy filing. Upon the subsequent termination of each of the swap transactions, in each case prior to the attachment point having been reached, there was no basis on which Beryl could have owed LBSF any remaining obligations to be secured. LBSF's estate thus has no rights whatsoever in the Collateral.

LBSF cannot through bankruptcy expand those rights to claim a positive Termination Payment or Unwind Costs payment and the Swap Counterparty Priority right that never arose and were lost prior to October 3, 2008, or to limit the application of the LBSF Credit Support to pay Unwind Costs to Beryl.[11] 5 *Collier on Bankruptcy* ¶ 541.04, at 541-11 (Lawrence P. King ed. 15th ed. rev. 2004) ("To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate"). Accordingly, Plaintiffs' contention that Aflac "does not question LBSF's ongoing property interest in the collateral securing the notes" (*see* Pl. Opp. Br. at 2) is plainly incorrect. That is precisely what Aflac *does* contend – that LBSF has no interest in the Collateral because the governing contract documents provide that, as of LBSF's own petition date, its rights were to receive a zero Termination Payment, subordinated payment priority in accordance with the Noteholder Priority, and Unwind Costs in accordance with Series Condition 44, which results in no payments due to LBSF.

---

[11]    Interests lawfully extinguished prepetition cannot be resurrected by virtue of bankruptcy. *See State Bank of Hardinsburg v. Brown*, 317 U.S. 135, 138-39 (1942) (interest extinguished prepetition under state law cannot be revived; "if Congress intended that a bankruptcy might reach back into the past and bring under the court's jurisdiction a former interest in property, which, under state law, had irrevocably passed to a third person, it would have so stated in terms too clear to leave any doubt"). *See also Sec. Mortgage Co. v. Powers*, 278 U.S. 149, 157 (1928).

3. **The Termination Payment and Unwind Costs provisions and the Noteholder Priority became effective prepetition and therefore remain effective postpetition.**

Each of the Termination Payment Provision requiring a zero payment, the Unwind Costs provision requiring the payment of Unwind Costs to Beryl, and the Noteholder Priority became effective immediately and automatically when LBHI, LBSF's guarantor, filed for bankruptcy on September 15, 2008. The Transaction Documents are governed by English law, and the English Court so held, and the Court of Appeal recently affirmed, in the *Perpetual* case,[12] involving Plaintiffs, the Trustee and similarly-documented swap transactions, with respect to the Noteholder Priority, which was the only one of the three provisions here in issue that was before the English Courts.[13] Because the zero Termination Payment Provision, the Noteholder Priority and the Unwind Costs provision all took effect upon LBHI's chapter 11 filing weeks before LBSF's petition date, the interests of LBSF's estate were limited accordingly, and those limitations remain effective today, notwithstanding Plaintiffs' effort to ignore the existence and effect of the LBHI filing.[14]

---

[12] *Perpetual Tr. Co., et al. v. BNY Corporate Tr. Servs. Ltd., et al.*, [2009] W.L.R. (D) 262 (Ch. 2009), *aff'd* [2009] EWCA Civ 1160.

[13] The English Court also found: "There is no determination of an unlimited interest in property owned by the insolvent at the commencement of the insolvency process by virtue of his insolvency." *Perpetual* at 21, ¶ 46. As LBSF did not have an unlimited interest subject to forfeit upon condition of its insolvency, the proscriptions on forfeitures in section 541(c)(1), and of enforcement of *ipso facto* provisions in section 365(e)(1), of the Bankruptcy Code do not apply. LBSF never had a right to a Termination Payment or to Unwind Costs, under the Swap Counterparty Priority or otherwise, in the first place – its right to such payments never arose, and its rights do not expand postpetition.

[14] Plaintiffs have argued in another proceeding that section 5.5 of the Supplemental Trust Deed demonstrates that Noteholder Priority does not take effect upon the occurrence of an Event of Default but, rather, only upon the later of "realization or enforcement of the collateral." (*See* LBSF's Memorandum Of Law In Opposition To BNY Corporate Trustee Services Limited's Motion For Summary Judgment, October 23, 2009 (cited "LBSF/BNY Opp. at __") (D.I. 68 in Adv. No. 09-01242), at 13) Plaintiffs' argument confuses the concepts of payment priority and the distinct act of distribution of collateral in accordance with such priority by distorting section 5.5. Section 5.5 states that Noteholder Priority becomes applicable when "an Event of Default (as defined in the Swap Agreement) *occurs* under the Swap Agreement and [LBSF] is the Defaulting Party " (emphasis added), which the English Courts in *Perpetual* found to have occurred on September 15, 2008, when LBHI filed for bankruptcy protection. The discrete act of distributing collateral must logically (and obviously) await

Because LBSF's rights to a zero Termination Payment and Noteholder Priority, and Beryl's rights under the Unwind Costs provision, were fixed well before LBSF's petition date, section 541(c)(1) is not implicated at all in this case. Section 541(c)(1)(B) provides that a debtor's interest in property becomes property of the estate notwithstanding a provision in a contract or under applicable non-bankruptcy law that is conditioned on the debtor's insolvency. The statute does not expand the rights LBSF held immediately prior to its bankruptcy petition under applicable non-bankruptcy law. Because LBSF's estate, as of the filing of the bankruptcy petition, had no right to a Swap Counterparty Priority distribution or a swap Termination Payment, or to expand its own and limit Beryl's rights under the Unwind Costs provision, section 541(c)(1) simply does not apply.

For the same reason, application of the Termination Payment Provision, the Noteholder Priority, and the Unwind Costs provision does not violate the automatic stay of section 362(a)(3) of the Bankruptcy Code, which only precludes acts to obtain possession of or exercise control over estate property. As discussed above, once LBHI filed for bankruptcy protection on September 15, 2008, amounts, if any, payable to LBSF could only have been determined in ac-

---

"the realization or enforcement of the collateral," but is conceptually independent from the order of priority. The flaw in Plaintiffs' argument is obvious on a straightforward reading of section 5.5, and is further demonstrated by the fact that under Lehman's view, *neither* Swap Counterparty Priority nor Noteholder Priority would apply until collateral was actually being distributed. Such a construction of section 5.5 is baseless.

The Unsecured Creditors Committee argues to similar effect with respect to Series Condition 44 (which here concerns calculation of the redemption amount and Unwind Costs, and not the Noteholder Priority). (*See* Statement of Official Committee of Unsecured Creditors in Support of Debtors' Motion for Summary Judgment and in Opposition to BNY Corporate Trustee Services Limited's Motion for Summary Judgment, October 23, 2009 (09 (cited as "Committee Statement at __") (D.I. 72 in Adv. No. 09-01242), *and* Joinder of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., *et. al,* In Debtor's Opposition to American Family Life Assurance Company of Columbus's Motion for Summary Judgment, October 23, 2009 (D.I. 51). The Committee argues that Series Condition 44 operates only upon the termination of the swap transactions and the redemption of the notes. (*See* Committee Statement, ¶¶ 15, 24, 31, 33) However, as with section 5.5 and the Noteholder Priority discussed above, the relevant provisions of Series Condition 44 on which Aflac relies also becomes applicable "if an Event of Default (as defined in the ISDA Master Agreement) *occurs* under the [Credit Default Swap Agreement] and [LBSF] is the Defaulting Party (as defined in the ISDA Master Agreement)." (Emphasis added) As with the Plaintiffs' argument discussed in the immediately preceding paragraph, the Committee's argument confuses when a right (or limitation) becomes applicable, with its actual exercise.

cordance with the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision.  LBSF's bankruptcy did not create rights or claims that did not exist prepetition as a result of LBHI's earlier filing.  *See, e.g.*, *In re Seven Stars Rest., Inc.*, 122 B.R. 213, 218 (Bankr. S.D.N.Y. 1990) (debtor could not resurrect lease terminated prepetition because it never became property of debtor's estate).  It follows that application of the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision do not implicate (let alone violate) section 362(a)(3).  *See Pioneer Commercial Funding Corp. v. United Airlines, Inc. (In re Pioneer Commercial Funding Corp.)*, 122 B.R. 871, 877 (S.D.N.Y. 1991) (prepetition setoff of $3.5 million did not violate automatic stay).

By the same logic, the ban on enforcement of certain *ipso facto* clauses under section 365(e)(1) also does not apply here.  The statute relates only to rights affected "***after*** the commencement of the [bankruptcy] case."  11 U.S.C. § 365(e)(1)(B) (emphasis added).  Here, however, the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision took effect well before LBSF's bankruptcy filing.  When a non-debtor's rights are thus fixed prepetition, "section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract."  *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992) (termination of franchise agreement one day prior to petition did not violate section 365(e)(1); court had no power to reinstate franchise agreement even where termination was solely on account of impending bankruptcy filing); *see also Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927, 938 (Bankr. E.D.N.Y. 1994) (contractor did not violate section 365(e)(1) by terminating purchase orders three days prior to commencement of debtor's bankruptcy); *LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*, 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) ("There is no provision in the Bankruptcy Code

which prohibits termination before bankruptcy of a contract on account of insolvency"). Section 365(e)(1) does not apply here because the Termination Payment Provision, the Noteholder Priority and the Unwind Costs provision became effective two and a half weeks before LBSF filed for bankruptcy protection.[15]

In sum, any ordering of the priorities and any other provisions regarding rights upon termination that occurred before LBSF's chapter 11 filing and pursuant to the terms of the parties' agreements are beyond the scope of, and unaffected by, sections 362(a)(3), 365(e)(1) and 541(c) of the Bankruptcy Code.[16]

### 4. The Noteholder Priority must be upheld in accordance with section 510(a).

LBSF and Aflac both assert rights to be paid by Beryl from the Collateral, and thus are competing creditors of Beryl.[17] Their relative rights to the Collateral are established in section 5.5 (5.6 in one case) of the Supplemental Trust Deeds, which clearly states that LBSF's rights to be paid from the Collateral are subordinated to those of Aflac. The parties' agreement

---

[15]  Plaintiffs argue, as they have in another proceeding (*see* Committee Statement at 17-22), that the reference in section 365(e)(1)(B) to the "commencement of *a* case" (emphasis added) is open-ended enough to permit LBSF to apply the statute retroactively based upon LBHI's prior filing. At least one court has flatly rejected such an argument. *See In re Amcor Funding Corp.*, 117 B.R. 549, 553 (Bankr. D. Ariz. 1990); *see also In re Enron Corp.*, 306 BR 465, 473-74 (Bankr. S.D.N.Y. 2004) (discussing and approving *Amcor Funding* in context of analysis of swap agreement termination and sections 560 and 365(e)(1)). No case has held to the contrary, and nothing in the legislative history of section 365(e)(1)(B) suggests that Congress intended any such thing. Finally, the Code is replete with other examples of the use of the phrase "commencement of a case." *See, e.g.*, 11 U.S.C. §§ 342(b), 363(a), 363(l), 365(b)(2)(B), 366(a), 503(b)(9), 525(b)(2), 525 (c)(1), 541(c)(1)(B), 543(a) and 546(c)(1). Aflac is aware of no decision in which a court construing the phrase "commencement of a case" in any provision of the Bankruptcy Code has concluded that the appropriate case in question is any case other than that of the debtor seeking to apply the statute in question.

[16]  Lehman's unsupported *in terrorem* contention that "sections 365(e) [sic] and section 362(a) would never take effect and a debtor's estate could be stripped entirely of its assets upon, and as a consequence of the filing of a bankruptcy petition" if Aflac's position is adopted (*see* Pl. SJ Opp. at 6) ignores Congress's repeated efforts to explicitly insulate swap agreements, security agreements and security arrangements from bankruptcy risk and uncertainty through the safe harbors of sections 362(b)(17), 362(o) and 560.

[17]  To be clear, Aflac's position is that Beryl owes Aflac a debt which is payable from the Collateral and other monies held by Beryl.

to subordinate LBSF's rights in an event of default attributable to LBSF, including an LBHI bankruptcy filing, must be upheld under section 510(a) of the Bankruptcy Code.

Section 510(a) provides that subordination agreements are enforceable in bankruptcy "to the same extent that such agreement[s] [are] enforceable under applicable nonbankruptcy law." The scope of section 510(a) is one of "unqualified breadth," and "if an agreement is a subordination agreement, it must be enforced according to its terms." *Collier* ¶ 510.03[2]. A "subordination agreement" is an agreement in which a party that otherwise holds "a senior interest agrees to subordinate that interest to a normally lesser interest." Bryan A. Garner, *Black's Law Dictionary* 68 (17th ed. 1999).[18] As a provision by which the parties agreed to adjust their respective payment priorities in certain circumstances, section 5.5 of the Supplemental Trust Deed squarely comes within the broad scope of section 510(a). *See, e.g.*, *In re Delta Air Lines*, 341 B.R. 439, 445 (Bankr. S.D.N.Y. 2006) ("Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress") (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 10 (2000)). Section 510(a) applies to subordination agreements between a debtor and third parties no less than to agreements between non-debtors. *See Enstar Group, Inc. v. Bank of New York (In re Amret, Inc.)*, 174 B.R. 315, 321 (M.D. Ala. 1994) (enforcing debtor's subordination of claims against subsidiary pursuant to section 510(a));

---

[18] *See also GMGRSST, Ltd. V. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 857 (S.D. Fla. 2005) ("Case law defines a subordination agreement as one in which 'a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior") (*citing In re Envtl. Aspecs, Inc.*, 235 B.R. 378, 396 (E.D.N.C. 1999) and *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990)); *In re Best Prods. Co.*, 168 B.R. 35, 69 (S.D.N.Y. 1994), *dismissing appeal,* 177 B.R. 791 (S.D.N.Y. 1995), *aff'd* 68 F.3d 26 (2d Cir. 1995) (subordination agreement is one in which "one creditor agrees to subordinate its claim against a debtor in favor of the claim of another"); *In re Holly's Inc.*, 140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) (defining subordination agreement as "a contract in which a creditor . . . agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor"); *New York Stock Exch. v. Pickard & Co., Inc.*, 296 A.2d 143, 146-47 (Del. Ch. 1972)(subordination agreement is "simply a contract in which a creditor . . . agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor").

*see also In re Village Rathskeller, Inc.*, 147 B.R. 665, 672-73 (Bankr. S.D.N.Y. 1992) (enforcing debtor's subordination of rights under lease to those of its landlord's mortgagee).

Where a subordination agreement is enforceable under non-bankruptcy law, it must be enforced according to its terms. *See Robinson v. Howard Bank* (*In re Kors, Inc.*), 819 F.2d 19, 24 (2d Cir. 1987); *see also In re Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966) ("A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have explicitly agreed not to accept them") (internal quotations and citations omitted). The enforceability of a subordination agreement is determined by applicable non-bankruptcy law. *In re Best Prods. Co.*, 168 B.R. at 69 (contract law applies under section 510(a)). The Supplemental Trust Deed is governed by English law, which enforces subordination agreements in accordance with their terms. For example, *In re Maxwell Communications Corp. Plc (No. 2)* [1993] 1 W.L.R. 1402, 1405, 1420 (citing, *inter alia*, 11 U.S.C. § 510(a) and *In re Credit Indus. Corp.*, 366 F.2d 402 (2d Cir. 1966)), recognized the general principle that subordination provisions in a trust deed are enforceable, and observed that it "would be a matter of grave concern if . . . English law alone refused to give effect to a contractual subordination" in the context of insolvency proceedings. *See also In re SSSL Realisations (2002) Ltd.* [2006] Ch. 610 (enforcing agreement subordinating debtors' intercompany claims to claims of surety).

Congress is certainly capable of stating that rights conferred under one statute are subject to provisions set forth elsewhere.[19] But unless Congress specifically states otherwise,

---

[19]   The Code is thus replete with examples of the use of "subject to," "except as provided in," and other similar provisions. *See, e.g.,* 11 U.S.C. §§ 107(a), 330(a)(1), 526(d)(1), 541(c)(1), 557(d)(3), 1110(a)(2), 1116(5) and 6(B), 1123(a)(1) and (b)(2), 1124(2)(D), 1129(b)(2)(A)(ii), 1168(a)(1), 1222(b)(6), 1322(b)(7), 1326(a)(3), 1509(e), 1517(a) (each using "subject to" another Code section); 11 U.S.C. §§ 103(a), (f) and (g), 108(c), 328(c), 346(k)(1), 349(a), 365(a), 542(c), 552(b)(1) and (2), 726(a), 727(b), 747, 752(b)(2), 766(j)(2), 902(5), 1104(b)(1), 1115(b), 1124, 1129(c), 1207(b), 1227(a) and (c) (each using "except as provided in" another Code section).

one provision of the Code is equal to another. *See Rake v. Wade*, 508 U.S. 464, 471(1993) (one Code provision should not be construed to suspend or supercede another); *Air Line Pilots Ass'n v. Shugrue* (*In re Ionosphere Clubs, Inc.*), 22 F.3d 403, 407 (2d Cir. 1994) ("when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective" (*quoting Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976)). "When Congress has intended to alter the general priority scheme [of the Bankruptcy Code], it has done so explicitly . . . ." *Id.* Section 510(a) is not made subject to other provisions of the Code. To the contrary, the language of section 510(a) is simple, straightforward and independent: if an agreement constitutes a sub-ordination agreement, it must be enforced in bankruptcy to the same extent as it would be enforced elsewhere.

Conversely, sections 541(c)(1) and 365(c)(1)(B) – the statutes on which Plaintiffs rely – do not purport to override section 510; indeed, neither statute even mentions section 510.[20] Therefore, LBSF's agreement to subordinate its rights pursuant to the Noteholder Priority and in accordance with section 6.2 of the Principal Trust Deeds and section 5.5 of the Supplemental Trust Deeds is an enforceable subordination agreement which must be upheld under section 510(a) of the Bankruptcy Code.

### 5. The safe harbors protect Beryl's termination and liquidation of the swap transactions and enforcement of the contracts.

Because the termination of the swap transactions was valid and effective, as Plaintiffs now concede, the only remaining question is what flows as a consequence from that

---

[20] Courts have observed, in considering other discrete provisions of sections 365, 510 and 541, that sections 541 and 365 were not intended to override section 510. *See In re Commercial Fin. Servs., Inc.*, 268 B.R. 579, 595 (Bankr. N.D. Okla. 2001) (Congress did not intend subsection 541(d) to supersede subsection 510(b)); *In re Racing Servs., Inc.*, 340 B.R. 73, 78 (8th Cir. BAP N.D. 2006) (concluding that Congress did not intend section 365 to supersede subsection 510(c)). Moreover, section 541(c)(1) by its terms is expressly subjected to restrictions on transfers of beneficial interests in trusts, as set forth in section 541(c)(2). That concept closely parallels the treatment of subordination agreements set forth in section 510(a).

termination. Section 560 of the Bankruptcy Code, along with two related provisions, sections 362(b)(17) and 362(o), provide the answer – the rights and remedies of Beryl (and, therefore, Aflac) are fully enforceable. Accordingly, LBSF is not entitled to any Termination Payment, and the Noteholder Priority and the Unwind Costs provision are in effect.

Plaintiffs ignore the plain words and meaning of these statutes to argue that other provisions of the Bankruptcy Code, specifically sections 365(e)(1) and 541(c)(1)(B), override the safe harbors, and entitle them to a payment of more than $165 million. (*See* Pl. Motion ¶¶ 1, 62) One would therefore expect Plaintiffs to cite to statutory language demonstrating the supremacy of sections 365(e)(1) and 541(c)(1)(B), but they do not because the statutes contain no such language. Aflac, on the other hand, relies upon the safe harbor provisions, which explicitly override other provisions of the Code and which even direct courts to not interfere with their operation. *See, e.g.*, 11 U.S.C. § 362(o) (providing that "the exercise of" safe-harbored rights "shall not be stayed by any order of a court or administrative agency in any proceeding under this title"). Because the safe harbor definitions and conditions are each satisfied here, Beryl's exercise of remedies, including the Termination Payment Provision, the Unwind Costs provision and the Noteholder Priority, is permitted under sections 560, 362(b)(17) and 362(o) of the Bankruptcy Code. Each section is discussed below.

### (A)    Section 560

Section 560 of the Bankruptcy Code provides that "[t]he ***exercise of any contractual right of any swap participant*** . . . ***to cause the liquidation, termination***, or acceleration ***of one or more swap agreements*** because of a condition of the kind specified in section 365(e)(1) of this title" – so called *ipso facto* provisions[21] – "or to offset or net out any termination values or

---

[21]    11 U.S.C. § 365(e)(1) states:

payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements ***shall not be stayed, avoided, or otherwise limited by operation of any provision of this title*** or by order of a court or administrative agency in any proceeding under this title."[22] (emphasis added)  Each of the requirements of section 560 is met here.

First, Beryl is undeniably a "swap participant."  That term is defined as "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor."  11 U.S.C. § 101(53C).  The term "swap agreement," includes "any agreement, ***including the terms and conditions incorporated by reference in such agreement,*** which is . . . a total return, credit spread or credit swap, option, future, or forward agreement . . .."  11 U.S.C. § 101(53B)(A)(i)(VI) (emphasis added).  Plaintiffs concede that the Credit Default Swap Agree-

---

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

[22]  11 U.S.C § 560 states:

**Contractual right to liquidate, terminate, or accelerate a swap agreement**

The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

ments are credit swaps included in the definition of "swap agreement"[23] that were outstanding when they filed for bankruptcy and that, as a party to these agreements, Beryl qualifies as a "swap participant."[24]  (*See, e.g.*, Complaint ¶¶ 1-2, 15, 19, 30)

Second, each of Beryl's contractual remedies – *i.e.,* the Bankruptcy Termination Provision, the Termination Payment Provision, the Noteholder Priority, and Unwind Costs -  is a "contractual right" within the meaning of section 560.  The defined scope of the term "contractual right" is broad, and includes written provisions in a contract between the parties, as is the case here, as well as market practices, exchange rules and common law rights.  5 *Collier on Bankruptcy* ¶ 560.04[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.)  ("The source of swap agreement liquidation, termination and acceleration rights will often be a written agree-

---

[23]    The Bankruptcy Code does not define the term "credit swap."  Courts and commentators agree, however, that a credit swap is a bilateral contract whereby the buyer makes periodic payments to the seller and, in exchange, receives a payment if the referenced financial instrument defaults.  *See, e.g., Eternity Global Master*, 375 F.3d 168, 172-73 (2d Cir. 2004); Arnaud De Servigny & Norbert Jobst, *The Handbook of Structured Finance*, 418-19 (2007).

Moreover, as the language highlighted in section 101(53B)(A)(i) above makes clear, the Conditions, which as part of the Trust Deed are incorporated by reference into each Credit Default Swap Agreement, also come within the "swap agreement" definition.  Part 5(g) of the Schedule forming part of each Credit Default Swap Agreement provides, in pertinent part, that "in relation to each Transaction, each party confirms that it is bound by the terms of the Trust Deed and that the terms of such Trust Deed prevail to the extent they conflict with terms relating to such Transaction.   [LBSF] agrees that its recourse against [Beryl] in respect of the relevant Transaction is limited to the assets on which the liabilities of [Beryl] under the relevant Transaction are secured pursuant to the Trust Deed and that its right to enforce the Security created by [Beryl] over those assets is limited as provided in the Trust Deed."  In addition, LBSF is a party to the Supplemental Trust Deed in its capacity as Swap Counterparty, and as such directly agreed to all of its provisions, including the Series Conditions forming part of the Supplemental Trust Deed, which, as Aflac has shown, in several important respects varied the boilerplate provisions of the ISDA Master Agreement and, therefore, clearly form part of the swap agreement between the parties.

[24]    The Committee argues that the rights at issue are being enforced by noteholders and not by a swap participant/issuer, which would have no economic reason to enforce the Noteholder Priority because it involves only the interests of LBSF and the Noteholders.  (*See* Committee Statement, ¶¶ 7, 52-57)  Whatever may be the case in the action that the Committee Statement actually addresses, Aflac consistently has sought a declaratory judgment as to the rights of Beryl, the swap participant (including as directed by the Trustee, as instructed by the Noteholder), which are indeed rights and remedies of Beryl against LBSF.  The Noteholder Priority, the zero Termination Payment Provision and the Unwind Costs provision, all reflect the respective entitlements of two creditors of Beryl, and Beryl indeed has an interest in (i) receiving all the amounts from LBSF to which Beryl is entitled, and (ii) not paying any more to LBSF than that, if anything, to which LBSF is entitled.  Otherwise, Beryl would not be able to comply with its obligation to redeem the Aflac Notes in accordance with the Transaction Documents.

ment or other document, such as a customer agreement, master agreement or the terms and conditions printed on a confirmation of the transaction").  Beryl's "contractual rights" thus include (i) the Bankruptcy Termination Provision, which appears in section 5(a)(vii) of the ISDA Master Agreements, (ii) the Termination Payment Provision, which is set forth in Series Condition 40,[25] (iii) the Noteholder Priority, which is set forth in section 6.2(iii) of the Principal Trust Deed and elected to apply to these transactions in section 5.5 of the Supplemental Trust Deed and in Series Condition 40, and (iv) Unwind Costs, set forth in Series Condition 44.  Moreover, all of these remedies are contractual provisions that effect the valuation and liquidation of the swap agreements upon termination, and thus come squarely within section 560.[26]

---

[25]  Pursuant to the Termination Payment Provision, LBSF gets a "zero" Termination Payment if the swaps are terminated due to a default triggered by the bankruptcy filing of either LBSF or LBHI.  (*See* Series Condition 40)  The Unwind Costs provision requires a payment to Beryl in an amount equal to any shortfall between the principal amount of the Aflac Notes and the value of the Collateral, if the swaps are terminated due to a default triggered by the bankruptcy filing of either LBSF or LBHI, and further provides that the LBSF Credit Support is to be available for the payment of any such shortfall.  (*See* Series Condition 44)

[26]  With respect to a Termination Payment, LBSF and Beryl (and, by its participation as Guarantor, LBHI) expressly and unambiguously agreed that none would be payable by or to **either party** if the swap transactions were terminated due to a default by LBSF, *i.e.*, that the Termination Payment would be "zero."  (*See* Series Condition 40)  The valuation of a swap is intrinsic to and inextricable from the process of terminating and liquidating the swap and, accordingly, is protected by the safe harbor of section 560.  *See, e.g., In re Enron Corp.*, 349 B.R. 96, 103 (Bankr. S.D.N.Y. 2006).

Plaintiffs also argue that the swap provisions on which Aflac here relies are merely "ancillary" to termination of the swaps and, therefore, beyond the scope of section 560's safe harbor.  (Pl. SJ Opp. at 6:  "But the exercise of rights that 'flow' subsequent to termination or that are 'associated' with or 'ancillary to' termination are undeniably beyond the bounds of the statute's safe harbors"), *citing Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C.* (*In re Calpine Corp.*), Adv. No. 08-1251(BRL), 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009).  But that case, which involved a similar safe harbor for termination of commodities and forward contracts under section 556 of the Bankruptcy Code, supports Aflac's position.  There, Judge Lifland did hold that a **notice provision** concerning calculation of a termination payment in a master power purchase and sale agreement that was "merely ancillary" to the *ipso facto* termination provision was not enforceable under the statutory safe harbor.  *Id.* at *6-*7.  However, the contract provisions allowing the non-debtor party, upon the bankruptcy filing of the debtor, to terminate the contract, determine the amount of the termination payment due from the debtor and seek payment thereof were covered by the safe harbor and fully enforceable.  *See id.* at *1-*2, *7.  The Bankruptcy Termination Provision, Termination Payment Provision, Unwind Costs rights and Noteholder Priority collectively serve the same function here as the contract provisions enforced in *Calpine, i.e.*, to terminate the swap agreements and liquidate and make the payments due upon such termination.

Finally, section 560's requirement of an *ipso facto* clause is also satisfied. Section 560 "permits the exercise of termination rights by a non-defaulting swap participant so long as the enforcement of those rights is first triggered because of a condition of the kind specified in section 365(e)(1)." *In re Enron Corp.*, 306 B.R. at 473. One such condition, specified in section 365(e)(1)(B), is "the commencement of a case under" the Bankruptcy Code.[27] The Bankruptcy Termination Provision is a textbook example of such a condition because it permits Beryl, the non-debtor party, to terminate due to a bankruptcy filing by the other swap party or its guarantor and, in fact, Plaintiffs' bankruptcy filings specifically were stated in the Termination Notice as grounds therefor. Likewise, each of Beryl's other remedies – the Termination Payment Provision, the Noteholder Priority, and the Unwind Costs – were triggered by the event of default that arose when LBHI filed its bankruptcy case.

To summarize, in the words of section 560, each of the Termination Payment Provision, the Unwind Costs provision and the Noteholder Priority is:

- a "contractual right" (*see* Series Condition 40, clause (iii) in the Series Prospectus for each swap transaction, Weber Decl., Ex. 7 at 16; Ex. 10 at 16; Ex. 13 at 15-16; Ex. 16 at 16);

- "of [a] swap participant" (Beryl);

- "to cause the liquidation, termination, or acceleration of one or more swap agreements" (each of the four Credit Default Swap Agreements);

- because of an *ipso facto* provision of the type described in section 365(e)(1) of the Bankruptcy Code; and

- which, therefore, "shall not be stayed, avoided, or otherwise limited by operation of any provision of [the Bankruptcy Code] or by order of a court[.]"

As explained above, the swap termination here was because of the bankruptcy filings of both LBHI and LBSF. Therefore, under the plain and unambiguous language of section

---

[27] *See In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005); *In re Child World*, 161 B.R. 349, 354 (Bankr. S.D.N.Y. 1993). *See also* S. Rep. No. 95-989, at 59 (1978).

560 and the Termination Payment Provision, LBSF has no right to receive any Termination

Payment whatsoever, and Beryl has the right to payment of the Unwind Costs.[28]

So how is it that Lehman seeks to "avoid[]," and asks the Court to "stay[]" and

"otherwise limit[,]" the effect of the Termination Payment Provision and the Unwind Costs pro-

vision when section 560 says that cannot be done?  Simply enough:  Plaintiffs just call the provi-

sions something else.  Since the word "*modify*" and its derivations do not appear in the text of

section 560, if Plaintiffs say, repeatedly, that the contract terms they prefer to avoid are "***modifi-***

***cation***" provisions, the safe harbor no longer protects any swap terminations where, as here,

LBSF gets no payment:

> The ***modifications*** of LBSF's payment priority and its right to receive termination
> payments and Unwind Costs solely as a result of its bankruptcy filing does not
> constitute a "Liquidation, termination, or acceleration" of the agreement, nor is it
> an "offset or net out" of the parties' positions.  Rather, by ***changing*** LBSF's prior-
> ity of payments and its right to receive payments, the clauses improperly ***modify***
> LBSF's rights under the contracts solely because of its bankruptcy filing, which
> sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code expressly
> forbid . . . . A broad construction of the safe harbors to permit a ***modification*** of
> LBSF's right to receive payments is not only contrary to the terms of the statute,
> but would not serve Congress's purpose in enacting the safe harbors to promote
> "certainty" and "liquidity" in the marketplace in the event one counterpart to the
> contract files for Bankruptcy protection.

(Pl. Motion ¶ 3) (emphasis added)  The logic seems to be that if the swaps had not been termi-

nated because of the bankruptcy filings, LBSF might otherwise one day have had a right to be

---

[28]  In addition to the Collateral, the Trustee holds LBSF Credit Support for two of the Credit Default Swap Agree-
ments.  Under the English law form of Credit Support Annex that was used in these transactions, that property
is deemed to be transferred absolutely (not merely pledged) to Beryl upon its transfer by LBSF to Beryl under
the Credit Support Annex.  Under the express terms of Series Condition 44, the LBSF Credit Support is to be
applied to satisfy the Unwind Costs component of the Early Redemption Amount.  Whether the LBSF Credit
Support is viewed as property of Beryl, as it is under the English law Credit Support Annex, or as property of
LBSF that was pledged to support its payment obligations to Beryl, as it potentially might be viewed under New
York law, it was clearly and unambiguously agreed by LBSF that the LBSF Credit Support was to be applied to
satisfy (in other words, to be set off against) the Unwind Costs.  Accordingly, as the exercise of a setoff right
under a security arrangement related to a swap agreement, its application for that purpose is protected by the
section 560 safe harbor.

paid something under the swaps; because the termination eliminates that theoretical possibility, LBSF's "rights" have been "changed" or "modified."

None of LBSF's rights have been changed in any way by the termination of the swaps, and none will be modified by Beryl enforcing the Credit Default Swap Agreements in accordance with their express terms, which state that, in the case of an LBHI or an LBSF bankruptcy default and termination, LBSF gets no Termination Payment, Beryl has the right to an Unwind Costs payment, and the Noteholder Priority is in effect. Put differently, by getting a payment of "zero" upon such a termination, being required to make an Unwind Costs payment, and being subordinated under the Noteholder Priority (each of which vested prepetition), LBSF is receiving precisely what it bargained for.[29] *See Rice v. Shoney's* (*In re Dean*), 174 B.R. 787, 790 (Bankr. E.D. Ark. 1994) (section 541(c)(1) does not apply where "rights, obligations, and restrictions existing pre-bankruptcy have not been forfeited, modified, or terminated . . . by the filing of the bankruptcy" but "[r]ather, the trustee has the same rights as the debtor under the agreement"; "property rights are [not] expanded" under section 541(c) "simply by virtue of the fact that the property belongs to the estate").

Section 560 expressly validates for swap transactions the very types of *ipso facto* clauses that, for other kinds of contracts, the statutes which Plaintiffs cite, sections 365(e)(1) and 541(c)(1)(B), prohibit. Therefore, the statutes upon which Plaintiffs rely simply do not apply, and are explicitly overridden by section 560. Because Beryl's exercise of its termination and as-

---

[29] In the *Drexel* bankruptcy, the district court upheld the enforceability under state law of a similar (though not identical) swap termination provision, known as the "first method," in which the defaulting party is not entitled to receive any net amount otherwise determined to be payable to it in the close-out of a swap transaction. *See In re Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223, at *3-4 (S.D.N.Y. Nov. 9, 1992) (finding provision "not unconscionable or contrary to public policy . . . [and thus should cause] neither a penalty, a forfeiture nor an unjust enrichment").

sociated rights under the swaps is expressly protected by section 560, Aflac is entitled to summary judgment on Count II of its counterclaim.

### (B)     Sections 362(b)(17) and 362(o)

Beryl's exercise of its safe harbored rights (exercisable by the Trustee, at the direction of Aflac as the holder of the Aflac Notes) to distribute the Collateral and the LBSF Credit Support to the Trustee and Aflac in accordance with the Noteholder Priority, the Termination Payment Provision and the Unwind Costs provision is further supported by section 362(b)(17) of the Bankruptcy Code which states, in pertinent part, that the automatic stay does not apply to

> the exercise by a swap participant . . . of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements[.]

And, under section 362(o), if the automatic stay does not apply, the Court also is expressly precluded from staying the exercise of such rights:  "The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph . . .  (17) . . . of subsection (b) shall not be stayed by order of a court . . . in any proceeding under this title."

Thus, pursuant to section 362(b)(17), a swap participant may exercise contractual rights (as defined in section 560), including such rights as provided under a security arrangement related to a swap agreement (*i.e.*, the Supplemental Trust Deed).[30]  Section 560 defines the term "contractual rights" ***independently*** from what Plaintiffs characterize as limiting verbs that are set

---

[30]     An important distinction between the relief provided in sections 362(b)(17) and 560 is that the latter specifically addresses rights that flow from the exercise of an otherwise invalid *ipso facto* clause.  Section 362(b)(17), on the other hand, does not refer to, and thus does not require, a swap participant to rely upon an *ipso facto* clause; to the contrary, such participant may exercise contractual rights under a security arrangement related to a swap agreement without regard to whether or not such rights flow from an *ipso facto* clause.

forth in that section (*e.g.*, terminate, liquidate, accelerate, setoff and net out). The definition thus

provides as follows:

> As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization . . ., a multilateral clearing organization . . ., a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade . . . or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

This broad definition includes both written and unwritten rules, agreements, resolutions, and

business practices.

The "limiting verbs," however, are set out separately in the text of section 560, in

an independent sentence which states: "The exercise of any contractual right of any swap par-

ticipant or financial participant ***to cause the liquidation, termination, or acceleration*** of one or

more swap agreements because of a condition of the kind specified in section 365(e)(1) of this

title ***or to offset or net out*** any termination values or payment amounts arising under or in con-

nection with the termination, liquidation, or acceleration of one or more swap agreements shall

not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order

of a court or administrative agency in any proceeding under this title." (emphasis added)

So what did Congress mean in section 362(b)(17) when it provided that the exer-

cise of a "contractual right (as ***defined*** in section 560)" was not subject to the automatic stay?

Did Congress mean, by referencing the definition, to also incorporate the limiting verbs which

section 560 separately applies to "contractual rights?" Such a reading cannot be sustained; if

Congress meant to capture in section 362(b)(17) not only the concept of "contractual rights" but

also the independent limiting verbs of section 560, Congress could easily have said so,

and drafted section 362(b)(17) to state that the stay does not apply to the exercise of "***ANY*** con-

tractual right (as defined in section 560) ***to cause the termination, liquidation, or acceleration***."

But that is not what Congress wrote; to the contrary, it stated that a holder of "contractual rights (as defined in section 560)" – any and all contractual rights – may act in respect of a swap or security agreement free from the automatic stay.

Plaintiffs' reading of section 362(b)(17) treats the reference to the definition of "contractual rights" in section 560 as also capturing the limiting verbs set forth therein. That reading is unsupported and contrary to the plain language of the statute, and should be rejected.[31] Accordingly, the Court should conclude that section 362(b)(17) permits the Trustee (directed by Aflac, as the holder of the Aflac Notes), as the holder of the lien on the Collateral and other assets of Beryl, to cause the distribution of all available assets, including the LBSF Credit Support, in accordance with the terms of the Security Arrangements to pay the Trustee's fees and expenses and then to redeem the Aflac Notes.

### (C) Legislative history of the safe harbors

Plaintiffs contend that the legislative history shows that Congress intended the safe harbors to be rigid and narrowly construed. Plaintiffs highlight selected snippets of witness testimony from the Congressional hearing that predated the 1990 Code amendments for interest

---

[31] The construction of section 362(b)(17) proposed by Plaintiffs is also flawed because it renders portions of the section superfluous, and is thus contrary to well-established principles of statutory construction. *See, e.g., Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 302 (2d Cir. 1997) ("It is our duty 'to give effect, if possible, to every clause and word of [the] statute") (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)); *Connecticut v. United States Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000) (courts required to disfavor interpretations of statute which render language superfluous), *cert. denied*, 532 U.S. 1007 (2001); *Allen Oil Co. v. Comm'r of Internal Revenue*, 614 F.2d 336, 339 (2d Cir. 1980) ("[A] statute must, if reasonably possible, be construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless"). Under Plaintiffs' reading of the statute, the parenthetical "(as defined in section 560)" is sufficient to capture all of the limiting verbs set forth in section 560. If that reading were correct, there would have been no need for Congress to specify the verbs "offset or net out" in section 362(b)(17), since those words are already applicable (under Plaintiffs' view) merely by virtue of the parenthetical. Because Plaintiffs' construction of section 362(b)(17) would render portions of section 362(b)(17) superfluous, it should be rejected in favor of Aflac's construction, which gives effect to each word of the statute.

rate and foreign currency swaps.[32]  (Pl. Motion ¶ 56)  The record, however, when reviewed in

full (*see* Supp. Weber Dec., Ex. D), demonstrates a very different Congressional intent:

- ***Not one witness*** testified that the safe harbor for swaps should be narrow or limited in any way to protect debtors.

- ***Not one witness*** testified that a debtor counterparty should be protected from "modification" of its payment priority rights under a swap that was being terminated due to the debtor's bankruptcy filing, or that sections 365(e)(1) and 541(c)(1) should be viewed as dispositive of conflicts with the safe harbors.

- ***To the contrary, the witnesses testified instead that the safe harbors would*** protect the financial markets from systemic risk and ***permit non-debtor counterparties to quickly limit exposure through prompt termination and application of any collateral to amounts owed as a result of the debtor's default.***

*See* Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Prac-

tice of the Senate Comm. on the Judiciary, 101st Cong., at 8, 61-62 (1989) (hereinafter "S. 396

Tr.")  (Remarks of Sen. Grassley: "This amendment would go a long way toward ensuring that

the failure of a participant will not unduly disrupt an extremely important market"; Remarks of

Mr. Sinatra: "Conversely, the code must be a flexible document . . . . The volatile nature of the

financial markets and the need for certainty and speed in quantifying exposure of its participants

provide further public policy goals that Congress can base its passage of S. 396 on").  Thus,

Plaintiffs' suggestion that the safe harbors were intended to be narrowly construed is inconsistent

with the statutory text and the legislative history, which instead demonstrate that Congress in-

tended the safe harbors to be broad and flexible.  Congress's intent to create broad, flexible safe

harbors is further shown in the most recent amendments, which expanded covered transactions

---

[32]  In general, testimony of witnesses before Congress is of little value in construing subsequently enacted statutes. *See, e.g., Universal Church v. Geltzer*, 463 F.3d 218, 225 (2d Cir. 2006) ("testimony is an especially indirect method of deriving the understanding of the legislators"; House Reports are more probative); *Disabled in Action v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy" provide the most "authoritative and reliable materials of legislative history").

and were specifically designed to facilitate contractual netting among transactions that were previously omitted.[33]

Pertinent to the current dispute, the legislative history is replete with statements indicating that Congress specifically contemplated that non-debtor counterparties would avail themselves of the safe harbors to realize upon collateral pledged in connection with a swap agreement:

- "[T]he bill amends section 362(b) of the Bankruptcy Code . . . to provide that a setoff pursuant to a swap agreement between two parties is not automatically stayed . . . [and] permits the participant to make a final accounting of the net amount due from or owed to the debtor under any swap agreement, by offsetting any amounts due against any amounts owed . . . *[and] permits the swap participant to use any collateral previously pledged by the debtor to guarantee, secure, or settle any swap agreement.*" H.R. Rep. No. 101-484, 4-5 (1990), *as reprinted* in 1990 U.S.C.C.A.N. 223, 226-27 (emphasis added).

- "Although in the majority of cases collateral is not provided in connection with a swap agreement, there are some collateralized swap agreements. *Under the bill, the counterparty will be able to terminate the swap agreement and liquidate any collateral that secures the unpaid obligation.*" S. 396 Tr. at 107 (Responses of Messrs. Brickell and Perlstein) (emphasis added).

- "Because the relevant definitions include related security agreements, the references to 'setoff' in *these provisions*, as well as in section 362(b)(6) and (7) of the Bankruptcy Code, *are intended to refer also to rights to foreclose on*, and to set off against obligations to return, *collateral securing swap agreements*, master netting agreements, repurchase agreements, securities contracts, commodity contracts, or forward contracts. *Collateral may be pledged to cover the cost of replacing the defaulted transactions in the relevant market, as well as other costs and expenses in-*

---

[33] Section 362(b)(17) was added to the Bankruptcy Code in 1990 to specifically protect swap transactions from the automatic stay. *See* 136 Cong. Rec. S7535 (June 6, 1990) (remarks of Sen. DeConcini) (noting that since enactment of modern Bankruptcy Code in 1978, Congress continually has intended to protect from the automatic stay securities contracts, commodities contracts, forward contracts and repurchase agreements to avoid disruption to financial markets, and swap agreements must receive comparable protection). Section 362(b)(17) was amended in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act and again in 2006 pursuant to the Financial Netting Improvements Act of 2006. *See* Pub. L. No. 109-8 (2005); Pub. L. No. 109-390 (2006). The 2006 amendments further clarify and protect the rights of swap participants to close out swap transactions and, in so doing, effectuate postpetition the realization upon collateral, including via setoff or netting rights. *See generally Are You Sailing in Safe Harbors? An Overview of Various Bankruptcy Code Safe-Harbor Protections*, 26-10 ABIJ 44, 88 (Dec. 2007/Jan. 2008); H.R. Rep. No. 109-31 (2005), *as reprinted* in 2005 U.S.C.C.A.N. 88, 121 ("As amended, the definition of 'swap agreement' will update the statutory definition and achieve contractual netting across economically similar transactions").

*curred or estimated to be incurred for the purpose of hedging or reducing the risks arising out of such termination. Enforcement of these agreements and arrangements free from the automatic stay is consistent with the policy goal of minimizing systemic risk.*" H.R. Rep. No. 109-31 (2005), *as reprinted* in 2005 U.S.C.C.A.N. 88, 132 (emphasis added).

- "Broadly speaking, these safe harbor provisions allow certain types of creditors to exercise their self-help rights to terminate defined financial market contracts like swap agreements and exercise their setoff rights and ***choose on how to deal with foreclosure on collateral free from the power of a receiver or bankruptcy trustee that would otherwise impair the exercise of those rights.***" 152 Cong. Rec. H7600 (2006) (statement of Rep. McHenry) (emphasis added).

- The 2006 amendments to section 362(b)(17) were intended "to protect enforcement, free from the automatic stay, ***of collateral***, setoff or netting provisions in . . . swap agreements." H.R. Rep. No. 109-648, at 7 (2006) (Report of Committee on Financial Services) (emphasis added).

- Section 362(b)(17) as amended "protect[s], free from the automatic stay, all rights previously protected by Section 362(b)(6), (7) and (17), including ***self-help foreclosure-on-collateral rights***, ***setoff rights, and netting rights (including foreclosure on, and setoff against, cash and securities held to margin or secure claims for margin payments and settlement payments*** . . .)." H.R. Rep. No. 109-648, at 7 (emphasis added).

These statements demonstrate that Congress intended, through the safe harbors, to provide a non-debtor counterparty with access to collateral securing a swap after a debtor's default.

The safe harbors also were drafted to include subsequent transactions using unforeseen structures that do not fit the letter of the Bankruptcy Code sections, but which are economically equivalent – further evidence that the safe harbors were intended to be broad. *See, e.g.*, H.R. Rep. No. 109-31 (2005), *as reprinted* in 2005 U.S.C.C.A.N. 88, 121 ("The definition of 'swap agreement' originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured . . . . [The Bankruptcy Code] expands the definition of 'swap agreement' to include 'any agreement or transaction that is similar to any other agreement or transaction referred to [the Bankruptcy Code] and that is of the type that has been, is presently, or in the future becomes the subject of recurrent dealings in the

swap markets").  *See also* 11 U.S.C. § 101(53B)(A)(ii)(I) (defining "swap agreement" to mean an agreement that "in the future becomes the subject of recurrent dealings in the swap or other derivatives markets").

Thus, the Congressional intent was to provide flexible safe harbors to permit the full termination and liquidation of the swaps of the future, including any collateral pledged to secure them, unimpeded by the Bankruptcy Code, as shown by the numerous references to collateral quoted above.  Aflac submits that synthetic CDOs, such as those here at issue, are precisely the type of future swap permutation that Congress sought to protect through the broad definitions and expansive language of the safe harbors.[34]

### (D)    Plaintiffs distort and mischaracterize the contract provisions.

To further confuse the issues, Plaintiffs mischaracterize and distort the terms of the contracts and misleadingly describe them as causing harm to LBSF's estate.[35]   As discussed

---

[34]  Congressional statements and the plain language of the relevant sections of the Bankruptcy Code indicate that Congress sought to remove judicial discretion in determining applicability of the safe harbors by providing transactions that fit within the broadened scope of the safe harbors with the relevant protections without further inquiry.  *See, e.g., Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev. 641, 657 (Winter 2005) (amendments to the safe harbor provisions "limit judicial discretion to assess the economic substance of financial transactions, even those that resemble ordinary loans or that retire a debtor's outstanding debt or equity [and] direct judges to apply a formalistic inquiry based on industry custom: a financial transaction is a 'swap,' 'repurchase transaction,' or other protected transaction if it is treated as such in the relevant financial market").

[35]  Plaintiffs concede that a Lehman affiliate, LBIE, was the structuring and placement agent for these transactions and drafted the Transaction Documents here at issue, but they contend that the identity of the drafter of a contract is irrelevant for bankruptcy purposes, citing *Official Comm. of Unsecured Creditors v. American Tower Corp. (In re Verestar)*, 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006).  (Pl. Motion at 12, n. 6)  One wonders why the case was cited, since in it, Judge Gropper never discussed or considered the relevance *vel non* of the identity of the drafter of the contract.  Here, the contracts in question were executed by LBSF as "swap counterparty" and were ratified by LBHI through its guaranty.  Given Lehman's stature before September 2008 as a leading global investment bank known for its expertise in credit derivatives and synthetic CDOs, it is reasonable to infer that Plaintiffs were familiar with and perfectly understood the terms of these contracts, and that they promoted and participated in these transactions because they considered them to be good business, as reflected by the enormous volume and quantity in which they executed these transactions.   Moreover, the fact that Plaintiffs and their affiliate structured, drafted, marketed, sold and profited handsomely from the very financial products whose terms they now seek to disavow is plainly relevant to the Court's consideration of the relative equities in determining whether to enforce the contracts as written, as Aflac seeks, or to rewrite them in the manner that Lehman, who wrote the contracts in the first place, asks the Court to do.

above, however, LBSF's estate is not harmed by the provisions in question – provisions that vested prepetition – because LBSF never had a right to the Termination Payment or Unwind Costs or payment priority that Plaintiffs now seek.

Plaintiffs suggest that the Bankruptcy Code effectively incorporates the standard ISDA Master Agreement, and permits no other agreed method of termination valuation.  (Pl. SJ Opp. at 7, 11-14, 18)  This, of course, is not true:  the Bankruptcy Code explicitly refrains from mandating any particular form of settlement of swap agreements or any other specific contract terms.  Instead, the safe harbor provisions accommodate *any* agreement "of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivatives markets (including terms and conditions incorporated by reference therein)," as well as "any combination of [such] agreements or transactions" and options relating to them.  11 U.S.C. § 101(53B)(A)(ii) – (iv).   The safe harbors likewise include a sweepingly broad scope of "contractual rights," including written and unwritten agreements, common law rights and "normal business practice."  11 U.S.C. §§ 362(b)(17), 560.   Provisions of the type here in question are the industry standard and "normal business practice" in structured finance transactions.

Fitch, the rating agency, in its August 14, 2009 press release[36] discussed potential downgrades and other adverse effects on global structured finance depending on the holdings in cases pending in the Lehman proceedings and stated that the subordination of termination payments to defaulting swap counterparties is "the industry convention."[37]  Just how standard such

---

[36]   August 14, 2009 Fitch Ratings press release entitled *Lehman Legal Challenge May Have Varying Impact on Global Structured Finance* (hereafter cited as "Fitch") (Supp. Weber Decl. Ex. B).

[37]   *Fitch, supra*, n. 36 ("Structured finance note issuers and investors identified the potential for loss to noteholders due to counterparty default risk at the early stages of using derivatives in securitisation.  The transactions were structured such that any derivative termination payments from the SF transaction to the defaulted counterparty were then structurally subordinated to the repayment of the noteholders in the priority of payments to mitigate this risk.  In assigning ratings to SF transactions, Fitch's global rating criteria also recognized this risk and states that where termination payments are applicable and rank senior to rated noteholders, the ratings of the notes

provisions have become, even for unrated structured finance transactions, is shown by the template documents for the United States Treasury Department's Public-Private Investment Program, which aims to provide liquidity to the capital markets by generating $500 billion of funding to purchase structured finance assets.  The priority of payments provision in the template loan agreement for that Program calls for the senior payment of swap counterparties generally and for the subordination of termination payments to defaulting swap counterparties.[38]  Indeed, Plaintiffs themselves acknowledge the industry standard nature and the purpose of such provisions.[39]

Likewise, Plaintiffs' extended discussion of the operation of the unmodified mechanics of the *standard* ISDA Master Agreement and *standard* English law form of credit support annex (*see* Pl. SJ Opp. at 7, 11-16, 18) is irrelevant here, because it is undisputed that the Transaction Documents as executed contained significant changes to those form agreements.  Plaintiffs' discussion is a mere distraction, a hypothetical, since it does not refer to the parties' actual agreements.  Under those, the parties expressly agreed that the Termination Payment would be zero and that Beryl would be entitled to Unwind Costs if an Event of Default under the

---

would be capped at the credit quality of the derivative counterparty.  However, most securitisation transactions were structured in line with the industry convention, such that derivative termination payments were subordinated and therefore the notes were eligible to achieve a rating higher than that of the derivative counterparty.").

[38]  *See* Section 2.07 ("*Application of Payments and Reinvestment*") of the template Loan Agreement among [the prospective Borrower], The Bank of New York Mellon as Administrative Agent and Collateral Agent and The United States Department of the Treasury, as Lender, available at http://www.financialstability.gov/roadtostability/publicprivatefund.html.

[39]  *See Lehman Brothers Special Financing, Inc. v. Harrier Finance Limited*, Adv. Case No. 09-01241, Sept. 17, 2009 hearing transcript at 22 (Lehman counsel: "provisions like this are put in only at the behest of the rating agency") (excerpt attached as Supp. Weber Decl. Ex. C).  Thus, notwithstanding Plaintiffs' labored exposition of "standard" practices for plain vanilla interest rate swaps (*see* Pl. Motion at 33-35), not structured finance transactions like the Aflac swaps, they know perfectly well that the provisions here in issue *are* the standard in the structured finance market.

Credit Default Swap Agreement occurred with respect to LBSF, as when LBHI filed its petition.[40]

        As used in Series Condition 40, the Termination Payment Provision, "termination payment" means only the mark-to-market component of the section 6(e) close-out determination. The parties' agreement to value the mark-to-market at "zero" where an Event of Default under the Credit Default Swap Agreement occurred with respect to LBSF does not eliminate Unpaid Amounts (as defined in the ISDA Master Agreement) owing by or to either party. LBSF and Beryl not only agreed to the zero mark-to-market payment, they also agreed that a deemed payment of Unwind Costs – equal to the amount of any shortfall in the collateral value relative to the par amount of the Aflac Notes – would be made to Beryl from the LBSF Credit Support that was to have been provided by LBSF if LBHI was downgraded. This agreement did not "deprive" LBSF of some value to which it was entitled. Quite clearly, it was intended to put Beryl and its investors in the same position they would have been in had the deal gone to maturity, where LBSF's final payment was to be the notional amount of the swap (*i.e.*, equal to the outstanding principal amount of the Aflac Notes), and Beryl's final payment was to be the redemption proceeds of the Collateral due on or before that date.

---

[40]    Plaintiffs also make much of the mechanics of the English law form of Credit Support Annex, and certain supposed drafting flaws it contains. (Pl. SJ Opp. at 15-16) The result here, however, is not the "absurd" outcome they portray; rather, the amount of LBSF Credit Support is determined on the basis of unpaid Fixed Amounts, estimated costs of enforcement and shortfall in Collateral value relative to the principal amount of the Aflac Notes, and not upon a standard mark-to-market amount, as Plaintiffs imply. In short, the unpaid LBSF Credit Support sought here is not collateral for a debt that does not exist, as Plaintiffs suggest; rather, it was sized to cover damages caused by Plaintiffs' default. (In fact, strictly speaking, the LBSF Credit Support is not "collateral" at all; to the extent it was provided, in two of the swaps, it is considered under English law to have become property of Beryl.) Plaintiffs are correct that the standard mechanics under the English form of credit support annex, had those mechanics not been amended by the parties, would have called for the value of the LBSF Credit Support that actually was transferred by LBSF to be netted into a close-out calculation as an amount payable by Beryl to LBSF. However, Series Condition 44 varies those standard mechanics by expressly providing that the LBSF Credit Support is to be applied to the Unwind Costs payable to Beryl, and the LBSF Credit Support that was transferred is less than the amount of those Unwind Costs.

Nor would the Termination Payment Provision have operated to deprive LBSF of realized loss amounts owing to it at the time of termination of any swap if the attachment point of that swap had been reached and there had been any such losses. The payment of those amounts, if any, would have been subject to the Noteholder Priority; however, the swap notional amount and, correspondingly, the principal amount of the notes, would have been reduced in those circumstances by the amount of the losses.

In short, the parties did not intend that section 6(e) of the ISDA Master Agreement would apply as written if LBSF defaulted; rather, they expressly agreed to vary its provisions as to mark-to-market valuation and calculation of Unpaid Amounts (with respect to the treatment of LBSF Credit Support and Unwind Costs), by agreeing that the termination value would be zero and that Beryl would be entitled to Unwind Costs if an Event of Default under the Credit Default Swap Agreement occurred with respect to LBSF. Whether one assumes that these express agreements of the parties were intended to entirely override and substitute for section 6(e) of the ISDA Master Agreement, or whether one plugs the zero valuation and Unwind Costs (as "Unpaid Amounts") agreed by the parties into the mechanics of section 6(e)(i)(3) and performs the netting operation provided for by that section, the result is the same: a single, net positive amount owing to Beryl under each Credit Default Swap Agreement consisting of the sum of (i) a zero mark-to-market amount, (ii) unpaid Fixed Amounts (reduced, if necessary, by any amount representing a coupon on Collateral that was not paid to LBSF following its defaults), (iii) in the case of the two swaps to which this is relevant, the Credit Support Balance (as defined in the Credit Support Annex) in relation to the LBSF Credit Support that actually was transferred, (iv) in the case of all four swaps, the unpaid LBSF Credit Support that was due prior to the termination date (and in fact became due prior to the filing of LBSF's petition), and (v) inter-

est as provided in the ISDA Master Agreement on the amounts owing to Beryl from the respective due dates until paid.

On another point, Plaintiffs may contend, as they have in the separate proceeding against BNY Corporate Trustee Services, that a portion of section 6.2(i) of the Principal Trust Deed (the proviso that follows section 6.2(i)(E)) is applicable to, and provides conditions to the effectiveness of, the Noteholder Priority provision. (*See* LBSF/BNY Opp. at ¶¶ 26, 27) That proviso, however, relates to a particular adjustment that could have been elected by the parties (but was not) and has no relevance to the unadjusted Swap Counterparty Priority mechanics, the Noteholder Priority mechanics, or the issues presented here.[41]

---

[41] The proviso that follows Section 6.2(i)(E) of the Principal Trust Deeds states:

> Provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, ***to the extent that there has been such failure***, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the issuer in relation to the balance (if any).

(Emphasis added). As the foregoing text shows, the adjustment contemplated by this proviso is an adjustment to the Swap Counterparty Priority itself that is limited in scope to the amount of a payment default by the Swap Counterparty, and is not a description of the switch to Noteholder Priority. That should be evident from the plain English of the text, but, lest there be any doubt, the template "Form of Final Terms" set forth in the Base Prospectus contemplates the following potential options to be elected and inserted opposite the heading "Security (order of priorities)" in the final terms and conditions of the notes:

> [Swap Counterparty Priority/Swap Counterparty Priority (Subject to adjustment on Swap Counterparty default)/*Pari Passu* Priority/Noteholder Priority/Other Priority]

*See* Base Prospectus, Multi Issuer Secured Obligation Programme dated 21 July 2006, at 62; Base Prospectus, Multi Issuer Secured Obligation Programme dated 20 July 2007, at 70. Excerpts from the foregoing are annexed as Exhibits B and C, respectively, to the Second Supplemental Declaration of Robert A. Weber dated November 9, 2009 (the "Weber 2d Sup.. Decl."), filed herewith. The elections made in the transactions here in issue were, as applicable in the relevant circumstances, "Swap Counterparty Priority" and "Noteholder Priority." The proviso that Plaintiffs cite relates to an entirely different potential election – Swap Counterparty Priority (Subject to adjustment on Swap Counterparty default) – that was not made by the parties to these transactions. Plaintiffs' contention that "*any* change in the normal priority scheme" "*must*" be preceded by a payment default, and a notice, is based on an evident misreading of the documents and is simply wrong. (*See* LBSF/BNY Opp. at ¶ 27) (emphasis added)

**(E)    Section 560 contemplates payment and application of collateral as part of the liquidation of a swap transaction.**

Plaintiffs urge a novel construction of the word "liquidate," as used in section 560.  Under Plaintiffs' unsupported view, the meaning of "liquidate" does not include the concepts of payment or satisfaction of an obligation through distribution of assets.  (LBSF-BNY Opp. at 48-52)  To the contrary, Plaintiffs argue that a swap may be terminated, and netting performed, under section 560, but that further activity, such as the distribution of collateral, remains subject to the automatic stay.  (*Id.*)  Plaintiffs are wrong, for at least four reasons.

*First,* the right to "liquidate" a swap transaction protected by section 560 ***must*** include the right to realize upon and apply collateral pledged in connection with that transaction in accordance with the terms of the relevant security arrangement, because that is the common meaning of the term "liquidate," and it is not otherwise defined by the Code.[42]  *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").  The common meaning of the word "liquidate" includes concepts of payment and distribution of assets to settle an obligation. *See Black's Law Dictionary* 941 ("liquidate" means "settle (an obligation) ***by payment*** or other adjustment" and "ascertain the liability ***and distribute the assets*** of (an entity), esp. in bankruptcy or dissolution") (emphasis added); 942 ("liquidation" includes "settling a debt ***by payment*** or other satisfaction") (emphasis added).  This conclusion is further bolstered by the express refer-

---

[42]  Courts often rely on dictionaries as a source for the common meaning of a word or phrase.  *See Arthur Anderson LLP v. United States*, 544 U.S. 696, 705 (2005) (obtaining plain meaning from dictionary definition); *In re Nat'l Gas Distribs.*, 556 F.3d 247, 255 (4th Cir. 2009) (citing *Black's Law Dictionary*); *Four Points Shipping & Trading, Inc. v. Poloron Israel, L.P.*, 846 F. Supp. 1184, 1187 (S.D.N.Y. 1994) (citing *Webster's Dictionary*).

ences in section 560 to the netting and set off of termination values and payment amounts in connection with liquidation of a swap agreement.[43]

Second, section 560 includes within its scope contractual rights (both written and unwritten) which reflect "normal business practice." 11 U.S.C. § 560 ("as used in this section, the term 'contractual right' includes . . . a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice"). Under normal business practice, swap agreements require immediate payment upon an event of a default. *Collier* ¶ 560.04. Moreover, under normal business practice, liquidation of a swap includes the closeout of the transaction through delivery of collateral or a cash payment. *See* International Swaps and Derivative Association, Inc., Memorandum of Law, May 15, 2008, *Validity and Enforceability of Collateral Arrangements under the ISDA Credit Support Documents* at 34 (non-defaulting party may "use any Collateral held to satisfy amounts due from the Security Collateral Provider free from any automatic stay"); 37 ("[B]y permitting a party to 'net out any termination values', section 560 of the Code makes clear that the provision contained in the ISDA Master Agreement for close-out netting will be enforceable upon termination of a 'swap agreement'").[44] Section 560's safe harbor thus authorizes non-defaulting parties to liquidate or net out pursuant to "normal business practices" and thereby receive collateral in connection with termination of the swap.

---

[43]  Plaintiffs' unsupported construction of section 560 would require the Court to conclude that Congress intended (i) to permit actual payments to a non-debtor counterparty in the context of netting and setoffs, but (ii) to prohibit such payments in the context of terminations, liquidations and accelerations; that simply makes no sense. Moreover, when it is convenient, Plaintiffs have proffered a different construction of the word "liquidate" in section 560, one that contemplates payment and application of collateral. (*See* LBSF's Response in Opposition to Ballyrock ABS CDO 2007-1 Limited's Motion to Dismiss, July 21, 2009 (D.I. 37 in Adv. No. 09-01032 (JMP)), at 34, contending that the word "liquidate" includes "the application of collateral or other credit support in the exercise of such setoff")  In this case, the value of the Termination Payment to be set off against the Collateral was expressly agreed by the parties to be zero.

[44]  Available at *www.isda.org*.

Third, section 560 also must be interpreted in light of contemporaneous amendments which exempt derivatives transactions from the automatic stay. Sections 362(b)(17) and 362(o) were enacted to confirm that derivatives transactions (including distributions of collateral made in accordance with the parties' written agreement) are exempt from the automatic stay. Section 362(b)(17) provides that the automatic stay thus does not bar "the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement." And as its legislative history makes clear, section 362(b)(17) protects a counterparty's self-help foreclosure on collateral pledged in connection with a swap transaction as well as the netting out of swap transactions.[45] Section 362(o) provides that the exercise of any rights under section 362(b)(17) cannot be stayed by any order of the court. As a consequence, "[p]rotected parties enjoy the same rights in bankruptcy as they do outside." Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankruptcy Debtors and Bankruptcy Judges*, 13 Am. Bankr. L. Rev. 641, 645 (2005). Plaintiffs would have the Court construe section 365(e)(1) to limit the scope of section 362(b)(17) and impose a stay where Congress expressly stated that none should apply. Plaintiffs' construction would render section 362(b)(17) meaningless,[46] and should be rejected as inconsistent with Con-

---

[45]  The forerunner to section 362(b)(17) was section 362(b)(14), added to the Code in 1990. This provision, exempting setoff between parties to a swap agreement, was enacted to allow the non-defaulting party to "use of any collateral previously pledged by the debtor to guarantee, secure, or settle any swap agreement." H.R. Rep. No. 101-484, 101st Cong., 2d Sess. 226-27 (1990). Section 362(b)(17) was amended in 2005 to better "protect enforcement, free from the automatic stay, of setoff or netting provisions in swap agreements." Congress made clear in the Committee report that the references to "setoff" in this section were "intended to refer also to right to foreclose on . . . collateral securing swap agreements." H.R. Rep. No. 109-31, at 132 (2005). The 2006 amendments in 2006 further confirmed that this section exempts from the automatic stay "self-help foreclosure-on-collateral rights[.]" H.R. Rep. No. 109-648, 109th Cong., 2d Sess. 7 (2006).

[46]  *Cf. Connecticut v. United States Dep't of the Interior*, 228 F.3d at 88 (courts disfavor interpretation of statute that renders language superfluous); *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 183 (S.D.N.Y. 2009) ("cardinal principle of statutory construction [is] that a statute should, upon the whole, be construed so that, if possible, no clause, sentence or word is rendered superfluous, void or insignificant") (modification in original).

gress's deliberate creation and subsequent confirmation and expansion of safe harbors for swap agreements.[47] Congress plainly intended that final settlements of swap transactions be permitted despite the automatic stay, including distributions of cash or collateral in accordance with the parties' agreements.

Fourth, the legislative history of section 560 further demonstrates that Congress intended "liquidate" to include payment and satisfaction.[48] As explained above, the purpose of section 560 is to remove derivative transactions from limitations imposed by the Bankruptcy Code, including sections 362(a)(3) and 365(e)(1). In 2005, Congress expanded section 560's reach from mere "termination of a swap agreement" to encompass "liquidation, termination, or acceleration of one or more swap agreements" and simultaneously expanded the definition of protected "contractual rights." Pub. Law. 109-8, 119 Stat 23, 179 (2005). Plaintiffs' construction of section 560 – which limits its scope to mere termination of a swap agreement, subjects distributions pursuant to the swap agreement to the automatic stay and further proceedings, and precludes the non-defaulting party from access to amounts payable following termination – is flatly contrary to the Congressional intent. The goal sought by Congress in expanding the safe harbors was to preserve liquidity in the derivatives markets by permitting non-defaulting parties to close out transactions and recover claims. By allowing for a liquidation in which the non-defaulting party is actually permitted to be paid and receive collateral to which it is entitled,

---

[47] "Normal business practice" confirms this construction. *See* International Swaps and Derivative Association, Inc., Memorandum of Law, December 15, 2007, *Enforceability of the Termination, Close-Out and Multibranch Netting Provisions of the 1987, 1992 and 2002 ISDA Master Agreements*, at 19 (section 362(b)(17) "permits netting of payment (or other property transfer) obligations at any time, including obligations arising after the filing of the bankruptcy petition"). Available at *www.isda.org*.

[48] Although legislative history need not be consulted where the terms of a statute are plain and unambiguous, reference to such history can serve to confirm statutory interpretation based upon the plain meaning. *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004) (plain meaning interpretation of statute supported by legislative history and policy considerations).

Congress insulated derivatives markets from the effects of bankruptcy. Plaintiffs' construction will, if accepted, eviscerate those protections and subject derivatives markets to the instability and turmoil which Congress sought to avoid.

Plaintiffs characterize the Unwind Costs provision under Series Condition 44 as "modifications" of the parties' rights. (Pl. Motion at 6-8, 24-25) As Aflac has shown, however, application of Series Condition 44 in accordance with its terms does not "modify" anything: the definition of Unwind Costs clearly and unequivocally provides that if there is an Event of Default attributable to LBSF, (i) the calculation of the redemption amount is to be made with no deduction of a Termination Payment or other Unwind Costs, and (ii) LBSF is required to make a deemed payment of Unwind Costs by the application of LBSF Credit Support. As such, Series Condition 44 does not effect a "modification" of rights but, rather, sets forth the agreement of the parties with respect to liquidation of the swap transactions. Series Condition 44 thus falls squarely within section 560's safe harbor as a liquidation mechanism which should be upheld.

## C. Aflac Is Entitled To Summary Judgment On Count III Of Its Counterclaim.

Count III of Aflac's counterclaim seeks a declaration as to Plaintiffs' liability to Beryl for unpaid Fixed Amounts and LBSF Credit Support, together with interest until paid, and Aflac's costs and expenses, including reasonable attorneys' fees. Plaintiffs dispute their liability for these items under the contracts, and also suggest that in seeking the recovery of these amounts, Aflac is double-dipping. Both contentions are wrong, as shown below.

### 1. Plaintiffs are liable to Beryl for Fixed Amounts and LBSF Credit Support.

LBSF was required to make quarterly "Fixed Amount" payments to Beryl. Plaintiffs acknowledge this obligation. (*See* Aflac's Counterclaim, and Plaintiffs' Reply, at ¶ 54) LBSF paid these Fixed Amounts through June 2008, but did not make the payments due in September 2008 or for the partial payment period thereafter until the Early Termination Date. Plain-

tiffs do not deny that these payments were required, were not made and were guaranteed by LBHI. (*Id.*)

Additionally, under the Credit Support Annex, when LBHI's short-term rating by S&P fell below a specified level, LBSF was required to transfer LBSF Credit Support sufficient (taken with the Collateral) for Beryl to satisfy the Aflac Notes upon an early termination.[49] Pursuant to the Guaranty, LBHI guaranteed LBSF's obligation to transfer LBSF Credit Support. Plaintiffs admit that well before LBHI filed its chapter 11 petition, it was downgraded below the level specified in two of the Credit Default Swap Agreements and, therefore, LBSF became obligated to, and did, transfer LBSF Credit Support under those agreements. (*See* Aflac's Counterclaim, and Plaintiffs' Reply, at ¶ 56)

However, after LBHI's filing but before the Early Termination Date, (i) the value of the Collateral for the Credit Default Swap Agreements under which LBSF had transferred LBSF Credit Support deteriorated, so that LBSF was required to transfer additional LBSF Credit Support, and (ii) LBHI was downgraded further, so that LBSF was required to transfer LBSF Credit Support under the other two Credit Default Swap Agreements. None of these payments have been made since LBHI's bankruptcy filing, which exposes Beryl and Aflac to potentially significant losses (*i.e.*, even assuming the redemption of the Aflac Notes in accordance with the terms of the Security Arrangements).

---

[49]   Specifically, each Credit Support Annex requires LBSF to provide LBSF Credit Support in an amount equal to the sum of (i) the estimated cost of liquidating the Collateral, (ii) a full quarterly Fixed Amount payment plus an additional "Grace Period Amount," and (iii) any excess of the outstanding principal balance of the Aflac Notes over the value of the Collateral. (*See* Weber Decl., Ex. 7 at 78; Ex. 10 at 78; Ex. 13 at 77-78; and Ex. 16 at 74-75)

Therefore, Plaintiffs are liable for the unpaid Fixed Amounts and the amount of the LBSF Credit Support that should have been posted but was not.[50]

## 2. Plaintiffs' arguments in opposition to Count III lack merit.

Plaintiffs assert two discrete arguments in opposing summary judgment for Aflac on Count III:

(i) Any amounts owed by Lehman to Beryl will be "recover[ed] through the workings of ISDA Master Agreement section 6(e)(i)(3), which sets forth a procedure to calculate payments to be made upon early termination due to an Event of Default" (Pl. SJ Opp. at 11), and that any other recovery by Beryl for either Unpaid Amounts or LBSF Credit Support would result in an "impermissible double recovery." (*Id*. at 12)

(ii) The English form of Credit Support Annex contains drafting errors that will require expert testimony to explain and resolve. (*Id*. at 12-13)

As explained below, neither argument has merit. The parties opted out of the mark-to-market process set forth in section 6(e), and also modified other terms relating to Unpaid Amounts. In addition, the Court need not take up Plaintiffs' belated challenges to the Credit Support Annex, because the contractual provisions upon which Aflac relies are set forth in other agreements as to which no "drafting error" challenge has been raised.

### (A) The parties opted out of the mark-to-market procedure set forth in section 6(e)(i)(3) of the ISDA Master Agreement.

Plaintiffs contend, in error, that section 6(e)(i)(3) of the ISDA Master Agreement sets out the procedure by which any amounts owing between the parties on account of a Termi-

---

[50] Plaintiffs admit that LBHI and LBSF were obligated to pay the Fixed Amounts and transfer credit support. (*See* Aflac's Counterclaim, and Plaintiffs' Reply, at ¶¶ 54, 56) In a belated attempt to change course, Plaintiffs now suggest (Pl. Motion at 3, n.2) that these admitted facts should be subject to challenge because "the Transaction Documents contain certain ambiguities and errors with respect to these Aflac claims and do not reflect the parties' intent or standard commercial practice." As a result, Plaintiffs assert that "extrinsic evidence," "expert testimony" and "discovery" will be necessary, on *these* issues alone. Plaintiffs cannot contend that for purposes of ***their claims alone***, the contracts are accurate, valid (subject to their *ipso facto* claims) and susceptible to summary judgment, while at the same time arguing that the contracts are subject to material mistakes of fact, presumably, and rescission or reformation when it comes to Aflac's claims.

nation Payment and Unpaid Amounts (including LBSF Credit Support) are to be determined and netted, resulting in a single amount, which they argue would be owing to Lehman. (Pl. SJ Opp. at 7, 11-14, 18) Plaintiffs do not intend that Beryl "recover" its value; what they intend, instead, is that the amounts owed to Beryl be made to disappear by being netted against a mark-to-market payment that the parties expressly agreed would not apply. The fundamental flaw in Lehman's argument is that here the parties expressly opted out of the mark-to-market process set forth in section 6(e)(i)(3) (and, as discussed below, modified other terms relating to the treatment of Unpaid Amounts). The parties specifically agreed that if the underlying Event of Default giving rise to the right to terminate was with respect to LBSF (including a bankruptcy filing by LBHI or LBSF), there would be no mark-to-market valuation. Instead, under those circumstances, which are applicable here, ***no Termination Payment amount is due to either party***. (*See* Series Condition 40) As shown above, the application of the netting procedures under section 6(3)(i)(3), when the values agreed by the parties are used – the zero Termination Payment and the Unwind Costs – results in a net amount payable by LBSF to Beryl.

### (B) Aflac does not rely upon the allegedly-mistaken English Credit Support Annex.

Plaintiffs contend that the English form of Credit Support Annex suffers from "drafting errors." (Pl. SJ Opp. at ¶¶ 21-22) According to Plaintiffs, those drafting errors, if read literally, produce an "absurd result" because they require "a party to post new collateral for a debt that it has already repaid[.]" (*Id.* at ¶ 21) Plaintiffs are wrong, for at least two reasons.

First, as a threshold matter, Aflac does not rely solely upon the English form of Credit Support Annex. The relief Aflac seeks is expressly provided for in Series Condition 44, part of a separate agreement as to which Plaintiffs raise no claims of material mistake or scriv-

ener's error.  Series Condition 44, which is set forth below in pertinent part,[51] is an explicit

agreement that overrides terms of the Credit Support Annex that otherwise would provide for the

Credit Support Balance to be part of the netting process under section 6(e) of the ISDA Master

Agreement as an amount owed by Beryl to LBSF.  Second, because there are Unwind Costs ow-

ing to Beryl in connection with the termination, there is a debt – the likelihood of which the con-

tracting parties foresaw – to which Series Condition 44 expressly provided for the LBSF Credit

Support to be applied.  Thus, even if there are hypothetical circumstances in which the English

form of Credit Support Annex could produce an odd result, that is not the case here.[52]

        Moreover, Plaintiffs' belated claim of "drafting errors" is inconsistent with their

prior position – that the parties' claims should be resolved by summary judgment because the

material facts are undisputed.  Now, Plaintiffs say there were "drafting errors," but they offer no

evidence – *e.g.*, affidavits from the drafters of the English form of Credit Support Annex or an

English law expert – to support the claim.  Accordingly, the Court should disregard Plaintiffs'

---

[51]  Series Condition 44 states, in pertinent part:

> The Unwind Costs shall be deemed to be an amount payable by the Swap Counterparty to the Issuer equal to the absolute value of the Aggregate Outstanding Principal Amount minus an amount in JPY equivalent to the proceeds from the sale or realisation of the Collateral (only if such calculation is positive) if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement); provided that such Unwind Costs shall be paid from the Credit Support Balance under the Credit Support Annex and to the extent that the Credit Support Balance is available to cover such Unwind Costs.

(Weber Decl., Ex. 7 at 21-22; Ex. 10 at 21; Ex. 13 at 21; Ex. 16 at 21)

[52]  Plaintiffs appear to suggest that the English law Credit Support Annex is some sort of rogue document, just because it doesn't function in an identical manner to the New York form of Credit Support Annex or an alternate English law credit support document.  (*See* Pl. SJ Op. at ¶ 21)  To the contrary, the English law Credit Support Annex is a standard form, published by ISDA, and is widely used in swap transactions governed by English law.  As stated in the same treatise relied upon by Plaintiffs, "Two credit support documents governed by English law been produced (in addition to the 2001 ISDA Margin Provisions) so that a choice can be made between collateral arrangements based on title transfer (contained in the Credit Support Annex) and those involving a charge (the Credit Support Deed).  In practice, however, the Credit Support Annex is by far the more widely used of the two."  (Simon Firth, *Derivatives Law & Practice* (Sweet & Maxwell, 2008), 12.003.)  Firth cites an ISDA survey conducted in 2008 that reported 33,513 agreements based on the English law Credit Support Annex but only 1,090 agreements based on the Credit Support Deed.  *Id.,* n.5.

unsupported and conclusory allegations of material mistake and grant summary judgment on Count III in Aflac's favor.

## D.     Count IV Of Aflac's Counterclaim[53]

Aflac seeks in Count IV a declaration that, to the extent any non-subordinated amounts should be determined to be owing by Beryl to LBSF, such amounts should be reduced through recoupment by amounts payable or deliverable by LBSF to Beryl.

The defense of recoupment is available to Beryl to reduce any liability that Beryl may be determined to have to LBSF under the Credit Default Swap Agreement; Beryl is entitled to reduce, net, and/or recoup any moneys determined to be owed by Beryl to LBSF by the aggregate amounts described above. *See Reiter v. Cooper*, 507 U.S. 258, 265, n.2 (1993) ("It is well settled, moreover, that a bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the same transaction, at least to the extent that the defendant merely seeks recoupment").

In opposing summary judgment on Count IV, Plaintiffs contend that recoupment does not apply because Aflac's claims are contingent, seek affirmative recovery, and allegedly arise out of separate transactions  (Pl. SJ Opp. at 19-20)  Plaintiffs are wrong on each point.

First, Aflac's claims are not contingent because Plaintiffs have already conceded liability by admitting their contractual obligation to pay Unpaid Amounts and to post LBSF Credit Support under certain circumstances,[54] and there is no genuine dispute that such circum-

---

[53]  Aflac included Count IV as an alternative claim, in the event that the Court were to rule adversely to Aflac on Counts I – III.  If the Court rules for Aflac on those Counts, as it should, Count IV will become moot.  For the sake of completeness, Aflac includes its discussion of Count IV, subject to the foregoing caveat.

[54]  *See* Aflac's Counterclaim, and Plaintiffs' Reply, at ¶¶ 54 (admitting that LBSF "did not pay the Fixed Amount in September 2008" and that LBHI guaranteed LBSF's obligation to do so), 55-56 (admitting LBSF's obligations to post LBSF Credit Support under certain circumstances).

stances in fact occurred here.[55]  Likewise, Aflac's claims do not seek an affirmative recovery, but instead only a reduction in any amounts which Beryl is found to owe to LBSF.  Finally, Aflac's claims do not arise from separate transactions; to the contrary, Aflac's claims on behalf of Beryl for Unpaid Amounts and LBSF Credit Support are asserted with respect to, and are specific to, each of the four swap transactions.  Aflac thus seeks, on behalf of Beryl, to reduce any amounts which Beryl may owe to Lehman on account of a particular swap transaction, by amounts which Lehman owes to Beryl on account of Unpaid Amounts and/or LBSF Credit Support owed in connection with the same swap transaction.  The elements of recoupment thus are satisfied.  *See In re Bill Heard Enters., Inc.*, 400 B.R. 813, 821 (Bankr. N.D. Ala. 2009) (recoupment requires that claims of debtor and creditor arise from same transaction, that creditor asserts claim defensively, and that action is timely); *New York State Elec. and Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 97 (2d Cir. 1997) (utility's application of debtor's deposit to pre-petition utility debt was subject to recoupment); *In re Norsal Indus., Inc.*, 147 B.R. 85, 88-89 (Bankr. E.D.N.Y. 1992) (upholding recoupment); *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. N.Y. 1982) (upholding recoupment in case involving executory contract).

Plaintiffs also raise the same flawed argument that they assert in connection with Count III - namely, that claims relating to Unpaid Amounts and LBSF Credit Support owed to Beryl are encompassed within the process provided for in section 6(e) of the ISDA Master Agreement, and that to address them separately would result in double recovery.  (Pl. SJ Opp. at 18).  That argument fails for the reasons noted in section C(2), *infra*.

Accordingly, summary judgment should be entered in Aflac's favor on Court IV.

---

[55]  Plaintiffs admit that "LBSF incurred obligations to transfer Credit Support to Beryl at several points during the transaction period[.]"  (Pl. SJ Opp. at ¶ 19)  Plaintiffs contend, however, that their obligations with respect to the Unpaid Amounts and LBSF Credit Support are merely factored into the calculation of a net termination amount that would include a mark-to-market valuation and Unpaid Amounts owing by Beryl in respect of the posted LBSF Credit Support.  Aflac has addressed that argument separately in Part C(2), *infra*.

## CONCLUSION

For the reasons set forth above and in Aflac's prior submissions, Aflac's motion

for summary judgment on its counterclaim should be granted, and Plaintiffs' Motion should be

denied.

Dated: New York, New York
      November 9, 2009

                        Respectfully submitted,

                        */s/ Sally McDonald Henry*
                        Sally McDonald Henry
                        SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP
                        Four Times Square
                        New York, New York 10036
                        Telephone: (212) 735-3000
                        Facsimile: (212) 735-2000

                        -and-

                        Anthony W. Clark (admitted *pro hac vice*)
                        Robert A. Weber (admitted *pro hac vice*)
                        SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP
                        One Rodney Square
                        P.O. Box 636
                        Wilmington, Delaware 19899
                        Telephone: (302) 651-3000
                        Facsimile: (302) 651-3001

                        *Attorneys for Defendant and Counterclaim Plaintiff*
                        *American Family Life Assurance Company of Co-*
                        *lumbus*

To:

Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Eric A. Schaffer
David M. Schlecker
REED SMITH LLP
599 Lexington Avenue
New York, New York  10022
(212) 521-5400

Dennis Dunne
Dennis O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000