WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

In re:                                              :          Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*    :          Case No. 08-13555 (JMP)

                      Debtors.              :

———————————————————————— x

LEHMAN BROTHERS SPECIAL FINANCING INC. and :
LEHMAN BROTHERS HOLDINGS INC.

                    Plaintiffs,           :

-against-                                                      Adversary Proceeding
                                                    :          No.: 09-01261 (JMP)
AMERICAN FAMILY LIFE ASSURANCE COMPANY
OF COLUMBUS and BNY CORPORATE TRUSTEE
SERVICES LIMITED                                    :

                    Defendants.           :

———————————————————————— x

AMERICAN FAMILY LIFE ASSURANCE COMPANY  :
OF COLUMBUS

                  Counterclaim Plaintiff,    :

-against-
                                                    :
LEHMAN BROTHERS SPECIAL FINANCING INC. and
LEHMAN BROTHERS HOLDINGS INC.

                  Counterclaim Defendants.  :

———————————————————————— x

**LEHMAN BROTHERS SPECIAL FINANCING INC. AND LEHMAN BROTHERS**
**HOLDINGS INC.'S REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION**
**TO AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS'S**
**MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF**
**DEBTORS' MOTION FOR SUMMARY JUDGMENT**

Table of Authorities ........................................................................................................... iii

Preliminary Statement ....................................................................................................... 1

Argument ........................................................................................................................... 3

I.    Aflac May Not Raise New Grounds for Relief for the First Time in Its Opposition Brief ....................................................................................................................... 3

II.    Aflac Cannot Substantiate Its New Arguments Regarding the Effect of LBHI's Chapter 11 Filing ............................................................................................................. 4

III.    Aflac's Belated Section 510(a) Argument Fails ............................................................ 10

    A.    Section 5.5 Is Not a Subordination Agreement as Contemplated by Bankruptcy Code Section 510(a) .......................................................... 11

    B.    Section 5.5 Is an Invalid *Ipso Facto* Provision Whose Enforcement Is Prohibited by the Bankruptcy Code .................................................................. 12

    C.    Even Were Section 5.5 Read as a Subordination Agreement, Aflac's Argument Fails Because Bankruptcy Code Section 510(a) Does Not Apply to Conditions 40 and 44, Absent Which Aflac Cannot Impose Its Purported Modifications ..................................................................................... 15

IV.    Aflac Has Not Met Its Burden to Demonstrate That the Safe Harbors Protect the Enforcement of the Zero-Payment and Unwind Costs Provisions ................................. 18

    A.    Neither Section 560 Nor Section 362(b)(17) Protects Modification of Rights or Distribution of Payment Subsequent to Termination ........................... 18

    B.    The Policies Underlying the Safe Harbor Provisions Do Not Apply to and Are Not Served by the Enforcement of the Zero-Payment and Unwind Costs Provisions ................................................................................................. 21

Conclusion and Relief Requested ............................................................................... 23

**CASES**

*COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic)*,
    524 F.3d 373 (2d. Cir. 2008)................................................................5

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ..................................................................18

*Calyon N.Y. v. Am. Home Mortgage, Inc. (In re Am. Home Mortgage, Inc.)*,
    379 B.R. 503 (Bankr. D. Del. 2008) ...............................................21

*Chase Manhattan Bank, N.A. v. T&N PLC*,
    905 F.Supp. 107 (S.D.N.Y. 1995)...................................................4

*Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*,
    136 B.R. 636 (Bankr. S.D.N.Y. 1992) .............................................9

*Cumis Ins. Soc'y v. Citibank, N.A.*,
    921 F.Supp. 1100 (S.D.N.Y. 1996)..................................................4

*GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*,
    336 B.R. 843 (S.D. Fla. 2005) ...................................................12, 16

*Goode v. Hagerty (In re Sys. Impact, Inc.)*,
    229 B.R. 363 (Bankr. E.D. Va. 1998)................................... 12, 16-17

*HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*,
    364 F.3d 355 (1st Cir. 2004)...........................................................12

*Hardy v. N.Y. City Health & Hosp. Corp.*,
    164 F.3d 789 (2d Cir. 1999)............................................................20

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994)..........................................11, 16

*In re Pine Lake Vill. Apartment Co.*,
    19 B.R. 819 (Bankr. S.D.N.Y. 1982)..........................................11, 16

*In re Seven Stars Rest., Inc.*,
    122 B.R. 213 (Bankr. S.D.N.Y. 1990)..............................................9

*In re Texaco, Inc.*,
    73 B.R. 960 (Bankr. S.D.N.Y. 1987)...............................................14

*In re WorldCom, Inc.*,
343 B.R. 486 (Bankr. S.D.N.Y. 2006) ........................................................5

*Interbulk Ltd. v. Louis Dreyfus Corp. (In re Interbulk)*,
240 B.R. 195 (Bankr. S.D.N.Y. 1999) ......................................................21

*LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*,
22 B.R. 556 (Bankr. S.D. Fla. 1982) ..........................................................9

*Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp.,
Inc.)*, 276 F.3d 123 (2d Cir. 2002) .............................................................8

*N.Y. Stock Exch. v. Pickard & Co., Inc.*,
296 A.2d 143 (Del. Ch. 1972) ...................................................................12

*Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*,
163 B.R. 927 (Bankr. E.D.N.Y. 1994) ........................................................9

*Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.)*,
928 F.2d 565 (2nd Cir. 1991) .....................................................................9

*Playboy Enters. Inc. v. Dumas*,
960 F.Supp. 710 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) ............4

*Scherer v. Equitable Life Assur. Soc'y*,
No. 01 Civ. 10193, 2004 WL 2101932 (S.D.N.Y. Sept. 21, 2004) ...................4

*Shopper's World Cmty. Ctr. v. Bradlee Stores, Inc. (In re Bradlees Stores, Inc.)*, Nos. 00-
16033 (BRL), 00-16035(BRL), 00-16036(BRL), 01-CV-3934 (SAS), 2001 WL
1112308 (S.D.N.Y. Sept. 20, 2001) .............................................................5

*Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's Inc.)*,
140 B.R. 643 (Bankr. W.D. Mich. 1992) ...................................................11

*United States v. Whiting Pools, Inc.*,
462 U.S. 198 (1983) ...................................................................................8

STATUTES, RULES, AND LEGISLATIVE MATERIALS

11 U.S.C. § 362(a) ...............................................................................................23

11 U.S.C. § 362(a)(3) ......................................................................................5, 14

11 U.S.C. § 362(b)(17) ................................................................................ *passim*

11 U.S.C. § 365(e)(1) ............................................................................ *passim*

11 U.S.C. § 365(e)(1)(A) ...................................................................... 13

11 U.S.C. § 365(e)(1)(B) ........................................................................ 2

11 U.S.C. § 510(a) ............................................................................... *passim*

11 U.S.C. § 541(c)(1) .............................................................................. 5

11 U.S.C. § 541(c)(1)(B) ...................................................................... *passim*

11 U.S.C. § 547 ..................................................................................... 10

11 U.S.C. § 548 ..................................................................................... 10

11 U.S.C. § 560 ................................................................................. *passim*

28 U.S.C. § 2201 ................................................................................... 23

Act of June 25, 1990, Pub. L. No. 101-311, H.R. Rep. No. 101-484 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223 ............................................. 22

Bankr. R. 7001 ...................................................................................... 23

Bankr. R. 7056 ...................................................................................... 23

H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 348-49 (1997), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ................................................ 14

H.R. Rep. No. 101-484 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223 ..................................... 20

H.R. Rep. No. 109-31, pt. 1, at 129 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88 ......... 19, 21, 22

Local Bankr. R. 7056-1(a) .................................................................. 2, 3, 4

**Other Authorities**

*Interest Swap: Hearing on S. 396 Before the S. Subcomm. on Cts. & Admin. Prac. of the S. Comm. Judiciary, 101st Cong. (1989)* ("Interest Swap Hearing") ...................................... 20

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), and LBHI, by and through undersigned counsel, hereby file this reply memorandum of law in further opposition to the motion for summary judgment filed by defendants American Family Life Assurance Corporation of Columbus ("Aflac") and in further support of LBSF and LBHI's motion for summary judgment filed on September 25, 2009.

### PRELIMINARY STATEMENT

1.      Aflac improperly seeks to inject new arguments in its opposition brief that are inconsistent with those raised in its summary judgment motion, but these untimely contentions still fail to breathe new life into the unlawful *ipso facto* clauses at issue.

2.      First, Aflac contends that LBHI's chapter 11 filing automatically triggered the zero-payment, Unwind Cost, and noteholder priority provisions in Conditions 40 and 44 of the Terms and Conditions of the Notes and the Supplemental Trust Deeds, relying solely on the English court's alternative holding in the *Perpetual* case dealing with other entities and other transactions.[1]   Second, Aflac contends that section 510(a) of the Bankruptcy Code somehow immunizes these provisions from otherwise being held unenforceable *ipso facto* clauses.[2]   Aflac cannot raise these grounds for relief for the first time in its opposition papers when its summary judgment motion does not even address them.   In its summary judgment motion, Aflac's sole

---

[1] Aflac could have raised both arguments in its motion for summary judgment, and in particular, its new argument regarding the effect of LBHI's chapter 11 filing is also untimely because it relies on the judgment issued by the English court on July 28, 2009.  Aflac filed its motion for summary judgment on August 4, 2009.

[2] Capitalized terms have the same meaning herein as ascribed to them in LBSF's and LBHI's motion for summary judgment or their memorandum in opposition to Aflac's motion for summary judgment.

arguments were that the zero-payment provision is an enforceable *ipso facto* clause under the safe harbor provisions of section 560 of the Bankruptcy Code, and that Aflac believes itself entitled to relief on its counterclaims. Aflac's belated arguments flout the local rules for summary judgment briefing established by the United States Bankruptcy Court for the Southern District of New York requiring a letter requesting a pre-motion conference and "setting forth the issues to be presented in the motion and the grounds for relief." LOCAL BANKR. R. 7056-1(a). Aflac already ignored this rule once by filing its summary judgment motion without first obtaining this Court's order authorizing it to do so. Now it seeks to raise arguments not set forth in its pre-motion conference letter or its motion for summary judgment. The Court should decline to entertain these arguments because they violate Rule 7056-1(a) as well as standard summary judgment procedure. *See infra* Part I.

3. Not only are Aflac's new arguments impermissibly late, they are fundamentally inconsistent with Aflac's safe-harbor arguments, which assume that the challenged contractual provisions are *ipso facto* clauses that implicate the property of LBSF's estate. Aflac originally relied on the "Bankruptcy Termination Provision" (which it defines as the zero-payment provision of Condition 40, Aflac Mot. for Summ. J. at 9-10) as "a textbook example of" an *ipso facto* clause under section 365(e)(1)(B) of the Bankruptcy Code. Aflac Mot. for Summ. J. at 18. Aflac is now contending that LBSF's property interests were *not* implicated as of the commencement of its chapter 11 case because the zero-payment, Unwind Cost, and noteholder priority provisions had already been triggered. Aflac (like BNY) cannot have its cake and eat it too.

4. But even if Aflac could properly raise these new and inconsistent arguments at this late date, they fail for the same reasons LBSF and LBHI articulated in their opposition to

BNY's summary judgment motion: (1) the challenged *ipso facto* provisions do not take effect automatically upon an Event of Default, but require several preconditions to be satisfied, which undisputedly have not occurred; (2) the English court's alternative holding about LBHI's September 15, 2008 chapter 11 filing is not even binding on this Court in the *Saphir* case,[3] much less this entirely separate case; and (3) section 510(a) does not apply and cannot be used to immunize Conditions 40, 44, and section 5.5 from being held invalid *ipso facto* clauses.

5.      Finally, Aflac's arguments that the *ipso facto* clauses fall within the safe harbor provisions of section 560 of the Bankruptcy Code must be rejected for the reasons LBSF has outlined on two previous occasions: the *ipso facto* provisions do not constitute a "liquidation, termination, or acceleration" of a swap agreement, nor do they effect an "offset or net out" of the parties' positions thereunder.

6.      Accordingly, this Court should deny Aflac's summary judgment motion and grant LBSF's motion for summary judgment, declaring these provisions unenforceable under sections 365(e)(1) and 541(c)(1)(B).

## ARGUMENT

## I. AFLAC MAY NOT RAISE NEW GROUNDS FOR RELIEF FOR THE FIRST TIME IN ITS OPPOSITION BRIEF.

7.      As noted above, Aflac's belated attempt to argue new grounds for relief in its opposition brief violates Local Bankruptcy Rule 7056-1(a), which requires that prior to filing any motion for summary judgment, a party must submit a letter requesting a pre-motion conference and "setting forth the issues to be presented in the motion and the grounds for relief." LOCAL BANKR. R. 7056-1(a). Aflac should not be permitted to ignore the rule a second time now by

---

[3] *Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Ltd.*, No. 09-01242 (JMP) (the "*Saphir*" case).

raising new arguments not previously requested in a pre-conference letter or authorized by this Court.

8.     Aflac's failure to include these arguments in its motion for summary judgment also violates standard summary judgment practice. It is well established that on summary judgment, a party may not properly raise new arguments or grounds for relief for the first time in its responsive brief. *See Scherer v. Equitable Life Assur. Soc'y*, No. 01 Civ. 10193, 2004 WL 2101932, at *5 n.1 (S.D.N.Y. Sept. 21, 2004) ("In its initial motion papers and main brief, *res judicata* and the law of the case were the only bases defendant urged in support of its motion. Defendant suggests additional grounds in its reply brief. This is improper practice."); *Chase Manhattan Bank, N.A. v. T&N PLC*, 905 F.Supp. 107, 122 n.5 (S.D.N.Y. 1995) ("Arguments for summary judgment cannot be raised for the first time in reply briefs.").[4]

9.     Because Aflac's new arguments were not authorized in advance by this Court and violate Local Bankruptcy Rule 7056-1(a) and standard motion practice, this Court should decline to consider them. But even were this Court to consider these arguments on the merits, they fail for the reasons discussed below.

## II.     AFLAC CANNOT SUBSTANTIATE ITS NEW ARGUMENTS REGARDING THE EFFECT OF LBHI'S CHAPTER 11 FILING.

10.     Aflac's first new-found argument contends that LBHI's chapter 11 filing automatically triggered the zero-payment, Unwind Costs, and noteholder priority provisions contained in Conditions 40 and 44 of the terms and conditions of the Notes and section 5.5 of the

---

[4] This requirement is fundamental not only in summary judgment briefing, but for any motion practice or appellate briefing. *See Playboy Enters. Inc. v. Dumas*, 960 F.Supp. 710, 720 n.7 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) ("Arguments made for the first time in a reply brief need not be considered by a court."); *Cumis Ins. Soc'y v. Citibank, N.A.*, 921 F.Supp. 1100, 1110 n.7 (S.D.N.Y. 1996) (declining to consider an argument raised for the first time in a reply brief).

Supplemental Trust Deeds. Aflac Opp. at 21, 23-28.[5] Aflac asserts that it is Debtors who ignore the effect of LBHI's filing, *id.*, but it was Aflac who ignored it, at least until it filed its opposition brief.

11. Aflac's new argument is fundamentally inconsistent with its safe harbor argument, which assumes that the challenged clauses constitute "textbook" *ipso facto* clauses. *See supra* ¶ 3; Aflac Mot. for Summ. J. at 18.[6] Aflac's new argument regarding LBHI's chapter 11 filing now contends that "section 541(c)(1) is not implicated at all in this case," the automatic stay of section 362(a)(3) is not violated, and section 365(e)(1) does not apply.[7] Aflac Opp. at 27-

---

[5] This brief will refer to parties' opposition briefs as "Opp." and to motions for summary judgment as "Mot. for Summ. J."

[6] Aflac previously focused exclusively on the zero-payment provision, but has had another change of heart and seeks now to enforce Condition 44 and section 5.5 as well for the first time. *Compare* Aflac Mot. for Summ. J. at 8, 10 *with* Aflac Opp. at 26-30.

[7] In a footnote, Aflac maintains that the contracts are not executory contracts. Aflac Opp. at 24 n.43. Aflac is wrong again. As LBSF has already established, the Transaction Documents are executory contracts subject to the prohibition on *ipso facto* clauses contained in section 365(e)(1) because, among other things, both BNY and LBSF had material, unperformed obligations under the Supplemental Trust Deeds *as of the commencement of LBSF's chapter 11 case*, which is the operative period of time to determine whether a modification of a debtor's interest as a result of a bankruptcy filing violates section 365(e)(1). LBSF & LBHI Mot. for Summ. J. at 15-16, 19-21. The contracts are executory, among other reasons, because they provide financial benefit to the estate. *See In re WorldCom, Inc.*, 343 B.R. 486, 493 (Bankr. S.D.N.Y. 2006); *see also* LBSF & LBHI Mot. for Summ. J. at 20; LBSF Opp. to BNY Mot. for Summ. J. at 9-12. This is so "regardless of whether any material obligations remain outstanding on the part of only one party to the contract." *WorldCom*, 343 B.R. at 493; *see also Shopper's World Cmty. Ctr. v. Bradlee Stores, Inc. (In re Bradlees Stores, Inc.)*, Nos. 00-16033 (BRL), 00-16035(BRL), 00-16036(BRL), 01-CV-3934 (SAS), 2001 WL 1112308, at *6 (S.D.N.Y. Sept. 20, 2001).

Aflac is also wrong in maintaining that the cases cited by LBSF and LBHI, including the *Penn Traffic* and *WorldCom* decisions, are inapposite because the contracts in those cases had not terminated. In fact, those cases are directly on point because the contracts in *this* case had not terminated as of LBSF's chapter 11 filing and remain executory. *See COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic)*, 524 F.3d 373, 379 (2d. Cir. 2008) (holding contract was executory in light of unsatisfied contractual obligation to pay, applying "Countryman" approach to determining whether contract is executory, looking to whether obligations of parties are so far unperformed that failure to complete performance would constitute a material breach excusing performance); *WorldCom*, 343 B.R. at 499 (explaining that the "Functional" approach to determining whether contract is executory looks to "whether assumption or rejection of a contract would benefit a debtor's estate").

Finally, even if the contracts are deemed not to be executory, the result is the same under section 541(c)(1)(B). That provision bars *ipso facto* clauses that impact any property interest of the estate solely because of the debtor's bankruptcy filing. Section 541(c)(1)(B) thus serves to protect LBSF's property interest in the Transaction Documents regardless of whether those contracts are considered executory.

28.     Aflac maintains that this is the case because the zero-payment, Unwind Costs, and noteholder priority provisions "became effective automatically upon LBHI's bankruptcy filing on September 15, 2008," relying solely on the English court's alternative holding regarding only the noteholder priority provision in section 5.5 of the Supplemental Trust Deeds.  Aflac Opp. at 26.  Aflac offers no analysis of these provisions to explain how they could have become effective when no termination notice was sent until after LBSF's chapter 11 filing and the preconditions necessary to effectuate these provisions had not occurred as of that October 3, 2008 date.  As detailed in LBSF's opposition to BNY's summary judgment motion in the *Saphir* proceeding, however, these provisions did not deprive LBSF of its property interest in the collateral, which was unchanged as of the commencement of its chapter 11 case.  *See* LBSF Opp. to BNY Mot. for Summ. J. at 7-17.

12.     In addition to the *ipso facto* clauses challenged in the *Saphir* proceeding, the Aflac Transaction Documents also contain a zero-payment provision in Condition 40 of the terms and conditions of the Notes that similarly requires several preconditions be met before it can go into effect, principal among which is that a "termination payment" cannot be determined unless and until there is a termination of the swap agreements.  *See* Aflac Decl. Ex. 7 at Condition 40, cl. iii; *id.* Ex. 10 at Condition 40, cl. iii; *id.* Ex. 13 at Condition 40, cl. iii; *id.* Ex. 16 at Condition 40, cl. iii (providing that the "termination payment shall be deemed to be zero in the event that the Swap Agreement is terminated due to the occurrence of an Event of Default (as defined in the ISDA Master Agreement) where the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement)").  Condition 40 is expressly limited to post-termination payments:

> *Upon any such early termination* of the Swap Agreement, the Issuer or the Swap Counterparty may . . . be liable to make a *termination payment* to the other . . . .

> Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement; provided that such termination payment shall be deemed to be zero *in the event that the Swap Agreement is terminated* due to the occurrence of an Event of Default (as defined in the ISDA Master Agreement) where the Swap Counterparty is the Defaulting Party.

Aflac Decl. Ex. 7 at Condition 40, cl. iii; *id.* Ex. 10 at Condition 40, cl. iii; *id.* Ex. 13 at Condition 40, cl. iii; *id.* Ex. 16 at Condition 40, cl. iii (emphases added). By its terms, Condition 40 provides that Early Termination Payments payable to LBSF will be "deemed to be zero" once the swap agreement is terminated. *Id.* Thus, contrary to Aflac's argument, condition 40 could not go into effect "automatically upon LBHI's bankruptcy filing," Aflac Opp. at 26, but only after "early termination of the Swap Agreement." Aflac Decl. Ex. 7 at Condition 40, cl. iii; *id.* Ex. 10 at Condition 40, cl. iii; *id.* Ex. 13 at Condition 40, cl. iii; *id.* Ex. 16 at Condition 40, cl. iii. Instead, termination of the swap agreements can only occur after the non-defaulting party sends a notice designating the relevant Event of Default and specifying an Early Termination Date:

> If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.

Aflac Decl. Ex. 8, § 6(a); *id.* Ex. 11, § 6(a); *id.* Ex. 14, § 6(a); *id.* Ex. 17, § 6(a). Because the termination notice was not sent until after LBSF's petition date, Aflac Decl. Ex. 23, Condition 40 cannot be read to "deem" the Early Termination Payment payable to LBSF to be zero.

13. Notably, Aflac does not contend that the English court's alternative holding regarding the effect of LBHI's filing under English law is binding on this Court's determination under U.S. bankruptcy law. The English court did not even consider the zero-payment provision in Condition 40 because that provision does not appear in the *Saphir* transaction documents. Nor are the English courts' decisions binding with respect to section 5.5 and Condition 44 because

they were made in an entirely separate proceeding in England and are not even binding on this Court in the *Saphir* proceeding, let alone in this case. As detailed in LBSF's opposition to BNY's summary judgment motion in the *Saphir* proceeding, the English court considered a distinct anti-deprivation principle under English law, and did not purport to speak to the U.S. bankruptcy law issues raised in the *Saphir* case, much less in this separate case involving different transactions.[8] This Court should exercise its duty to independently review the Transaction Documents in light of the U.S. Bankruptcy Code. *See* LBSF Opp. to BNY Mot. for Summ. J. at 5.

14. Aflac offers no support of any kind for its argument that LBSF's interest in the collateral amounted to "contingent interests" that had not "ripen[ed] into enforceable rights" and that were effectively extinguished on September 15, 2008 when LBHI filed its chapter 11 case. Aflac Opp. at 22. Aflac offers no support for this proposition because it conflicts with bedrock principles of the Bankruptcy Code recognizing that even contingent interests are protected property of the estate. *See Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 128 (2d Cir. 2002) (recognizing that "property of the estate" is sufficiently broad to include even strictly contingent interests). As LBSF and LBHI established in their motion for summary judgment, LBSF & LBHI Mot. for Summ. J. at 22-23, the Supreme Court has recognized that property of the estate is broadly construed, *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983), and the Second Circuit has

---

[8] The same infirmity as a useful precedent for this Court is also present in the appellate decision issued in the *Perpetual* case on November 6, 2009. *See* LBSF Reply to BNY Opp. Ex. A. The English Court of Appeal was still interpreting the documents for purposes unrelated to the *ipso facto* doctrine under principles that are not sufficiently analogous to have any bearing on U.S. bankruptcy law. *See* Decl. of G. McCormack in Support of LBSF Opp. to BNY Mot. for Summ. J. ¶¶ 32, 43, 52, 53. The Bankruptcy Code's prohibition on *ipso facto* clauses is far broader and more comprehensive than the anti-deprivation principle. *Id.* ¶ 32. Indeed, section 541(c)(1)(B) broadly prohibits contractual agreements conditioned on "the commencement of *a* case under [chapter 11]." 11 U.S.C. § 541(c)(1)(B).

recognized that Congress wished to "bring anything of value that the debtors have into the estate." *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.)*, 928 F.2d 565, 573 (2nd Cir. 1991). Aflac cannot dismiss LBSF's property interest in receiving payments under the transaction documents simply because LBHI filed its chapter 11 case first. As LBSF established in its opposition to BNY's summary judgment motion, the challenged *ipso facto* clauses are not automatic or self-executing, and until the issuer, in this case Beryl, took steps to terminate the contracts—which undisputedly occurred after LBSF's chapter 11 filing, LBSF's property interest remained unchanged. Thus, Aflac's contention that LBSF is seeking to expand its interests after its chapter 11 filing is simply incorrect. Aflac Opp. at 23-26.

15.     Aflac also cites cases for the proposition that pre-petition acts do not violate the automatic stay or section 365(e)(1), but these cases actually support LBSF and LBHI's arguments because they involve *pre-petition* terminations, which undisputedly did not occur here. *See* Aflac Opp. at 27-28; *In re Seven Stars Rest., Inc.*, 122 B.R. 213, 218 (Bankr. S.D.N.Y. 1990) (involving lease terminated prepetition); *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992) (involving termination one day prior to petition date); *Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927, 938 (Bankr. E.D.N.Y. 1994) (involving termination three days prior to petition date); *LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.)*, 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) (discussing prepetition termination). The termination notices in this case were not sent until October 10, 2008, *after* LBSF's chapter 11 filing. Compl. Ex. H. Thus, these cases are wholly inapposite.

16.     In sum, this Court should reject Aflac's belated argument regarding the effect of LBHI's chapter 11 filing because it is untimely and unsupported by the Transaction Documents or any case law.[9]

### III.    AFLAC'S BELATED SECTION 510(a) ARGUMENT FAILS.

17.     In its opposition to LBSF's motion for summary judgment, Aflac argues for the first time that section 5.5 of the Supplemental Trust Deed is a subordination agreement that must be upheld in accordance with 11 U.S.C. § 510(a).[10]  *See* Aflac Opp. at 29-30.  But this new argument, which Aflac has belatedly borrowed from BNY's filings in the *Saphir* proceeding, fails for several reasons.  As a threshold matter and as discussed above, a party may not raise a new ground for relief in a responsive brief.  *See supra* Part I. Aflac did not raise its section 510(a) argument in its motion for summary judgment or seek permission from this Court to do so and is forbidden from doing so now.  Additionally, Aflac's section 510(a) argument is not only barred, but incorrect as well: section 5.5 does not qualify as a subordination agreement under any of the basic definitions provided by Congress and court decisions.  Moreover, enforcement of section 5.5 would violate the prohibition of *ipso facto* provisions contained in 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), as well as the automatic stay imposed upon LBSF's bankruptcy filing.  Aflac's interpretation applying section 510(a) to section 5.5 would thus violate both the intent and the plain language of the Bankruptcy Code.  Finally, even if section 510(a) is somehow applicable to section 5.5 and enforcement of section 5.5 would not violate the

---

[9] To the extent that this Court rules that LBSF was deprived of a property interest pre-petition, LBSF anticipates that it would seek leave of Court to amend its complaint to include an avoidable transfer claim.  *See* 11 U.S.C. §§ 547, 548.

[10] Aflac does not contend that section 510(a) applies to Conditions 40 and 44 of the Terms and Conditions of the Notes, but only to section 5.5, which it argues is irrelevant given the zero-payment provision in Condition 40.  As discussed below, *infra* at Part III.C, Aflac's avoidance of any discussion of Conditions 40 and 44 in connection with section 510(a) reflects the weakness of its arguments.  Assuming Aflac believes that section 510(a) is inapplicable to Conditions 40 and 44, LBSF agrees and limits its discussion of section 510(a) to section 5.5.

prohibition of *ipso facto* provisions contained in 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), Aflac does not contend that Conditions 40 and 44 are subordination agreements under section 510(a), and Aflac cannot obtain the payments it seeks absent enforcement of those conditions.[11]

A.      **Section 5.5 Is Not a Subordination Agreement as Contemplated by Bankruptcy Code Section 510(a).**

18.      As discussed in LBSF's opposition to BNY's motion for summary judgment, section 5.5 does not become a subordination agreement merely because Aflac chooses to label it as such. *See* LBSF Opp. to BNY Mot. for Summ. J. ¶¶ 75-77.  Courts in the Second Circuit and a number of other jurisdictions have clarified that a contract clause must possess some basic characteristics to qualify as a subordination agreement. *See id.* ¶ 77.  Several cases in particular have held that subordination agreements are those which require a creditor with a superior or equal right to the repayment of a debt to subordinate its claim to another creditor. *See In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) (ruling that "[a] contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another"); *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 822, 830-31 (Bankr. S.D.N.Y. 1982) (rejecting a party's argument that a contract should be construed as a subordination agreement on the ground that the contract clause merely specified a priority of payment among creditors, instead of creating an agreement "where a creditor and a debtor agree[d] to create priorities among debts"); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's Inc.)*, 140 B.R. 643, 667-68 (Bankr. W.D. Mich. 1992) ("[A] subordination agreement is simply a contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any

---

[11] As a result, Aflac's safe-harbor arguments under section 560 entirely ignore section 5.5 and focus exclusively on Conditions 40 and 44.  *See infra* note 13.

payment on the subordinated debt may be made to, and retained by, the subordinated creditor."
(citing *N.Y. Stock Exch. v. Pickard & Co., Inc.*, 296 A.2d 143, 146-47 (Del. Ch. 1972))).  Other
decisions contain similar definitions, all of which emphasize that a subordination agreement
must involve an agreement between creditors to create a priority among debts owed by a
common debtor.  *See Goode v. Hagerty (In re Sys. Impact, Inc.)*, 229 B.R. 363, 369 (Bankr. E.D.
Va. 1998) (holding that "[a] subordination agreement requires three necessary parties:
(1) common debtor, (2) a junior creditor who agrees to be subordinate, and (3) a senior creditor
who acquires priority"); *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843,
857 (S.D. Fla. 2005) ("Case-law defines a subordination agreement as one in which a party
having a superior right of some sort agrees with someone having an inferior right that, as
between the two of them, the inferior right shall be treated as if it were superior.") (internal
citations omitted); *HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*, 364 F.3d 355,
361 (1st Cir. 2004) (noting that "[s]ubordination agreements are essentially inter-creditor
arrangements").  Section 5.5 does not meet these standards because it does not subordinate one
creditor's claim to another's.  Rather, it alters the priority of payments applicable upon the
realization or enforcement of collateral only upon termination of the transactions pursuant to
LBSF's bankruptcy filing.  *See* Compl. Ex. B § 5.5; *id.* Ex. C § 5.5; *id.* Ex. D § 5.6; *id.* Ex. E
§ 5.5.  Accordingly section 5.5 is not a subordination agreement and is not enforceable under
Bankruptcy Code section 510(a).

> **B.**     **Section 5.5 Is an Invalid *Ipso Facto* Provision Whose Enforcement Is Prohibited by the Bankruptcy Code.**

19.     In fact, section 5.5 is not only excluded from section 510(a)'s reach, but is
forbidden by other provisions of the Bankruptcy Code.  Sections 365(e)(1) and 541(c)(1)(B) of
the Bankruptcy Code render unenforceable *ipso facto* provisions—clauses that deprive a debtor's

estate of its property solely as a result of a bankruptcy filing.[12]  As discussed in LBSF and

LBHI's motion for summary judgment, *see* LBSF & LBHI Mot. for Summ. J. at 12-25, sections

365(e)(1) and 541(c)(1)(B) bar application of any provisions containing impermissible

modifications of LBSF's payment rights.  Section 5.5 is one such provision.  ISDA section

5(a)(vii) defines the commencement of a bankruptcy proceeding as an Event of Default, *see*

Aflac Decl. Ex. 8 § 5(a)(vii); *id.* Ex. 11 § 5(a)(vii); *id.* Ex. 14 § 5(a)(vii); *id.* Ex. 17 § 5(a)(vii);

section 5.5, in turn, modifies LBSF's right to be paid prior to the noteholders after the occurrence

of an Event of Default by modifying the priority of payments from "Swap Counterparty Priority"

to "Noteholder Priority."  *See* Compl. Ex. B § 5.5; *id.* Ex. C § 5.5; *id.* Ex. D § 5.6; *id.* Ex. E §

5.5.  Because it modifies LBSF's payment rights solely because of the financial condition of

LBSF or the commencement of a chapter 11 case, section 5.5 is an *ipso facto* provision rendered

invalid by sections 365(e)(1) and 541(c)(1)(B).  *See* LBSF & LBHI Mot. for Summ. J. at 12-25;

LBSF & LBHI Opp. ¶ 2.  In fact, Aflac's arguments under section 560 of the Bankruptcy Code

expressly admit that the challenged provisions amount to *ipso facto* clauses that they contend are

safe-harbored.  *See supra* ¶ 3; Aflac Mot. for Summ. J. at 18.

      20.     Accordingly, Aflac's argument that section 510(a) supports enforcement of

section 5.5 contradicts the prohibitions on *ipso facto* provisions described above.  As LBSF has

noted in its opposition to BNY's motion for summary judgment, *see* LBSF Opp. to BNY Mot.

---

[12] In relevant part, section 365(e)(1) states that "[n]otwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on . . . the insolvency or financial condition of the debtor at any time before the closing of the case."  11 U.S.C. § 365(e)(1)(A).  Section 541(c)(1)(B) provides that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."  11 U.S.C. § 541(c)(1)(B).

for Summ. J. ¶ 81, Congress and the courts have plainly stated that *ipso facto* clauses hinder the purposes of the Bankruptcy Code and that sections 365(e)(1) and 541(c)(1)(B) were enacted in order to counter their harmful impact. *See, e.g.*, H.R. REP. NO. 95-595, 95th Cong., 1st Sess., at 348-49 (1997), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6304-6305 ("Subsection (e) [of Section 365] invalidates *ipso facto* or bankruptcy clauses. These clauses, protected under present law . . . frequently hamper[ ] rehabilitation efforts."); *In re Texaco, Inc.*, 73 B.R. 960, 968 (Bankr. S.D.N.Y. 1987) ("Congress specifically rejected *ipso facto* clauses geared to the commencement of title 11 cases not only with respect to executory contracts [as provided by § 365(e)(1)], but also with respect to the concept of what constitutes property of the estate, as expressed in . . . § 541(c)(1)(B)."). As LBSF has argued, allowing parties to circumvent this intent by cloaking *ipso facto* provisions as subordination agreements would frustrate the orderly and equitable resolution of debtors' estates and would negate the objectives of the Bankruptcy Code. *See* LBSF Opp. to BNY Mot. for Summ. J. ¶ 81.

21. Moreover, enforcement of section 5.5 would violate Bankruptcy Code section 362(a)(3)'s automatic stay provision, which states that a chapter 11 petition "operates as a stay, applicable to . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[ ]." 11 U.S.C. § 362(a)(3). Because it would affect LBSF's payment rights by modifying the priority of payments, enforcement of section 5.5 would constitute "an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *See* LBSF Opp. to BNY Mot. for Summ. J. ¶ 82. And as these modifications to LBSF's payment rights would occur only because of LBSF's bankruptcy filing, enforcement of section 5.5 would infringe upon the automatic stay. *See* LBSF & LBHI Mot. for Summ. J. at 21-25. In desperation, Aflac hopes to

bypass this issue by calling section 5.5 a subordination agreement—suddenly, and for the first time—in its opposition brief. But Aflac cannot be permitted to interpret section 510(a) in a way that flouts the automatic stay provision as well as the prohibitions on *ipso facto* provisions contained in sections 365(e) and 541(c)(1)(B)—nor has it cited any authority suggesting that section 510(a)'s protection of subordination agreements somehow supersedes the Bankruptcy Code's automatic stay provision and restraints on *ipso facto* clauses. *See* Aflac Opp. at 29-30. Because section 510(a) does not protect section 5.5's modifications from the other Bankruptcy Code provisions that prevent their enforcement, section 5.5 should not be enforced.

      **C.**      **Even Were Section 5.5 Read as a Subordination Agreement, Aflac's Argument Fails Because Bankruptcy Code Section 510(a) Does Not Apply to Conditions 40 and 44, Absent Which Aflac Cannot Impose Its Purported Modifications.**

      22.      As discussed above, section 5.5 is not a subordination agreement as defined by Bankruptcy Code section 510(a). *See supra* Part III.A. Furthermore, section 5.5 is an invalid *ipso facto* provision whose enforcement would violate several provisions of the Bankruptcy Code. *See supra* Part III.B. But even were section 5.5 enforceable, Aflac would still not be entitled to the relief it seeks because Aflac does not seek to enforce Conditions 40 and 44 under section 510(a), and those provisions, which are necessary to effectuate payment under the transactions, remain barred by both the Bankruptcy Code's prohibition of *ipso facto* clauses and the automatic stay. Although section 5.5 changes LBSF's payment priority from "Swap Counterparty Priority" to "Noteholder Priority," it does not direct particular amounts to either party and so does not entitle Aflac to any specific payments. *See* Compl. Ex. B § 5.5, *id.* Ex. C § 5.5; *id.* Ex. D § 5.6; *id.* Ex. E § 5.5. Instead, the relief that Aflac claims depends on enforcement of Conditions 40 and 44, which list specific modifications to LBSF's payment rights and specify the circumstances in which those modifications apply. Condition 40 provides

that LBSF's default negates either party's obligation to transfer a termination payment: "[s]uch termination payment shall be deemed to be zero in the event that the [Credit Default Swap Agreement] is terminated due to the occurrence of an Event of Default . . . where [LBSF] is the Defaulting Party . . . ." Aflac Decl. Ex. 7 at Condition 40, cl. iii; *id.* Ex. 10 at Condition 40, cl. iii; *id.* Ex. 13 at Condition 40, cl. iii; *id.* Ex. 16 at Condition 40, cl. iii; LBSF & LBHI Mot. for Summ. J. at 6. Condition 44, in relevant part, modifies the calculation of the Early Redemption Amount upon LBSF's default so that LBSF no longer receives Unwind Costs and other payments to which it would otherwise be entitled. Aflac Decl. Ex. 7 at Condition 44; *id.* Ex. 10 at Condition 44; *id.* Ex. 13 at Condition 44; *id.* Ex. 16 at Condition 44; LBSF & LBHI Mot. for Summ. J. at 7. Conditions 40 and 44, rather than section 5.5, are fundamental to Aflac's purported modifications: without justifying their enforcement, Aflac cannot show that it is entitled to any relief.

23. But tellingly, Aflac has omitted any mention of Condition 40 or Condition 44 from its section 510(a) argument, perhaps realizing that section 510(a) is inapplicable to both Conditions and, furthermore, that enforcement of either is blocked by the same restraints on *ipso facto* clauses and automatic stay provisions that curb the application of section 5.5. Neither Condition 40 nor Condition 44 contains any of the basic elements of a subordination agreement because neither requires a creditor with a superior or equal right to the repayment of a debt to subordinate its claim to another creditor. *See supra* Part III.A; *In re Best Prods. Co.*, 168 B.R. at 69; *In re Pine Lake Vill. Apartment Co.*, 19 B.R. at 822, 830-31. Moreover, neither Condition defines respective rights of different creditors with respect to debts owed by a common debtor. *See supra* III.A; *In re Sys. Impact, Inc.*, 229 B.R. at 369; *In re Air Safety Int'l, L.C.*, 336 B.R. at

857. Accordingly, as Aflac implicitly recognizes, Bankruptcy Code section 510(a) does not support enforcement of either Condition 40 or Condition 44.

24.     Therefore, even if Aflac succeeds on its section 510(a) argument with respect to section 5.5, any victory would be entirely Pyrrhic because Aflac cannot obtain the payments it seeks unless it can also enforce the payment provisions contained in Conditions 40 and 44. Aflac makes this abundantly clear by entirely disregarding section 5.5 in its safe harbor arguments under section 560 and seeking to enforce only Conditions 40 and 44.  *See infra* note 13. But as LBSF has noted in its motion for summary judgment, Conditions 40 and 44 are unenforceable *ipso facto* provisions that violate sections 365(e)(1) and 541(c)(1)(B), as well as the automatic stay imposed by section 362(a)(3).  *See* LBSF & LBHI Mot. for Summ. J. at 12-25.  Conditions 40 and 44 penalize LBSF for its bankruptcy filing by defining such a filing as an Event of Default and by stripping LBSF of a termination payment and Unwind Costs if a Swap Counterparty Event of Default takes place.  *See* Aflac Decl. Ex. 7 at Condition 40, cl. iii, Condition 44; *id.* Ex. 10 at Condition 40, cl. iii, Condition 44; *id.* Ex. 13 at Condition 40, cl. iii, Condition 44; *id.* Ex. 16 at Condition 40, cl. iii, Condition 44.  Moreover, Conditions 40 and 44 do not fall within the safe harbor provisions of section 560 and 362(b)(17).  *See infra* Part IV; LBSF & LBHI Mot. for Summ. J. at 25-40.

25.     In sum, this Court should reject Aflac's section 510(a) argument because it (1) is untimely and unauthorized by this Court, (2) fails on the merits, and (3) is irrelevant unless Aflac can also demonstrate that Conditions 40 and 44 are enforceable, which they are not.

## IV. AFLAC HAS NOT MET ITS BURDEN TO DEMONSTRATE THAT THE SAFE HARBORS PROTECT THE ENFORCEMENT OF THE ZERO-PAYMENT AND UNWIND COSTS PROVISIONS.

### A. Neither Section 560 Nor Section 362(b)(17) Protects Modification of Rights or Distribution of Payment Subsequent to Termination.

26.     Aflac has failed to sufficiently refute the plain reality that the language of section 560 of the Bankruptcy Code protects *only* the right of a swap participant to cause the "*liquidation, termination and acceleration* of one or more swap agreements . . . or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation or acceleration of one or more swap agreements. . . ." 11 U.S.C. § 560 (emphasis added); LBSF & LBHI Mot. for Summ. J. at 26-27. Instead, Aflac attempts to blur the distinction between the "termination and liquidation" of transactions, referred to as the Close-Out, LBSF & LBHI Mot. for Summ. J. at 31, and its exercise of "associated rights" and "what flows as a consequence of such termination," in the zero-payment and Unwind Costs provisions that LBSF challenges in Conditions 40 and 44.[13] Aflac Opp. at 34, 37. But the exercise of rights that "flow" subsequent to termination or that are "associated" with or "ancillary to" termination are undeniably beyond the bounds of the statute's safe harbors. *Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282, at *7 (Bankr. S.D.N.Y. May 7, 2009) (holding that provision in master agreement requiring debtor to dispute termination calculations within two days was unenforceable as "ancillary" to termination). Aflac's position, therefore, is wholly unsupportable.

---

[13] Aflac previously focused exclusively on the zero-payment provision, but now seeks to enforce the Unwind Costs provision as well, which LBSF and LBHI challenge. However, Aflac does not seek to defend the noteholder priority provision, contained in section 5.5 of the Supplemental Trust Deeds, under section 560.

27.     Additionally, Aflac fails to establish that section 362(b)(17) provides refuge for Beryl to distribute the collateral in accordance with the zero-payment provision and the Unwind Costs provision to the severe detriment of LBSF.  Aflac makes three arguments on this point— none of which are persuasive.

28.     First, Aflac argues that section 362(b)(17), which protects "the exercise by a swap participant . . . of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap," incorporates unlimited contractual rights, by virtue of section 560, into the protections of 362(b)(17).  Aflac Opp. at 38-39.  Specifically, Aflac contends that because section 560 provides that the term "contractual right" includes "a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice," Congress intended that "any and all contractual rights—may act in respect of a swap or security arrangement free from the automatic stay."  Aflac Opp. at 39.

29.     But the portion of section 560 to which Aflac attributes this significance describes the *potential sources* of contractual rights—and does not define their operative nature, which is clearly limited (in the first part of section 560) to the exercise of rights to cause the "liquidation, termination, or acceleration of one or more swap agreements."  11 U.S.C. § 560.  Moreover, Aflac's interpretation ignores the patently clear legislative history that states Congress intended, by section 362(b)(17), to "ensure[ ] that any such agreement, arrangement or enhancement is itself . . . eligible for treatment as such for purposes of *termination, liquidation, acceleration*, offset and netting under the Bankruptcy Code. . . ." H.R. REP. NO. 109-31, pt. 1, at 129 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 190 (emphasis added); *see* LBSF & LBHI Mot. for Summ. J. at 37-39.  Congress did not intend for section 362(b)(17) to provide unlimited

protection of the exercise of *any and all* contractual rights under a security agreement, as Aflac suggests.

30.    Second, Aflac contends that by section 362(b)(17) Congress "specifically contemplated that nondebtor counterparties would avail themselves of the safe harbors to realize upon collateral pledged in connection with a swap agreement." Aflac Opp. at 41. It is true that Congress contemplated the foreclosure on collateral to make a "*final accounting* of the net amount *due from to or owed to* the debtor under any swap agreement." H.R. REP. NO. 101-484, 4-5 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223, 226-27; Aflac Opp. at 41. The right to utilize posted collateral to make a "final accounting for the net amount" owed under the swaps does not constitute a right to *distribute* or otherwise pay collateral posted by the nondebtor pursuant to a separate agreement—such as the Supplemental Trust Deeds and the related Notes—from the one governing the swap obligations.[14]

31.    Third, Aflac's contention that the zero-payment or Unwind Costs provisions qualify for ancillary protections for "swap agreements" under the theory that Congress intended to include "subsequent transactions using unforeseen structures" in the safe harbor provisions is wholly without merit. Aflac Opp. at 42-43. Despite the amendments to the definition of "swap agreement" to include more innovative *swap products*, Congress remained stalwart:

---

[14] Nor is the introduction of Aflac's own "snippets" of legislative history convincing, or for that matter accurate. Aflac contends that "not one witness testified that safe harbor for swaps should be narrow or limited." Aflac Opp. at 40. In fact, the *entire* hearing concerned the scope of an exception to the cardinal tenets of the automatic stay and the prohibition of *ipso facto* clauses. *Interest Swap: Hearing on S. 396 Before the S. Subcomm. on Cts. & Admin. Prac. of the S. Comm. Judiciary, 101st Cong. (1989)* ("Interest Swap Hearing"). "Safe harbors" are by definition, exceptions to the traditional rule, for which "there is a reasonable inference that Congress did not intend to preempt matters beyond that reach . . . [because] the mention of one thing implies the exclusion of the other." *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999) (internal quotation and citation omitted). Furthermore, as shown in LBSF's motion for summary judgment, several witnesses testified to the need for caution in the legislation. *See* Interest Swap Hearing at 61 (statement of Sinatra); *id.* at 1 (statement of Heflin); LBSF & LBHI Mot. for Summ. J. at 31-32.

> The new definition of "swap agreement" . . . should not be interpreted to permit parties to document non-swaps as swap transactions. Traditional commercial arrangements, such as supply agreements, or other non-financial market transactions, such as commercial, residential or consumer loans, cannot be treated as "swaps" under . . . the Bankruptcy Code simply because the parties purport to document or label the transactions as "swap agreements."

H.R. REP. NO. 109-31, at 129. Likewise, the zero-payment and Unwind Costs provisions are not enforceable under the cloak of a "safe harbor" simply because they appear to be part of an agreement related to the swap, or because parties purport to call the rights enforceable under the swap transaction.[15] *Id.*; *Calyon N.Y. v. Am. Home Mortgage, Inc. (In re Am. Home Mortgage, Inc.)*, 379 B.R. 503, 521, 523 (Bankr. D. Del. 2008) (finding servicing provision in repurchase agreement was different in nature and purpose and was separate asset from the repurchase agreement and thus, was not entitled to the safe harbor benefits afforded repurchase agreements). Aflac ignores congressional rigidity on this issue when it states that the "synthetic CDO's . . . are precisely the type of future swap permutation which Congress sought to protect through the broad definitions and expansive language of the safe harbors," and this Court should not adopt Aflac's position. Aflac Opp. at 43.

### B. The Policies Underlying the Safe Harbor Provisions Do Not Apply to and Are Not Served by the Enforcement of the Zero-Payment and Unwind Costs Provisions.

32. More importantly, Aflac in its Opposition wholly fails to show how the policies behind and purpose of the safe harbor provisions, which are to enable swap participants to retain the economic positions of the swap transactions notwithstanding a party's bankruptcy and protect against market fluctuations during the pendency of a party's bankruptcy, are furthered, rather

---

[15] This is clear when considering the industry definition of a swap transaction, which is "an agreement by two parties whereby the parties agree to exchange one or more future payments . . . with payments calculated by reference to a notional amount." *Interbulk Ltd. v. Louis Dreyfus Corp. (In re Interbulk)*, 240 B.R. 195, 201 n.7 (Bankr. S.D.N.Y. 1999) (internal citations omitted). The value of the swap is derived irrespective of the counterparty's financial performance. Here, the amounts due under the zero-payment and Unwind Costs provisions arise *as a result* of LBSF's financial performance and do not derive value from an independent notional amount.

than undermined, by enforcement of the zero-payment and Unwind Costs provisions.  *See* Act of

June 25, 1990, Pub. L. No. 101-311, H.R. REP. NO. 101-484 (1990), *as reprinted in* 1990

U.S.C.C.A.N. 223, 224.  The purpose of the safe harbor provisions and the amendments thereto

are to reduce "systemic risk," which is defined as:

> [T]he risk that the failure of a firm or disruption of a market or settlement system
> will cause widespread difficulties at other firms, in other market segments or in
> the financial system as a whole.  If participants in certain financial institutions are
> unable to enforce their rights to *terminate* their financial contracts with an
> insolvent entity in a timely manner, or to *offset or net* their various contractual
> obligations, the resulting uncertainty and potential lack of liquidity could increase
> the risk of an inter-market disruption.

H.R. REP. NO. 109-31, at 20 n.78 (emphasis added).   The key to reducing the risks of

"uncertainty and potential lack of liquidity" was in allowing counterparties to *terminate* and *net*

termination values.  *Id.*

      33.      The zero-payment and Unwind Cost provisions that Aflac seeks to enforce are not

designed to achieve the purposes of the safe harbors, namely to allow parties to terminate swap

transactions, crystallize their gain or loss, and, if they choose, protect their current economic

position by entering into a new swap.  Rather, by eliminating any termination payment in favor

of LBSF, these provisions are designed to give Noteholders a windfall at the expense of LBSF

and insulate Noteholders from any loss they would otherwise incur. In other words, these

provisions are intended to redistribute, not preserve, the value of the swap transactions at the

time of termination.

> That is the fundamental and important reason for these provisions, like the
> Termination Payment Provision, designed to *insulate* special purpose issuers of
> rated debt (and their noteholders) from defaults by institutional counterparties: to
> *prevent exposure* to larger, potentially substantially larger, losses than those that
> might ever actually occur in the reference portfolio.

Aflac Opp. at 16 (emphases added). Nothing in the legislative history indicates that Congress

intended by section 560 or 362(b)(17) to insulate counterparties from payment obligations upon

termination of the swap transactions. Indeed, the safe harbor provisions, in intent and in effect, preserve the economic positions of parties to a swap agreement in the event of a party's bankruptcy. Requiring Aflac to satisfy its obligations under the mark-to-market value of the swap does not implicate concerns regarding "systemic risk" that could accompany the inability of counterparties to terminate their swap transactions and calculate the net value. On the contrary, enforcement of the zero-payment and Unwind Cost provisions would lead to a dramatic broadening of the landscape of safe harbors—and permit counterparties to strip debtors' estates of assets altogether—for reasons entirely antithetical to the congressional goal of minimizing the effect of a swap counterparty bankruptcy. For this reason, and the others stated, this Court should not accept Aflac's unsupportable position that the zero-payment and Unwind Costs provisions are enforceable under section 362(b)(17) or section 560 of the Bankruptcy Code.

## CONCLUSION AND RELIEF REQUESTED

34. Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001 and 7056, LBSF requests that this Court deny Aflac's motion for summary judgment and grant LBSF's motion for summary judgment, including the following: (a) award LBSF summary judgment disposing of this adversary proceeding in its entirety and enter final judgment, and (b) enter a declaratory judgment declaring that the provisions in the Transaction Documents (1) modifying LBSF's rights to priority of payments, (2) imposing a zero-payment provision upon termination, (3) altering the calculation of the Early Redemption Amount and (4) changing the definition of Unwind Costs as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) and that LBSF is entitled to payment under Swap Counterparty Priority, and that any action to enforce the *ipso facto* provisions in the Transaction Documents as a result of its bankruptcy filing violates the automatic stay under 11 U.S.C. § 362(a).

Respectfully submitted,


 */s/ Ralph I. Miller*
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: New York, New York
       November 9, 2009