Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
MILBANK, TWEED, HADLEY & M^cCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

and

David S. Cohen (admitted *pro hac vice*)
Adrian C. Azer (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & M^cCLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | Case No. 08-13555 (JMP) |
| Debtors. | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. and LEHMAN BROTHERS HOLDINGS INC. | : | |
| Plaintiffs, | : | |
| -against- | | Adversary Proceeding No.: 09-01261 (JMP) |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS and BNY CORPORATE TRUSTEE SERVICES LIMITED | : : | |
| Defendants. | : | |

---------------------------------------------------------------------

AMERICAN FAMILY LIFE ASSURANCE COMPANY  :
OF COLUMBUS

       Counterclaim Plaintiff,  :

-against-
                 :
LEHMAN BROTHERS SPECIAL FINANCING INC. and
LEHMAN BROTHERS HOLDINGS INC.
                 :
       Counterclaim Defendants.
---------------------------------------------------------------------x


**JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC. ET AL. IN DEBTORS' REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS'S MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

                                                                                                                    Page

ARGUMENT ................................................................................................................ 1

    A.   LBSF's Interest Under the CDS Agreements and Condition 40 of the Trust
Documents ................................................................................................................ 2

    B.   LBSF's Interest Under Condition 44 .............................................................. 4

CONCLUSION ............................................................................................................8

# TABLE OF AUTHORITIES

Page

**Cases**

In re Margules,
   323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005)......................................................................5

Pan Am Corp. v. Delta Air Lines,
   175 B.R. 438, 507 (S.D.N.Y. 1994)................................................................................5

Wakefield v. Northern Telecom, Inc.,
   769 F.2d 109, 113 (2d Cir. 1985) ...................................................................................5

The Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in possession, including Lehman Brothers Special Financing Inc. ("LBSF", collectively, the "Debtors"), hereby joins (the "Joinder") in Debtors' Reply Memorandum of Law in Further Opposition to American Family Life Assurance Company of Columbus's ("Aflac") Motion for Summary Judgment and in Further Support of Debtors' Motion for Summary Judgment ("Debtors' Motion") in the above-captioned matter and makes the following additional arguments in support thereof:[1]

## ARGUMENT

1. In its Opposition to Debtors' Motion (the "Aflac Opposition"), Aflac attempts to avoid addressing the enforceability of the *ipso facto* clauses included in the Trust Documents by asserting that LBHI's bankruptcy petition triggered these provisions (*i.e.*, Conditions 40 and 44) and modified LBSF's interests under the CDS Agreements and Trust Documents prior to its Petition Date. (See, e.g., Aflac Opp'n at 21-22.) Aflac ignores that LBHI's bankruptcy filing does not alter LBSF's entitlement to an Early Termination Payment under the CDS Agreements and is not a condition precedent that triggers Condition 40 or Condition 44. As discussed below, on its Petition Date, LBSF held an interest in an Early Termination Payment under the CDS Agreements notwithstanding its Event of Default, and Conditions 40 and 44 could not operate to modify LBSF's interest under the Trust Documents because necessary conditions precedent had not occurred.

---

[1] To avoid unnecessary repetition, the Committee incorporates by reference herein the arguments made in its Statement in Support of Debtors' Motion for Summary Judgment and in Opposition to BNY Corporate Trustee Services Motion for Summary Judgment [Docket No. 72], and its Statement in Further Support of Debtors' Motion for Summary Judgment, as filed in Lehman Bros. Special Fin. v. BNY Corporate Trustee Servs. Ltd., No. 09-1242 (Bankr. S.D.N.Y. Oct. 23, 2009).

### A. LBSF's Interest Under the CDS Agreements and Condition 40 of the Trust Documents

2. Although Aflac argues that "LBSF's entitlements under the swap contracts were fixed *prepetition*, as a result of LBHI's prior bankruptcy filing" (Aflac Opposition at 2), this argument finds no support in language of the CDS Agreements or the Trust Documents, and is otherwise wrong for at least two reasons. First, for each of the CDS Agreements, termination payments are calculated pursuant to the "Second Method and Market Quotation."[2] (See Decl. of Robert A. Weber [Docket No. 32] (the "Weber Declaration"), Ex. 8 ISDA Master Agreement § 6(e)(i)(3); id., Ex. 9 ISDA Master Agreement Schedule, Pt. 1, Clause (i).) In relevant part, the CDS Agreement provides:

> If the Early Termination Date results from an Event of Default: …
>
> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(Id., Ex. 8 ISDA Master Agreement § 6(e)(i)(3).) Thus, under the CDS Agreements' Second Method and Market Quotation method of calculating termination payments, as of the Petition

---

[2] In relevant part, the CDS Agreements provide the parties with four options for calculating the Early Termination Amount, two that apply variations of the so-called "First Method" and two that apply the "Second Method." (See Weber Decl., Ex. 8 ISDA Master Agreement § 6(e)(i).) The First Method provides that termination payments will be paid only to a non-defaulting party, thereby penalizing default by depriving the defaulting party of any "in-the-money" position. Id. In contrast, the Second Method provides that payments may be made to either the defaulting party or non-defaulting party, as appropriate. Id. The First Method and Second Method options are further divided between the "Loss" and "Market Quotation" method of calculation. As its name suggests, the Loss method calls for the termination payment to be measured by the loss (or gain) incurred by the non-defaulting party with respect to the CDS Agreement. The Market Quotation method calls for the termination payment to be measured by the "Settlement Amount," which is essentially the amount required to enter into an economically equivalent replacement swap transaction.

Date, upon early termination of the CDS Agreements, LBSF would become entitled to an Early Termination Payment notwithstanding its Event of Default. Thus, LBHI's bankruptcy petition had no effect on the subsequent calculation of Early Termination Payment under the CDS Agreements.

3. Second, Condition 40 – on which Aflac extensively relies – is quite clear that termination of the CDS Agreements is a condition precedent to its operation. In relevant part, Condition 40 to the Aflac Notes provides:

> ***Upon any such early termination of the Swap Agreement***, the Issuer or the Swap Counterparty may . . . be liable to make a termination payment to the other . . . . Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement; provided that ***such termination payment shall be <u>deemed</u> to be zero in the event that the Swap Agreement is terminated due to the occurrence of an Event of Default*** (as defined in the ISDA Master Agreement) where the Swap Counterparty is the Defaulting Party.

(See, e.g., Weber Decl., Ex. 16 Beryl 2008-7 Series Prospectus, Condition 40 (emphasis supplied).) By its explicit terms, Condition 40 does not affect the calculation of Early Termination Payments under the CDS Agreements. Rather, it provides that Early Termination Payments payable to LBSF will be "deemed to be zero" as one of the "Consequences of Early Termination." (Id.)[3]

4. Far from operating "automatically upon LBHI's bankruptcy filing" (Aflac Opposition at 26), Condition 40 is triggered only "upon any such early termination of the Swap Agreement." (Id.) Early termination of the CDS Agreements did not – and could not – occur

---

[3] As Black's Law Dictionary notes, "'deem' has been traditionally considered to be a useful word when it is necessary to establish a legal fiction … by 'deeming' something to be what it is not…." Black's Law Dictionary (8th ed. 2004) (Deem: "To treat (something) as if (1) it were really something else, or (2) it had qualities that it does not have.").

3

automatically upon the filing of LBHI's bankruptcy petition on September 15, 2008.[4] Instead, termination of the CDS Agreements could be effectuated only through notice by the Non-defaulting Party and the designation of an Early Termination Date:

> If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the"Non-defaulting Party") *may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date* in respect of all outstanding Transactions.

(Weber Decl., Ex. 8 ISDA Master Agreement § 6(a).) Here, early termination occurred on October 10, 2009 – after LBSF's Petition Date – because that is when Aflac affirmatively chose to demand termination. Consequently, Condition 40 could not operate to "deem" the Early Termination Payment payable to LBSF to be zero until the CDS Agreements were terminated, one week after LBSF's Petition Date.

### B. LBSF's Interest Under Condition 44

5. Aflac further asserts that, under Condition 44, it is entitled to an Early Redemption Amount equal to the full "outstanding principal and interest on the Aflac Notes." (Aflac Opp'n at 17.) According to Aflac, the provisions of Condition 44, including "the Unwind Costs provision, … became effective automatically upon LBHI's bankruptcy filing on September 15, 2008." (Id. at 26.) Condition 44, however, does not become operative until one of its conditions precedent occur.

6. Condition 38 sets forth the circumstances under which the Aflac Notes may be redeemed: "upon the occurrence of any of the events set out in [Base] Condition 6(c) and (d) and [Base] Condition 10," Beryl "shall forthwith notify the Trustee, S&P and the

---

[4] The CDS Agreements specifically provide that automatic termination shall not occur. (See Weber Decl., Ex. 9 Schedule, Pt. 1(h).)

4

Noteholders informing them of the occurrence of such event" and "[u]pon the expiry of such notice, [Beryl] shall redeem each Note at its Early Redemption Amount as set out in paragraph [condition] 44." (See, e.g., Weber Decl., Ex. 16 Beryl 2008-7 Series Prospectus, Condition 38.) Thus, until there is an "event" under Base Conditions 6(c), 6(d), or 10 that triggers early redemption of the Aflac Notes, notice, and expiration of the notice period, there can be no calculation of the Early Redemption Amount under Condition 44[5] and, correspondingly, no change in LBSF's interest.[6] Here, none of these conditions precedent occurred prior to LBSF's bankruptcy filing.

7. <u>First</u>, Base Conditions 6(c) and 6(d)(i) do not apply as no party alleges that events set out in Base Condition 6(c) (the Collateral becoming repayable prior to its stated maturity) or Base Condition 6(d)(i) (the imposition of tax on Beryl), have occurred. Accordingly, Condition 44 could not have been triggered pursuant to these provisions and LBSF's interests could not have been affected.

8. <u>Second</u>, Base Condition 6(d)(ii) governs early redemption and calculation of the Early Redemption Amount based on termination of the CDS Agreements.[7] This provision explicitly provides that Beryl "shall redeem all but not some only of the Notes at their Early

---

[5] Indeed, the introductory paragraph of Condition 44 reads: "Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions)," Condition 44 is only "required" when triggered by Base Conditions 6(c), 6(d), and 10. (See, e.g., Weber Decl., Ex. 16 Beryl 2008-7 Series Prospectus, Condition 44.)

[6] See, e.g., Pan Am Corp. v. Delta Air Lines, 175 B.R. 438, 507 (S.D.N.Y. 1994) ("If the occurrence[e] of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies.") (quoting Wakefield v. Northern Telecom, Inc., 769 F.2d 109, 113 (2d Cir. 1985) modified after remand on other grounds, 813 F.2d 535 (2d Cir. 1987)); cf. In re Margules, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) (stating that a contract is executory when condition precedent to termination did not occur prepetition).

[7] See, e.g., Weber Decl., Ex. 6 Principal Trust Deed, Base Condition 6(d)(ii).

5

Redemption Amount" only "*[i]f a Swap Agreement is terminated in whole*."[8] As discussed above, early termination of the CDS Agreements is not automatic, but is effectuated only through the non-defaulting party electing to provide notice setting an Early Termination Date.[9] Here, Early Termination Notices were provided to LBSF on October 10, 2008, seven days after LBSF's Petition Date. Consequently, Condition 44 could not have been triggered prior to LBSF's Petition Date so as to deprive LBSF of its interest.[10]

9. Finally, Base Condition 10 triggers early redemption and calculation of the Early Redemption Amount under Condition 44 only upon a Trust Event of Default.[11] A Trust Event of Default is defined as: (a) a failure to pay amounts due under the notes; (b) a failure of Beryl to perform its obligations under the Notes after BNY gives notice demanding such performance; and (c) Beryl commencing insolvency proceedings.[12]

10. For all of the Aflac Notes, the applicable Base Condition 10(a) defines a failure to make "payment of any sum due in respect of the Notes" for "14 days or more" to be a Trust Event of Default. (See, e.g., Weber Decl., Ex. 6 Principal Trust Deed, Base Condition 10(a).) Although Aflac refers to purported defaults by LBSF with respect to making payment on the Aflac Notes due in September 2008,[13] Aflac is careful to avoid providing the Court with the actual dates such payments were due. For all of the Aflac Notes, an interest payment was due on

---

[8] Id. (emphasis added).

[9] See Weber Decl., Ex. 8 ISDA Master Agreement § 6 (a); id. Ex. 9 Schedule, Pt. 1(h).

[10] Because early termination under LBSF's Event of Default is not automatic (see Weber Declaration, Ex. 9 ISDA Master Agreement Schedule, Pt. 1(h); id., Ex. 9 ISDA Master Agreement Schedule, Pt. 1(h)) and occurs only at the election of Aflac, Condition 44 need not have ever come into operation.

[11] See, e.g., Weber Decl., Ex. 6 Principal Trust Deed, Base Condition 10 (Principal Trust Deed);

[12] Id.

[13] See Aflac Opp'n at 20 ("LBSF paid these Fixed Amounts through June 2008, but did not make the payments due in September 2008.").

6

September 22, 2008.[14] As such, the earliest possible default date was not until October 6, 2008 – three days after LBSF's Petition Date.

11. With respect to the second two Trust Events of Default, it is indisputable that BNY did not provide notice to Beryl demanding that Beryl perform with regard to the Aflac Notes prior to LBSF's Petition Date, and Beryl has not been subject to any insolvency proceedings.

12. Because no default under Base Conditions 6(c), 6(d), or 10 occurred prior to LBSF's petition date, neither early redemption under Condition 38 nor the calculation of an Early Redemption Amount under Condition 44 was triggered prior to LBSF's petition date. Therefore, contrary to Aflac's arguments, LBSF's rights under Condition 44 were unaffected by LBHI's bankruptcy filing and LBSF had a clear, unaltered interest at its Petition Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[14] The date interest payments are due on the Aflac Notes is governed by Condition 13 of the relevant Supplemental Trust Agreement, which states quarterly Interest Payment Dates and provides that such dates will be adjusted "in accordance with the Following Business Day Convention." With respect to the Beryl 2006-15 Notes, Beryl 2007-14 Notes, Beryl 2008-7 Notes, the relevant stated Interest Payment Date was September 20, 2008. With respect to the Beryl 2007-5 Notes, the relevant stated Interest Payment Date on September 21, 2008. Because September 20th and 21st fell on Saturday and Sunday (respectively) in 2008, the payment date was adjusted to the following business day: Monday, September 22, 2008.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Committee hereby joins in the Debtors' Reply to the Aflac Opposition, and respectfully requests that the Court enter an order denying summary judgment in favor of Aflac and granting summary judgment in favor of the Debtors, and such other and further relief as the Court deems just and proper.[15]

Dated: New York, New York
November 9, 2009

> MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
>
> By: */s/ Dennis F. Dunne*_____
> Dennis F. Dunne
> Wilbur F. Foster, Jr.
> Evan Fleck
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Telephone: (212) 530-5000
>
> David S. Cohen (admitted *pro hac vice*)
> Adrian C. Azer (admitted *pro hac vice*)
> 1850 K Street N.W., Suite 1100
> Washington, DC 20006
> Telephone: (202) 835-7500
>
> Counsel for the Official Committee
> of Unsecured Creditors of Lehman Brothers
> Holdings Inc., et al.

---

[15] To the extent the Court finds that the decision of the Court of Appeal, Royal Courts of Justice, London, England, as to LBSF's interests is correct in connection with <u>Lehman Bros. Special Fin. v. BNY Corporate Trustee Servs. Ltd.</u>, No. 09-1242 (Bankr. S.D.N.Y. Oct. 23, 2009), <u>i.e.</u>, that LBSF lost its property interest prepetition upon LBHI's bankruptcy filing, and holds that this does not constitute a violation of the Bankruptcy Code's prohibition on the enforcement of *ipso facto* provisions, the Committee joins in the Debtors' request for leave to amend their complaint to assert avoidance claims pursuant to sections 547 and 548 of the Bankruptcy Code.